# Exhibit 7

To Declaration of Jarad Brown in Support of
Federal Trade Commission's
Motion for Summary Judgment

# In the Matter of:

# FTC v. D-Link Systems, Inc.

*August 23, 2018*
*Jerome R. Radcliffe*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

## Page 1

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4
 5   FEDERAL TRADE COMMISSION,      )
 6        Plaintiff,                )
 7     vs.                          )  Case No.
 8   D-LINK SYSTEMS, INC.,          )  3:17-CV-00039-JD
 9        Defendant.                )
10   -------------------------------)
11
12                       Thursday, August 23, 2018
13                       Cause of Action
14                       1875 Eye Street, N.W.
15                       Washington, D.C.
16
17        The above-entitled matter came on for
18   deposition, pursuant to notice, at 10:00 a.m.
```

## Page 2

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4        JARAD BROWN, ESQ.
 5        KEVIN MORIARTY, ESQ.
 6        COURTNEY BROWN, ESQ.
 7        Federal Trade Commission
 8        600 Pennsylvania Avenue, N.W.
 9        Washington, D.C.  20580
10        (202) 326-2927
11        jbrown4@ftc.gov
12
13   ON BEHALF OF THE DEFENDANT:
14        KARA E. MCKENNA, ESQ.
15        ASHLEY SALVINO, ESQ.
16        CYNTHIA FLEMING CRAWFORD, ESQ.
17        CATIE SHAWLEY, ESQ.
18        Cause of Action
19        1875 Eye Street, N.W.
20        Suite 800
21        Washington, D.C.  20006
22        (202) 499-2417
23        kara.mckenna@causeofaction.org
```

## Page 3

```
              I N D E X

WITNESS:                        EXAMINATION:
JEROME R. RADCLIFFE
     BY MR. BROWN                    4
     BY MS. MCKENNA                260


MARKED EXHIBITS    DESCRIPTION       FOR ID
None


EXHIBITS REFERENCED                  PAGE
  PX03152                             53
  PX03193                             81
  PX03200                            198
  PX05110                            169
  PX05114                            258
  PX05115                            170
  PX05120                            211
  PX06018                            198
  PX06021                              8
  PX06026                             10
```

## Page 4

```
              P R O C E E D I N G S
                  -  -  -  -  -
Whereupon--
              JEROME R. RADCLIFFE
a witness, called for examination, having been first
duly sworn, was examined and testified as follows:
                    EXAMINATION
     BY MR. BROWN:
     Q.  Good morning.  My name is Jarad Brown.  I am an
attorney with the Federal Trade Commission, and I'm
here to talk about your reports in this matter, which
is the FTC's case vs. D-Link Systems in the Northern
District of California.
         Could you please state your full name for the
record.
     A.  Jerome Ryan Radcliffe.
     Q.  Thank you for appearing to testify today.
         Before we get going, counsel for D-Link Systems
and folks in the room, could you please introduce
yourself?
         MS. MCKENNA:  Kara McKenna on behalf of D-Link
Systems.
         MS. SALVINO:  Ashley Salvino on behalf of
D-Link Systems.
         MS. SHAWLEY:  Catie Shawley with Cause of
```

1 (Pages 1 to 4)

105
1  moves very quickly, so it's impossible for the vendor
2  to update things that are already on store shelves and,
3  you know, recall all those devices when there's a
4  process for patching and updating those devices in
5  existence already.
6      BY MR. BROWN:
7      Q. And that -- would that be the same answer even
8  if the vulnerabilities had been public for two years?
9      MS. MCKENNA: Objection. Vague. Incomplete
10 hypothetical. Calls for speculation. Assumes facts
11 not in evidence.
12     THE WITNESS: I would need more information
13 to -- you know, based upon that vague description, I
14 don't -- I don't think that -- I don't think that I
15 could answer that question.
16     BY MR. BROWN:
17     Q. Let's take a look at paragraph 11 of PX6021,
18 the declaration attached to your expert report, which
19 breaks over the page, from page 15 to page 16. In
20 particular, on the top of page 16, starting about three
21 or four lines in, it says, "Second, in response to the
22 changing landscape, D-Link Corporation, which is
23 responsible for working with the vendors that produce
24 the cameras and routers at issue here, instituted a
25 policy in the middle of 2014 whereby it now sends

106
1  representatives of all products or product groups with
2  new platforms or new source code to a third party
3  expert to test before they are released."
4      What third-party expert are you referring to
5  here?
6      A. Probably Onward Security and III Security.
7      Q. We are going to probably talk more about
8  Onward/III. Do you understand that those two
9  organizations are related and --
10     A. Vaguely, yes.
11     Q. If I refer to the combined testing of them as
12 III, Onward Security, or III/Onward, does that work for
13 you?
14     A. Sure.
15     Q. Okay. I will try to use that word going
16 forward to refer to them.
17     Looking at the next sentence, "I understand
18 that D-Link Corporation previously used this entity
19 (and others) to test products, but on a more ad hoc
20 basis."
21     Is it still your understanding that prior to
22 the middle of 2014, D-Link Corporation used III/Onward
23 on a more ad hoc basis?
24     A. That is what I wrote, yes, and that is what I
25 understand.

107
1      Q. What is the basis for this statement?
2      A. The reports that I got and my conversations
3  with William Brown.
4      Q. Looking two sentences ahead, which state, "The
5  nature of computer systems means that even with
6  extensive internal code review followed by expert third
7  party security testing that not all issues will be
8  found."
9      Why is that?
10     A. Technology is extremely complicated. You can
11 spend billions of dollars doing security testing and
12 still miss very common, very easy to identify
13 vulnerabilities. It happens every day. Microsoft
14 deals it on a monthly basis, Google deals with it on a
15 monthly basis, and they're considered the best in the
16 industry at what they do in security.
17     Q. Why is it that vulnerabilities are missed that
18 otherwise could be easily detectable, in your opinion?
19     A. Just like I answered, technology is extremely
20 complicated. We're talking about different codes and
21 different libraries. We're talking about how those
22 codes interact, different languages that intersect, how
23 they are compiled. It is extremely complicated to --
24 it is not as simple as writing a document and having a
25 processor process it.

108
1      Q. What do you mean by "third party security
2  testing" in this sentence dealing with "extensive
3  internal code review, followed by expert third party
4  security testing, that not all issues will be found"?
5      A. I mean that even if you hire a company to do a
6  security evaluation of a product, they are not going to
7  find every vulnerability in that product. It is
8  impossible, even with unlimited resources and unlimited
9  time, to find every vulnerability in a given product.
10     Q. What's the scope of the kinds of testing you're
11 meaning to encompass in that sentence?
12     A. Every type of testing. Black-box testing,
13 white-box testing, source code analysis tools, source
14 code review. All of those tools are used every day on
15 products, and there are still vulnerabilities found in
16 those products. It is inherent in the nature of the
17 technology that we use that those vulnerabilities
18 exist.
19     Q. This would be a good time to clarify something.
20 You mentioned in your answer white-box testing, source
21 code analysis tools, and source code review. I want to
22 just understand how those relate and try to figure
23 out -- to make sure we can understand each other,
24 because I think I'll ask more about that.
25     A. Sure.

27 (Pages 105 to 108)

### Page 141

1   A. I would have to go through all of these, but I
2   don't think that any of them are D-Lab reports, no.
3   Q. Did you review contracts between D-Link
4   Corporation and the vendors who build routers and write
5   software for D-Link Systems?
6   MS. MCKENNA: Objection. Compound.
7   THE WITNESS: That would be outside the scope
8   of what my expertise is and what I was asked to do.
9   So, no, I did not.
10  BY MR. BROWN:
11  Q. So in your expertise, you don't typically look
12  at contractual provisions companies use to manage
13  software development that happens across, you know,
14  multiple entities and supply chains?
15  MS. MCKENNA: Objection. Calls for
16  speculation. Vague.
17  THE WITNESS: I am not a lawyer. Contract law
18  is not my specialty. So, no, I would not be able to
19  form accurate and worthwhile opinions on contracts that
20  companies have.
21  BY MR. BROWN:
22  Q. Have you evaluated how companies manage
23  software development across parents and subsidiaries
24  and subcontractors?
25  A. Yes, I have.

### Page 142

1   Q. And what kind of controls or processes do you
2   look for in evaluating how they manage the process
3   between them?
4   A. How do you define "controls"?
5   Q. Anything that would allow a party to influence
6   how software gets developed, even if they weren't the
7   one doing it themselves.
8   A. I have had conversations -- yeah, I mean, I
9   have worked with companies that have multiple
10  subsidiaries and how they interact with software
11  developers on other teams and other companies to make
12  sure that their products have functionality and get
13  QA'd and that there are gates that they have to go
14  through in order to make sure that their products have
15  some security and have security controls in place on
16  them.
17  Q. Is there any documentation or practices that
18  you would expect companies to use to manage that
19  process?
20  MS. MCKENNA: Objection. Vague. Calls for
21  speculation.
22  THE WITNESS: Specifically, I don't have
23  anything specific that I would recall. Every industry
24  is different, and especially when we're dealing with
25  international companies with different cultures, that

### Page 143

1   changes the equation quite a bit. I look for some
2   technical things, but I also look for the company to
3   take responsibility for the end product. Particularly,
4   that comes through pen testing and doing black-box
5   testing on products to make sure the end result has
6   security controls that are in place and that they are
7   looking for security flaws in their devices.
8   BY MR. BROWN:
9   Q. So one of the things you would consider in
10  whether a company was ultimately taking responsibility
11  for security was whether they were doing testing to
12  kind of verify the security of those devices?
13  A. Testing is certainly part of a security
14  program, and I think that testing is an integral part
15  of a security program, looking for vulnerabilities in
16  their products.
17  Q. You said in your previous answer, "I look for
18  some technical things." What kind of technical things
19  were you referring to?
20  A. You know, source code repositories would be
21  something. What -- could you flesh out the entirety of
22  the question?
23  Q. I want to just understand, when you said -- I
24  was asking about what kind of controls a company might
25  implement or that you would look for to try to manage

### Page 144

1   software development across multiple parties, and you
2   mentioned some complexities but then ultimately said,
3   "I look for some technical things, but I also look for
4   the company to take responsibility for the end
5   product." And I wanted you to explain what technical
6   things you look for.
7   A. It could be source code repositories. It could
8   be access to source code. It could be insight into the
9   testing process that the vendor uses or the
10  subcontractor uses. It's not all of those things. It
11  could be none of those things. But those are some of
12  the things.
13  Q. As of the time that you executed your
14  declaration in March 2015, did D-Link Systems have a
15  source code repository that you're aware of?
16  A. I don't believe that was part of the
17  conversation that I had with William Brown.
18  Q. Do you know if D-Link Systems had access to
19  source code for its routers and IP cameras?
20  A. I believe that we did talk about that, and they
21  did have access to that source code, yes.
22  Q. At the time of your declaration in March 2015,
23  did D-Link Corporation have access to source code for
24  devices?
25  A. I just answered that. I said I believe yes.

                                                            197
1    A. I reviewed his opinion, in addition to the
2    footnotes of that opinion, where he cites the original
3    researcher's vulnerability, so that way I could
4    understand the full vulnerability.
5        Q. So you reviewed documents cited in his
6    footnotes?
7        A. Yes.
8        Q. Did you review all of the documents cited in
9    his footnotes?
10       A. I don't recall. I didn't keep track of every
11   single document of his footnotes that I looked at, but
12   I did look at the footnotes and the things that he
13   referred to in his document.
14       Q. In the last five lines of paragraph 10(a) of
15   the rebuttal report, you say, "An attacker would need
16   to know the specific user's email address, know the
17   exact model of router, know how the router is setup
18   [sic], have to time the attack so the user would be
19   home at the exact time that the email would be read,
20   and hope that the user would follow all the commands
21   and visit all the malicious links in the attack."
22           What is your basis for saying that an attacker
23   would need to know a user's email address to launch
24   this attack?
25       A. Because that attack type and the four steps

                                                            198
1    that he talks about in there involve a user's browser
2    getting compromised and having that browser redirect to
3    that person's router. That -- you would have to know
4    that person's email address and you would have to know
5    that they're using a particular model of router, in
6    addition to all these other steps, in order for an
7    exploitation of that type of vulnerability to work.
8        Q. Did you review the document Mr. Graff cited in
9    support of his explanation of how the exploit would
10   happen?
11       A. Yes, I did.
12       Q. I am handing you a document that has been
13   premarked PX03200. It appears as DLS0023965 through
14   23970. Take a moment to review it.
15       A. (Document review.)
16       Q. Do you recognize this document?
17       A. Not specifically.
18       Q. Let me take you quickly, if we could turn to
19   the Expert Report of Mark Graff --
20       A. I don't have that.
21           MS. MCKENNA: I don't think that was provided
22   yet.
23           MR. BROWN: Oh, that's what this is here.
24           BY MR. BROWN:
25       Q. It's marked as PX6018. I'm turning your

                                                            199
1    attention to paragraphs 174 through 176, which appears
2    at 6018-089, otherwise known as page 89.
3        A. Yes.
4        Q. Okay. Is this the -- Mark Graff's description
5    of the vulnerability you were addressing in your
6    paragraph 10(a) of your rebuttal report?
7        A. I believe that is correct.
8        Q. Okay. And if you look at footnote 273, is this
9    the footnote describing the four-step attack that
10   you're referencing in your rebuttal report at paragraph
11   10(a)?
12           MS. MCKENNA: Objection. Mischaracterizes the
13   deponent's previous testimony.
14           THE WITNESS: Did you say footnote 273?
15           BY MR. BROWN:
16       Q. Yes.
17       A. Yeah, I believe that's what I've talked about.
18       Q. Can you see the control number, the DLS number
19   there?
20       A. Yes.
21       Q. And is that 23 -- DLS0023965, does that match
22   the document I just handed you as PX03200?
23       A. Yes.
24       Q. Okay. So let's take a look at this.
25           Do you believe this is the document you

                                                            200
1    reviewed in reviewing Mr. Graff's report?
2        A. Ah, yeah. That seems to be the case.
3        Q. Okay. If we could take a look at page 2 of
4    PX3200, which appears at 966, if you could just take a
5    quick read through that, through at least number 4.
6        A. (Document review.) Yes.
7        Q. Does this description of an attack scenario
8    include knowing someone's email?
9        A. It doesn't include knowing somebody's email,
10   no.
11       Q. Does it require someone to know the exact model
12   of router for an individual?
13       A. For the attack to work? Yes, it does.
14       Q. Doesn't it say here that the attacker could
15   simply post the attack code on a forum for its -- a
16   preset model that it -- that the attacker chose?
17       A. But that doesn't necessarily mean that the user
18   would go to that site or a particular targeted attack
19   would work, because that user, A, might not be home to
20   be able to access that, or secondarily, you know,
21   that -- if that user had a different model, they could
22   go to that web page and nothing would happen.
23       Q. What if the attacker is not interested in
24   attacking any particular individual but just anyone who
25   has the vulnerable router?

### Page 217

1  are unsuccessful in the wild.  It's one of the things
2  that we documented.  It's one of the things that's in
3  the rebuttal.  A lot of these exploits are trumped up
4  claims that just don't occur and are not that high of a
5  risk.
6      Q.  So if I could turn your attention to paragraph
7  10(f) of your rebuttal report, PX6026-009, did you
8  review anything other than Mr. Graff's report in
9  forming this opinion?
10     A.  I reviewed Mr. Graff's report, in addition to
11 the footnotes and references that he used.
12     Q.  Okay.  In the third line -- sentence of that,
13 you say, "The scenario that Graff cites where an
14 attacker can trick or deceive someone to enable remote
15 administration is highly unlikely."  Then you go on to
16 describe it a little bit.
17     I would like to turn your attention to
18 paragraph 209 through 212 of Mr. Graff's report, which
19 is PX6018-106 through 107.  Could you point me to what
20 you call the scenario that Graff cites where an
21 attacker can trick or deceive someone to enable remote
22 administration in his report?
23     A.  "The vulnerability could allow attackers to
24 send commands to a vulnerable router to control it,
25 change any setting, access the password, reset it,

### Page 218

1  monitor traffic, or download software onto the device."
2      Q.  And that's what you're describing in your
3  report as the scenario that Graff cites where an
4  attacker can trick or deceive someone to enable remote
5  administration.
6      A.  Correct.
7          MS. MCKENNA:  Counsel, we are right at 5:45, so
8  I don't know if you have a couple more in this string
9  or --
10         MR. BROWN:  Can I just ask a couple more
11 questions just as to this vulnerability and then we can
12 take a break?
13         MS. MCKENNA:  Sure.
14         BY MR. BROWN:
15     Q.  You also say in this paragraph 10(f) of your
16 rebuttal report, PX6026, "This specific flaw has never
17 been found to be exploitable."
18     A.  Correct.
19     Q.  What's your basis for that statement?
20     A.  The write-up done and referenced by him and
21 Romero.
22     Q.  To your memory, did the researcher say he did
23 not find it to be exploitable?
24     A.  He found a vulnerability, but that
25 vulnerability doesn't necessarily mean exploitability.

### Page 219

1  There was no proof of concept code or publishing of an
2  exploit for that vulnerability.
3      Q.  And you would describe that as it was never
4  found to be exploitable?
5      A.  That's correct.
6      Q.  Likewise, you say that the researcher that
7  found this flaw was unable to change any settings or
8  cause any harm related to this flaw.  What's your basis
9  for that?
10     A.  His write-up.
11     Q.  So in his write-up, where he doesn't provide an
12 exploit, you're describing that as he was unable to
13 change any settings or --
14     A.  Correct.
15     Q.  -- cause any harm related to this flaw?
16     A.  Correct.
17     Q.  Is it your position that pre-release testing
18 could not have identified this vulnerability?
19     A.  I was not asked to speculate on that.
20     Q.  So as to these handful of vulnerabilities we've
21 discussed, that you discuss in 10(a) through 10(f) of
22 your report, were there any for which you express an
23 opinion that the researcher's report is unreliable?
24         MS. MCKENNA:  Objection.
25         THE WITNESS:  No.  Those vulnerabilities exist.

### Page 220

1          MR. BROWN:  All right.  Why don't we take a
2  break.
3      (A brief recess was taken.)
4          BY MR. BROWN:
5      Q.  Mr. Radcliffe, are you familiar with the term
6  "secure software development life cycle"?
7      A.  Yes.
8      Q.  In your expert report, which we have as PX6021,
9  is it your opinion that, as of March 2015, D-Link
10 Systems had a secure software development life cycle in
11 place?
12     A.  I did not evaluate the entirety of D-Link's
13 software development life cycle.  My primary role was
14 to look at how they intake vulnerabilities and how they
15 handle vulnerabilities in their secure process.
16     Q.  So you don't have an opinion that you offer in
17 your expert report as to whether they had implemented a
18 full secure software development life cycle?
19     A.  That's correct.
20     Q.  Do you agree that the objective of secure
21 software development is to create software that is free
22 from vulnerabilities?
23         MS. MCKENNA:  Ob --
24         THE WITNESS:  I disagree.
25         MS. MCKENNA:  I was going to object to vague.

225

1   A. Okay.
2   Q. And I generally want to call your attention to
3   paragraph 10 and its subparts, which begins at
4   PX6026-006.
5   A. Okay.
6   Q. You're not offering an opinion as to the
7   vulnerabilities described in paragraphs 177 to 79 of
8   Mr. Graff's report.  Is that right?
9       MS. MCKENNA: Objection.  Vague.
10      THE WITNESS: Ah, I don't -- no, I don't
11  specifically address that vulnerability.
12      BY MR. BROWN:
13  Q. Similarly, you're not offering an opinion as to
14  the vulnerabilities discussed in paragraphs 214 through
15  244 of Mr. Graff's expert report.
16      MS. MCKENNA: Objection.  Vague.
17      THE WITNESS: That's correct.
18      BY MR. BROWN:
19  Q. If we can jump to paragraph 15 of your rebuttal
20  report, which is at PX6026-012 through 013.  If you
21  look at the fourth line of the page 013, you say, "I
22  have spoken with William Brown and he also shared the
23  relevant security advisory regarding the matter."
24      When did the conversation you're referencing
25  there take place?

226

1   A. You said the third line of paragraph 15?
2   Q. I believe it's in the fourth line of the top of
3   page 013.  So it's in paragraph 15, but it's near the
4   end of the paragraph.
5   A. Oh, near the end of the paragraph, so not the
6   third line.
7   Q. It's the fourth line of the page, 6026-013,
8   starting, "I have spoken with..."  Take your time.
9   A. (Document review.)  Okay.  I don't recall the
10  exact date or time.  We have had many conference calls
11  with William Brown and counsel.  So I don't have a
12  specific time in mind.
13  Q. Were these calls in 2018?
14  A. Yes, probably.
15  Q. Did you have conversations with William Brown
16  in 2018 that you relied on in forming the opinions in
17  your expert report and expert rebuttal report?
18      MS. MCKENNA: Objection.  Privileged.  I'm
19  instructing -- the witness may answer to the extent he
20  doesn't reveal privileged information.
21      THE WITNESS: Again, I had many phone calls
22  with William Brown on the line with counsel.
23      BY MR. BROWN:
24  Q. In 2018?
25  A. Yes.

227

1   Q. On any of those calls, were you provided with
2   information that you used to support the opinions in
3   your expert report and expert rebuttal report?
4       MS. MCKENNA: Objection.  Vague.
5       THE WITNESS: You'll have to excuse me.  I'm
6   trying to think.
7       A lot of those conversations are privileged.
8       BY MR. BROWN:
9   Q. Did you rely on information from those
10  conversations in forming the opinions in your expert
11  report or rebuttal expert report?
12      MS. MCKENNA: Objection.  Compound.  Vague.
13      THE WITNESS: Exactly which opinion are you
14  kind of referring to?  I mean, in the statement, you
15  know, I -- I talk about that I still regard D-Link's
16  security practice as being extremely reasonable and
17  reaffirming my 2015 declaration and re -- and it says
18  at the end of that paragraph that -- that everything in
19  that kind of reaffirms my declaration, in addition to
20  reiterating it now.
21      BY MR. BROWN:
22  Q. So just focusing on your rebuttal report, then,
23  did you have conversations with William Brown in which
24  information was provided -- facts or data was
25  provided -- let me strike that.

228

1       Did you have conversations with William Brown
2   in 2018 in which facts or data was provided that you
3   considered in forming your rebuttal expert opinion?
4       MS. MCKENNA: Again, the objection is as to
5   privilege, and I instruct the witness to answer insofar
6   as it does not reveal privileged information, including
7   attorney mental impressions or similar.
8       THE WITNESS: Ah, to that extent, we just
9   talked about the -- their testing and the fact that
10  they worked on it with their vendor, Alpha, and III
11  Security and Onward Security.  So there was no
12  additional facts other than the ones documented here in
13  the rebuttal.
14      BY MR. BROWN:
15  Q. Where are the facts documented as coming from
16  discussions with William Brown?
17  A. Ah, I said no -- I mean, I said no additional
18  facts, other than the ones documented here.
19  Q. So are you saying the facts are in the report?
20  A. Correct.
21  Q. But not their attribution to a discussion with
22  William Brown?
23  A. Well, the attribution of the footnote here, so
24  footnote 30, seeing it's a particular deposition
25  exhibit, but there were no additional details that

Page 237

1   the intention to.
2       BY MR. BROWN:
3   Q.  If you -- where would that opinion appear in
4   your rebuttal report?
5   A.  Well, it's not in my rebuttal report.  I said
6   if I was asked, I would provide an opinion, but I don't
7   anticipate doing that.
8   Q.  You're not offering an opinion regarding the
9   existence of vulnerabilities in routers identified by
10  Mr. Graff in his opinion.
11      MS. MCKENNA:  Objection.  Vague, "existence of
12  vulnerabilities."  Also, asked and answered.
13      THE WITNESS:  Those vulnerabilities --
14  vulnerabilities exist in those products as they're
15  documented, yes.
16      BY MR. BROWN:
17  Q.  For your expert report and the declaration that
18  it incorporates, what methodology did you apply?
19  A.  Method --
20      MS. MCKENNA:  Objection.  Vague, "methodology."
21      THE WITNESS:  You would have to -- you would
22  have to describe "methodology" for me.  I'm not exactly
23  sure what you're referring to.
24      BY MR. BROWN:
25  Q.  Do you contend that you applied a methodology

Page 238

1   in your expert report and the declaration it
2   incorporates?
3       MS. MCKENNA:  Same objection.  Vague,
4   "methodology."
5       THE WITNESS:  I'm not sure what you're talking
6   about.  I'm lost.  I wrote up my opinion.  I had
7   counsel help me with the structure of that opinion and
8   grammar of that opinion, but the opinion is my own, and
9   the writing is my own.
10      BY MR. BROWN:
11  Q.  Can you take a look at your rebuttal report,
12  paragraph 5, which is PX6026.
13  A.  Yes.
14  Q.  It's page 003 through 004.
15  A.  Yes.
16  Q.  You state that, "This is not an accurate or
17  valid methodology of measuring the security posture of
18  an organization."
19      What are you referring to by the word "this" in
20  that sentence?
21  A.  The existence of having vulnerabilities.
22  Q.  Were you asked to assess the methodology of
23  Mr. Graff's report?
24  A.  The methodology?
25      MS. MCKENNA:  Objection.  Vague, "methodology."

Page 239

1       THE WITNESS:  I don't understand what you mean
2   by "methodology."
3       BY MR. BROWN:
4   Q.  Do you agree that that paragraph in your
5   rebuttal report says, "This is not an accurate or valid
6   methodology"?
7   A.  That is -- that is my opinion, yes.  You
8   cannot --
9   Q.  And what --
10  A.  Go ahead.
11  Q.  No, please.
12  A.  You cannot evaluate the security program of a
13  company just by looking at if they have vulnerabilities
14  and what kind of vulnerabilities they have.
15  Q.  So what did you mean by the idea of a
16  methodology?
17  A.  That seems to be what Graff's report talks
18  about exclusively, is they have vulnerabilities.  These
19  are the vulnerabilities.  These are how the
20  vulnerabilities work.  My rebuttal to that is saying
21  that just pointing those things out is not an accurate
22  representation of the maturity of a security program.
23  Q.  So when you used the word "methodology" in your
24  answer just now, what concept are you referring to?
25  Not specific to Mr. Graff, but just generally.

Page 240

1   A.  Just what I stated, that that's not an accurate
2   portrayal of the maturity of a security organization.
3   Q.  So you don't have a definition of the word
4   "methodology"?
5       MS. MCKENNA:  Objection.
6       THE WITNESS:  I'm using what you are describing
7   as a methodology to me.  You're asking me about what
8   that sentence means.  I'm interpreting it and telling
9   you what that sentence means.
10      BY MR. BROWN:
11  Q.  Did you write this sentence?
12  A.  Yes.
13  Q.  But you can't tell me what "methodology" means
14  in this sentence?
15  A.  I think that I answered that question when I
16  said Graff's approach is to talk about the
17  vulnerabilities.  The methodology that he's using to
18  express his opinion is to talk about the existence of
19  vulnerabilities.  I am saying that that methodology is
20  not an accurate portrayal of a security organization's
21  maturity or how seriously they take security.
22  Q.  Can you point me to where in Mr. Graff's report
23  he purports to be measuring the security posture of
24  D-Link Systems or any organization?
25  A.  I think it's the entirety of his report talks

### Page 261

1  DISTRICT OF COLUMBIA, to wit:
2
    I, Susanne Bergling, the officer before whom
3  the foregoing deposition was taken, do hereby certify
    that the within-named witness personally appeared
4  before me at the time and place herein set out, and
    after having been duly sworn by me, according to law,
5  was examined by counsel.
6      I further certify that the examination was
    recorded stenographically by me and this transcript is
7  a true record of the proceedings.
8      I further certify that I am not of counsel to
    any of the parties, nor an employee of counsel, nor
9  related to any of the parties, nor in any way
    interested in the outcome of this action.
10
    As witness my hand and notarial seal on August
11  25, 2018.
12
13
14
    _____
15      Susanne Bergling
    Notary Public
16
17
18  MY COMMISSION EXPIRES:
19      3/31/2023
20
21
22
23
24
25

### Page 262

1      CERTIFICATE OF WITNESS
2
3
    I hereby certify that I have read and examined
4  the foregoing transcript, and the same is a true and
    accurate record of the testimony given by me.
5
6
    Any additions or corrections that I feel are
7  necessary, I will attach on a separate sheet of paper
    to the original transcript.
8
9
    I hereby certify, under penalty of perjury,
10  that I have affixed my signature hereto
    on the date so indicated.
11
12
13      DATED:
14
15
16
17      _____
    JEROME RADCLIFFE
18
19
20
21
22
23
24
25

### Page 263

1  WITNESS: JEROME RADCLIFFE
2  DATE:  AUGUST 23, 2018
3  CASE:  FTC VS. D-LINK SYSTEMS
4  Please note any errors and the corrections thereof on
    this errata sheet.  The rules require a reason for any
5  change or correction.  It may be general, such as "To
    correct stenographic error," or "To clarify the
6  record," or "To conform with the facts."
7  PAGE LINE    CORRECTION    REASON FOR CHANGE
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25