# Exhibit 8

To Declaration of Jarad Brown in Support of
Federal Trade Commission's
Motion for Summary Judgment

# In the Matter of:

# FTC v. D-Link Systems, Inc.

*August 8, 2018*
*Patrick Schaumont, Ph.D.*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Schaumont, Ph.D.

FTC v. D-Link Systems, Inc.                                                                 8/8/2018

---

1

```
 1                UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4
 5    FEDERAL TRADE COMMISSION,        )
 6          Plaintiff,                 )
 7       vs.                           )  Case No.
 8    D-LINK SYSTEMS, INC.,            )  3:17-CV-00039-JD
 9          Defendant.                 )
10    -------------------------------)
11
12                        Wednesday, August 8, 2018
13                        Cause of Action
14                        1875 Eye Street, N.W.
15                        Suite 800
16                        Washington, D.C.  20006
17
18         The above-entitled matter came on for
19    deposition, pursuant to notice, at 10:02 a.m.
20
21
22
23
24
25
```

---

2

```
 1    APPEARANCES:
 2
 3    ON BEHALF OF THE PLAINTIFF:
 4          KEVIN MORIARTY, ESQ.
 5          KATHERINE E. MCCARRON, ESQ.
 6          Federal Trade Commission
 7          600 Pennsylvania Avenue, N.W.
 8          Washington, D.C.  20580
 9          (202) 326-3392
10          kmoriarty@ftc.gov
11
12    ON BEHALF OF THE DEFENDANT:
13          JOSHUA N. SCHOPF, ESQ.
14          CYNTHIA FLEMING CRAWFORD, ESQ.
15          ASHLEY SALVINO, ESQ.
16          Cause of Action
17          1875 Eye Street, N.W.
18          Suite 800
19          Washington, D.C.  20006
20          (202) 499-2420
21          josh.schopf@causeofaction.org
22
23
24
25
```

---

3

```
 1                    I N D E X
 2
 3    WITNESS:                          EXAMINATION:
 4    PATRICK SCHAUMONT, PH.D.
 5         BY MR. MORIARTY                5, 235
 6         BY MR. SCHOPF                   225
 7
 8
 9    MARKED EXHIBITS        DESCRIPTION      FOR ID
10    DX
11    Number 101   Unidentified (written in    232
                   foreign language), Bates
12                 DKC0004436
13    Number 102   D-Link Product Security     233
                   Issue Analysis
14
15
16
17    EXHIBITS REFERENCED               PAGE
18    PX01031                            176
19    PX01033                            153
20    PX02002                             97
21    PX03188                            188
22    PX04148                            167
23    PX04150                            161
24    PX04154                            150
25    PX04158                            121
```

---

4

```
 1    EXHIBITS REFERENCED                      PAGE
 2    PX04159                                   124
 3    PX04160                                   123
 4    PX04161                                   122
 5    PX04162                                   122
 6    PX05084                                   185
 7    PX05086                                   148
 8    PX05087                                   136
 9    PX05091                                   205
10    PX05093                                   183
11    PX05095                                   200
12    PX05096                                   196
13    PX05099                                    70
14    PX06016                                    14
15    PX06017                                    44
16    PX06020                                   115
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

FTC v. D-Link Systems, Inc.                                                     8/8/2018

---

41

1      MR. SCHOPF:  Objection.  Vague and asked and
2   answered.
3      BY MR. MORIARTY:
4   **Q. I can try again.**
5   A. Yeah.  Can you ask your question again?
6   **Q. Yes, okay.  So if -- maybe I should start it at**
7   **a different place.**
8   **Is it correct that if the vulnerabilities**
9   **identified during pre-release source code scanning were**
10  **not remediated, you have no opinion on the**
11  **reasonableness of the security practices -- of the**
12  **software development practices that went into D-Link**
13  **products?**
14     MR. SCHOPF:  Objection to form.
15     THE WITNESS:  So at this moment I am not able to
16  give you any opinion based on assumptions.  That would
17  require me some time to prepare and to think about
18  giving this opinion.  Everything that I have written
19  down in my text is based on documents that I have read,
20  and I am not making assumption on "what-if" at this
21  point.
22     BY MR. MORIARTY:
23  **Q. But you are making an assumption, which is that**
24  **the vulnerabilities were remediated, correct?**
25  A. That is common sense in my profession.

---

42

1   **Q. And if for some reason they weren't remediated,**
2   **you are not going to speculate on that.**
3   A. That is correct.
4   **Q. Okay.  So the same question for the black-box**
5   **testing.  Do you have an opinion on the reasonableness**
6   **of the software development practice that went into**
7   **D-Link devices if you learned that your assumption was**
8   **untrue, that the vulnerabilities identified during**
9   **pre-release black-box testing were not remediated?**
10     MR. SCHOPF:  Objection.  Calls for speculation.
11     THE WITNESS:  So at this moment I do not have
12  any opinion on anything that requires me to guess.
13     BY MR. MORIARTY:
14  **Q. You are not offering an opinion disputing the**
15  **importance of maintaining the secrecy of private keys**
16  **for code signing, correct?**
17     MR. SCHOPF:  Objection.  Vague.
18     THE WITNESS:  I do describe the private key
19  issue both in my rebuttal report as well as in the main
20  expert report.
21     BY MR. MORIARTY:
22  **Q. And my question is, are you disputing the**
23  **importance -- in your -- in the places that you've**
24  **offered your opinion, are you disputing the importance**
25  **of maintaining the secrecy of private keys used for code**

---

43

1   signing?
2   A. Private keys always have to be secret or have to
3   be kept secret.
4   **Q. You are not offering an opinion regarding the**
5   **likelihood that vulnerabilities found in one version of**
6   **firmware existed in earlier versions of the firmware,**
7   **correct?**
8      MR. SCHOPF:  Objection.
9      THE WITNESS:  I do not offer an opinion on that.
10     BY MR. MORIARTY:
11  **Q. You are not offering an opinion disputing the**
12  **existence of the vulnerabilities identified in**
13  **Mr. Graff's report, correct?**
14     MR. SCHOPF:  Objection.
15     THE WITNESS:  Can you repeat the question?
16     BY MR. MORIARTY:
17  **Q. Sure.**
18  **Is it correct that you're not offering any**
19  **opinion disputing the existence of the vulnerabilities**
20  **identified in Mr. Graff's report?**
21  A. All the vulnerabilities described in Mr. Graff's
22  report are -- have been identified publicly.  So I do
23  not dispute their existence.
24  **Q. Is it correct that you are not offering an**
25  **opinion regarding the code development failures that**

---

44

1   caused the vulnerabilities identified by Mr. Graff?
2      MR. SCHOPF:  Objection.  Form.
3      THE WITNESS:  I do offer an opinion on that in
4   my rebuttal report.
5      BY MR. MORIARTY:
6   **Q. Can you tell me -- can you direct me --**
7   **Well, can we get his rebuttal report?**
8      MS. MCCARRON:  Yes.
9      BY MR. MORIARTY:
10  **Q. So I am going to hand you your rebuttal report,**
11  **which is marked PX06017.**
12  A. Um-hum, thank you.
13  **Q. Do you recognize this document?**
14  A. I do.  It's my rebuttal report.
15  **Q. Great.  And it is -- and so just to remind you**
16  **what my question was, my question was, I believe, is it**
17  **correct that, in your expert reports, you do not dispute**
18  **the code development failures causing the**
19  **vulnerabilities that were identified by Mr. Graff?**
20  **You said you did offer an opinion on that.  So I**
21  **guess my followup question is, where?**
22  A. Paragraph 24 talks about Section 2(d) of
23  Mr. Graff's report, where he enumerates, including, you
24  know, lack of input filtering, improper string handling,
25  system calls, unnecessary protocols and services,

---

11 (Pages 41 to 44)

Schaumont, Ph.D.

FTC v. D-Link Systems, Inc.                                            8/8/2018

---

53

1    and D-Link Corporation are described in my report.
2         BY MR. MORIARTY:
3         Q. And can you describe for me what the
4    responsibilities of D-Link Systems were?
5         A. So D-Link Systems is the U.S. subsidiary of
6    D-Link Corporation and sells the routers and IP cameras
7    of D-Link Corporation in the United States.
8         Q. And what is the role with regard to security of
9    D-Link Systems?
10        A. So D-Link Systems will notify D-Link Corporation
11   of security issues that it has been made aware of.
12        Q. And what does D-Link Corporation do with that
13   information?
14        MR. SCHOPF: Objection. Vague.
15        BY MR. MORIARTY:
16        Q. Do your best to answer it. I won't hold you to
17   it, but just can you generally describe for me what
18   D-Link Corporation does when they get that information
19   from D-Link Systems?
20        A. So D-Link Corporation's job -- what they do with
21   it, I don't know, but their job is to build the software
22   for the IP routers and IP cameras, integrating the
23   components from multiple vendors into secure systems.
24   So if D-Link Systems would announce there is a problem
25   or a security issue, eventually D-Link Corporation would

---

54

1    build a version of the modem which is -- which has that
2    vulnerability removed.
3         Q. So is D-Link Corporation responsible for
4    addressing security vulnerabilities for products that
5    are sold by D-Link Systems in the United States?
6         MR. SCHOPF: Objection. Vague.
7         THE WITNESS: Eventually they are one and the
8    same company. So whether you could point to a specific
9    partner in those two, who is most responsible for
10   security vulnerability, I think both of them need to
11   solve the problem if they do not want to go out of
12   business.
13        BY MR. MORIARTY:
14        Q. Who does the most technical work in addressing
15   security vulnerabilities for products that D-Link
16   Systems sells in the United States?
17        MR. SCHOPF: Objection. Vague.
18        THE WITNESS: So the -- the modems are
19   technically constructed and tested by D-Link
20   Corporation.
21        BY MR. MORIARTY:
22        Q. When you say "modems," do you mean routers?
23        A. Routers, yeah. I keep on connecting that to --
24        Q. That's my first time ever correcting anyone on a
25   technical term.

---

55

1         A. Routers and IP cameras, yes.
2         Q. Okay. Did you ask -- no, scratch that.
3         You're not offering an opinion that source code
4    scanning is not important, correct?
5         MR. SCHOPF: Objection.
6         THE WITNESS: Implicitly, I do offer an opinion
7    on that, because I refer to the source code scanning
8    reports.
9         BY MR. MORIARTY:
10        Q. And is it your opinion that source code scanning
11   reports are important?
12        A. Yes. They are a way to implement white-box
13   testing.
14        Q. Is the use of source code scanning for D-Link
15   routers and IP cameras critical to your conclusion that
16   the testing and remediation procedures are reasonable?
17        A. They are a part of the secure development life
18   cycle.
19        Q. Are they an essential part of the secure
20   development life cycle?
21        A. White-box testing is an essential part of the
22   secure development life cycle. You do not have to have
23   an automatic tool, such as source code scanning, to do
24   that, but if you have it, yes, it will automate it and it
25   will make your life easier.

---

56

1         Q. What are the other forms of white-box testing?
2         A. Read the source code printed out on a piece of
3    paper and scan it yourself.
4         Q. Are you offering any opinion that there was any
5    not automated version of white-box testing that occurs
6    for D-Link routers and IP cameras?
7         MR. SCHOPF: Objection.
8         THE WITNESS: It is -- it is assumed in the
9    secure development life cycle that was in place by -- at
10   D-Link Systems and D-Link Corporation, or D-Link in
11   general, to build those modems.
12        BY MR. MORIARTY:
13        Q. Do you explicitly discuss anywhere in either of
14   your reports any manual source code scanning that
15   occurred for D-Link routers and IP cameras?
16        A. It is assumed.
17        Q. Did you ask your counsel or William Brown to
18   provide you with any evidence that manual source code
19   scanning occurred for D-Link routers and IP cameras?
20        A. It is assumed.
21        Q. So you did not ask them?
22        A. Correct.
23        Q. And who do you assume that manual source code
24   scanning was conducted by?
25        MR. SCHOPF: Objection. Vague.

---

14 (Pages 53 to 56)

237

1  document that is Appendix A to Mark Graff's report,
2  which is PX06020.
3     A. Okay.
4     Q. So is it your testimony that this is the list of
5  documents that you're referring to when you use the
6  expression "accused product" in your expert report?
7        MR. SCHOPF: Objection. It mischaracterizes his
8  testimony.
9        THE WITNESS: So you asked me this question
10  before in the context of my expert reports, and there I
11  said that when I used the term "accused products," I was
12  talking about the ones which are listed in -- in your
13  complaint.
14        BY MR. MORIARTY:
15     Q. Got it. So you stated before that -- and if I'm
16  wrong, just tell me -- but I believe you stated before
17  that your conclusions in paragraph 14 of your expert
18  report apply to all the products on this list. Is that
19  correct?
20     A. That is correct.
21     Q. In the last sentence of that paragraph, it
22  states, "The testing procedures used for products --
23  I'll start over. "The testing procedures used for the
24  products D-Link Systems sells have been consistently
25  improved since 2012 to include black box testing, white

238

1  box testing, a secure Software Development Lifecycle and
2  the Building Security in Maturity Model."
3        Is that correct?
4     A. That is correct.
5     Q. Do you know how many of the products listed on
6  Appendix A received a pre-release III or onward security
7  test?
8     A. Well, no, I have recollection of Onward Security
9  testing reports available. Whether all of these reports
10  encompass all of these -- all of these cameras and
11  routers listed here, I cannot tell, but if the opposite
12  is true, I cannot conclude either.
13     Q. Would it affect your opinion about the
14  application of paragraph 14 to all of these devices if
15  you learned that fewer than 20 of the products on this
16  list received a pre-release III or Onward Security test?
17        MR. SCHOPF: Objection. Speculation.
18        THE WITNESS: So I cannot make that assumption,
19  and let me clarify why that is the case. The expert
20  report describes a methodological issue with the
21  security of these products. Now, you can point to any
22  of these cameras and wonder, would this conclusion also
23  apply to this particular product or this particular
24  product? And my answer would be yes in all of the
25  cases. There is no reason that D-Link Systems or DKC

239

1  would have treated any of these routers or IP cameras
2  different from each other. They're -- all of them are
3  products and all of them would need to meet the same
4  security standards that they apply.
5        BY MR. MORIARTY:
6     Q. What is the basis for your assumption that
7  that's true?
8     A. That they are -- that they are a company that
9  wants to stay in business. They cannot afford to give
10  one product a differential treatment from another
11  product. All of them needs to have the same quality
12  standard.
13     Q. And would you say it's the same quality standard
14  if some of them received black-box testing and some of
15  them did not?
16     A. Well, just --
17        MR. SCHOPF: Objection. Vague.
18        THE WITNESS: -- this is, again, assuming that I
19  would know that -- that I would know that some of them
20  have received black-box testing or not. I do not -- I
21  do not know that. I have made my conclusions based on
22  the testing reports that I have seen.
23        BY MR. MORIARTY:
24     Q. How many testing reports have you seen?
25     A. The ones that have been made available to me.

240

1     Q. And would you say that there's approximately 22
2  of them?
3     A. I have referenced -- I do not recall the exact
4  number. I have referenced black-box testing reports for
5  approximately three products in my report.
6     Q. But in your Appendix C, there's approximately 20
7  or 22 different black-box test reports listed. Is that
8  correct?
9     A. Okay. Yeah, okay.
10     Q. And so does the fact that there are, at most, 22
11  black-box tests affect your conclusions about all of the
12  products listed on Appendix A?
13     A. I believe that these conclusions apply to all of
14  the products.
15     Q. Even though there are far more than 22 products
16  listed on Appendix A?
17     A. Yes, yes. Let me tell you why. Some of these
18  products will have shared the same code base, such that
19  if you can use black-box testing for one particular
20  product, it would apply also to derivative products or
21  related products.
22     Q. Do you have any reason to think that D-Link
23  Corporation simply engaged in ad hoc black-box testing
24  prior to 2014?
25        MR. SCHOPF: Objection. Calls for speculation.

241

1    Outside the scope.
2        THE WITNESS:  No.  They are a company that wants
3    to build -- in my -- from my -- based on my evaluation,
4    they are a company that wants to build products that
5    work and that do not have security issues.
6    BY MR. MORIARTY:
7        Q.  So your conclusion is based on your assumption
8    that they did not engage in ad hoc black-box testing
9    prior to 2014.
10       A.  Ah --
11       MR. SCHOPF:  Objection.
12       THE WITNESS:  -- my conclusion is based on the
13   ensemble of the timeline, as we discussed before, which
14   actually starts before 2012.
15   BY MR. MORIARTY:
16       Q.  And --
17       A.  And which includes, you know, white-box testing,
18   black-box testing, secure software development life
19   cycle, and BSIMM.
20       Q.  Does it affect your conclusion about the
21   application of paragraph 14 to all of the devices
22   identified in Appendix A if you were to learn that no
23   more than five of them were subject to source code
24   scanning?
25       MR. SCHOPF:  Objection.  Calls for speculation.

242

1        THE WITNESS:  The answer is no for the same
2    reason as I said before.  Some of these have shared code
3    basis, and it is possible that -- let me rephrase that.
4    The source code scanning is applied to source code and
5    would have been done by the vendors, what you described.
6        What you are pointing at here are integrated
7    products which are complete cameras and complete
8    routers, and so one source code scanning report might
9    very well apply to 20 different modems here, if this is
10   a component that is used in each of these modems --
11   sorry, routers.
12   BY MR. MORIARTY:
13       Q.  The source code scanning report that you discuss
14   in your report was for the DCS-936L, correct?
15       A.  Let me verify that.
16       Q.  If you would look at paragraph 89.
17       A.  In the expert report?
18       Q.  Correct.  Yeah, in the opening expert report.
19       A.  Okay, yeah.  DCS-930L.
20       Q.  And do you have any reason to think that vendors
21   did any source code scanning prior to 2015?
22       MR. SCHOPF:  Objection.  Form.
23       THE WITNESS:  Yeah, you're -- hold on.
24   BY MR. MORIARTY:
25       Q.  Yeah.

243

1        A.  You mentioned DCS-930L?
2        Q.  I got it wrong -- no, said the wrong number --
3    oh, no, wait.
4        A.  The source code scanning reports my expert
5    report refer to is DCS-7010L and DCS-936L.
6        Q.  Okay.  Is the DCS-936L on the list?
7        A.  DCS-936L?  It is not on the list.
8        Q.  But if you turn to the page, can you confirm the
9    DCS-7010L is on the list?
10       A.  That is correct.
11       Q.  So you only reviewed the source code scanning
12   report for one device on this list of products under
13   Appendix A.
14       MR. SCHOPF:  Objection.  Mischaracterization.
15       THE WITNESS:  I'm using these examples here as
16   representative examples of source code scanning reports.
17   It is not an exhaustive list of all of the source code
18   scanning reports I have taken a look at.
19       BY MR. MORIARTY:
20       Q.  I guess I just want to know why you think it's
21   representative.
22       MR. SCHOPF:  Objection.  Vague.
23       THE WITNESS:  Well, I scanned several of these
24   scanning reports -- of all of the source code scanning
25   reports I had available to me, I reviewed multiple of

244

1    them, and I wanted to include in my expert report a
2    representative sample of reports that I have -- that I
3    have reviewed, and so I chose these two examples for no
4    particular reason, other that they are using two
5    different source code scanning tools.
6    BY MR. MORIARTY:
7        Q.  And tell me -- the same question for the
8    black -- for the III/Onward testing.  How do you know
9    that the testing that you reviewed is representative of
10   the testing that was conducted on all of the devices on
11   Appendix A?
12       A.  Because I looked at all of the D-Lab reports and
13   all of the black-box testing reports and then chose a
14   representative sample among those reports to include in
15   the expert report.
16       Q.  So if there is a device listed on Appendix A
17   that you did not review a III or Onward report for, do
18   you think there is a III or Onward report?
19       MR. SCHOPF:  Objection.  Speculation.
20       THE WITNESS:  It is a reasonable assumption that
21   there is either a conclusion that can be made based on
22   the existing III/Onward reports that apply to that
23   modem, which has not been specifically tested, or there
24   is such a report.
25       BY MR. MORIARTY:

FTC v. D-Link Systems, Inc.                                                                8/8/2018

245

1      Q.  And do you know how many of the products listed
2   on Appendix A were developed while BSIMM had been
3   implicated -- sorry.
4          Do you know how many of the products on
5   Exhibit -- on Appendix A were developed after the
6   implementation of BSIMM?
7      A.  No.  I am not familiar with the exact timeline
8   of these -- these products, and it's not listed in the
9   table.
10         MR. MORIARTY:  I don't have any other questions.
11         MR. SCHOPF:  Okay.  I think we are done.
12         (Reading and signature reserved.)
13         (Whereupon, at 7:05 p.m., the deposition was
14  adjourned.)
15
16
17
18
19
20
21
22
23
24
25

247

1                    CERTIFICATE OF WITNESS
2
3
4      I hereby certify that I have read and examined
    the foregoing transcript, and the same is a true and
    accurate record of the testimony given by me.
5
6
7      Any additions or corrections that I feel are
    necessary, I will attach on a separate sheet of paper to
    the original transcript.
8
9
10     I hereby certify, under penalty of perjury, that
    I have affixed my signature hereto
    on the date so indicated.
11
12
13         DATED:
14
15
16
17         _____
18         PATRICK SCHAUMONT, PH.D.
19
20
21
22
23
24
25

246

1   DISTRICT OF COLUMBIA, to wit:
2
3          I, Susanne Bergling, the officer before whom the
    foregoing deposition was taken, do hereby certify that
    the within-named witness personally appeared before me
4   at the time and place herein set out, and after having
    been duly sworn by me, according to law, was examined by
5   counsel.
6          I further certify that the examination was
    recorded stenographically by me and this transcript is a
7   true record of the proceedings.
8          I further certify that I am not of counsel to
    any of the parties, nor an employee of counsel, nor
9   related to any of the parties, nor in any way interested
    in the outcome of this action.
10
           As witness my hand and notarial seal on
11  August 10, 2018.
12
13
14
           s/Susanne Bergling
15         Susanne Bergling
           Notary Public
16
17
18  MY COMMISSION EXPIRES:
19         3/31/2023
20
21
22
23
24
25

248

1   WITNESS:  PATRICK SCHAUMONT, PH.D.
2   DATE:  AUGUST 8, 2018
3   CASE:  FTC VS. D-LINK
4   Please note any errors and the corrections thereof on
    this errata sheet.  The rules require a reason for any
5   change or correction.  It may be general, such as "To
    correct stenographic error," or "To clarify the record,"
6   or "To conform with the facts."
7   PAGE LINE CORRECTION      REASON FOR CHANGE
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25