# Exhibit 55

To Declaration of Jarad Brown in Support of
Federal Trade Commission's
Motion for Summary Judgment

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

D-LINK SYSTEMS, INC.,

      Defendant.

NO. 3:17-CV-00039-JD

**DECLARATION OF TERENCE A.**
**SHIMP INCORPORATING EXPERT**
**REPORT**

I, Terence A. Shimp, declare as follows:

1.      I am a Distinguished Professor Emeritus at the University of South Carolina's Moore School of Business. I am over the age of 21 and fully competent to make this declaration. The matters stated in this declaration are true of my own knowledge and, if necessary, I could and would testify competently thereto.

2.      I was asked to render an expert opinion in this case. My Expert Report, executed July 2, 2018, and appended hereto, contains opinions about which I expect to testify in the above-captioned case and the facts supporting them, if called upon to do so.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of September, 2018, in Columbia, South Carolina.

*Terence A. Shimp*

TERENCE A. SHIMP

**Expert Report of Terence A. Shimp**
**Re: Federal Trade Commission v.**
**D-Link Systems, Inc. (Case No. 3:17-CV-00039-JD)**

Terence A. Shimp
Distinguished Professor Emeritus
Moore School of Business
University of South Carolina

July 2, 2018

# TABLE OF CONTENTS

I.   OVERVIEW ................................................................................................................ 2

   A.   Qualifications and Compensation ...................................................................... 2

   B.   Scope of Undertaking ......................................................................................... 4

II.   THE FTC'S COMPLAINT RE:  D-LINK'S ROUTERS AND IP CAMERAS ................... 5

   A.   Factual Allegations ............................................................................................ 5

   B.   Scope of Opinion ............................................................................................... 6

III.   THEORETICAL FRAMING OF ADVERTISING DECEPTION ....................................... 7

IV.   PRELIMINARY ISSUES ............................................................................................ 9

   A.   Consumer Processing of D-Link's Marcom ...................................................... 10

   B.   Consumers' Online Search Behavior ................................................................ 11

V.   ANALYSIS OF D-LINK'S MARCOM MATERIALS ...................................................... 12

   A.   Consumer Motivation ....................................................................................... 12

   B.   PX 2:  Marcom for the DIR-615 Wireless N 300 Router ................................... 16

     Analysis of Express and Implied Claims for the DIR-615 Router. ..................... 17

   C.   PX 3:  Marcom for the DIR-412 Mobile Wireless Router ................................. 19

     Analysis of Express and Implied Claims for the DIR-412 Mobile Wireless Router. ........... 20

   D.   PX 4:  Marcom for the DIR-815 Wireless N Dual Band Router ................................. 21

     Analysis of Express and Implied Claims for DIR-815 Wireless N Dual Band Router. ....... 22

   E.   PX 5:  Marcom for the DIR-645 Whole Home Router 1000 ........................................ 23

     Analysis of Express and Implied Claims for the DIR-645 Whole Home Router 1000. ....... 24

   F.   PX 1:  SECURITY EVENT RESPONSE POLICY ........................................................ 25

     Analysis of Express and Implied Claims for the Security Event Response Policy ............. 27

VI.   CONCLUSIONS ...................................................................................................... 29

VII.   REFERENCES ...................................................................................................... 31

VIII.   Appendix:  SHIMP Publications and Case Participation ............................................. 33

   A.   Publications (Past 10 Years) ............................................................................. 33

   B.   Prior Expert Testimony (Past 4 Years) ............................................................. 33

   C.   Materials Considered ........................................................................................ 33

# I.   OVERVIEW

## A.  Qualifications and Compensation

1.      I retired from the University of South Carolina's Moore School of Business in 2006 and now hold the title Distinguished Professor Emeritus.  My teaching and scholarly career spanned nearly four decades.  My work, which mostly concentrated in the areas of consumer psychology and marketing communications, has been recognized by professional colleagues through such awards as being elected president of the Association for Consumer Research (1993), having been selected to receive the American Academy of Advertising's Lifetime Contributions to Advertising Research Award (2001), and having been elected Fellow of the Society of Consumer Psychology (2003).  I was an active scholar publishing many articles in top academic journals along with several textbooks.  I also served on the editorial review boards of virtually every major journal in my field.  My most recent textbook (now coauthored with former Ph.D. student, Dr. Craig Andrews)—*Advertising, Promotion, and Other Aspects of Integrated Marketing Communications*[1]—has been widely adopted throughout the United States and internationally.  Finally, an analysis of the first 40 years (June 1974-April 2014) of publications in the premier journal reporting on consumer behavior—the *Journal of Consumer Research* ("*JCR*")—revealed that of the nearly 900 authors who had published at least one article in *JCR* during that period, only 35 authors had published more frequently than had I.[2]

2.      Over the past 30 years, I have served as an expert witness in approximately 15 advertising deception cases, mostly representing the Federal Trade Commission ("FTC") but also

---

[1] Terence A. Shimp & J. Craig Andrews, Advertising, Promotions, and Other Aspects of Integrated Marketing Communications (10th ed. 2018).

[2] Xin "Shane" Wang, Neil T. Bendle, Feng Mai & June Cotte, *The Journal of Consumer Research at 40: A Historical Analysis*, 42 Journal of Consumer Research, 5-18 (2015).

several state agencies, and I have been deposed on approximately 10 occasions.  My role in most of these cases has been to analyze various forms of marketing communications pertinent to each case (e.g., print advertisements, web pages, infomercials, TV commercials, packaging materials, sales promotions) and render opinions as to whether, in my opinion, the marketing communications would deceive consumers.

3.      To render informed opinions in these various cases, I have applied relevant academic theories and concepts to understand how typical consumers might process the applicable marketing communications materials.  The claims sometimes are predominantly objective and explicit—rather than subtle, abstract, or implicit—and thus my analyses have involved a rather straightforward identification of these claims and an effort to assess their materiality to prospective consumers' product evaluations and purchase decision making.  In those instances where claims have been mostly subjective and implicit, I have offered opinions— buttressed with suitable theory and concepts—as to how they likely are interpreted by typical, reasonable consumers.  Regardless of the nature of the claim, my analyses have required me to make inferences regarding key message-processing determinations such as consumers' motivation, opportunity, and ability to process message claims.[3]

4.      My scholarly work involving deception and related matters[4] and my knowledge of aspects of consumer psychology (especially attitude formation/change, information processing,

---

[3] *Cf.*, Scott B. Mackenzie & Richard A. Spreng, *How Does Motivation Moderate the Impact of Central and Peripheral Processing on Brand Attitudes and Intentions?*, 18 JOURNAL OF CONSUMER RESEARCH, 519-529 (1992); Deborah J. MacInnis & Bernard J. Jaworski, *Information Processing from Advertisements:  Toward an Integrative Framework*, 53 JOURNAL OF MARKETING, 1-23 (1989); Deborah J. MacInnis, Christine Moorman & Bernard J. Jaworski, *Enhancing and Measuring Consumers' Motivation, Opportunity, and Ability to Process Brand Information from Ads*, 55 JOURNAL OF MARKETING, 32-53 (1991); RICHARD E. PETTY & JOHN T. CACIOPPO, ATTITUDES AND PERSUASION: CLASSIC AND CONTEMPORARY APPROACHES (1981).

[4] *E.g.*, Terence A. Shimp, *Do Incomplete Comparisons Mislead?* 18 JOURNAL OF ADVERTISING RESEARCH, 21-28 (1978); Terence A. Shimp, *Social-Psychological (Mis)Representations in Television Advertising*, 13 JOURNAL OF

and persuasion practices—themes contained in many of my journal publications that are too extensive to list but are coalesced in my multiple textbooks[5]—prepared me well to offer informed opinions in the various cases for which I have served as an expert witness.

5.      The Appendix contains a list of my publications over the past 10 years and a record of my participation as an expert witness over the past 4 years.  The Appendix also includes a list of materials I considered in forming my opinions contained in this report.

6.      I am being compensated at a rate of $250 per hour.

**B.  Scope of Undertaking**

7.      I was employed as an expert witness by the FTC for the purpose of evaluating certain statements made by defendant D-Link Systems, Inc. ("D-Link") to consumers.  I offer my opinions as to how reasonable consumers would interpret D-Link's statements related to security and whether they are likely to influence consumers' purchasing decisions.  My qualifications as an active researcher for more than 30 years and as a scholar of consumer psychology and marketing communications enable me to offer a well-informed opinion to a reasonable degree of professional certainty of how reasonable consumers would interpret D-Link's statements.

---

CONSUMER AFFAIRS, 28-40 (1979); Terence A. Shimp & Ivan L. Preston, *Deceptive and Nondeceptive Consequences of Evaluative Advertising*, 45 JOURNAL OF MARKETING, 22-32 (1981); Terence A. Shimp & J. Thomas Yokum, *Advertising Inputs and Psycho-physical Judgments in Vending-Machine Retailing*, 58 JOURNAL OF RETAILING, 95-113 (1981); Terence A. Shimp, *Evaluative Verbal Content and Deception in Advertising: A Review and Critical Analysis*, *in* INFORMATION PROCESSING RESEARCH IN ADVERTISING, 195-216 (Richard J. Harris ed., 1983); Jeff Langenderfer & Terence A. Shimp, *Expert Opinion Testimony in Federal Trade Commission Enforcement Proceedings: Theoretical Versus Empirical Evidence*, *in* 8 Marketing and Public Policy Conference Proceedings, 41-42 (Alan Andreasen, Alex Simonson & N. Craig Smith eds., 1998); Jeff Langenderfer & Terence A. Shimp, *Consumer Vulnerability to Scams, Swindles, and Fraud:  A New Theory of Visceral Influence on Persuasion*, 18 PSYCHOLOGY AND MARKETING, 763-783 (2001).

[5] TERENCE A. SHIMP & J. CRAIG ANDREWS, ADVERTISING, PROMOTIONS, AND OTHER ASPECTS OF INTEGRATED MARKETING COMMUNICATIONS (9th ed. 2013).

## II.    THE FTC'S COMPLAINT RE:  D-LINK'S ROUTERS AND IP CAMERAS

### A.  Factual Allegations

8.      Among other things, the FTC's Complaint ("Complaint")[6] alleges that D-Link has failed to take "reasonable steps to protect their routers and IP cameras from widely known and reasonably foreseeable risks of unauthorized access"[7] and, as a result, "thousands of Defendants' routers and cameras have been vulnerable to attacks that subject consumers' sensitive personal information and local networks to a significant risk of unauthorized access."[8]

9.      The FTC's Complaint subsequently states, "Defendants have disseminated or caused to be disseminated to consumers statements regarding the security of their products, including their routers and IP cameras."[9]  In Paragraph 20 of its Complaint, the FTC asserts that "after highly-publicized security flaws were found to affect many of its products"—during the period of "approximately December 2013 until early September 2015"—D-Link "posted a Security Event Response Policy on its product support webpage" (PX 1).  The Complaint further states that "Defendants highlight their routers' security features in a wide range of materials available on Defendant DLS's website, including user manuals and promotional brochures, which describe these features alongside language that specifically references the device's 'security.'  Such materials include, but are not limited to, brochures about routers in the general

---

[6] Complaint for Permanent Injunction and Equitable Relief (Dkt. No. 1) (hereinafter, "Complaint").

[7] Complaint, ¶ 15.

[8] Complaint, ¶ 16.

[9] Complaint, ¶ 19.

form of Exhibits 2-5."[10]  It is to be noted that Exhibits 1-5 are labeled PX 1 through PX 5, and my subsequent analysis will use this labeling convention when discussing these exhibits.

10.     The FTC Complaint against D-Link claims that due to the representations in D-Link's Security Event Response Policy characterized in Paragraph 20 that "Defendant DLS has represented, directly or indirectly, expressly or by implication, that Defendants took reasonable steps to *secure their products from unauthorized access*."[11]  The FTC therefore alleges that "the making of the representation set forth in Paragraph 31 of this Complaint constitutes a deceptive act or practice."[12]

11.     The FTC Complaint against D-Link also claims that due to the communication materials characterized in Paragraph 21 that "Defendants have represented, directly or indirectly, expressly or by implication, that the routers described by these claims were *secure from unauthorized access*."[13]  The FTC therefore alleges that "the making of the representation set forth in Paragraph 34 of this Complaint constitutes a deceptive act or practice."[14]

**B.  Scope of Opinion**

12.     In this report, I provide expert opinion regarding D-Link's representations in its marketing communications materials (PX 2 through PX 5) as to whether they do indeed claim—either directly or indirectly, expressly or by implication—that the routers involved in these communications are "secure from unauthorized access."  I additionally present an opinion of D-Link's Security Event Response Policy (PX 1) as to whether it claims, either directly or

---

[10] Complaint, ¶ 21.

[11] Complaint, ¶ 31, italics added.

[12] Complaint, ¶ 33.

[13] Complaint, ¶ 34, italics added.

[14] Complaint, ¶ 36.

indirectly, expressly or by implication, that D-Link took reasonable steps to secure its routers and IP cameras from unauthorized access.  Finally, I opine as to whether these representations are likely to affect prospective consumers' decisions related to purchasing routers and IP cameras from D-Link.

13.     I lack the expertise to assess the factual bases of the FTC's allegations that D-Link has failed to protect their routers and IP cameras from risks of unauthorized access.

## III.     THEORETICAL FRAMING OF ADVERTISING DECEPTION

14.     The FTC in its Complaint has referred to D-Link's advertising materials as "promotional brochures" or simply "brochures,"[15] available on D-Link's website[16] and possibly available through its retail partners.[17]  The language of "promotional brochures" and "brochures" is perfectly suitable, but I use the label "marcom material" throughout my report with marcom being a term of art and truncated version of "marketing communications."[18]  I find the term marcom more descriptive of D-Link's materials and thus will employ this terminology hereafter.

15.     I analyze D-Link's marcom materials and offer opinions as to the likely belief formed by reasonable consumers upon reviewing them.  The model depicted in Figure 1, *infra*, frames my view of the deception process that is grounded in my scholarly background and expertise involving deception and marketing communications and is also influenced by Richards'[19] thoughtful and sophisticated theorizing.  The five boxed sections in the model are

---

[15] Complaint, ¶ 22.

[16] DLS First Amended Answers to FTC 3rd Set of Interrogs. No. 8.

[17] DLS Answers to FTC 6th Set of Interrogs. No. 26.

[18] TERENCE A. SHIMP & J. CRAIG ANDREWS, ADVERTISING, PROMOTIONS, AND OTHER ASPECTS OF INTEGRATED MARKETING COMMUNICATIONS (9th ed. 2013).

[19] JEF RICHARDS, DECEPTIVE ADVERTISING: BEHAVIORAL STUDY OF A LEGAL CONCEPT (2013).

labeled A through E, and oval outcomes are described as either Nondeceptive or Deceptive. *Box A* denotes "Marcom Material" such as D-Link's promotional brochures that promote its various routers. *Box B* represents the "Message Conveyed" to prospective purchasers of D-Link's router products, and *Box C* translates the conveyed message into "Likely Consumer Belief" regarding the expected probability that a particular D-Link router possesses a claimed attribute or will deliver a promised benefit.

16.     I apply this framing in analyzing D-Link's marcom materials and in assessing what beliefs reasonable consumers likely form while processing D-Link's marcom materials. To facilitate reading my subsequent analyses for each of D-Link's routers subject to the FTC's Complaint, the references to Boxes in my theoretical framing are as follows:

Box A – *Marcom material* (i.e., product brochures on D-Link's website)
Box B – *Message conveyed* by these materials
Box C – Likely consumer *belief* formed from reading these materials
Box D – *Materiality* of belief
Box E – D-Link's ability to *support* claim (outside the scope of my expertise)



*Figure 1*

17.     Importantly, the distinction between "Message Conveyed" and "Likely Consumer Belief" is more than mere semantics.  A message is conveyed to consumers when they are exposed to a message claim, pay attention to that claim, and comprehend what has been claimed.[20] This, however, is not tantamount to "believing" the claim.  Rather, "Likely Consumer Belief"[21] results only when consumers internalize the claim—i.e., accept it into memory—as something that a brand of router is likely to provide (in the case of a desirable product feature) or prevent (in the instance of an undesirable feature).  It thus should be clear that message conveyance is a necessary but insufficient requirement for what consumers believe about a brand whose benefits have been communicated via a marcom message.

18.     Returning now to the theoretical framing of marcom messages, *Box D* queries whether the belief is material to the purchase decision.  If consumer belief resulting from a message claim is material, then a further query is needed as to whether the advertiser—D-Link in this case—can support the claim (*Box E)*.  If "yes," then the message conveyed is nondeceptive, but if "no," then consumers can be considered to have been deceived.  I include reference to claim supportability (*Box E*) simply as a matter of model completeness.

IV.     PRELIMINARY ISSUES

19.     Before presenting my analysis of D-Link's marcom materials, it is important to consider two factors that bear on consumer shopping behavior related to routers:  First, when during the buying process would prospective purchasers of routers come into contact with D-Link's marcom?  Second, what is the evidence of consumers' online search behavior for routers?

---

[20] *E.g., id.*

[21] *Id.*

**A.  Consumer Processing of D-Link's Marcom**

20.    There are various ways that consumers may acquire product- and brand-related information and subsequently purchase routers that fit their consumption needs.  Some consumers may do their router-related shopping exclusively at brick-and-mortar ("B&M") stores; others might shop exclusively online; while yet others likely shop both online and in B&M outlets.  Although I have no way of knowing what proportion of consumers visit router brand websites prior to making a purchase decision, it is incontrovertible that some percentage of consumers likely would acquire router information from online sources, which would include the websites of various router brands such as D-Link.  D-Link has made the business decision to promote its router models via online information presentation, and I conclude from that decision that some consumers would indeed visit D-Link's website prior to making purchase decisions. D-Link apparently does not maintain logs of visitations to its website, but if it did I would have a better understanding of the proportion of its total unit sales that are preceded by website information acquisition.

21.    Importantly, D-Link has acknowledged that it promoted the router models identified in PX 2 through PX 5 (i.e., models DIR-615, DIR-412, DIR-815, and DIR-645) online and in B&M outlets.  D-Link's response to the FTC's Interrogatory No. 8 reveals that these router models "could have been" posted on D-Link's main product website and subsequently archived on D-Link's support website.[22]  In terms of distribution outlets, D-Link "believes it may have provided PX 2 – PX 5 to the following brick-and-mortar and online retail sales partners": Amazon.com, Inc.; Newegg, Inc.; B&H Foto & Electronics Corp.; Rakuten Commerce Ltd.

---

[22] DLS First Amended Answers to FTC 3rd Set of Interrogs. No. 8.

DBA buy.com; Walmart Inc.; RadioShack Inc.; Staples, Inc.; Office Depot, Inc.; Office Max, Inc.; Fry's Electronics Inc.; Microcenter Inc."[23]

22.     All said, it is apparent that D-Link actively marketed and advertised its various router models and that, accordingly, numerous consumers would have been exposed to its marcom messages, either directly through online visitations or possibly via presentations by B&M sales associates.[24]

**B.  Consumers' Online Search Behavior**

23.     Numerous academic articles have been written on the topic of online search behavior.  However, none of these articles involve online search for router products.  Most involve nondurable products, and many took place in the early-to-mid 2000s, which may not well-reflect consumer search behavior during the period relevant to the D-Link case.  The only article I have located that is closely relevant to the D-Link case—both in terms of time frame and product category—is a publication involving consumers' online search for digital cameras.[25] These researchers collected log files from nearly 1,000 online panelists, all of whom ultimately purchased cameras from online retailers.  They determined that online search for digital cameras is extensive and consumers conduct an average of 14 online searches across multiple brands and models.

24.     Extrapolating to router products, it is possible that online search in this category also is extensive insofar as products in this category vary greatly in price, performance, and likely effectiveness—thus representing a moderate- to high-involvement purchase for many

---

[23] DLS Answers to FTC 6th Set of Interrogs. No. 26.

[24] *See id.*, (stating that D-Link believes it may have provided PX 2 – 5 to B&M partners).

[25] Bart J. Bronnenberg, Jun B. Kim & Carl F. Mela, *Zooming in on Choice: How Do Consumers Search for Cameras Online?*, 35/5 MARKETING SCIENCE, 693-712 (2016).

consumers.  Because so many retailers sell and provide information regarding routers and IP cameras online, I conclude that consumers likely engage in online searches for routers and that these searches bring them into contact with websites and marcom for D-Link routers.  D-Link commands shelf space at leading B&M retailers and thus would be the object of online searches.

## V.      ANALYSIS OF D-LINK'S MARCOM MATERIALS

25.      I now review the various marcom materials that are included in the FTC's Complaint against D-Link.  These are labeled PX 2 through PX 5 in the FTC's Complaint.  I also analyze, in Section V.F., D-Link's Security Event Response Policy (PX 1).  In each of the following four sections, which correspond to the marcom materials in PX 2 through PX 5 and represent marcom for four of D-Link's router models, I initially describe the overall marcom and then highlight via bullet points those claims that relate to the FTC's case against D-Link.  I conclude the discussion for each router model with an analysis of how reasonable consumers would internalize D-Link's express and implied claims about security and whether those claims are likely to influence reasonable consumers' purchasing decisions.

### A.  Consumer Motivation

26.      As a prelude to presenting my analysis, I need to explain my approach to determining what messages D-Link's marcom materials likely convey to consumers (Box B of theoretical model) and what beliefs probably are formed (Box C).  My method to this determination is based on my opinion, discussed herein, that many consumers who are interested in purchasing a router—and thus undertake store visitations and/or shop online for routers—are *moderately to highly motivated* to process information that will enable them to learn about routers and ultimately make prudent purchase decisions.  *See* Section IV.B. above.  Motivation is defined as the consumer's goal-directed arousal and desire to process brand information in an

advertisement or other form of marcom.[26]  Based upon my experience and research, the consumer's level of motivation to process brand information is determined by the personal importance of making an appropriate or a wise purchase decision and typically would be expected to be higher with (1) more expensive purchases; (2) when choosing among brands is difficult; (3) when choice criteria are somewhat uncertain (i.e., determining what product attributes should facilitate making a wise brand-selection decision); (4) when the brand choice is relevant to the consumer's self-concept; (5) when product safety is an important purchase consideration; and so on.

27.     For consumers making purchase decisions in any given product category—automobiles, appliances, routers, wine, etc.—there is no singular level of motivation that would characterize all consumers in that category.  Rather, it is expected that motivation levels are varied and that some form of statistical distribution—possibly normal but typically skewed—would best capture consumers' levels of motivation for that product.  For example, when consumers are exposed to an advertisement for a mundane product, say a common food item, it would be expected that the information-processing-motivation level for most consumers would be relatively low, thus representing a distribution skewed to the downside of motivation.  Comparatively, the motivation level likely would be high for many consumers choosing which car to purchase because cars are expensive and purchased relatively infrequently, which would represent motivation skewed to the upside.

28.     It is my opinion that many router purchasers are moderately to highly involved when in process of making a router purchase decision.  This is because (1) routers are not inexpensive; (2) router models vary in what benefits they offer; (3) many consumers have little

---

[26] Deborah J. MacInnis & Bernard J. Jaworski, *Information Processing from Advertisements:  Toward an Integrative Framework*, 53 JOURNAL OF MARKETING, 1, 4 (1989).

experience in making router brand and model choices in this category; and (4) the relevant

choice criteria for distinguishing among brands are somewhat uncertain in comparison to product

instances where consumers regularly make choices among competitive brands.  In other words,

many prospective router purchasers must learn about routers and router brands before making a

satisfying purchase decision.[27]  This required learning would elevate purchasers' motivation to

process router-related marcom messages to acquire meaningful and purchase-relevant

information.

29.     I expect that the many router purchasers who are moderately to highly involved

when in the process of making a router purchase decision would seek out arguments in marcom

messages that are central to the claims made by D-Link and its competitors rather than spend

their time examining peripheral, or unimportant, aspects of message claims.[28]

30.     But, to the key issue of what messages are conveyed (Box B) and what beliefs are

formed (Box C), it is my opinion that (1) there are a finite number of message claims contained

in D-Link's marcom materials; (2) these claims are overwhelmingly explicit; and (3) there are a

limited number of plausible messages conveyed.  Hereafter, I identify for each of D-Link's

router models the messages likely conveyed to reasonable and moderately to highly motivated

consumers.  Moreover, to assess whether these conveyed messages are believed, versus doubted,

---

[27] *C.f.*, Stephen J. Hoch & Young-Won Ha, *Consumer Learning: Advertising and the Ambiguity of Product Experience*, 13 JOURNAL OF CONSUMER RESEARCH, 221-233 (1986); Stephen J. Hoch & John Deighton, *Managing What Consumers Learn from Experience*, 53 JOURNAL OF MARKETING, 1-20 (1989).

[28] *C.f.*, Scott B. Mackenzie & Richard A. Spreng, *How Does Motivation Moderate the Impact of Central and Peripheral Processing on Brand Attitudes and Intentions?*, 18 JOURNAL OF CONSUMER RESEARCH, 519-529 (1992); Deborah J. MacInnis & Bernard J. Jaworski, *Information Processing from Advertisements:  Toward an Integrative Framework*, 53 JOURNAL OF MARKETING, 1-23 (1989); Deborah J. MacInnis, Christine Moorman & Bernard J. Jaworski, *Enhancing and Measuring Consumers' Motivation, Opportunity, and Ability to Process Brand Information from Ads*, 55 JOURNAL OF MARKETING, 32-53 (1991); RICHARD E. PETTY & JOHN T. CACIOPPO, ATTITUDES AND PERSUASION: CLASSIC AND CONTEMPORARY APPROACHES (1981).

I turn to the psychology literature that addresses matters of perception and belief formation. Gilbert has presented an especially compelling argument as encapsulated in this statement: "Findings from a multitude of research literatures converge on a single point:  People are credulous creatures who find it very easy to believe and very difficult to doubt."[29]  Believing is, in other words, less cognitively demanding than is doubting!  Empirical support is provided by psychologists Gilbert, Tafarodi, and Malone,[30] and in an advertising context by consumer researchers, Koslow and Beltramini.[31]

31.     In sum, it is my opinion that the messages conveyed to consumers who process D-Link's marcom materials are also likely believed and incorporated into their cognitive structures regarding the performance of this company's router products.  This is not to say that all consumers believe every claim made by D-Link or its router competitors, as consumer skepticism is an aspect of marketing communications and consumer behavior in general.[32] Research has revealed, however, that consumers are less skeptical of objective than subjective claims,[33] with objective claims characterizing concrete product features and subjective claims representing intangible aspects—e.g., as contained in a hypothetical claim that a router model is "fabulous."  I conclude that D-Link's security-related claims are objective and thus unlikely to generate much consumer skepticism.  The net result is that messages conveyed in D-Link's

---

[29] Daniel T. Gilbert, *How Mental Systems Believe*, 46 AMERICAN PSYCHOLOGIST, 117 (1991).

[30] Daniel T. Gilbert, Romin W. Tafarodi & Patrick S. Malone, *You Can't Not Believe Everything You Read*, 65 JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY, 221-233 (1993).

[31] Scott Koslow & Richard F. Beltramini, *Consumer Skepticism and the "Waiting Room of the Mind": Are Consumers More Likely to Believe Advertising Claims If They Are Merely Comprehended?*, 29 ADVANCES IN CONSUMER RESEARCH, 473-479 (2002).

[32] Gary T. Ford, Darlene B. Smith & John L. Swasy, *Consumer Skepticism of Advertising Claims:  Testing Hypotheses from Economics of Information*, 16 JOURNAL OF CONSUMER RESEARCH, 433-441 (1990).

[33] *Id.*

marcom materials for its router products also are likely believed and thus likely to positively influence reasonable consumers' product evaluations and purchase decisions.

**B. PX 2:  Marcom for the DIR-615 Wireless N 300 Router**

32.     The marcom material (PX 2) for the DIR-615 router consists of a two-page document.  The first page displays the product and provides three photos of representative product users captioned with claimed brand benefits.  Immediately below the three photos is detailed verbiage related to product functioning and benefits, specifically (1) Upgrade your network; (2) Easy to set up; and (3) Easy to secure.  The second page presents two additional sections of product information labeled (1) What this product does; and (2) Benefits of a wireless N 300 router.  Two thirds of the remainder of this page entails a presentation of technical specifications (standards, device interface, security, weight, warranty, etc.).

33.     In terms of total space attributed to the issue of security, I roughly estimate it at only about 10 percent.  However, in terms of the impression on reasonable consumers, I would gauge the emphasis as considerably greater, minimally at least 25 percent.  I arrive at this 25%+ estimate in view of how I believe typical, nonexpert consumers would process this marcom piece.  Specifically, it is my opinion that the technical details would escape the interest and attention of most nonexperts, who, rather, would devote their attention to comprehensible and salient issues such as those treated under the headings "easy to set up" and "easy to secure." Ease of set up would be especially attention-grabbing insofar as many consumers experience setup difficulties and frustrations with digital products.  But "easy to secure" also would capture the reader's considerable attention given the combination of consumers' familiarity with the concept of security in general and their uncertainty with exactly what "secure" means as related to routers.  I am of the opinion that the issue of security would constitute disproportionate

interest on the reader's part in comparison to the total amount of space this marcom piece devotes to the topic.

34.     Here specifically is what PX 2 for the DIR-615 N 300 router expressly claims with respect to the product's security:

- Under the subheading "*Easy to Secure*," on page 1, consumers are told explicitly that the DIR-615 "supports the latest wireless security features to help prevent unauthorized access," regardless of the source ("from over a wireless network or from the Internet"). Consumers also are promised that the DIR-615 router "utilizes dual active firewalls (SPI and NAT) to prevent potential attacks from across the Internet."  A concluding sentence claims that the DIR-615 router delivers great performance and "network security."

- In the "*Technical Specifications*" section on page 2, a SECURITY bullet point claims that this product provides "Wi-Fi Protected Access (WPA, WPA2)."  A bullet point in the section labeled "ADVANCED FIREWALL FEATURES" lists three technical features.

35.     *Analysis of Express and Implied Claims for the DIR-615 Router.*  The marcom material (PX 2) for the DIR-615 wireless N 300 router clearly conveys to potential purchasers (Box B of deception model) that not only is this router "easy to secure," but that, in fact, it *is* secure from unauthorized access.  The bullet points describing the "ADVANCED FIREWALL FEATURES" are likely understood only by technical sophisticates but which may imply to novice consumers that this router is protected from interventions by hackers who might compromise the device's security.  It is my opinion that reasonable consumers would form the belief (Box C) that this product is secure from unauthorized access.  This claim is stated expressly under the subheading labeled "*Easy to Secure*" and then buttressed elsewhere in the marcom piece.

36.     Although the semantic concepts "secure" and "security" are theoretically subject to different meanings, of which unauthorized access is just one possible interpretation, it is my opinion that in context of router marcom there are only a finite number of plausible

interpretations, or conveyed meanings (Box B), on which consumers might form beliefs regarding product performance.  Surely, possibilities such as "secure from physically breaking down" or "secure from personal injury" are implausible interpretations.  To the contrary, reasonable consumers most likely would interpret "secure" as promising that this router is protected from unauthorized access (qua hacking) and have this belief (Box C) as an important cognitive component bearing on their evaluation of this router.

37.     Is, however, this conveyed message and corresponding belief material (Box D) to a consumer's decision to seriously consider purchasing this brand and particular model?  It goes without saying that security *is* a material consideration for tech-savvy consumers who fully understand that Internet-connected devices are potentially susceptible to unauthorized access. But what about those consumers who lack technical expertise?  Router security also is a material purchase consideration for this group of consumers.  My reasoning is as follows:  These consumers probably have never considered the possibility that a router may be accessed (hacked) by intruders.  However, upon reading the marcom material for the DIR-615 they are alerted prominently to the possibility of potential attacks from across the Internet.  Hence, if security were relatively immaterial to their product evaluation prior to processing marcom for the DIR-615, upon reading it those consumers learn that they should take security into consideration when evaluating and choosing to purchase the DIR-615.  It thus is my opinion that security *is* a material purchase consideration for all consumers, technically savvy or otherwise, who have reviewed the marcom for the DIR-615.  Apparently D-Link considers security to be a material purchase consideration in view of its page-one emphasis on "Easy to Secure," which is one of three key sales points on this opening page.

### C. PX 3:  Marcom for the DIR-412 Mobile Wireless Router

38.     The marcom piece (PX 3) for the DIR-412 mobile wireless router presents on the first of two pages this model's advantages ordered as (1) Maximum portability; (2) Advanced network security; and (3) Simple to install and use.  This marcom piece's security emphasis is prominent.  Specifically, the second subheading on the front page is labeled "ADVANCED NETWORK SECURITY," and in this section it is claimed that the "DIR-412 ensures a secure Wi-Fi network" through wireless encryption.  And, importantly, the marcom content declares that all the router owner need do to ensure security is to "Simply press the WPS button to quickly establish a secure connection to new devices."  The marcom further claims that the router's firewalls "prevent potential attacks and intrusions from across the Internet."  The message conveyed (Box B) is that when setting up this router, the consumer can be assured that the DIR-412 is secure from unauthorized access.  Likewise, this claim likely is internalized by consumers in the form of a belief (Box C) that the router is protected from intrusions.

39.     As was the case with the marcom for the DIR-615 (PX 2), the total amount of space in the marcom for the DIR-412 devoted to security is relatively slight; however, as also applicable to the DIR-615's marcom, I believe the prominent emphasis on security for the DIR-412 router belies the limited coverage devoted to that topic.  In fact, one of three headers on the front page emphasizes network security (indeed, *advanced* network security) and the lead header (Maximum Portability) also treats security in its reference to "a secure, high-speed 802.11n wireless network."  Hence, I am of the opinion that the overall effect on consumers of this router's prominent security promise is substantially greater than the physical amount of coverage it receives.

40.     The marcom for the DIR-412 states (in the Advanced Network Security section) that this router utilizes firewalls "to prevent potential attacks and intrusions from across the Internet."  Via this language, the marcom material for the DIR-412 is effectively defining for consumers "security" as meaning secure from unauthorized access.

41.     Here specifically is what the web page for the DIR-412 mobile wireless router expressly asserts with respect to the product's security:

- As mentioned previously, the section labeled Advanced Network Security asserts that the DIR-412 router ensures a secure Wi-Fi network and that this can be achieved by simply pressing a WPS button.  The section also states that the firewalls "prevent potential attacks and intrusions from across the Internet."

- Under the Technical Specifications section on page two, a subsection is labeled Wireless Security, and three bullets list technical features describing wireless encryption.

42.     _Analysis of Express and Implied Claims for the DIR-412 Mobile Wireless Router._

I conclude that the marcom material for the DIR-412 mobile router conveys (Box B) to reasonable consumers that this device is secure from unauthorized access.  Reasonable consumers would have no reason to believe otherwise and thus would form the purchase-influencing belief (Box C) that this router is secure from "potential attacks and intrusions from across the Internet," which is tantamount to claiming that this router is secure from unauthorized access.  The marcom material for this router not only promises security but also offers simplicity in the claim that security can be achieved by merely pressing a button.

43.     D-Link's promise of providing security along with the push-button ease of achieving this would be, in my view, material (Box D) to reasonable consumers in determining whether this D-Link router deserves their serious purchase consideration.  The marcom's emphasis on "Advanced Network Security" in one of three headers on the first page leads me to

conclude that D-Link considers security to be a material purchase consideration.  Tech-savvy consumers certainly would be concerned about unauthorized access to a potential router purchase, and marcom for the DIR-412 likely would have persuaded them that security is enabled by this product.  Less technically sophisticated consumers would have learned from the marcom for the DIR-412 that security from unauthorized access is something they absolutely should take into consideration when making a router purchase decision.  Hence, regardless of one's technical sophistication, security would be (for tech-savvy consumers) or become (for less-savvy consumers) a material purchase consideration.

### D.  PX 4:  Marcom for the DIR-815 Wireless N Dual Band Router

44.      The marcom material (PX 4) for the DIR-815 consists of a three-page presentation.  Page one displays the router and describes several product benefits such as faster network speeds and superior home coverage.  At the top of the second page are two bolded headers.  The first, labeled "Exceptional Performance," informs prospective purchasers that with this router they can "Create a secure wireless network to share photos, files, music, printers, and more."  Readers are informed, in the section labeled "Advanced Network Security," that this router "supports the latest wireless security features to help prevent unauthorized access, be it from over a wireless network or from the Internet."  The remainder of the content on page two presents technical product features and displays a graphic showing the relative superiority of Dual Band N 600 technology compared with other D-Link models, N 150 and N 300.

45.      The third page displays the back view of the DIR-815 Wireless N Dual Band Router and provides technical specifications, one of which is labeled "Security" with a bullet point stating "Wi-Fi protected access (WPA, WPA2)."

46.     The following bullet points identify express references to security on the DIR-815's marcom:

- Under the heading "Advanced Network Security," the marcom makes strong claims that the N Dual Band Router "supports the latest wireless security features to help prevent unauthorized access, be it from over a wireless network or from the Internet," that enable users to "use the best possible encryption method," and that the router's firewalls "help prevent potential attacks from across the Internet."

- A highlighted blue-boxed section lists under Features that the product provides "Wi-Fi Protected Setup" and "Supports Secure Wireless Encryption."

- Additional content placed alongside the blue-boxed section compares three router products and indicates that all three provide (1) safe network connection with wireless encryption; and (2) push button Wi-Fi protected setup (WPS).

- A "Security" bullet point on the final page notes that this router enables "Wi-Fi Protected Access (WPA, WPA2)."

47.     _Analysis of Express and Implied Claims for DIR-815 Wireless N Dual Band Router._  In addition to various advantages claimed for this router (e.g., faster network speeds and superior home coverage), network security also receives prominent space and emphasis.  This is especially so in the section labeled "Advanced Network Security" where it is claimed that this router "supports the latest wireless security features to help prevent unauthorized access. . . ." Applying again my theoretical framing of the deception process, it is my opinion that, among other information, the marcom piece for the DIR-815 router conveys (Box B) that this router is secure from unauthorized access.  Reasonable consumers reading this information would likely believe (Box C) that this router is secure from unauthorized access.

48.     As I have opined in the instance of D-Link's two router models that I discussed previously (DIR-615 and DIR-412), I regard the emphasis on security in the marcom for the DIR-815 to be a material representation to reasonable consumers.  Upon processing the marcom

for this product, reasonable consumers would likely believe they should be concerned about purchasing a router that is secure from unauthorized access over a wireless network or from the Internet.  As before, the relatively small subset of tech-savvy consumers would know the importance of security prior to processing this marcom message, and the larger subset of technically unsophisticated consumers would now have learned from the marcom for the DIR-815 that security from unauthorized access is a critically important to well-informed product evaluation and choice—ergo, material—when making a router purchase decision.

### E.  PX 5:  Marcom for the DIR-645 Whole Home Router 1000

49.     The marcom material (PX 5) for the DIR-645 router consists of a three-page document.  Page one presents both front and back pictures of the Whole Home Router 1000 and emphasizes the SmartBeam technology that enables this router to provide coverage throughout the home.  Page two is delineated into five sections with subheadings (not numbered in the original):  (1) "Give your wireless devices the bandwith they crave.  Give them SmartBeam"; (2) "Now Playing: Everything"; (3) "Advanced home networking.  Simple setup"; (4) "128-bit security encryption"; and (5) "Get ready for the future—IPv6 equipped."  Page three presents, at the top of the page, before-and-after graphics to demonstrate the superior performance of the Amplifi wireless network vis-à-vis a traditional wireless network.  Thereafter on this page are shown product features and technical specifications.

50.     All in all, I estimate that the marcom material for the DIR-645 router devotes only about five percent of the total amount of space to security matters.  However, given that page two represents the essence of this three-page layout and that security represents about 14 percent of the space on that page, I would roughly estimate that security would command at least 20 percent of the reader's attention in view of the importance to consumers of having secure

products and in light of the fact that the last subsection on page two ("Get ready for the future—IPv6 equipped") is devoted to technical details that most nonexpert consumers would, in my opinion, simply bypass.

51.     Express references to security on the web pages for the DIR-645 router are:

- In a section labeled "128-bit Security Encryption," on page two, D-Link claims that this router "protects your network" using "the same technology used in E-commerce or online banking."  Obviously, the promise to consumers is that this router provides state-of-the-art protection.  This protection is enabled with "hassle-free plug and play installation," "Push Button Security," and "advanced Wi-Fi protected setup" that is "standard on every Amplifi device." Consumers are further informed in this section that the Whole Home Router 1000 is "not only one of the fastest routers available, its [sic] also one of the safest."

- In a section on page three labeled Features, a bullet point lists WPS (for Wi-Fi Protected Setup), and a following bullet point claims that the product "Supports Secure Wireless Encryption Using WPA or WPA2."

- The Technical Specifications section on page three claims under a SECURITY heading that the router provides "Wi-Fi Protected Access" and offers two technical means for accomplishing this.

52.     _Analysis of Express and Implied Claims for the DIR-645 Whole Home Router_ _1000._  Although the marcom material for this router places emphasis on consumer benefits other than security—particularly whole-home coverage, ability to power multiple digital devices, and simple setup—security is not neglected.  Page two conveys (Box B) to prospective purchasers that the DIR-645 router will protect one's network with the "same technology used in E-commerce or online banking," making it "**_one of the safest_**" routers.  This reference to E-commerce and online banking represents a powerful claim inasmuch as consumers would be impressed that D-Link employs the same technology as used by firms that are implied to be sophisticated protectors of their customers' sensitive data.  The claim also is thoroughly

believable in that skepticism is unlikely to be evoked among reasonable consumers who would have no compelling reason to question the claim given that the protection is based on the use of a technically sophisticated-sounding language, including "128-bit AES data security encryption." It is my opinion that all except the most cynical consumers would likely form the belief (Box C) that the Whole Home Router 1000 is "one of the safest" routers available, with safety interpreted, in context of the advertising claims, as secure from unauthorized access.  This broad claim ("one of the safest") attached to a very specific claim ("128-bit encryption") underscores that D-Link is purposefully endeavoring to convey broad claims of security from unauthorized access using specific claims about particular security features.

53.     It is my further opinion that security from unauthorized access is what D-Link is promising to prospective purchasers in PX 5.  This promise—internalized as a consumer belief— would represent an important choice criterion, or buying consideration, for many consumers, especially those who lack technical sophistication and now would realize—pursuant to reading the marcom for the DIR-645—that security from unauthorized access is something they must consider when making a router purchase decision.  As such, security is material (Box D) to prospective purchasers in evaluating whether this router is a serious purchase candidate.

## F.  PX 1:  SECURITY EVENT RESPONSE POLICY

54.     The FTC's Complaint[34] includes as an exhibit a document labeled PX 1, which is D-Link's Security Event Response Policy ("SERP").  The FTC asserts that "after highly-publicized security flaws were found to affect many of its products" D-Link "posted a Security Event Response Policy on its product support webpage."[35]  Because D-Link's SERP is

---

[34] Complaint, ¶ 20.

[35] Complaint, ¶ 20.

applicable to its IP camera products as well as to its various router models, the following analysis pertains to both product categories.  I otherwise employ the same methodology as described above in Sections III. and IV.

55.     First, the fact that D-Link includes such a policy on its web site suggests that the company is acknowledging that security issues represent a significant concern with its router and IP camera products.  Second, it is my understanding that purchasers of D-Link routers and IP cameras who may have had concerns about device vulnerability—perhaps grounded in media reports and/or based on comments from other consumers—would have had access to the SERP from a link available on D-Link's product support page.[36]  As with the marcom for routers, D-Link did not track page views of the SERP on its website.[37]  Finally, in view of the official-looking nature of this document and the density of content, it is my opinion that only highly motivated consumers would read this document carefully and form judgments based on their careful reading.  If, on the other hand, consumers are not highly motivated, their processing of this document would be superficial and thus I would have a somewhat different opinion as to the judgments they may form from their surface reading.

56.     This document when processed by highly motivated consumers would suggest to them the following:

    a.   that D-Link takes security very seriously;

    b.   that D-Link has the operational capability of dealing with security threats and problems, as indicated in the section labeled "Product Security Event Response" where it is pointed out that D-Link has expansive "security event response teams" that work with "customers, vendors, partners, consultants, security researchers,

---

[36] Complaint, ¶ 20.

[37] DLS Answers to FTC 5th Set of Interrogs. No. 24.

industry organizations, and others to identify potential security issues in our products";

c.   that, as indicated in the section labeled "Suspected Security Vulnerability Support and Reporting," D-Link encourages anyone who suspects a product security issue to bring that concern to the attention of its security event response team;

d.   that the "security event response team" monitors security requests received via e-mail on a 24/7/365 basis, and that "Reports [of security vulnerability] are typically acknowledged within 24 hours" and that "Plan of actions are typically offered with in [sic] 48 hours of a recognition and posting of a report";

e.   that consumers can readily track security vulnerability information from D-Link by accessing any of various sources (web, e-mail, RSS, Twitter, or various public relations contacts); and

f.   that, in a final section labeled "D-Link's Commitment to Product Security," that "D-Link prohibits at all times, including during product development by D-Link or its affiliates, any intentional product feature or behaviors which allow unauthorized access to the device or network, including but not limited to undocumented account credentials, covert communications channels, 'backdoors' or undocumented traffic diversion."  It is my opinion that consumers would not process this section as restricted to just *intentional* actions but rather would consider this section as a claim—in conjunction with prior information in the document—that D-Link is simply committed to maintaining the highest levels of product security.

57.   *Analysis of Express and Implied Claims for the Security Event Response Policy*.

In sum, D-Link promises with this document that it takes security very seriously, and that it has taken reasonable steps to secure its products from unauthorized access.  It moreover promises that D-Link regularly provides security vulnerability information, has mechanisms available to deal with security threats quickly and efficiently, and that consumers can easily track security issues in D-Link devices.

58.   I predicated the foregoing analysis on the supposition that primarily only highly motivated consumers would carefully read and study this document.  On the other hand, it is my opinion that less-motivated information processors—i.e., those who devote only minimal effort

to examining this document and who read it only superficially—would likely not have read the document carefully enough to form the belief that D-Link will protect their devices from unauthorized access and that support is available in the event a security problem occurs.

59.     It is reasonable for me to assume, for at least two significant reasons, that some percentage of D-Link's purchasers fall into the high-motivation category.  First, it is well-known that consumers are concerned about privacy violations when using the Internet. Consumers are worried, for example, that personal online data is insecure.[38]  A survey of more than 2,000 American consumers determined that more than 90 percent of respondents are worried about their online privacy.  Concerns about online shopping represent the greatest area of alarm.  More than one half of respondents to this survey indicated they avoid companies they believe do not protect their online data.[39]  Granted, Internet-related privacy concerns are not equivalent to D-Link's Security Event Response Policy, but there is a parallel relation in that apprehension about one's online privacy infringement is conceptually similar to fear that one's router or IP camera is susceptible to hacking, which also represents a form of privacy invasion.

60.     Second, and more directly relevant, given that consumers have learned from the general media that Internet-connected products are susceptible to outside intrusions—and perhaps some consumers have personally experienced such invasions—they would, upon being alerted by D-Link to the possibility of a security threat, be motivated to learn more about the nature of the threat and how they could secure their Internet-connected devices.  Hence, these two factors taken together suggest that some purchasers of D-Link's routers and IP cameras

---

[38] TrustArc Blog 2015, *Data Privacy is a Major Concern for Consumers* (January 28, 2015), https://www.trustarc.com/blog/2015/01/28/data-privacy-concern-consumers/.

[39] TRUSTe, *TRUSTe 2014 US Consumer Confidence Privacy Report: Consumer Opinion and Business Impact* (Jan. 27, 2014), http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

would be highly motivated to diligently process the information in D-Link's SERP. Those highly motivated, reasonable consumers would form the belief that D-Link takes security seriously and has taken reasonable steps to secure its routers and IP cameras from unauthorized access. Insofar as this belief would be instrumental in consumers' decision making with respect to D-Link's router and IP camera products, I opine that D-Link's SERP conveys impressions to consumers that are manifestly material to their subsequently evaluating and choosing D-Link's router and IP camera products.

## VI.     CONCLUSIONS

61.     My analysis leads me to conclude that reasonable consumers for four models of D-Link's router products—DIR-615, DIR-412, DIR-815, and DIR-645—were led to believe by D-Link's marcom materials that these routers are secure from unauthorized access. In all instances, the claim of security from unauthorized access creates a belief that is purchase influential and thus material to reasonable consumers who have been exposed to these marcom pieces and thus would enhance their evaluations of these router models and elevate the likelihood of their purchasing D-Link models.

62.     The specific messages conveyed and consumer beliefs formed for the four router models are as follows:

- DIR-615: The primary claims conveyed to potential purchasers of this model and the likely beliefs formed are that this router is easy to set up and secure from unauthorized access, both of which are material to product evaluation and purchase consideration.

- DIR-412: The marcom material for this router conveys to consumers that this model is secure from unauthorized access. This security is claimed to be achieved

with the mere pushing of a button.  These claims are likely internalized by

consumers as believable product features and would be material considerations in

their product evaluations.

- DIR-815:  The marcom for this router model asserts that the DIR-815 has the
  latest wireless security features to help prevent unauthorized access.  Prospective
  purchasers would have little reason to doubt this claim and thus would internalize
  it as a product-related belief that would materially influence their assessment of
  this model as a viable purchase candidate.

- DIR-645:  The most salient and influential message conveyed by the marcom for
  this router model is that it protects the owner's network security by using the
  same technology as employed by E-commerce and online banking companies,
  making it "one of the safest" routers available.  Reasonable consumers would
  believe, upon reading this powerful claim, that D-Link is promising that this
  router is secure from unauthorized access.  Prospective purchasers would be
  persuaded by such a claim, internalize it as a belief as to how the DIR-645 would
  perform, and be materially influenced to consider this model a serious purchase
  candidate.

63.     My analysis also leads me to conclude that reasonable consumers were led to

believe by D-Link's Security Event Response Policy that D-Link takes security very seriously;

that it is committed to the security of its routers and IP cameras "at all times," including during

product development; and that it prohibits features in its products that allow unauthorized access.

Motivated consumers who read the policy carefully would thus believe that D-Link has taken

reasonable steps to secure its routers and IP cameras from unauthorized access.  This internalized

belief would materially influence their decision to purchase D-Link branded routers and IP cameras.

## VII.    REFERENCES

Bart J. Bronnenberg, Jun B. Kim & Carl F. Mela, *Zooming in on Choice: How Do Consumers Search for Cameras Online?*, 35/5 MARKETING SCIENCE, 693 (2016).

Gary T. Ford, Darlene B. Smith & John L. Swasy, *Consumer Skepticism of Advertising Claims: Testing Hypotheses from Economics of Information*, 16 JOURNAL OF CONSUMER RESEARCH, 433 (1990).

Daniel T. Gilbert, *How Mental Systems Believe*, 46 AMERICAN PSYCHOLOGIST, 107 (1991).

Daniel T. Gilbert, Romin W. Tafarodi & Patrick S. Malone, *You Can't Not Believe Everything You Read*, 65 JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY, 221 (1993).

Stephen J. Hoch & Young-Won Ha, *Consumer Learning: Advertising and the Ambiguity of Product Experience*, 13 JOURNAL OF CONSUMER RESEARCH, 221 (1986).

Stephen J. Hoch & John Deighton, *Managing What Consumers Learn from Experience,* 53 JOURNAL OF MARKETING, 1 (1989).

Scott Koslow & Richard F. Beltramini, *Consumer Skepticism and the "Waiting Room of the Mind": Are Consumers More Likely to Believe Advertising Claims If They Are Merely Comprehended?*, 29 ADVANCES IN CONSUMER RESEARCH, 473 (2002).

Jeff Langenderfer & Terence A. Shimp, *Expert Opinion Testimony in Federal Trade Commission Enforcement Proceedings: Theoretical Versus Empirical Evidence, in* 8 Marketing and Public Policy Conference Proceedings, 41 (Alan Andreasen, Alex Simonson & N. Craig Smith eds., 1998).

Jeff Langenderfer & Terence A. Shimp, *Consumer Vulnerability to Scams, Swindles, and Fraud: A New Theory of Visceral Influence on Persuasion*, 18 PSYCHOLOGY AND MARKETING, 763 (2001).

Deborah J. MacInnis & Bernard J. Jaworski, *Information Processing from Advertisements: Toward an Integrative Framework*, 53 JOURNAL OF MARKETING, 1 (1989).

Deborah J. MacInnis, Christine Moorman & Bernard J. Jaworski, *Enhancing and Measuring Consumers' Motivation, Opportunity, and Ability to Process Brand Information from Ads*, 55 JOURNAL OF MARKETING, 32 (1991).

Scott B. Mackenzie & Richard A. Spreng, *How Does Motivation Moderate the Impact of Central and Peripheral Processing on Brand Attitudes and Intentions?*, 18 JOURNAL OF CONSUMER RESEARCH, 519 (1992).

RICHARD E. PETTY & JOHN T. CACIOPPO, ATTITUDES AND PERSUASION: CLASSIC AND CONTEMPORARY APPROACHES (1981).

JEF RICHARDS, DECEPTIVE ADVERTISING: BEHAVIORAL STUDY OF A LEGAL CONCEPT (2013).

Terence A. Shimp, *Do Incomplete Comparisons Mislead?* 18 JOURNAL OF ADVERTISING RESEARCH, 21 (1978).

Terence A. Shimp, *Social-Psychological (Mis)Representations in Television Advertising*, 13 JOURNAL OF CONSUMER AFFAIRS, 28 (1979).

Terence A. Shimp & Ivan L. Preston, *Deceptive and Nondeceptive Consequences of Evaluative Advertising*, 45 JOURNAL OF MARKETING, 22 (1981).

Terence A. Shimp & J. Thomas Yokum, *Advertising Inputs and Psycho-physical Judgments in Vending-Machine Retailing*, 58 JOURNAL OF RETAILING, 95 (1981).

Terence A. Shimp, *Evaluative Verbal Content and Deception in Advertising: A Review and Critical Analysis*, *in* INFORMATION PROCESSING RESEARCH IN ADVERTISING, 195 (Richard J. Harris ed., 1983).

TERENCE A. SHIMP & J. CRAIG ANDREWS, ADVERTISING, PROMOTIONS, AND OTHER ASPECTS OF INTEGRATED MARKETING COMMUNICATIONS (9th ed. 2013).

TrustArc Blog 2015, *Data Privacy is a Major Concern for Consumers* (January 28, 2015), https://www.trustarc.com/blog/2015/01/28/data-privacy-concern-consumers/.

TRUSTe, *TRUSTe 2014 US Consumer Confidence Privacy Report: Consumer Opinion and Business Impact* (Jan. 27, 2014), http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

Xin Wang, Neil T. Bendle, Feng Mai & June Cotte, *The Journal of Consumer Research at 40: A Historical Analysis*, 42 JOURNAL OF CONSUMER RESEARCH, 5 (2015).

## VIII.   APPENDIX:  SHIMP PUBLICATIONS AND CASE PARTICIPATION

### A.  Publications (Past 10 Years)

J. Craig Andrews & Terence A. Shimp, Advertising, Promotions, and Other Aspects of Integrated Marketing Communications (10th ed. 2018).

Laura Smarandescu & Terence A. Shimp, *Drink Coca-Cola, Eat Popcorn, Choose Powerade: The Limits of Subliminal Persuasion*, Marketing Letters 26, 715 (2015.

Terence A. Shimp & J. Craig Andrews, Advertising, Promotions, and Other Aspects of Integrated Marketing Communications (9th ed. 2013).

Terence A. Shimp, Advertising, Promotions, and Other Aspects of Integrated Marketing Communications (8th ed. 2010).

### B.  Prior Expert Testimony (Past 4 Years)

Festiva Resorts, Inc.  –  Served as an expert witness in a case filed by the State of Maine's

Attorney General's Office.  Submitted a final report and was deposed in Portland, Maine in

2016.

### C.  Materials Considered

Docket Entries:

Complaint for Permanent Injunction and Equitable Relief (Dkt. No. 1) and attached Exhibits (Dkt. No. 1-1).

Order re Motion to Dismiss (Dkt. No. 90).

Discovery Responses:

DLS First Amended Answers to FTC 3rd Set of Interrogs.

DLS Answers to FTC 5th Set of Interrogs.

DLS Answers to FTC 6th Set of Interrogs.

Other D-Link Marcom:

D-Link DCS-2310L Cloud Camera 2300 Datasheet (Rev. A), available at:
https://support.dlink.com/productinfo.aspx?m=DCS-2310L.

Websites:

D-Link DIR-615 Wireless-N Router, 4-Port product page, available at
https://www.amazon.com/D-Link-DIR-615-Wireless-N-Router-4-Port/dp/B000QD7B6W (last
accessed June 29, 2018).

Best Buy, *Network Buying Guide*, available at https://www.bestbuy.com/site/buying-
guides/networking-buying-guide/pcmcat387100050008.c?id=pcmcat387100050008 (last
accessed June 29, 2018).

D-Link DIR-815 300Mbps Wireless-N Dual-Band 4-Port Router w/Firewall product page,
available at https://www.walmart.com/ip/D-LINK-Dual-Band-Router-DIR-815/15421413 (last
accessed June 29, 2018).

c|net, *D-Link DIR-615 Wireless N Router review*, available at https://www.cnet.com/products/d-
link-dir-615-wireless-n-router/review/ (last accessed June 29, 2018).

Top Ten Reviews, *Best Premium Wireless Routers*, available at
http://www.toptenreviews.com/computers/networking/best-premium-wireless-routers/ (last
accessed June 29, 2018).