# EXHIBIT C

# EXPERT REBUTTAL REPORT OF HAL PORET IN MATTER OF FEDERAL TRADE COMMISSION V. D-LINK SYSTEMS, INC.

REPORT PREPARED FOR:
Cause of Action Institute; and
Law Office of S.J. Christine Yang

PREPARED BY:
Hal Poret
142 Hunter Ave
Sleepy Hollow, NY 10591

July 2018

## BACKGROUND AND PURPOSE

Cause of Action Institute, counsel for D-Link Systems, Inc. (DLS), previously retained me to design and conduct surveys to test the extent to which, if at all, alleged misrepresentations pertaining to security of DLS wireless routers[1] are material to purchase decisions – i.e., whether such representations influence consumers' likelihood of purchasing the routers. As detailed in my opening Expert Report, the surveys showed that the allegedly misleading representations pertaining to security are not material to purchase decisions. I have now been asked to review the Expert Reports of Dr. Kent Van Liere and Professor Terence Shimp. This Rebuttal Report contains my opinions regarding the Van Liere Report and the survey discussed therein. Because Professor Shimp's opinions are not based on any empirical research that could be analyzed, I generally am not offering opinions regarding the Shimp Report. My sole comment on the Shimp Report is that my own survey empirically tested some of the issues Professor Shimp opines on – namely, whether certain representations pertaining to security are material to purchase decisions – and the results of my research establish the lack of merit of Professor Shimp's unsupported opinions. Certain aspects of Professor Shimp's Report are also useful to explain why consumers were not influenced by the security-related content in the DLS wireless router advertising I tested.

In connection with preparing this Rebuttal Report I reviewed the materials cited in my opening Expert Report, the Van Liere and Shimp Reports and supporting exhibits, and DCS-2310L_Bates No. DLS0055084 and DLS 0055096. My qualifications are detailed in my opening Expert Report and an updated copy of my CV is included here as Appendix A. My continuing work in connection with this matter is being billed at my hourly rate of $625. Payment is not contingent on the outcome of the litigation.

---

[1] The D-Link wireless routers at issue are shown in Exhibits PX 2, PX 3, PX 4, and PX 5 of the Complaint. My survey specifically tested advertising for the D-Link N 300 (DIR-615) wireless router (Exhibit PX 2) and the D-Link N 600 Dual Band (DIR-815) wireless router (Exhibit PX 4) to represent the DLS products.

CONFIDENTIAL

The following is a summary of my key opinions regarding the Van Liere Survey and Report.

First, the Van Liere Report is striking in its failure to include surveys pertaining to any of the DLS wireless routers, or in fact any DLS advertising at all. The sole topic that Dr. Van Liere purported to test concerns the portion of the process for setting up a DLS IP camera where the consumer creates a password to access the device, which naturally occurs <u>after</u> the decision to purchase the product has already been made. Dr. Van Liere did not survey any DLS advertising of any kind that could be seen by consumers during the process of deciding whether to purchase any DLS product. Nor did Dr. Van Liere's survey address DLS wireless routers in any respect. Accordingly, the Van Liere Survey entirely fails to address any issue pertaining to the DLS wireless routers at issue or any issue pertaining to any DLS advertising that consumers could have been misled or influenced by in the course of making their purchase decision.

Even with respect to the lone issue Dr. Van Liere attempted to study, the survey entirely fails to test whether any mistaken consumer beliefs were <u>caused by</u> any DLS representations or whether any purchase decisions were <u>influenced by</u> any DLS representations. To the contrary, even putting aside the additional flaws in the survey (discussed below), the most the survey design could be capable of testing is: (1) whether consumers believe that only one password will allow access to the IP camera, regardless of whether DLS representations played any role in <u>causing</u> such a belief; and (2) whether explicitly informing consumers that additional passwords could allow access to the IP camera would influence them, regardless of whether any DLS representations had misled them in the first place.

Even as to those latter topics, the survey is flawed and unreliable for the following reasons: (1) the survey universe included those who had purchased an IP camera any

CONFIDENTIAL

time in the past 10 years, a period that is far too long to reliably assure that survey respondents have the mindset of a purchaser, and that significantly exceeds the class period for most of the products at issue; (2) the survey questions asking about influence on the purchase decision were artificial and nonsensical given that the survey simulated a situation where respondents had already purchased the product and were in the midst of setting it up, and the experience the survey simulated could not have influenced a purchase that had already occurred; (3) the survey unnecessarily and improperly inserted the word "unauthorized" when asking about access to the camera, an inflammatory word that is biased to prompt a negative response; and (4) the survey failed to show respondents the End User License Agreement, which all consumers would have needed to accept prior to reaching the portion of the setup process tested in the survey, and which contains information relevant to the security of the product.

These and other flaws are discussed in more detail below.

**<u>BRIEF OVERVIEW OF VAN LIERE SURVEY</u>**

The following is a very brief overview of the Van Liere Survey. Additional detail is contained in the Van Liere Report and is discussed below.

The Van Liere Survey was an online survey using the online panel Critical Mix.[2] The survey consisted of individuals who have purchased a Wi-Fi home IP security camera in the past 10 years (since 2008).

In the main survey, all respondents were shown a portion of the on-screen set-up process for an IP camera. The specific portion shown was a simulation of the screen on

---

[2] My survey was also an online survey using an online panel.

CONFIDENTIAL

which a consumer is asked to create a password.  Specifically, respondents were shown the following screen from a DLS setup wizard:



Respondents in a Test Group were shown only this screen.

Respondents in a Control Group were also shown the following additional screen containing a pop-up disclaimer indicating that there may be other passwords left by the manufacturer that are able to access the device:

CONFIDENTIAL



All respondents in both groups were then asked the following question:

After finishing the set up do you think that...?

○ There are passwords OTHER than the one you just created that will allow access to this camera

○ The ONLY password that will allow access to this camera is the one you just created

○ Don't know / No opinion

Respondents who answered "ONLY password" or "don't know" were later asked:

CONFIDENTIAL

You mentioned you think the ONLY password that will allow access to this camera is the one you just created or you don't know or have no opinion.

Assume you learned there may be ADDITIONAL current passwords that will allow access to this camera. These additional passwords may allow unauthorized users to access your camera. Would this information...?

○ Not influence your decision to purchase this security camera
○ Influence your decision to purchase this security camera
○ Don't know / No opinion

Respondents who answered that there are "OTHER" passwords were instead asked:

You mentioned you think there are passwords OTHER than the one you just created that will allow access to this camera. These additional passwords may allow unauthorized users to access your camera. Would this information...?

○ Influence your decision to purchase this security camera
○ Not influence your decision to purchase this security camera
○ Don't know / No opinion

All respondents who answered that the information that additional passwords "may allow unauthorized users to access your camera" would influence their decision were subsequently asked whether the information would make them more or less likely to purchase the camera (or neither).

The Van Liere Report indicates that 74% of Test Group respondents answered that the password they create is the ONLY password that will allow access to the camera, as compared to 30% in the Control Group where the disclaimer about other passwords was provided. Based on this result, Dr. Van Liere opines that a net 43 percent (the difference between the two groups due to rounding) are misled into believing that the only password that will allow access to the camera was the one they created.

CONFIDENTIAL

The Van Liere Report also indicates that 46% of Test Group respondents answered that the information that additional passwords may allow unauthorized access to their camera would make them less likely to purchase the product, as compare to 16% in the Control Group. Based on this result, Dr. Van Liere opines that a net 30% of respondents would be less likely to purchase the product due to that information.

**DETAILED OPINIONS REGARDING VAN LIERE SURVEY AND REPORT**

I. **The Van Liere Survey did not test any DLS wireless routers or any DLS advertising that consumers would see in the course of making a purchase decision.**

A critical initial observation regarding the Van Liere Report is that it does not include any surveys pertaining to any of the DLS wireless routers at issue, and does not include any surveys pertaining to any DLS advertising that consumers would see in the course of making a purchase decision. The FTC Complaint alleges that DLS wireless routers were misleadingly advertised. Since Dr. Van Liere disclosed no surveys pertaining to DLS wireless routers, his report has no bearing on the claims regarding wireless routers. The FTC Complaint also alleges that DLS advertising content that could potentially be seen by consumers at the point of sale misled and influenced consumers. Since Dr. Van Liere disclosed no surveys pertaining to DLS web pages, brochures, or any other materials that consumers could have reviewed in deciding whether to purchase a DLS product, his report has no bearing on the claims regarding such advertising materials. At most, the Van Liere Report attempts to address one portion of the set-up process for an IP camera product.

CONFIDENTIAL

## II. The Van Liere Survey did not test whether any mistaken belief relating to password security was <u>caused by</u> any DLS representations.

The sole survey disclosed in the Van Liere Report asks whether a password created by the user is the ONLY password that will allow access to the camera or whether there could be OTHER passwords that will allow access to the camera. Roughly 74% of respondents in the Test Group answered that they believe the password they create during the setup is the ONLY password that will allow access to the camera. As Dr. Van Liere concedes, it is necessary in a survey such as his to determine whether such answers are <u>caused by</u> the effects of "advertising or assurances" and to rule out the possibility that the answers merely reflect "background noise," which includes pre-existing beliefs or assumptions that consumers bring into the survey.[3] Dr. Van Liere claims to have accomplished this by using a Control Group in which a disclaimer was added stating that there may be other passwords left by the manufacturer that are able to access the device. This Control Group, however, entirely failed to accomplish the goal of ruling out background noise as the cause of the results, and thus renders the survey incapable of testing whether any mistaken belief is <u>caused by</u> any DLS representations.

In order to appreciate the flaw in the Van Liere Survey design, it is important to consider the critical distinction between a pre-existing belief or assumption, on the one hand, and a belief <u>caused by</u> an advertisement, on the other hand. The fact that a respondent expresses a belief after viewing a stimulus does not prove that the stimulus caused the respondent to form that belief. One possibility is that viewing the stimulus caused the respondent to form the belief. The other possibility, however, is that the stimulus has <u>not</u> caused the respondent to form the belief, but that the respondent already had the belief prior to the survey or simply used their own judgment to express

---

[3] Van Liere Report, Paragraph 31.

CONFIDENTIAL

a belief upon hearing a question, complete unimpacted by anything the stimulus said or showed.

The Van Liere Survey contains data that conclusively demonstrate that a high percentage of respondents can report an "incorrect" belief about a DLS IP camera for reasons that have nothing to do with anything communicated by DLS.  In addition to the questions relating to the password, the Van Liere Survey also asked questions on other topics, including the following one (Q.3):

After the camera has been online and recording a data feed, do you think...?

○  The camera feed data from this camera is NOT stored in the cloud.

○  The camera feed data from this camera IS stored in the cloud.

○  Don't know / No opinion

In response to this question, 78% of respondents (388 of 500) answered that the camera feed data from the camera IS stored in the cloud.  It is my understanding that this is false.  Since the materials shown in the Van Liere Survey regarding the set-up process do not in any way address the topic of data being stored in the cloud, it is clear that the 78% rate of mistakenly answering that camera feed data is stored in the cloud is completely the product of respondents' assumptions, pre-existing beliefs, or guesses.  This clearly demonstrates the acute risk that the comparable 74% rate of answering that only the password created during the setup process can access the camera is similarly the product of assumptions, pre-existing beliefs and guesses, rather than anything communicated by any DLS advertising materials.

The following hypothetical is useful in understanding how the Van Liere Survey design entirely failed to measure whether any beliefs expressed in the survey were caused by any DLS representations.  Imagine that a group of consumers are shown no advertising

CONFIDENTIAL

at all, but are simply told that there is a new social media app. They are told nothing about security or anything relating to security. They are then asked a question comparable to Dr. Van Liere's question – i.e., if they sign up for the mobile app and create a password for their account, do they think that will be the only password that can access the account or that other passwords may allow access to the account. It could easily be the case that 74% of consumers or more would answer that the password they create would be the ONLY password that can access the account, simply because they are making an assumption or because they have a pre-existing belief that a social media account will only allow one password to access it. In this hypothetical, the high rate of consumers answering that only one password can access the account <u>cannot</u> be caused by any misleading representations from the social media company, because the consumers have not even seen any representations at all. The high rate of opinion that only one password will allow access could only be based purely on pre-existing beliefs and assumptions.

For the second part of the hypothetical, imagine that a "Control Group" is given the same introduction about the new social media app, but is also read a "disclaimer" stating that, in addition to a password they create, there may be other passwords that can access the account. It would not be at all surprising if the provision of this explicit disclaimer regarding the existence of other passwords significantly reduced the percentage of consumers who thereafter answer that ONLY one password can access the account. The fact that this disclaimer <u>reduced</u> the percentage of Control Group consumers who believe that only one password can access the social media account would not prove that the higher rate in the Test Group was <u>caused by advertising representations</u>. To the contrary, it would merely prove that an explicit disclaimer that tells people that their existing beliefs or assumptions are incorrect can dispel such beliefs or assumptions.

CONFIDENTIAL

For this precise reason, the Van Liere Survey entirely fails to prove that any mistaken belief about there being only one password that can access a DLS IP camera is <u>caused by</u> any DLS representations ("advertising or assurances" in Dr. Van Liere's wording). The Test Group result was that 74% believe the password they create is the ONLY one that can access the camera. This, however, could be entirely the product of pre-existing beliefs or assumptions that have nothing to do with the DLS setup screen they were shown in the survey. In other words, some consumers may simply assume that any password for any device or account is the only one that will work, regardless of whether any advertising materials said or implied this to them. Accordingly, prior to consulting the Control Group, it is possible that the entire 74% result reflects pre-existing beliefs and assumptions, and that there is nothing about the DLS set-up screen or representations that caused a mistaken belief.

It is then up to the Control Group to assure us that a substantial portion of the 74% result is <u>caused by</u> DLS representations. Dr. Van Liere's Control Group does not do so. It merely shows that adding an explicit disclaimer stating that more than one password may access the camera reduces the percentage of respondents who believe that only one password can. This may simply mean that the disclaimer is explicitly dispelling a pre-existing belief or assumption, but does not at all prove that the higher result in the Test Group is <u>caused by</u> any DLS representations. The 43% "net" difference between the Test and Control Group is not proven to represent the percentage who were misled by any DLS representations. It could just as easily represent the percentage who answered that only one password can access the camera based on pre-existing beliefs or assumptions but could have that belief changed by a disclaimer that explicitly tells them otherwise.[4]

---

[4] An even simpler hypothetical makes this equally obvious. Imagine a Test Group of respondents is shown a banana asked if they believe bananas are high in iron or low in iron. Imagine a Control Group respondent is asked the same thing but is first shown a card that says "a banana does not have enough iron to meet your daily needs." The percentage of

CONFIDENTIAL

Another way to easily see how the Van Liere Survey design fails to establish that any rate of mistaken belief is <u>caused by</u> any DLS representations is to consider the alternative design that could have done so.  If the Test Group had viewed the DLS set-up screen and the Control Group had viewed an alternative version of that screen on which any allegedly misleading content had been <u>removed</u>, the resulting "net" difference between the two groups would have properly measured a rate of mistaken belief that is caused by the allegedly misleading content.  For instance, if the FTC believed that the phrase "secure your camera" in the portion of the set-up process where respondents are instructed to select a password was misleading, the survey could have used a Control Group where this phrase was removed.  If the removal of the phrase "secure your camera" from the Control Group stimulus had caused the result to drop from 74% to 30%, this would have proven (assuming no other flaws in the survey) that the language "secure your camera" must be the <u>cause</u> of the higher result, as that would have been the only difference between the two groups.

On the other hand, where the <u>disclaimer</u> is the only difference between the two groups, all we have learned from the survey is the obvious fact that telling one group that there may be additional passwords reduces the percentage of consumers who think only one password will access the camera.  This tells us nothing, however, about <u>why</u> many consumers thought only one password will work in the first place, and does nothing to establish that such a belief was caused by DLS representations as opposed to pre-existing beliefs or assumptions.

---

respondents in the "Control Group" who have been shown an explicit disclaimer may have a substantially <u>lower</u> rate of answering that bananas are high in iron.  This would not, however, mean that the "net" difference between the Test and Control Group represents any <u>deception</u> caused by any <u>advertising</u>.  It would simply reflect the obvious fact that you can reduce the percentage of people who believe something by explicitly telling them otherwise, regardless of what had caused them to form the belief in the first place.

CONFIDENTIAL

### III.   The Van Liere Survey did not test the materiality of any DLS representations.

For the same reasons detailed in the preceding section, the Van Liere Survey entirely failed to test whether any <u>DLS representations</u> are material.  Again, in considering materiality, there is a distinction between <u>advertising content</u> and "information" that may have nothing to do with advertising.  Dr. Van Liere provided all respondents with "information" indicating that there may be other passwords that can access the camera and reports that 46% of Test Group respondents (or a net of 30%) answered that this would make them less likely to purchase the camera.  This result has no bearing on any issue relating to alleged DLS misrepresentations.  At most, it could show that the provision of information that is perceived as negative would reduce likelihood of purchase.  It in no way shows that any DLS advertising content influences respondents' likelihood of purchase.  Again, it may simply be that respondents have pre-existing beliefs or assumptions about how passwords work that have nothing to do with DLS advertising, and that additional "information" regarding the existence of other passwords reduced the reported likelihood of purchase by dispelling pre-existing beliefs, not by correcting any deception caused by the advertising.  This means that the survey provides no showing that any DLS <u>advertising</u> is material.[5]  Even prior to considering any of the additional flaws discussed below, the Van Liere Survey design could, at most, test whether the "information" that multiple passwords could access the camera could influence likelihood of purchase, regardless of whether any DLS advertising content influenced any beliefs or purchase decisions.

### IV.   Additional flaws undermine the reliability of the Van Liere Survey.

---

[5] Dr. Van Liere appears to concede this in concluding that the "information" that there may be additional passwords is material, rather than concluding that any DLS advertising content or representations are material.  Van Liere Report, Pararaph 48.

CONFIDENTIAL

As detailed above, the Van Liere Survey only attempted to survey a single issue relating to IP camera passwords, and did not use a design that was capable of testing whether any DLS advertising or representations are the cause of any mistaken consumer belief or purchase decisions relating to that issue. Additional flaws in the survey further undermine the reliability of the survey even as it pertains to the lone issue the survey design could have tested.

### A. The survey universe was improperly broad.

The purpose of the requirement that a survey target a proper universe is that in order for the survey results to reflect the likely perceptions or behaviors of actual consumers, those taking the survey must have a <u>state of mind</u> that is representative of purchasers of the products at issue.[6] In most cases testing perception of advertising, this means surveying those who have relatively <u>recent</u> experience shopping for or purchasing the type of product at issue or who are considering purchasing the type of product at issue in the reasonably foreseeable future. Both recent purchasers and prospective purchasers have a mindset that is reflective of the population of purchasers at issue, because they are not far removed from the process of considering a purchase. For instance, in my own survey testing DLS wireless router advertising, respondents were included if they have purchased a wireless router in the past 12 months or are likely to purchase a wireless router in the coming 12 months. Such individuals have a mindset that is consistent with the relevant population at issue, as they have relatively current knowledge and interest relating to wireless routers due to their recent purchase experience or current purchase interest.

The Van Liere Survey, on the other hand, included anyone who has purchased an IP camera in the past 10 years. A 10-year period is far too expansive to ensure that the

---

[6] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* Section 32:159.

CONFIDENTIAL

survey respondents had a mindset that would reflect the perceptions of relevant purchasers. A respondent in the Van Liere Survey may have last purchased and set up an IP camera upwards of 5 or 10 years ago. This may have been the last time the respondent has shopped for, purchased, or set up an IP camera, or given any thought at all to any issues relating to selection or set up of an IP camera. In such a case, the survey's simulation of the set-up process for an IP camera and questions regarding their expectations about the number of passwords or about impact on purchase would have little relevance or realism to that respondent. In the case of respondents who have not purchased or set up an IP camera for many years, their answers to the survey questions about passwords are just as likely to reflect whatever experiences or assumptions they have had with creating passwords for other devices and accounts during more recent years (such as on mobile phones, tablets, or email or social media accounts) as to reflect the perceptions of actual IP camera purchasers.

To the extent that the 10-year time period was used because the products at issue go back as far as 2008, it is important to note that this is not a proper basis for a survey of the type that Dr. Van Liere conducted. The survey was not questioning respondents about underlined actual past purchases of the relevant DLS products, which would of course require including respondents who had made purchases during the relevant time periods. Rather, the survey was simulating a hypothetical scenario in which a current purchaser sets up their camera. For such a survey to be realistic and produce useful insights, it must include respondents for whom such a simulation is currently relevant – i.e., a recent or prospective purchaser – not individuals who made a purchase so long ago that the survey's simulation has no relevance or interest to them. It is also worth noting that the 10-year period largely exceeds the relevant time period for most of the relevant DLS products, which I understand mostly did not come on the market until 2011 or later.

CONFIDENTIAL

**B.   The questions about influence on purchase decisions were artificial and nonsensical.**

One of Dr. Van Liere's findings is that information that there may be additional passwords that can access the camera would influence respondents' purchase decisions. For instance, the following is one of the questions:

> You mentioned you think there are passwords OTHER than the one you just created that will allow access to this camera. These additional passwords may allow unauthorized users to access your camera. Would this information...?
>
> ○  Influence your decision to purchase this security camera
> ○  Not influence your decision to purchase this security camera
> ○  Don't know / No opinion

As shown above, this question invites respondents to answer whether the information would influence their "decision to purchase this security camera."  The survey simulation, however, presumes that respondents have already purchased the camera. The survey simulates the process of selecting a password during the setup process, which means the decision to purchase the camera has already been made.  The subsequent questions asking whether information regarding additional passwords would influence their decision to purchase "this security camera" is artificial and nonsensical.  In the scenario being surveyed, the consumer has already purchased the camera and is in the midst of setting it up, and the presence or absence of additional information about passwords cannot influence a decision about whether to purchase the camera.  The results to the question are, therefore, arbitrary and do not reflect anything about a scenario in which a respondent is considering making a purchase (which the survey did not test).

**C.  The questions regarding purchase influence used biased wording.**

CONFIDENTIAL

The Van Liere results regarding the purported influence of information regarding additional passwords are also unreliable due to the use of biased question wording. The purpose of the question was to assess whether information that there are passwords other than the one created by the user would influence a purchase decision. The following shows the language of the key question:

> You mentioned you think there are passwords OTHER than the one you just created that will allow access to this camera. These additional passwords may allow unauthorized users to access your camera. Would this information...?
>
> ○ Influence your decision to purchase this security camera
> ○ Not influence your decision to purchase this security camera
> ○ Don't know / No opinion

As this shows, Dr. Van Liere used the word "unauthorized" in stating that the passwords may allow <u>unauthorized</u> users to access the camera. The inclusion of the word "unauthorized" is inflammatory and biases the results by explicitly suggesting a negative consequence. The survey could have simply asked whether the existence of additional passwords that may allow access to the camera would influence their decision. This would be objective and neutral wording that does not merely suggest a negative consequence, but rather leaves open other possibilities, such as that the existence of other passwords could be useful in customer service accessing the camera in an <u>authorized</u> manner to provide assistance. Explicitly referring to the threat of <u>unauthorized</u> use is biased toward suggesting a concerning, negative scenario that would tend to encourage a negative response by survey respondents.

It is clear from the wording Dr. Van Liere used on previous screens of the survey that it was unnecessary to use an inflammatory word like "unauthorized" to accurately depict the scenario the survey was intended to test. The following shows the language that the survey used to provide the disclaimer regarding additional passwords.

CONFIDENTIAL



As shown above, this disclaimer does not mention <u>unauthorized</u> access. It simply states in a neutral manner that there may be other passwords that are able to access the device, leaving open the possibility that such passwords could be used in an <u>authorized</u> or otherwise positive manner (such as for the consumer to get assistance from the manufacturer). There was no need to refer to "unauthorized" access in questioning respondents about the potential influence of additional passwords. The impact of using the word "unauthorized" is that it improperly provokes a concerned, negative reaction, which undermines the reliability of the results.

**D. The Van Liere Survey did not show respondents preceding portions of the setup process that consumers could review to learn more about the security of the device.**

CONFIDENTIAL

It is further worth noting that all actual consumers of the DLS IP camera would have been required to accept the terms and conditions of the End User License Agreement prior to reaching the portion of the setup process simulated in the survey. The End User License Agreement contains the following provisions:



CONFIDENTIAL



As shown above, Provision 5 includes significant content relating to security, including explicitly stating that some products and services are not encrypted, that information may be intercepted, and that D-Link cannot and does not guarantee that the product or software is completely secure. Provision 6 further emphasizes evolving threats to network security and states that D-Link does not warrant that the product, software, or any system or network is free of vulnerability to intrusion, attack or capturing of data. Any consumer who cares about the issue of security would have had the opportunity to review these portions of the End User License Agreement, and such content may impact their understanding of any security-related risks inherent to the device. The Van Liere Survey did not show these provisions. Accordingly, it deprived respondents of the ability to learn more about security risks that real consumers would have, and may have overstated the extent to which real consumers who care about security would have had certain beliefs about the security of the device.

CONFIDENTIAL

## OPINION REGARDING SHIMP REPORT

As noted above, I am generally not providing an analysis of the Shimp Report, because Professor Shimp's opinions are not based on any empirical research that can be analyzed. My lone opinion regarding the Shimp Report is that Professor Shimp opines (without empirical research or other objective support) on certain topics that were empirically tested in my own surveys. Specifically, Professor Shimp opines that the representations related to security in the DLS advertising materials for wireless routers (such as those shown in Exhibits PX 2 through PX 5) would influence purchase decisions. Since my own surveys empirically tested this issue and found that interest levels in purchasing the DLS products did not change when the security-related content was removed from the advertising, it is my opinion that my own surveys prove that Professor Shimp's opinions regarding the impact of DLS wireless router advertising are invalid. It is my opinion that my surveys' testing of 800 recent and prospective consumers of wireless routers through a scientifically controlled experiment provides superior and more reliable evidence of the impact on consumers (or lack thereof) than Professor Shimp opining on the topic based purely on his own review of the materials without any study of consumer perception.

One additional observation about the Shimp Report is that Professor Shimp actually provides the most likely explanation for <u>why</u> consumers would <u>not</u> be substantially influenced by the DLS advertising content related to security, which is the result shown by my survey. One might initially be prone to assume that "security" would generally be an important topic to consumers, assuming they have any reason to think about it. Professor Shimp, however, provides the key insight as to why most consumers were likely not thinking about the issue of security when shopping for a wireless router during the relevant period and why, therefore, they might gloss over and be uninfluenced by advertising language pertaining to security. As Professor Shimp observes in Paragraph 37 of his report, consumers who lack technical expertise (which

CONFIDENTIAL

is the vast majority of consumers) "probably have never considered the possibility that a router may be accessed (hacked) by intruders."[7]  Since, as Professor Shimp observes, most consumers of routers may be completely unaware of any security issue related to wireless routers, their entire focus in shopping for a router may be on aspects that they are familiar with, such as how fast their wi-fi will be or how easy or difficulty the router is to set up.  For this reason, they may examining products with the specific goal of searching for the type of information they already believe is relevant (such as a stronger signal, larger range, faster speeds or easy installation) and may gloss over the mention of other topics that they perceive to be technical in nature and that they may not believe differ from router to router.  For instance, consumers may be well aware that some routers have stronger signals or a broader coverage area and may be specifically looking to compare which router is better with respect to such issues.  On the other hand, consumers may be entirely unaware that security is a potential issue with routers, or to the extent they are aware of security as an issue, they may assume that various router products use comparable security measures, and it may therefore not occur to consumers to compare router advertising based on statements about security.

Professor Shimp has no basis for opining that those who were previously unaware of security as an issue will suddenly take an active interest in security upon seeing the word "secure" or other terms relating to security (such as firewall protection) in DLS advertising.  The opposite outcome is also possible, which is that they will pay no attention to security-related wording because it is not a topic they understand to be relevant to the selection of a router and which they may assume is not a distinguishing feature that would cause them to pick one router over the other (as compared to issues like strength of signal or range of coverage).  Indeed, Professor Shimp specifically states

---

[7] Shimp Report, page 18.  It is particularly likely that most consumers were unaware of such concerns at the times relevant to the FTC Complaint, as there had been less well-publicized episodes involving hackers and security breaches.

CONFIDENTIAL

that he believes "technical details" would "escape the interest and attention" of most nonexperts, who would devote their attention to "comprehensible and salient issues…"[8]  Professor Shimp's own observation that most consumers were likely unaware that security is an issue to be concerned about with a router is the precise explanation for why security may not strike consumers as a "salient" issue, and why anything pertaining to security might strike consumers as the type of "technical" detail that would escape their interest or attention.  Professor Shimp has no objective basis for concluding that any mention of security in the advertising would cause previously non-tech-savvy consumers to suddenly appreciate and attend to security issues, as opposed to glossing over them as technical details that are not likely to be the basis for selecting one router over another.  My survey showed that consumers who reviewed the DLS materials were not influenced by the security-related content.  Professor Shimp's observation that many consumers would be unaware of security being an issue for routers and that many consumers don't pay attention to details that seem technical or hard to understand may explain why the security-related content did not impact respondents' level of purchase interest.

## <u>CONCLUSION</u>

For the foregoing reasons, it is my opinion that the Van Liere Survey entirely fails to test any issue relating to any DLS advertising and is significantly flawed as pertains to the limited issue it attempted to test.  It is further my opinion that Professor Shimp's opinion that the alleged misrepresentations relating to security materially impact the likelihood of purchase of the advertised DLS routers is proven inaccurate and unreliable by my surveys that objectively tested that very issue.

---

[8] Shimp Report at Paragraph 33, page 16.

CONFIDENTIAL

Hal Poret

Dated:  July 27, 2018

CONFIDENTIAL