**CAUSE OF ACTION INSTITUTE**
JOHN J. VECCHIONE [admitted *pro hac vice*] [Lead Counsel]
john.vecchione@causeofaction.org
MICHAEL D. PEPSON [admitted *pro hac vice*]
Admitted only in Maryland.
Practice limited to matters and proceedings before Unite States Courts and agencies.
michael.pepson@causeofaction.org
JESSICA LEE THOMPSON [admitted *pro hac vice*]
jessica.thompson@causeofaction.org
ASHLEY SALVINO [admitted *pro hac vice*]
ashley.salvino@causeofaction.org
JOSHUA N. SCHOPF [admitted *pro hac vice*]
josh.schopf@causeofaction.org
NICHOLE C. WILSON [admitted *pro hac vice*]
nichole.wilson@causeofaction.org
KARA E. MCKENNA [admitted *pro hac vice*]
kara.mckenna@causeofaction.org
1875 Eye Street N.W., Suite 800
Washington, DC 20006
Telephone: (202) 422-4332/Facsimile: (202) 330-5842

Christine Yang (SBN 102048)
chrisyang@sjclawpc.com
**LAW OFFICES OF S.J. CHRISTINE YANG**
17220 Newhope Street, Suites 101 &102
Fountain Valley, CA 92708
Telephone: 714.641.4022
Facsimile: 714.641.2082

Christopher Kao (SBN 237716)
christopher.kao@pillsburylaw.com
Brock S. Weber (SBN 261383)
brock.weber@pillsburylaw.com
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Tel.: 415.983.1000 / Facsimile: 415.983.1200

*Attorneys for Defendant D-Link Systems, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

D-LINK SYSTEMS, INC.,

Defendants.

Case No. 3:17-cv-00039-JD

**DEFENDANT D-LINK SYSTEMS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

Date: Thursday, November 1, 2018
Time: 10:00 a.m.
Courtroom: 11
Judge: Honorable James Donato

1

**TABLE OF CONTENTS**

2

**Page**

3
NOTICE OF MOTION AND MOTION ................................................................1

4
MEMORANDUM OF POINTS AND AUTHORITIES ........................................2

I.      INTRODUCTION ............................................................................2

5
II.     RELEVANT PROCEDURAL HISTORY .......................................3

6
III.    RELEVANT FACTUAL BACKGROUND ......................................5

7
        A.     Each of DLS' Allegedly Deceptive Statements Were Made in the Past, and Do Not Reflect DLS' Current Advertising Practices. ....................................5

8
              1.    Count II: PX 1 .........................................................5

9
              2.    Count III: PX 2-PX 5 ...............................................6

10
              3.    Count VI: PX 10 and PX 11 ......................................7

11
        B.     DLS Addressed and Resolved Each of the Potential Vulnerabilities Alleged in the FTC's Complaint Before The Complaint Was Even Filed. ............8

12
              1.    Paragraph 15-18 ......................................................8

13
              2.    Paragraph 21 (Count III) .......................................10

14
              3.    Paragraph 24 (Count VI) ........................................10

15
        C.     The Current Security Practices Used for DLS' Products Are More Than Reasonable ...................................................................10

16
IV.    LEGAL STANDARD ...................................................................14

17
V.      ARGUMENT ................................................................................14

18
        A.     There is No Evidence Warranting Any Prospective Injunctive Relief ................15

19
              1.    All of DLS' Allegedly Deceptive Statements, and "Unreasonable" Security Practices Occurred Well In The Past, And Are Not Ongoing .....16

20
              2.    There Is No Evidence DLS Will Violate Section 5 in the Future .............18

21
         B.     In Any Case, The Permanent Injunctive Relief Sought By The FTC Is Barred as a Matter of Law. ......................................................20

22
VI.    CONCLUSION .............................................................................24

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2
**Page(s)**

3
## <u>Cases</u>

4
*Anderson v. Liberty Lobby, Inc.*,
5
    477 U.S. 242 (1986) ......................................................................................... 14, 23

6
*Brickman v. Fitbit*,
    No. 3:15-cv-02077-JD, Inc., 2017 WL 6209307 (N.D. Cal. 2017)........................................ 14
7

*Celotex Corp. v. Catrett*,
8
    477 U.S. 317 (1986) ...................................................................................................... 14

9
*CFPB v. Gordon*,
    819 F.3d 1179 (9th Cir. 2016) ...................................................................................... 15
10

11
*Columbia Pictures Indus. v. Gary Fung*,
    710 F.3d 1020 (9th Cir. 2013) ...................................................................................... 20

12
*Enrico's, Inc. v. Rice*,
13
    730 F.2d 1250 (9th Cir. 1984) ...................................................................................... 15

14
*FTC v. AbbVie Inc.*,
    No. 14-5151, 2018 WL 3830533 (E.D. Pa. June 29, 2018) ........................................... 18
15

16
*FTC v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ................................................................................... 19

17
*FTC v. Amazon.com, Inc.*,
18
    No. C14-1038-JCC, 2016 WL 10654030 (W.D. Wash. 2016) .......................................... *passim*

19
*FTC v. Evans Prods. Co.*,
    775 F.2d 1084 (9th Cir. 1985) ......................................................................... 2, 15, 17, 24
20

21
*FTC v. H. N. Singer, Inc.*,
    668 F.2d 1107 (9th Cir. 1982) ...................................................................................... 24

22
*FTC v. Infinity Grp. Servs.*,
23
    No. SACV 09-977 DOC (MLGx), 2009 WL 10670551 (C.D. Cal. Sep. 2, 2009) ................... 18

24
*FTC v. Neovi, Inc.*,
    604 F.3d 1150 (9th Cir. 2010) ...................................................................................... 23
25

26
*F.T.C. v. Merchant Services Direct, LLC*,
    No. 13-CV-0279-TOR, 2013 WL 4094394 (E.D. Wash. 2013) ............................................ 16

27
*In re Nat'l Credit Mgmt. Grp. LLC*,
28
    21 F. Supp. 2d 424 (D.N.J. 1998)................................................................................... 19

*LabMD, Inc. v. FTC,*
    891 F.3d 1286 (11th Cir. 2018) ................................................................ *passim*

*Negusie v. Holder,*
    555 U.S. 511 (2009) ................................................................................ 23

*Sears, Roebuck & Co. v. FTC,*
    676 F.2d 385 (9th Cir. 1982) ................................................................... 19

*U.S. v. ACB Sales & Serv., Inc.,*
    683 F. Supp. 734 (D. Ariz. 1987) ............................................................ 18

*U.S. v. Laerdal Mfg. Corp.,*
    73 F.3d 852 (9th Cir. 1995) ..................................................................... 18

## **Statutes and Codes**

15 U.S.C. § 45(l) ............................................................................................ 23

15 U.S.C. § 53(b)(1) ....................................................................................... 15

I5 U.S.C. § 53(b) ............................................................................................ 15

## **Rules and Regulations**

Fed. R. Civ. P. 56 ........................................................................................... 14

Fed. R. Civ. P. 56(a) ...................................................................................... 14

Fed. R. Civ. P. 65(d)(1)(B)-(C) ..................................................................... 20

## **Other Authorities**

S.Rep. 93-151, 30-31 ...................................................................................... 24

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

      PLEASE TAKE NOTICE that on November 1, 2018, or as soon thereafter as this may be heard, before the Honorable James Donato of the United States District Court for the Northern District of California, defendant D-Link Systems, Inc. ("DLS") will, and hereby does, move this Court for summary judgment or partial summary judgment pursuant to Federal Rules of Civil Procedure 56.  This Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declarations of Michael Pepson,[1] William Brown ("Brown Decl."), and Peter Tsai ("Tsai Decl."), and Kuang Chun Hung ("Hung Decl.")  in support thereof, and other related documents filed in connection with this Motion; all pleadings and papers filed in this action; oral argument of counsel; and any other matter properly considered.

---

[1] Exhibits are attached to the Declaration of Michael Pepson unless otherwise indicated.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Based on the undisputed and indisputable facts in the record, the FTC has no basis under controlling precedent to obtain permanent injunctive relief—the only relief that it is seeking—against Defendant D-Link Systems, Inc. ("DLS") in this case.  Accordingly, the Court should grant summary judgment in DLS' favor on each of the FTC's remaining claims in this case.

Specifically, the FTC's remaining "deception" claims (Counts II, III and VI of the Complaint) at this stage of the case, after the completion of fact and expert discovery, are based entirely on expert conjecture completely unsupported by evidence.  Simply put, there are no consumer victims here.  The FTC has not presented any evidence that an identifiable "consumer" was actually "deceived" by the challenged statements made by DLS, and has now confirmed that it will not present a single "consumer" witness at trial.  Nor has the FTC presented any evidence that any of the accused products were actually compromised in the real world.  (Indeed, the FTC's own security expert agrees with DLS on this point.)  Thus, there is no harm for the Court to remedy in this case.

Moreover, the record establishes that the specific statements and practices challenged by FTC here were all voluntarily addressed and resolved by DLS long ago; most before this case was filed.  And there is no evidence that the FTC can use to meet its burden under *FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985), to show that these practices are likely to reoccur.  To the contrary, the evidence shows that DLS, and the D-Link brand, like any responsible corporate citizen, has continuously (and voluntarily) adopted at great expense increasingly advanced security practices since at least 2010—well before the FTC investigation, before the FTC filed its Complaint in this case, and continuing today—to keep pace with the ever-changing security threat environment, as newer security tools and better practices become known.

As there is no genuine dispute as to any of these material facts, the FTC cannot obtain the sole relief it seeks here—a forward-looking permanent injunction under Section 13(b) "to prevent future violations" of the FTC Act.  For this reason alone, this Court should grant DLS's Motion on the discrete—but dispositive—issue that the FTC is not entitled to the relief it seeks here.  *See FTC*

1   *v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at \*4-6 (W.D. Wash. 2016)

2   (granting summary judgment on this exact issue).

3        In addition, summary judgment is also appropriate because the type of injunctive relief the

4   FTC purports to seek here—a mandatory injunction commanding a complete overhaul of the

5   security practices used for DLS' products measured against an indeterminable, ever-shifting

6   "reasonableness" standard to be supervised by this Court based on expert testimony—is barred, as a

7   matter of law, by Rule 65(d) of the Federal Rules of Civil Procedure, the text and structure of the

8   FTC Act, and basic requirements of due process. *See LabMD, Inc. v. FTC*, 891 F.3d 1286 (11th

9   Cir. 2018).  This Court should not be expected to set *de facto* security <u>policy</u> for the entire industry

10  via micro-management of DLS' security practices under a mandatory injunction so vague as to be

11  effectively incomprehensible and thus unenforceable.  Nor should the FTC be permitted to use DLS

12  and this case as a vehicle to conduct a rulemaking via litigation implicating complex policy

13  considerations in a rapidly changing area of technology.

14  **II.    RELEVANT PROCEDURAL HISTORY**

15       The FTC notified DLS that it was conducting an investigation into DLS' products and

16  practices in May 2013.  The next month, in June 2013, the FTC served DLS with a Civil

17  Investigative Demand ("CID") propounding numerous interrogatories and requiring DLS to

18  produce documents.  DLS voluntarily complied with the CID.  In June 2014, the FTC served CIDs

19  on both DLS and a DLS employee, William Brown, for oral testimony.  DLS and Mr. Brown

20  voluntarily complied with this CID and provided deposition testimony to the FTC in July, 2014.  In

21  July and again in October 2015, FTC Staff provided DLS' counsel with proposed administrative

22  complaints and consent orders.  Efforts by DLS to reach a negotiated resolution with the FTC futile

23  and ended in December 2015.  More than eleven ensuing months passed without any further contact

24  from the FTC.

25       Then, out of the blue, on November 1, 2016, FTC Staff surprised DLS with a new proposed

26  federal court complaint and a 20-year consent order.  DLS was pressured by the FTC to either

27  accept the consent order, or defend the litigation.  Companies subject to the terms of these standard

28  FTC consent orders are, among other things, required to "establish and implement, and thereafter

1    maintain, a comprehensive information security program that is reasonably designed to address

2    security risks related to new and existing Covered Devices and Covered Information" and "obtain

3    initial and biannual assessments and reports" from third parties at substantial expense.  *See, e.g.,*

4    Ex. 32 (Asus consent) at pp. 4-6, pts. II-III; Ex. 31 (Trendnet consent) at pp. 4-7, pts. II-III; *see also*

5    Ex. 28 (Arias Tr.) at 73:14-15.  DLS vigorously objected to such an oppressive and draconian 20-

6    year consent order, and submitted multiple white papers to present its position during ensuing

7    meetings with FTC.  Ultimately, two of the then-three active FTC Commissioners (who have both

8    since left the FTC) voted to authorize FTC Staff to proceed with the Complaint in this case.

9    Commissioner Maureen Ohlhausen, who was later the Acting Chairwoman of the FTC, dissented.

10   Ex. 34 (FTC Press Release).

11        On the eve of the annual Consumer Electronics Show in Las Vegas (one of the world's

12   largest shows in the electronics industry, where all major consumer electronics companies present

13   and promote their latest products and services), the FTC filed its Complaint against DLS on

14   January 5, 2017.  The Complaint alleged one "unfairness" claim (Count I) and five "deception"

15   claims (Counts II-VI) in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.  On September 18,

16   2017, the Court dismissed the "unfairness" claim and two of the "deception" claims (Counts IV and

17   V).  *See* Dkt. No. 90.  The operative Complaint, as narrowed by the Court, alleges three "deception"

18   claims (Counts II, III, and VI), which solely rely on paragraphs 15-18, 20-21, and 24 of the

19   Complaint, and Exhibits PX 1-5 and PX 10-11.  *See* Compl. ¶¶ 31-36, 43-45.  The Complaint "does

20   not allege any actual consumer injury in the form of a monetary loss or an actual incident where

21   sensitive personal data was accessed or exposed." Dkt. No. 90 at 8:18-20.  The FTC "does not

22   allege that D-Link [Systems] intended to deceive consumers."  Ex. 23 (Dkt. No. 28) at 12 n.5.

23        With the exception of Count III, which relies on exhibits PX 2-5 ("datasheets" for four

24   specific DLS router models), the Complaint does not identify the DLS product models at issue in

25   this case.  However, at the Court's instruction, *see* Dkt. No. 137; Dkt. No. 42 at 17:23-18:3, the

26   FTC has identified the accused products at issue in this case in Appendix A of its Initial

27   Disclosures.  Ex. 17 (FTC 3d ID), at 22 (Appx A).  The FTC has asserted that Count II relates to all

28   product models listed in Appendix A; Count III relates to four identified DLS router models (DIR-

---

1   615, DIR-412, DIR-815, DIR-645); and—until August 24, 2018—that Count VI relates to seven

2   identified DLS IP camera models (DCS-930L, DCS-2310L, DCS-3410, DCS-3411/3430, DCS-

3   3716, DCS6210, and DCS-6510).  Ex. 11 (FTC Rog Resp.), at 10-16 (Nos. 12-13).  According to

4   FTC, the time period for its "deception" claims "is the time frame in which the representations

5   identified in Exhibits 1-11 of the FTC Complaint were available to consumers."  Ex. 10 (FTC Rog

6   Resp.) at 10 (No. 7).

7          The FTC did not seek a preliminary injunction in this case.  Ex. 12 (FTC RFA Resp.) at 6

8   (Nos. 4-5).   Nor is FTC seeking monetary relief.  *Id.* (No. 6).  Instead, FTC is solely seeking

9   prospective permanent injunctive relief purportedly to prevent <u>future</u> violations of the FTC Act. *Id.*

10  (Nos. 5-6); Compl., Prayer for Relief, ¶ A; Ex. 6 (FTC 30(b)(6)) at 316:11-317:10.

11  **III.      RELEVANT FACTUAL BACKGROUND**

12          **A.      Each of DLS' Allegedly Deceptive Statements Were Made in the Past, and Do
            Not Reflect DLS' Current Advertising Practices.**

13

14          As set forth below, the FTC's remaining "deception" claims are predicated on isolated past

15  statements, most of which were ceased by DLS long before the Complaint was filed and, in any

16  event, do not reflect DLS's current advertising practices.

17          **1.      Count II: PX 1**

18          PX 1 of FTC's Complaint is not an advertisement at all,  Rather, it is a "Security Event

19  Response Policy" that was previously displayed on DLS's technical support site,

20  http://support.dlink.com , *see* PX 1; Ex. 5 (Wang Tr.) at 153:16, but has not been available there <u>since</u>

21  <u>September 2015.</u> Compl. ¶ 20; Ans. (Dkt. No. 92) ¶ 15; *see* Ex. 6 (FTC 30(b)(6)) at 304:12-305:7.  PX

22  1 was developed by DLS as part of an experiential learning process to keep in step with the evolving

23  security threat management process.  *See* Ex. 3 (Brown Tr.) at 214-219.  Among other things, this

24  Security Event Response Policy provided a link to a form that third-party security researchers could use

25  to report what they perceived as potential vulnerabilities to DLS for investigation and, if needed,

26  remediation.  *See* Ex 3 (Brown Tr.) 65-69; Ex. 5 (Wang Tr.) at 33:11-34:4.

27

28

1    In any event, the FTC's own marketing expert has opined that this document does not

2    communicate that DLS products are free from vulnerabilities, Ex. 13 (Shimp Tr.) 147:5-15, and that

3    it does not make any implied claims, *id.* 205:19-25.[2]

4              **2.    Count III: PX 2-PX 5**

5    The statements at issue in Count III apply to four discrete router models: DIR-615, DIR-412,

6    DIR-815, DIR-645.  *See* Ex. 11 (FTC Rog Resp.) at 11-15 (No. 12); Compl., PX 2-5.  The FTC

7    does not dispute that these routers did, in fact, provide the specific security features listed in PX 2-5,

8    such as Stateful Packet Inspection (SPI) and Network Address Translation (NAT) firewall features;

9    Wi-Fi Alliance (WFA) Wi-Fi Protected Access™ (WPA, WPA2) encryption standards; and WFA

10   Wi-Fi Protected Setup (WPS).  Instead, the FTC claims that PX 2-5 contain "representations about

11   the general security of … [these] device[s] that are false and misleading."  *See* Ex. 11 (FTC Rog

12   Resp.), at 11-15 (No. 12).

13   PX 2-PX 5 are "datasheets" for these product models, <u>all of which are no longer sold by</u>

14   <u>DLS</u>.  Brown Decl.  ¶¶ 9, 13-16.  These datasheets were originally created in 2010 (PX 3), 2011

15   (PX 2, PX 5), and 2012 (PX 4), long before the FTC filed its Complaint in this case.  *See* PX 2-5;

16   Brown Decl. ¶ 9.  The DLS product datasheets are different from what prospective purchasers

17   would see on DLS product packaging at retail stores (*e.g.*, Best Buy or Office Depot); thus, for

18   example, the packaging boxes for the DIR-645, DR-412, DIR-815, and DIR-615 routers do not

19   contain the challenged statements.  Brown Decl.  ¶ 12 & Ex. A.

20   DLS stopped selling the router models that PX 2-PX 5 pertain to no later than October

21   2016.[3]  *See* Brown Decl. ¶¶ 13-16.   As part of the standard DLS product lifecycle, after DLS stops

22   selling a product, information including "datasheets" are removed from DLS's marketing website,

23   http://us.dlink.com, and product information and DLS "datasheets" are archived into DLS's support

24

25   [2] The FTC's expert further testified that he did not know the "target market" for the document, but
     believed only "highly motivated" people would read it.  *See* Ex. 13 (Shimp Tr.) 107:23-108:17,
26   113:2-9, 123:16-23, 128:14-17, 144:10-14.  He stated that he did not know what percentage of the
     population would fall into this category, *id.* 109:22-25, and agreed that PX1 would "have no
27   impact" on any other consumers, *id.* 115:20-116:7, 156:4-21.

28   [3] The last sales date for the DIR-412 was in March 2015; for the DIR-815, December 2015; for the
     DIR-645, March 2016; and for the DIR-615, October 2016.  Brown Decl. ¶ 9.

1    site, support.dlink.com.  This archived information is used solely for the purpose of facilitating

2    technical support of legacy products when requested by end-users.[4]  *See* Ex. 2 (DLS 30(b)(6)) at

3    155:4-156:22; Brown Decl. ¶¶ 17-20 & Ex. B; *see also* Ex. 3 (Brown Tr.) at 20:10-21:24.  The

4    accused "datasheets" are not currently used for marketing purposes.  *See* Brown Decl. ¶¶ 20 & Ex. B.

5      With the exception of archived data sheets and user manuals accessible through DLS's

6    technical support website, http://support.dlink.com, the challenged statements do not appear

7    currently on the DLS website, http://us.dlink.com/, or in product advertising.[5]  Brown Decl. ¶ 22.

8    This is DLS's standard practice today, which also now includes quarterly audits conducted by DLS

9    in an effort to ensure that the challenged statements do not appear on http://us.dlink.com or in

10   product advertising.  *Id.*

11      **3. Count VI: PX 10 and PX 11**

12     PX 10 and PX 11 are not advertisements, were not intended for marketing purposes, and

13   have never been used for marketing purposes.  Brown Decl. ¶ 24.  Rather, PX 10 and PX 11 are one

14   of many images of the graphical user interface ("GUI") that an end user would have briefly seen

15   when using DLS' now-outdated Setup Wizard for Microsoft Windows PCs only <u>after</u> purchasing

16   the camera, during the setup process of the camera and the desktop software that could be used with

17   the camera.  Ex. 2 (DLS 30(b)(6)) at 187:6-188:13, 189:1-24; *see, e.g.,* Brown Decl. ¶¶ 27-28, &

18   Exs. E (DCS-2310L Setup Wizard), Ex. F (Business Camera/PX 10).[6]  Moreover, before an end

19   user would even see PX 11, for example,  using the Setup Wizard for the DCS-2310L camera, he or

20   she would be required to agree to the terms of an End User License Agreement ("EULA") advising

21

---

22   [4] The process for accessing "datasheets" like PX2-PX5 through DLS's website involves multiple
     steps and would alert any visitor to the fact that the products have been discontinued.  *See* Brown
23   Decl. ¶ 25; *see also id.* ¶¶ 18-19.

24   [5] Indeed, since 2014, DLS management has instructed DLS personnel not to use challenged
     statements or similar language on http://us.dlink.com.  Brown Decl. ¶ 21.

25   [6] PX 10 and PX 11 are specifically taken from DLS user manuals that contain some representative
     images of the GUI for the Setup Wizard.  Ex. 12 (FTC RFA Resp.) at 41-42 (Nos. 78-82 (PX11));
26   Ex. 17 (Van Liere Report) at 6 (¶¶ 10, 12 n.1) (citing page numbers of user manuals); Ex. B; *see*
     Brown Decl. ¶ 25 & Ex. C.  The FTC does not claim that these user manuals were "deceptive,"
27   apart from just these isolated GUI images.  *See* Ex. 12 (FTC RFA Resp.) at 42 (No. 82).  In any
     event, these user manuals are for discontinued products and, like PX 2-PX 5, now remain archived
28   on DLS's support website solely to facilitate technical support.  *See* Brown Decl. ¶ 25.

---

1    that DLS did not guarantee perfect security or the absence of vulnerabilities.  *See* Brown Decl.

2    ¶¶ 24-25, 27 & Ex. E.  The FTC does not allege that these disclaimers are inadequate in any way.

3    Ex. 6 (FTC 30(b)(6)) at 321.

4           DLS consumer IP cameras manufactured after January 2015 do not use and are incompatible

5    with the old Setup Wizard, which included the image in PX 11.  Brown Decl. ¶ 30 & Ex. G; *see*

6    *also* Ex. 2 (DLS 30(b)(6)) at 186:6-16, 193:1-8.   Since 2015, the setup process these cameras relies

7    on the "mydlink" and "mydlink lite" mobile applications, not the old Microsoft Windows and Apple

8    MacOS mydlink Setup Wizards.  Brown Decl. ¶ 30.  These mobile applications do not contain any

9    of the challenged statements that appear in PX 10 and 11.[7]  Brown Decl.  ¶ 30.

10          **B.     DLS Addressed and Resolved Each of the Potential Vulnerabilities Alleged in**

11          **the FTC's Complaint Before The Complaint Was Even Filed.**

12          As set forth below, each of the specific examples of DLS's allegedly "unreasonable"

13   security practices set forth in the Complaint had been addressed by DLS long before the FTC filed

14   its Complaint in this case.

15                 **1.      Paragraph 15-18**

16          As to FTC's allegations regarding "hard-coded" user credentials and other "backdoors,"

17   prior to 2013, some pre-set credentials were accidentally included in some D-Link-branded products

18   (specifically, business IP cameras) by DLS' product vendors during the manufacturing process.

19   These pre-set credentials could in theory be exploited to gain access to the data on these cameras,

20   although no instances of such exploitations have ever occurred in the real world, to DLS'

21   knowledge.  *See* Ex. 7 (Graff Tr.) at 200:5-10; Ex. 8 (Graff Rep.) at p.88 ¶ 173.

22          In any event, as soon as DLS learned that its vendors had left pre-set credentials in the

23   business IP cameras, DLS immediately demanded that the vendors provide product and software

24

25   ─────────────────────
     [7] The Microsoft Windows "Securicam" CD Setup Wizard from which the image was derived that
26   became PX 10 was derived was exclusively used for DLS Business IP Camera products that are
     intended to be sold for commercial use.  Brown Decl. ¶¶ 31-33 & Ex. H.  Installation of the
27   commercial category of products for business entities requires more sophisticated technical
     knowledge and/or experience in electronic networking area and is normally performed by educated
28   technicians, not by the ordinary consumers.  Brown Decl.  ¶ 32; Ex. 3 (Brown Tr.) at 16:15-25,
     102:6-103:4, 211:16-18; Ex. 5 (Wang Dep. Tr.) at 229:8-230:11.

1    updates to address and resolve these issues as quickly as possible.  In addition, as part of DLS'

2    constant improvement process for security threats, all DLS products were phased in to include

3    testing and searching for these kinds of persistent credentials prior to product release.  Since 2014,

4    DLS's current practices include: (a) screening all products and their firmware for unintentionally

5    coded credentials before release; (b) supplying all products with unique initial passwords; (c)

6    requiring the user to set his own password during set up of the products; and (d) overwriting (and

7    thus invalidating) the initial password after the user sets his password.  *See* Tsai Decl. ¶ 12.  In

8    addition, all products are now checked through state-of-the-art "white-box" security testing.  Tsai

9    Decl. ¶ 23; Ex. 1 (Tsai Tr.) at 150-155; Ex. 4 (Hsu Tr.) at 34; Hung Decl. ¶ 8.

10          The allegations in the Complaint regarding a "private key" relate to a single, isolated

11   incident caused by a third-party developer's inadvertent failure to remove the code for the digital

12   certificate before releasing the software.  Ex. 1 (Tsai Tr.) at 250:4-13.  There is no evidence that any

13   harm resulted from this issue.  *See* Ex. 8 (Graff Rep.) at 86-87, ¶ 167); Ex. 7 (Graff Tr.) at 173:11-13,

14   199:8-10.  Appropriate steps were quickly taken to prevent recurrence, and this issue has not

15   reoccurred since.  *See* Ex. 1 (Tsai Tr.) at 251:16-25, 254; Ex. 3 (Brown Tr.) at 282-84; Ex. 2 (DLS

16   30(b)(6)) at 195:16-22.

17          Finally, since 2015—long before FTC filed its Complaint—passwords for "mydlink"

18   registered devices and "mydlink" mobile applications have not been stored in clear text.  *See* Tsai

19   Decl. ¶ 15; Ex. 18 (Brown IHT) at 689:17-20.  Further, there is no evidence that the alleged clear

20   text vulnerability regarding the mobile app has ever been exploited.  *See* Ex. 7 (Graff Tr.) at

21   228:5-10.

22          After more than five years of investigation and discovery in the U.S. and abroad, the FTC

23   has not identified any evidence of a real-world exploit of any of these alleged vulnerabilities.  *See*

24   Ex. 8 (Graff Report) at ¶ 173; Graff Dep. Tr. 200:5-10, 173:11-13, 199:8-10, 221:11-13, 225:6-8,

25   228:5-10, 233:13-21, 236:18-237:5, 265:10-13, 266:11-14, 267:22-268:3, 268:13-17, 270:1-4,

26   271:1-4, 271:17-272:2.

27

28

1    **2.    Paragraph 21 (Count III)**

2          With the exception of the DIR-412 (PX 3),[8] which DLS has not sold since 2015, any

3    potential vulnerabilities affecting the accused routers at issue in Count III (DIR-615, DIR-815, DIR-

4    645) have all been fixed via firmware updates.  Brown Decl. ¶ 34.  There is no evidence that any of

5    these were exploited or that any DLS router was compromised.  Ex. 7 (Graff Tr.) at 200:5-10,

6    265:10-13 (DIR-615), 266:11-14 (DIR-615), 267:22-268:3 (DIR-615), 268:13-17 (DIR-412),

7    270:1-4 (DIR-815), 271:1-4 (DIR-645); Ex. 8 (Graff Rep.) at p.88 ¶ 173.

8    **3.    Paragraph 24 (Count VI)**

9          The reported potential vulnerabilities affecting the accused DLS consumer IP cameras at

10   issue in Count VI have been fixed via firmware updates, except for functional nuisances, which,

11   even if exploited in the real world, would not result in loss of private information.  Brown Decl.

12   ¶ 34.  There is no evidence that any of these were exploited or that any DLS IP camera was

13   compromised.  *See* Ex. 7 (Graff Tr.) at 200:5-10, 271:17-272:2 (Count VI IP Cameras); Ex. 8 (Graff

14   Rep.) at p.88 ¶ 173; Ex. 6 (FTC 30(b)(6)) at 110:12-101:12.

15   **C.    The Current Security Practices Used for DLS' Products Are More Than
          Reasonable**

16

17         Security-related best practices evolve, as they must, over time to keep pace with new

18   technology and the changing threat environment.  Ex. 26 at FTC-DLS-00033389 ("Security threats

19   and best practices evolve quickly."); Ex. 36 at FTC-DLS-00034669 ("security threats and

20   technology constantly evolve").  "[T]here is no such thing as perfect security[.]" Ex. 12 (FTC RFA

21   Resp.) at 35-36 (Nos. 61-62).  "[I]t is impossible to eliminate all security vulnerabilities[.]"  Ex. 9

22   (Graff Reb.) at 20, ¶ 32.

23         There can be no genuine factual dispute that the security practices used for the products DLS

24   sells have been constantly improving and evolving over the past eight years, and that the resources

25

26   ───────────────
     [8] DIR-412 is a legacy 3G mobile wireless to WiFI™ router that is no longer compatible with the
27   current high-speed mobile wireless LTE technology. This one-off vulnerability could not be fixed
     due to a unique combination of technological and practical issues; instead, DLS offered more recent
     models as replacements.  Ex. 18 (Brown IHT) at 794:21-795:8; Ex. 2 (DLS 30(b)(6)) at 263:3-25;
28   Ex. 25 (Schaumont Rebuttal) at ¶ 4.b, n.10.

1    devoted to these issues have only increased.  Long before the FTC commenced this action, DLS and

2    D-Link Corporation ("DKC") demonstrated their commitment to the security of D-Link brand

3    products by voluntarily and continuously implementing newer, more advanced security practices to

4    prevent and respond to rapidly-evolving security threats.  Beginning in 2012, DLS adopted this

5    evolving security response model, which remains the current and official practice for all DLS

6    products, completely through its vendor supply chain.  Among other things, the security practices

7    for DLS products include the following:

8    •   **Pre-2012:**  The internal testing department (the "D-Lab") of DKC regularly conducts both

9        functional and security pre-release quality assurance testing on all products and firmware.  *See*

10       Ex. 1 (Tsai Tr.) at 48:14-50:24, 68:9-69:2, 240:19-25; Ex. 4 (Hsu Dep.) at 20:12-22:2.  In

11       addition, recognized third-party security experts are also contracted to perform certain security

12       tests of DLS products.  *See* Ex. XX (Rapid7 30(b)(6) at 121:7-123:16.  Since before 2012,

13       DLS personnel have also actively monitored and investigated potential security issues,

14       including working with third-party researchers and hiring third-party experts to test DLS

15       products and firmware as needed. *See* Ex. 18  (Brown IHT) at 34:9-52:22, 165:9-24, 191:2-17;

16       *see* Ex. 3 (Brown Tr.) at 127:12-20, 139:11-22, 146:11-25.

17   •   **September 2012:**  Beginning in September 2012, the Institute for Information Industry ("III",

18       now known as "Onward Security")—an independent third-party security expert located in

19       Taipei, Taiwan, which has been recognized by the FTC for its expertise and has advised

20       multiple companies subject to FTC consent orders to implement security practices that have

21       been deemed acceptable by FTC, *see* Hung Decl. ¶¶ 3-11; Ex. 29 (DX26) (Trendnet requests

22       FTC approval of III); Ex. 30 (III reports to FTC); Ex. 29 (Arias Tr.) at 72:2-79:2—was

23       retained to conduct sophisticated "black-box" security testing.  Ex. 1 (Tsai Tr.) at 40:1- 46:11,

24       52:15-57:10, 68:9-69:2, 73:23-74: 240:19-25; Tsai Decl. ¶¶ 6-7 & Ex. A.

25   •   **2013:**  Onward Security's engagement was expanded in 2013 to increase the annual minimum

26       number of "black box" tests and also provide for "white box" source code tests.  Ex. 1 (Tsai

27       Tr.) at 115:2-118:12, 122:15-124:25.  DLS also enhanced its process for actively monitoring

28       and investigating potential vulnerabilities by creating an open channel for independent third-

1   party security researchers to report perceived potential vulnerabilities to DLS.  Ex 3 (Brown

2   Tr.) 65-69; Ex. 5 (Wang Tr.) at 33:11-34:4; Ex. 1 (Tsai Tr.) at 130:20-131:10; Ex. 4 (Hsu

3   Dep.) at 22:16-23:4.

- **2014:**  Onward Security's contract is expanded again to facilitate investigation of reported
  potential vulnerabilities and, if appropriate, third-party vendors' creation of firmware fixes.
  Ex. 1 (Tsai Tr.) at 128:2-130:11, 144:7-146:17; Tsai Decl. ¶¶ 9-10.  Onward Security also
  begins performing pre-release black-box testing for new platforms, new firmware, and
  products from new vendors.  Tsai Decl. ¶ 11.

- **September 2015:**  Onward Security began conducting secure coding trainings, attended by
  vendors and DKC employees who are involved in product cybersecurity and management.  *See*
  Ex. 1 (Tsai Tr.) at 162:23-164:22, 165:21-168:22; Tsai Decl. ¶¶ 13-14 & Ex. B. *Cf.* Ex. 8
  (Graff Rep.) at 134-35 (¶¶ 271-72) ("[T]he content of these training sessions was likely of
  substantial quality, and improving over the presentations dated in subsequent years.").

- **December 2015:**  DKC licensed a white-box security threat testing software, Checkmarx, and
  began trials with this source code testing tool with the third-party vendors that make most of
  the accused DLS products.  *See* Ex. 1 (Tsai Tr.) at 152:4-23; Tsai Decl. ¶ 17.  (In 2016, for the
  trial vendors, submission of firmware required the submission of a completed Checkmarx
  report, or a report from another DKC approved tool prior to submission to the DKC D-Lab
  quality assurance test group.  Ex. 1 (Tsai Tr.) at 152:4-23; Tsai Decl. ¶ 17.)

- **March 2016:**  Beginning in March 2016, an upgraded Security Management System ("SIM")
  has been used to track reported potential vulnerabilities identified post-release and facilitates
  vendors' creation of quality firmware fixes.  Tsai Decl. ¶ 16.  Cf. Ex. 8 (Graff Rep.) at pp. 51,
  140 (¶¶ 100, 284 ("Assuming that access to the SIM was rolled out to D-Link Systems by no
  later than 2016, it represents a significant step forward in security quality[.]")).

- **April 2016:**  The Building Security In Maturity Model ("BSIMM") began to be implemented
  for the D-Link brand products.  Tsai Decl. ¶ 18.

- **June 2016:** Onward Security was hired to assist with the implementation of BSIMM for the D-Link brand products. Tsai Decl. ¶ 18; Hung Decl. ¶ 6; Ex. 8 (Graff Rep.) at 143, ¶ 290 ("BSIMM is a good step[.]").

- **November 2016:** DKC, with Onward Security's assistance, created initial versions of BSIMM policy, procedure, guideline, and recordkeeping documents. Tsai Decl. ¶¶ 21-22 & Ex. C; *see* Hung Decl. ¶ 7. *Cf.* Ex. 8 (Graff Rep.) at 143, ¶ 291.

- **March 2017:** The BSIMM security policies initially developed in November 2016 were formally adopted in March 2017. See Ex. 1 (Tsai Tr.) at 176-177, 239-240; Ex. 2 (DLS 30(b)(6)) at 63-66, 79-82; Tsai Decl. ¶ 22; Hung Decl. ¶ 8. *Cf.* Ex. 8 (Graff Rep.) at 143, ¶ 291 ("These policies seem very promising."). Starting at this time, vendors that make and create firmware for the products DLS sells were required to conduct pre-release "white box" tests on products and firmware using source code scan tools like Checkmarx, and provide the scan reports to DKC for review and confirmation. Ex. 1 (Tsai Tr.) at 150:7-151:8, 153:2-155:14; Ex. 4 (Hsu Tr.) at 34:9-40:7; Ex. 2 (DLS 30(b)(6)) at 93:3-23; Tsai Decl. ¶ 23; Hung Decl. ¶ 8. *Cf.* Ex. 9 (Graff Rebuttal) at 6, ¶ 9 ("I agree that source-code scanning is a sound effective practice[.]"). Onward Security was hired to ensure compliance with the BSIMM policies through internal and external audits. Ex. 1 (Tsai Tr.) at 182:16-188:21; Tsai Decl. ¶ 14; Hung Decl. ¶ 9.

- **August and November 2017:** An independent third party, Bureau Veritas ("BV"), conducted two external audits, and issued preliminary and final audit reports concluding that BSIMM is being successfully implemented over time. Tsai Decl. ¶¶ 26-27, Exs. D (1st BV Audit Report), E (final BV report); Hung Decl. ¶ 9.

The FTC's security expert agrees that the security practices implemented to protect the DLS products are "generally sound practices." Ex. 8 (Graff Rep.) at pp. 122-23, ¶ 246. And although the parties' security experts offer conflicting opinions as to whether "reasonable" security practices were used (primarily pre-September 2015), there is no genuine factual dispute that the security practices used for DLS' products have continuously evolved and matured, as illustrated above, and

1  that these improvements were made on a voluntary basis at substantial expense.[9]  And critically,

2  even the FTC's security expert does not seriously claim that the security practices used for the

3  routers and IP cameras DLS has sold since March 2017 are unreasonable, or that the products are

4  not currently secure.  *See* Ex. 8 (Graff Rep.), at 122-24, 143-49, ¶¶ 246-247, 291, 297-302; Ex. 7

5  (Graff Tr.) at 252:12-253:5, 268:1-269:1, 270:1-7, 271:1-11, 272:3-7, 288:7-295:9.  *Cf.* Ex. 24

6  (Schaumont Rep.) ¶¶ 70, 114; Ex. 25 (Schaumont Rebuttal) at 4, 13-14, 42, ¶¶ 4.a, 13-15, 63.

## IV.  LEGAL STANDARD

8       Summary judgment is appropriate when the pleadings, discovery, and affidavits show "no

9  genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of

10  law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A

11  principal purpose of summary judgment 'is to isolate and dispose of factually unsupported claims.'"

12  *Brickman v. Fitbit*, No. 3:15-cv-02077-JD, Inc., 2017 WL 6209307, at *2 (N.D. Cal. 2017) (quoting

13  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The moving party must initially establish

14  the absence of a genuine issue of material fact, which it can do by 'pointing out to the district court

15  ... that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting

16  *Celotex*, 477 U.S. at 325).  Once the moving party meets its initial burden, the nonmoving party

17  must, by affidavits or discovery, set forth specific facts showing that there is a genuine issue for

18  trial.  Fed. R. Civ. P. 56.

## V.  ARGUMENT

20       As this Court observed in ruling on DLS' Motion to Dismiss in September 2017:  "The FTC

21  does not identify a single incident where a consumer's financial, medical or other sensitive personal

22  information has been accessed, exposed or misused in any way, or whose IP camera has been

23  compromised by unauthorized parties, or who has suffered any harm or even simple annoyance and

24  inconvenience from the alleged security flaws in the DLS devices."  Dkt. No. 90 at 8:25-9:2.  A

25  year later, and after costly, burdensome discovery in the U.S. and abroad, the FTC indisputably *still*

26  cannot identify a single individual consumer who suffered any harm of any kind (even

---

[9] For instance, in total, DKC has spent more than $500,000 on Onward Security's services alone over the past several years.  *See* Tsai Decl. ¶ 28.

1  inconvenience) as a result of DLS' alleged practices.  Indeed, "the FTC will not present any

2  consumer witnesses at trial." Dkt. No. 137.  Nor does the FTC have any evidence of a single real-

3  world exploit of the alleged vulnerabilities purportedly affecting DLS products, as the FTC's own

4  data security expert forthrightly acknowledges.  *See* Ex. 7 (Graff Tr.) at 200:5-10 ("I have not seen

5  any evidence that the vulnerabilities have, in fact, been exploited[.]"), *id.* at 173:11-13 (private key),

6  199:8-10 (private key), 221:11-13, 225:6-8, 228:5-10, 233:13-21, 236:18-237:5, 265:10-13 (DIR-

7  615), 266:11-14 (DIR-615), 267:22-268:3 (DIR-615), 268:13-17 (DIR-412), 270:1-4 (DIR-815),

8  271:1-4 (DIR-645), 271:17-272:2 (IP Cameras); Ex. 8 (Graff Rep.) at p.88 ¶ 173 ("I have not

9  reviewed any evidence that these vulnerabilities have been exploited."), pp. 86-87, ¶ 167.

10      What remains of the FTC's case does not, and cannot, support the permanent injunctive

11  relief that the FTC is seeking as a remedy for DLS' alleged violations of the FTC Act.

12          **A.      There is No Evidence Warranting Any Prospective Injunctive Relief.**

13      Permanent injunctive relief under Section 13(b) of the FTC Act requires "proper proof" that

14  the alleged harm is ongoing or likely to occur in the future.  *See* I5 U.S.C. § 53(b).  "<u>Past wrongs</u>

15  <u>are not enough for the grant of an injunction</u>; an injunction will issue only if the wrongs are ongoing

16  or likely to recur."  *FTC v. Evans Prods. Co*., 775 F.2d 1084, 1087 (9th Cir. 1985) (internal

17  citations and quotation marks omitted) (emphasis added); *see also Enrico's, Inc. v. Rice*, 730 F.2d

18  1250, 1253 (9th Cir. 1984) ("Past wrongs are not enough for the grant of an injunction.").  This is

19  even true regardless of whether any alleged "injury flowing from that violation" may be "continuing

20  today."  *Evans Prods*., 775 F.2d at 1088.

21      It is ultimately the <u>FTC's burden</u> to show that permanent injunctive relief under Section

22  13(b) is appropriate by establishing, <u>with evidence</u>, that DLS is currently violating or is likely to

23  violate Section 5.  *See FTC v. Amazon.com, Inc*., No. C14-1038-JCC, 2016 WL 10654030, at *4-6

24  (W.D. Wash. 2016) ("inquiry … hinges upon whether the FTC has established, with evidence, a

25  cognizable danger of a recurring violation"); *CFPB v. Gordon,* 819 F.3d 1179, 1197 n.9 (9th Cir.

26  2016) (quoting *Evans*, 775 F.2d at 1087 (quoting 15 U.S.C. § 53(b)(1))) ("The FTC had authority to

27  pursue the action in *Evans Products* under 15 U.S.C. § 53(b), which gives the FTC authority to

28  pursue injunctive relief only if it [FTC] can show that a person '"is violating, or is about to violate"

1  any law enforced by the FTC; the statute does not mention past violations.'"'" (emphasis added));

2  *see also F.T.C. v. Merchant Services Direct, LLC,* No. 13-CV-0279-TOR, 2013 WL 4094394, at *3

3  (E.D. Wash. 2013) ("This necessarily requires the FTC to demonstrate that the violations referenced

4  in its Complaint are likely to recur." (citations omitted)).

5      In this case, based on the record of undisputed and indisputable facts before the Court, the

6  FTC simply cannot meet its burden to show that DLS is currently violating, or is likely to violate,

7  the FTC Act in the future.  Accordingly, the Court should grant summary judgment in favor of DLS

8  on all of the FTC's remaining claims on this case.  *See FTC v. Amazon.com, Inc.,* No. C14-1038-

9  JCC, 2016 WL 10654030, at *4-6 (W.D. Wash. 2016) (granting Amazon's motion for partial

10  summary judgment and finding that a permanent injunction is not warranted for alleged past

11  practices).

12          **1.    All of DLS' Allegedly Deceptive Statements, and "Unreasonable"**

13                **Security Practices Occurred Well In The Past, And Are Not Ongoing.**

14      As set forth in detail above, there is no <u>genuine</u> factual dispute that, for all practical

15  purposes, the allegedly deceptive statements and "unreasonable" practices relied on by the FTC to

16  support its remaining claims (Counts II, III and VI) occurred long before FTC initiated this

17  litigation on January 5, 2017, and are not being made by DLS today:

18  •   **Count II:**  The challenged statement at issue was removed from DLS' support website <u>three

19      years ago</u> in <u>September 2015</u>, and is no longer used by DLS for any purpose, marketing or

20      otherwise.  *See* Compl. ¶ 20 & PX 1; Ans., Dkt. 92, ¶ 20.  Indeed, the FTC does not claim that

21      PX 1 supports an allegation of currently deceptive advertisements.  Ex. 6 (FTC 30(b)(6)) at

22      221:1-22, 304-05; Compl. ¶ 20.

23  •   **Count III:**  The statements at issue with respect to Count III were made in DLS datasheets

24      created between 2010 and 2012 that relate to four router models that were first sold between

25      2007 and 2011.  Brown Decl. ¶ 9.  These products are no longer sold by DLS, and as a result the

26      datasheets relating to these products have long since been removed from DLS' main product

27      website and exist only as archival copies on DLS' support website for technical support

28      purposes.  In addition, with one isolated exception (the DIR-412, an outdated and usable 3G

1    product that is incompatible with current mobile LTE technology), all of the alleged

2    vulnerabilities with respect to these routers were fixed via firmware updates to the products well

3    before the Complaint in this case was filed.   Brown Decl., ¶ 34

4  • **Count VI:**  The statements at issue with respect to Count VI were made in the obsolete user

5    interfaces for setting up the IP cameras at issue (which were depicted in part in old DLS user

6    manuals for those cameras, as shown in PX 10 and PX 11).  *See* Brown Decl., ¶¶ 24-25 & Ex.

7    C. All of DLS' consumer IP cameras manufactured after January 2015 are incompatible with the

8    Microsoft Windows Setup Wizard application containing the allegedly deceptive statements in

9    PX 11, and instead rely on the newer "mydlink" and "mydlink lite" mobile applications that

10   indisputably do not contain the challenged statements.  *See* Brown Decl., ¶¶ 29-30.

11        As in *Evans Products*, therefore, there is no genuine factual dispute that the challenged

12   advertisements at issue in this case ceased being made long before the FTC even filed its

13   Complaint.  *Cf.* 775 F.2d at 1088.  Indeed, the consumer products that these statements describe

14   have not been sold or shipped by DLS since the filing of the Complaint.  As a result, these allegedly

15   deceptive statements cannot properly serve as the basis for a permanent injunction going forward.

16   The fact that PX 2-PX 5 remain archived on DLS's support website, so that they can be accessed

17   solely for required technical support for these obsolete products that are not offered for sale any

18   more should not alter this result—DLS long ago ceased to utilize these statements to market

19   consumer products to distributors.[10]  Nor should the fact that PX11 can be found within user

20   manuals archived on DLS's support website solely for technical support or can possibly be briefly

21   viewed by purchasers of legacy models from unaffiliated third parties, who then consciously choose

22   to ignore the setup instructions.  *See* Brown Decl. ¶¶ 24-25, 29-30.   Finally, PX10, an image from a

23   Microsoft Windows Setup Wizard for Business Cameras intended for use by commercial

24   enterprises for purposes such as store and warehouse surveillance that also appears within old DLS

25   user manuals archived on DLS's support website to facilitate technical support for obsolete

26   commercial products, Brown Decl. ¶¶ 31-33, is insufficient to defeat summary judgment.

27

28   [10] In any event, *de minimis* potential ongoing violations are insufficient to support an injunction.
     *See Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at *5-6.

1    Similarly, there is no genuine factual dispute that the overwhelming majority of the alleged

2 potential vulnerabilities affecting the accused products have all been fixed, and most of them many

3 years ago.  *See* Brown Decl. ¶ 34; Ex. 24 (Schaumont Rep.) at pp. 55-59, ¶¶ 102-110, 114; Ex. 20

4 (Radcliffe Rep.) Appx. B, ¶¶ 8-10.  To the extent any of those alleged vulnerabilities could be

5 considered "unreasonable," DLS long ago cured the problem and there has been no reoccurrence

6 since.  Finally, there is no genuine factual dispute that DLS and DKC voluntarily went to great

7 lengths to improve their security practices long before the Complaint was filed and continue to do

8 so.  Accordingly, there is also no proper basis for the Court to enter a permanent injunction with

9 respect to this past conduct either.

10    **2.    There Is No Evidence DLS Will Violate Section 5 in the Future**

11    Although the Complaint includes a boilerplate allegation that DLS is likely to violate

12 Section 5 in the future, *see* Compl. ¶ 46, there is no evidence in the record, and the FTC has made

13 no effort to develop any, suggesting there is cognizable risk of a future violation.

14    The FTC cannot rely on a remote possibility or unsupported speculation about future

15 conduct to justify the extraordinary remedy of an injunction, particularly where, as here, there is no

16 current violation.  *See, e.g., U.S. v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854 (9th Cir. 1995) ("A

17 district court cannot issue an injunction unless there exists some cognizable danger of recurrent

18 violation. The determination that such danger exists must be based on appropriate findings

19 supported by the record." (internal quotation marks and citations omitted)).  Instead, the FTC must

20 come forward with credible evidence that there is more than a "mere possibility" that DLS will

21 violate Section 5 in the future.  *See, e.g., Amazon.com, Inc.*, 2016 WL 10654030, at *4-6 (granting

22 Amazon's motion for partial summary judgment and finding that a permanent injunction is not

23 warranted for alleged past practices); *U.S. v. ACB Sales & Serv., Inc.*, 683 F. Supp. 734, 741 (D.

24 Ariz. 1987) (past violations outside § 13(b)'s purview); *FTC v. Infinity Grp. Servs.*, No. SACV 09-

25 977 DOC (MLGx), 2009 WL 10670551, at *2 (C.D. Cal. Sep. 2, 2009) ("Section 13(b) cannot be

26 used to remedy past violations of Section 5 of the FTC Act."); *FTC v. AbbVie Inc.*, No. 14-5151,

27 2018 WL 3830533, at *34-36 (E.D. Pa. June 29, 2018) (declining to impose permanent injunction

28 because FTC did not meet its burden of showing defendant is violating, or is likely to violate, the

1   FTC Act).  *Cf. FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) ("When, as in this

2   case, a defendant has ceased offending conduct, the party seeking injunctive relief must demonstrate

3   to the court that there exists some cognizable danger of recurrent violation, something more than the

4   mere possibility which serves to keep the case alive." (quotation marks omitted)).  The FTC has

5   failed to do so this in this case.  The FTC has not identified <u>any</u> evidence at all that suggests DLS

6   may violate Section 5 in the future. To the contrary, the evidence that is in the record before this

7   Court suggests that DLS <u>has always</u>, and continues to this day, endeavored to take all reasonable

8   measures to protect the security of its products.

9           Where, as here, the allegedly offending conduct has ceased, courts consider a variety of

10  factors to determine whether prospective injunctive relief is warranted, including the degree of the

11  defendant's scienter, the sincerity of the defendant's assurances against future violations, and the

12  genuineness and success of efforts to comply.  *Accusearch*, 570 F.3d at 1201; *In re Nat'l Credit*

13  *Mgmt. Grp. LLC*, 21 F. Supp. 2d 424, 440 (D.N.J. 1998); *see also Sears, Roebuck & Co. v. FTC*,

14  676 F.2d 385, 392 (9th Cir. 1982) ("Two factors or elements frequently influence our decision [to

15  issue an injunction under Section 5]—the deliberateness and seriousness of the present violation,

16  and the violator's past record with respect to unfair advertising practices.").

17          None of these factors supports the imposition of injunctive relief in this case.  Most

18  importantly, as the undisputed facts set forth in detail above show (*see supra* 5-14), DLS and DKC

19  have for many years engaged in voluntary and thorough efforts to protect the security of D-Link

20  brand products by using the best practices known at the time, including establishing an internal

21  testing lab, the D-Lab; continually adopting new practices and procedures and using increasingly

22  advanced security testing tools to counter emerging security threats; seeking out and hiring the top

23  independent experts to conduct training, perform testing, and undertake audits; and by undertaking

24  great efforts to investigate reported potential vulnerabilities and, when necessary, working with

25  vendors to ensure that firmware fixes are promptly released.  This indisputably evinces DLS'

26  genuine and good faith efforts to comply with Section 5 at all times.[11]  In addition, the record

27

28  _____

[11]  The FTC does not provide, use, or offer any public security standards to notify technology
companies of what they must do to comply with *what FTC Staff believes at the time* that Section 5

1  reflects that DLS voluntarily ceased making any of the allegedly deceptive statements long ago, and

2  took immediate steps and devoted substantial resources to correcting any potential vulnerabilities in

3  its products once they became known.  And DLS has no "past record" at all of any unfair

4  advertising practices.  All of this reflects DLS' complete sincerity in preventing any future violation

5  of Section 5.  Last, as to "scienter," even FTC is not alleging DLS intentionally did anything wrong

6  in the first place.  Ex. 23 (Dkt. No. 28) at 12 n.5.  There is therefore absolutely no basis, on this

7  record, for the Court to grant the relief sought by the FTC on its remaining claims and to enter a

8  permanent injunction against DLS.

9       **B.     In Any Case, The Permanent Injunctive Relief Sought By The FTC Is Barred as**
        **a Matter of Law.**

10

11      Even if there was a proper basis for the Court to enter some type of injunction in this case

12  (which there is not, in part for the reasons stated above), the injunctive relief the FTC seeks here—a

13  mandatory injunction commanding DLS to overhaul the security practices used for its products to

14  meet an indeterminable standard of reasonableness—is unenforceable.  The injunction requested by

15  the FTC is not sufficiently specific to be enforceable under Rule 65(d), and is inconsistent with the

16  FTC Act and due process.  *See LabMD, Inc. v. FTC*, 891 F.3d 1286, 1299-302 (11th Cir. 2018).

17      "Rule 65(d) requires '[e]very order granting an injunction' to 'state its terms specifically'

18  and to 'describe in reasonable detail—and not by referring to the complaint or other document—the

19  act or acts restrained or required.'"  *Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020, 1047-

20  48 (9th Cir. 2013) (quoting Fed. R. Civ. P. 65(d)(1)(B)-(C)); *see LabMD*, 891 F.3d at 1300.[12]

21  _____

22  prohibits or requires, or is supposedly "reasonable."  *See* Ex. 12 (FTC RFA Resp.) at 11 (No. 12);
    Ex. 7 (Graff Tr.) at 104:10-12 (no FTC security standards or guidelines); Ex. 15 (LabMD PI Tr.) at

23  94:14-15 ("[T]here are no security standards from the FTC.").  Nevertheless, in 2016, DLS even
    went so far as to consult an outside expert, Onward Security, in part to attempt to understand what

24  FTC Staff thought Section 5 prohibited or required at that time.  Tsai Decl. ¶¶ 18-20.  This very
    same consultant has counseled other IP camera and router companies in Taiwan on compliance with

25  FTC "reasonable practices" consent orders to which they were subject.  *See* Hung Decl. ¶ 11.
    Moreover, beginning in 2016, and, at latest, by March 2017, many newer and additional practices

26  were voluntarily implemented that go above and beyond those that have apparently been deemed
    acceptable by FTC (albeit not publicly, *see* Ex. 30 (Trendnet compliance reports).  Tsai Decl. ¶¶ 18-

27  24 & Ex. C.

28  [12] "[T]he specificity provisions of Rule 65 (d) are no mere technical requirements.  The Rule was
    designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and
    to avoid the possible founding of a contempt citation on a decree too vague to be understood."

1   Moreover, specificity is particularly "important in the fashioning and enforcement of an injunction

2   consequent to an action brought in district court under Section 13(b)." *LabMD*, 891 F.3d at 1300.

3   The requirement that terms of injunctive relief under Section 13(b) of the FTC Act must be specific

4   is grounded in principles of due process, the text, purpose, and structure of the FTC Act, and

5   practical necessity. *See LabMD*, 891 F.3d at 1299-1303 & n.40.

6         Here, the mandatory injunctive relief the FTC seeks, as framed by the Complaint's core

7   allegation that DLS failed to act "reasonably," cannot meet these requirements.  The FTC's broad

8   position is that DLS "engaged in … deceptive conduct in violation of Section 5 of the FTC Act by

9   failing to undertake the most basic security practices to protect their routers and IP cameras, all

10   while representing that these devices were secure." Ex. 22 (Dkt. No. 67) at 7:24-26; Ex. 23 (Dkt.

11   No. 28) at 1:2-6 (same), 2:1-10, 13:22-24; *see* Dkt. No. 90 at 2:2-3 ("DLS's practices constitute, in

12   the FTC's view, unfair and deceptive conduct….").  As a remedy for this purportedly "deceptive"

13   failure to affirmatively implement security practices, FTC seeks "[a] permanent injunction against

14   [DLS] … including the imposition of various monitoring and reporting provisions[.]"  Ex. 22 (Dkt.

15   No. 67) at at 21:19-20; Ex. 17 (FTC 3d ID), at 26.[13]

16         In essence, the theory of "deception" alleged in the Complaint with respect to Counts II, III,

17   and VI is based on the notion that DLS implicitly represented that it had taken "reasonable"

18   measures to secure its products but did not do so.  *See* Compl. ¶¶ 15 (alleging failure to act

19   reasonably), 31-32 (using phrase "reasonable steps to secure their products" (emphasis added)); Ex.

20   11 (FTC Rog Resp.), at 10-16 (Nos. 12-13) (stating with respect to Count II, III, and VI that DLS

21   did not take "reasonable software testing and remediation measures" regarding "well-known and

22   easily preventable software security flaws" (emphasis added)); Ex. 6 (FTC 30(b)(6)) at 361:7-10

23   (PX 2), 363:6-8 (PX 3), 364:22-365:3 (PX 4), 367:2-4 (PX 5); Ex. 14 (Shimp Rep.) at ¶¶ 9-10.[14]  As

24   _____

25   *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).  "[T]hose against whom an injunction is issued
    should receive fair and precisely drawn notice of what the injunction actually prohibits."  *Granny*
26   *Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 444 (1974).

27   [13] FTC apparently seeks relief requiring DLS to either "enter into contracts with third parties or
    restructure its business operations."  *See* Ex. 27 (Dkt. No. 58) at 2:22-24.

28   [14] Paragraph 15 of the Complaint is structurally indistinguishable from a key paragraph in the
    LabMD Complaint, which the Eleventh Circuit emphasized as preclusive of injunctive relief.

1  to how the FTC intends to establish DLS' alleged "unreasonableness," the FTC has pinned its case

2  to expert testimony.  *See* Ex. 6 (FTC 30(b)(6)) at 366:14-15 ("A The FTC will demonstrate what

3  reasonable steps are through expert testimony."), 345:6-9, 345:16-18 (same); *see also* Ex. 28 (Arias

4  Tr.) at 55:13-58:6.

5       The FTC's theory of liability for these "deception" claims—based upon DLS's alleged

6  failure to meet an indeterminate, ever-shifting "reasonableness" standard—therefore mirrors that of

7  the now-dismissed the "unfairness" claim except that this theory of necessity relies on two layers of

8  expert testimony: one FTC expert says that DLS communicated a message that DLS engages in

9  what the FTC considers to be "reasonable testing and remediation" practices (DLS and its experts

10  dispute this);[15] a second FTC expert then says that DLS did not use "reasonable" testing practices

11  and procedures (DLS and its experts dispute this).[16]  Indeed, "the FTC has said that for all of its

12  claims 'the core facts overlap, absolutely[.]'" Dkt. No. 90 at 3:23-24 (quoting Dkt. No. 42 at 13).

13       Critically, just as the FTC's "deception" claims here are, by necessity, predicated on layers

14  of expert testimony as to an ever-shifting "reasonableness" standard, *see* Ex. 8 (Graff Rep.) at ¶¶

15  14-22, 297-302; Ex. 14 (Shimp Rep.) ¶ 63, so, too, is the relief.  As with the FTC's "unfairness"

16  cases, the permanent injunctive relief the FTC is seeking here would include imposition of a "a

17  comprehensive security program that is reasonably designed to address security risks related to new

18  and existing Covered Devices and Covered Information" as well as "initial and biennial assessments

19  and reports ("Assessments") from a qualified, objective, independent third-party professional, who

20  uses procedures and standards generally accepted in the profession," as with its standard 20-year

21  consent orders.[17]  *See* Exs. 31, Pts. II-III (Trendnet consent), 32, Pts. II-III (Asus consent).

---

*Compare* Compl. ¶ 15, *with LabMD,* 891 F.3d at 1290 n.8 (reproducing paragraph of LabMD Complaint).  *See id.* at *15-17.

[15] *Compare* Ex. 14 (Shimp Rep.) ¶¶ 12, 63, *with* Ex. 35 (Seitz Rebbutal) pp. 18-19.

[16] *Compare* Ex. 8 (Graff Rep.), ¶¶ 14, 15, 17, 18, 21, 22, 297, 302 (claiming "reasonable steps" were not taken), *with* Ex. 20 (Radcliffe Rep.) Appx. B, ¶ 4; Ex. 22 (Radcliffe Rebuttal) ¶ 18; Ex. 24 (Schaumont Rep.) ¶¶ 14, 71-72, 97-101, 113-114; Ex. 25 (Schaumont Rebuttal), ¶¶ 2.a, 5-7, 62-63.

[17] Parts II and III of the Trendnet and Asus consent orders are functionally identical to Parts I and II of the LabMD Final Order.  *Compare* Ex. 32 (Asus consent) at 4-6; Ex. 31 (Trendnet consent) at 4-7, *with* Ex. 33 (Final Order, In re LabMD, Dkt. No. 9357, at 2-3 (Pts. I-II) (July 28, 2016)).

1   This lack of specificity is fatal.  As the 11th Circuit recently ruled in *LabMD*, 891 F.3d

2   1286, the mandatory injunctive relief the FTC seeks here is unenforceable as a matter of law.  As in

3   *LabMD*, this type of injunction "contains no prohibitions.  It does not instruct … [DLS] to stop

4   committing a specific act or practice.  Rather, it commands [DLS] to overhaul and replace its data-

5   security program to meet an indeterminable standard of reasonableness." *LabMD, Inc*., 891 F.3d at

6   1300.  "This command is unenforceable." *Id.*

7   Moreover, tasking federal district courts with ensuring the "reasonableness" of the

8   affirmative security practices technology companies must use to comply with the Section 5 by

9   micromanaging injunctions is inconsistent with the text, structure, and purpose of the FTC Act.  *See*

10  *id*. at 1302 ("This is a scheme Congress could not have envisioned.").

11  Finally, even if the permanent injunctive relief that the FTC seeks here could meet the

12  specificity requirements set by Rule 65(d) and Section 13(b) of the FTC Act—which it cannot—it

13  should nonetheless be barred by Section 13(b) because is a mandatory injunction, as opposed to a

14  prohibitive one, because it would affirmatively require DLS (and other third parties) to take a

15  number of actions.[18]  Although the Ninth Circuit has not decided this question yet, *see FTC v.*

16  *Neovi, Inc*., 604 F.3d 1150, 1160 & n.10 (9th Cir. 2010), the text, structure, and history of the FTC

17  Act foreclose the FTC from obtaining this type of injunctive relief under Section 13(b).

18  Congress specifically allowed for mandatory injunctive relief under Section 5 of the FTC

19  Act, but only where a person or entity has violated a final order of the Commission.  *See* 15 U.S.C.

20  § 45(l).  This extraordinary type of injunctive relief, however, is not allowed under Section 13(b) of

21  the Act, which authorizes injunctive relief where an entity is about to violate or is violating the FTC

22  Act. 15 U.S.C. § 53(b).  Had Congress intended to authorize district courts to order mandatory

23  injunctive relief under Section 13(b), it would have expressly so provided, as it did in Section 5(l).

24  *See Negusie v. Holder,* 555 U.S. 511, 544-45 (2009).  It did not.  This is confirmed by Section

25  13(b)'s purpose: "permit[ing] the Commission to bring an immediate *halt* to unfair or deceptive acts

26

27  [18] A prohibitory injunction preserves the status quo. A mandatory injunction "goes well beyond

28  simply maintaining the status quo pendente lite [and] is particularly disfavored." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979); *see also Neovi*, 604 F.3d at 1160.

1   or practices[.]" *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982) (citing S.Rep. 93-

2   151, 30-31) (emphasis added); *see also Evans Products*, 775 F.2d at 1087.

3   **VI.      CONCLUSION**

4            For the foregoing reasons, DLS respectfully requests that the Court grant its Motion for

5   Summary Judgment.

6    Dated:  September 21, 2018                    Respectfully submitted,

7                                                  CAUSE OF ACTION INSTITUTE

8                                                  By: _____ */s/ John Vecchione* _____

9                                                  JOHN VECCHIONE [admitted *pro hac vice*]
                                                   MICHAEL PEPSON [admitted *pro hac vice*]

10

11                                                 *Attorneys for Defendant*
                                                   *D-Link Systems, Inc.*

12                                                 *(Additional counsel listed on caption page)*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28