**CAUSE OF ACTION INSTITUTE**
JOHN J. VECCHIONE [admitted *pro hac vice*] [Lead Counsel]
john.vecchione@causeofaction.org
MICHAEL D. PEPSON [admitted *pro hac vice*]
Admitted only in Maryland.
Practice limited to matters and proceedings before United States Courts and agencies.
michael.pepson@causeofaction.org
JESSICA LEE THOMPSON [admitted *pro hac vice*]
jessica.thompson@causeofaction.org
ASHLEY SALVINO [admitted *pro hac vice*]
ashley.salvino@causeofaction.org
JOSHUA N. SCHOPF [admitted *pro hac vice*]
josh.schopf@causeofaction.org
NICHOLE C. WILSON [admitted *pro hac vice*]
nichole.wilson@causeofaction.org
KARA E. MCKENNA [admitted *pro hac vice*]
kara.mckenna@causeofaction.org
CYNTHIA CRAWFORD [admitted *pro hac vice*]
cynthia.crawford@causeofaction.org
1875 Eye Street N.W., Suite 800
Washington, DC 20006
Telephone: (202) 422-4332/Facsimile: (202) 330-5842

Christine Yang (SBN 102048)
  chrisyang@sjclawpc.com
**LAW OFFICES OF S.J. CHRISTINE YANG**
17220 Newhope Street, Suites 101 &102
Fountain Valley, CA 92708
Telephone: 714.641.4022
Facsimile: 714.641.2082

Christopher Kao (SBN 237716)
  christopher.kao@pillsburylaw.com
Brock S. Weber (SBN 261383)
  brock.weber@pillsburylaw.com
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Tel.: 415.983.1000 / Facsimile: 415.983.1200

*Attorneys for Defendant D-Link Systems, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:17-cv-00039-JD |
| Plaintiff, | **DEFENDANT D-LINK SYSTEMS, INC.'S OPPOSITION TO PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| D-LINK SYSTEMS, INC., | Date: **November 8, 2018** |
| Defendants. | Time: 10:00 a.m. |
| | Courtroom: 11 |
| | Judge: Honorable James Donato |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II. LEGAL STANDARD ..................................................................................................2

    A.  Summary Judgment Standard ...........................................................................2

    B.  Standard for "Deception" Claims Under the FTC Act. ...................................3

III. ARGUMENT ...............................................................................................................4

    A.  There are Genuine Issues of Material Fact that Preclude
        Summary Judgment In Favor of the FTC on Count 2. ....................................4

        1.  There Are Material Factual Disputes as to the
            Representations Made in the DLS Security Advisory Website...................4

            a.  The "Express Claims." ......................................................................4

            b.  The "Implied" Claims.......................................................................6

        2.  There are Material Factual Disputes Regarding the
            "Reasonableness" of the Practices Used for DLS Products ........................8

            i.   There Is Conflicting Expert Testimony on
                Critical Issues. ..................................................................................9

            ii.  There Are Genuine Factual Disputes as to the
                Practices Used by DLS. ..................................................................10

        3.  There are Material Factual Disputes Regarding the
            "Materiality" of the Alleged Representations. ...........................................16

    B.  There are Genuine Issues of Material Fact that Preclud
        Summary Judgment In Favor of the FTC on Count 3. ....................................17

         1.  The DLS Datasheets At Issue In Count 3 Either
            Contain Nonactionable Opinions or are Literally True. ............................17

        2.  There are Material Factual Disputes Regarding the
            Security of the Accused Routers. ..............................................................18

        3.  There are Material Factual Disputes Regarding the
            "Materiality" of the Alleged Representations. ...........................................20

    C.  There are Genuine Issues of Material Fact that Preclude
         Summary Judgment In Favor of the FTC on Count 6. ....................................21

1. There Are Material Factual Disputes as to the Representations Made in the DLS Business and Consumer IP Camera User Manuals and Graphical User Interfaces. .......21

2. There are Material Factual Disputes Regarding the Security of the Accused IP Cameras. .........................................................23

3. There are Material Factual Disputes Regarding the "Materiality" of Challenged Images. ........................................................24

IV.    CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. FCA US LLC*,
No. 17-00007, 2017 WL 1957068 (W.D. Va. May 10, 2017) ................................. 17

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ............................................................................................... 2

*Atari Corp. v. 3DO Co.*,
No. 94–20298, 1994 WL 723601 (N.D. Cal. May 16, 1994) ................................. 17

*Carlay Co. v. Fed. Trade Comm'n*,
153 F.2d 493 (7th Cir. 1946) ........................................................................... 3, 17

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
911 F.2d 242 (9th Cir. 1990) ................................................................................. 3

*Donachy v. Playground Destination Props., Inc.*,
No. 10-4038, 2013 WL 3793033 (D.N.J. July 19, 2013) ...................................... 17

*Fed. Trade Comm'n v. Cyberspace.com, LLC*,
453 F.3d 1196 (9th Cir. 2006) ........................................................................... 3, 4

*Fed. Trade Comm'n v. DIRECTV, Inc.*,
No. 15-01129-, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ........................ 3, 23

*Fed. Trade Comm'n v. Nat'l Urological Grp., Inc.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) .................................................................. 8

*Fed. Trade Comm'n v. Stefanchik*,
559 F.3d 924 (9th Cir. 2009) ................................................................................. 3

*Fed. Trade Comm'n v. Sterling Drug, Inc.*,
317 F.2d 669 (2d Cir. 1963) .............................................................................. 4, 6

*Federal Trade Commission v. Medlab, Inc.*,
615 F. Supp. 2d 1068 (N.D. Cal. 2009) ................................................................. 7

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
352 F.3d 367 (9th Cir. 2003) .............................................................................. 5, 8

*Greater Hous. Transp. Co. v. Uber Techs., Inc.*,
155 F. Supp. 3d 670 (S.D. Tex. 2015) ................................................................. 18

*In re Cliffdale Assocs., Inc.*,
103 F.T.C. 110, 1984 WL 565319 (1984) .............................................................. 4

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
    601 F. Supp. 2d 1201 (S.D. Cal. 2009) .................................................................. 17

*In re LabMD, Inc.*,
    No. 9357, 2014 WL 2331027 (F.T.C. May 19, 2014)...................................... 1, 9, 10

*In re POM Wonderful LLC*,
    No. 9344, 2013 FTC LEXIS 6 (F.T.C. Jan. 10, 2013) ...................................... 6, 16, 21

*In re Thompson Med. Co.*,
    104 F.T.C. 648, 1984 WL 565377 (1984)......................................................... 8

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ........................................................................... 3

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    No. 16-02752, 2017 WL 3727318 (N.D. Cal. 2017)....................................... 5, 8

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*,
    No. 13-00909, 2014 UWL 1320281 (D. Utah Mar. 31, 2014)........................... 17

*Kraft, Inc. v. Fed. Trade Comm'n*,
    970 F.2d 311 (7th Cir. 1992) ........................................................................... 4

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*,
    114 F. Supp. 3d 852 (N.D. Cal. 2015) ............................................................ 18

*Lenscrafters, Inc. v. Vision World*,
    943 F. Supp. 1481 (D. Minn. 1996) ................................................................. 17

*Lopez v. CTPartners Exec. Search, Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ............................................................... 5, 8

*Newcal Indus. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ......................................................................... 3

*Pac. Express, Inc. v. United Airlines, Inc.*,
    959 F.2d 814 (9th Cir. 1992) ........................................................................... 3

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ......................................................................... 25

*S&H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Comm.*,
    659 F.2d 1273 (5th Cir. 1981) ......................................................................... 9

*S. Cal. Gas Co. v. City of Santa Ana*,
    336 F.3d 885 (9th Cir. 2003)............................................................................ 2

*Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*,
    641 F. App'x 849 (11th Cir. 2016)................................................................... 9

D-Link Systems' Opposition to Plaintiff FTC's
Motion for Summary Judgment
    iv    Case No. 17-cv-00039-JD

*Simeon Management Corp. v. Federal Trade Commission*,
   579 F.2d 1137 (9th Cir. 1978) ........................................................................ 8

*Sw. Sunsites v. Fed. Trade Comm'n*,
   785 F.2d 1431 (9th Cir. 1986) ..................................................................... 3, 8

*Thomas v. Newton Int'l Enters.*,
   42 F.3d 1266 (9th Cir.1994) ........................................................................ 3

*U.S. v. F/V Repulse*,
   688 F.2d 1283 (9th Cir. 1982) ..................................................................... 3

*United States v. Bayer Corp.*,
   2015 WL 5822595 (D.N.J. Sept. 24, 2015) ................................................. 8

*Zamani v. Carnes*,
   491 F.3d 990 (9th Cir. 2007) ..................................................................... 25

**Rules and Regulations**

Fed. R. Civ. P. 56(a) ........................................................................................ 2

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The Federal Trade Commission's ("FTC") motion for summary judgment on Counts 2, 3 and 6 of the FTC's Complaint ("MSJ") is based almost entirely on <u>disputed</u> issues of material fact, including with respect to fundamental issues regarding Defendant D-Link Systems, Inc.'s ("DLS") products, and DLS' practices and procedures to prevent against potential intrusions of those products by third parties.  The Court cannot resolve these critical disputed issues of fact on summary judgment in concluding whether DLS has engaged in any "deception" under the FTC Act.  Accordingly, the FTC's MSJ must be denied.

As an initial matter, the FTC's argument that DLS has engaged in deceptive practices regarding its products admittedly relies on expert testimony about core issues in this case, such as the security of the accused DLS routers and IP cameras, and the "reasonableness" of the practices with respect to the engineering and testing of those products.  The FTC's experts' opinions and conclusions on these fundamental issues squarely conflict with those offered by DLS' experts.  This alone is sufficient to defeat summary judgment on all counts.  Indeed, in administrative actions under the FTC Act, the FTC itself has <u>unanimously</u> held that conflicting expert opinions as to the "reasonableness" of a company's security practices precludes summary judgment.  *See In re LabMD, Inc.*, No. 9357, 2014 WL 2331027, at *6 (F.T.C. May 19, 2014) ("[C]onflicting expert opinion is precisely the type of dispute that evidentiary hearings are held to resolve.").  The result should be no different here.

In addition, the FTC's MSJ should be denied because there are numerous material disputes as to the fundamental facts that form the basis for the FTC's claims.  These include for example:

- the security practices used for the products DLS sells, including among other things (i) the frequency and nature of pre- and post-release testing of the products; (ii) the processes used to determine how, when, and whether a possible hypothetical vulnerability should be patched; and (iii) practices relating to firmware upgrades;
- the conditions under which potential theoretical security vulnerabilities affecting DLS products could be exploited in the real world, and the hypothetical consequences thereof;

1   • the context, purpose, and user experience of DLS' predecessor Security Advisories page;

2   • the context and user experience of DLS' business and consumer IP camera Setup Wizards

3       and User Manuals; and

4   • the intent, context, and purpose of various DLS emails and Security Advisements directed to

5       security issues.

6       Tellingly, the FTC's MSJ primarily relies on a few stray emails and DLS web postings

7   (many of which contain inadmissible hearsay statements from unaffiliated third parties), and the

8   declaration of Jamie Hine, an FTC attorney who purported to test two DLS model DCS-2310L IP

9   cameras, to support its claims. However, even a cursory review of all the relevant documentation

10  concerning DLS' products, and the testimony of DLS' witnesses, establish that the FTC's exhibits

11  and its attorney's testimony provide an incomplete view of the relevant events in this case, are

12  divorced from necessary context, and ignore that the material facts in this case are vigorously

13  disputed. Mr. Hine's October 1, 2018, deposition testimony pursuant to the Court's September 24,

14  2018 Order, Dkt. No. 168, if anything, provides further factual support for DLS's arguments.

15      For these reasons, which are discussed in greater detail below, the Court should deny the

16  FTC's MSJ.

17  **II.     LEGAL STANDARD**

18      **A.     Summary Judgment Standard**

19      In order to prevail on summary judgment, the FTC, as the movant, must show that "there is

20  no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed.

21  R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (applying same

22  standard under earlier wording of Rule 56). "As the party with the burden of persuasion at trial, the

23  [FTC] must establish 'beyond controversy every essential element of its' . . . claim." *S. Cal. Gas*

24  *Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted).

25      "[T]he substantive law will identify which facts are material" and "summary judgment will

26  not lie if the dispute about a material fact is 'genuine[.]'" *Anderson*, 477 U.S. at 248 (citation

27  omitted). Further, "[t]he inferences to be drawn from the underlying facts must be viewed in the

28  light most favorable to the nonmoving party." *Pac. Express, Inc. v. United Airlines, Inc.*, 959 F.2d

814, 816 (9th Cir. 1992) (applying summary judgment standard in Sherman Act Section 2 case). Conflicting expert opinion evidence is generally sufficient to defeat summary judgment. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case."); *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir.1994) ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion.").

### B. Standard for "Deception" Claims Under the FTC Act.

"As the plaintiff, the FTC bears the burden of proof and must prove each element of its case by a preponderance of the evidence." *Fed. Trade Comm'n v. DIRECTV, Inc.*, No. 15-01129-, 2018 WL 3911196, at \*2 (N.D. Cal. Aug. 16, 2018) (citing *U.S. v. F/V Repulse*, 688 F.2d 1283, 1284 (9th Cir. 1982)). Here, in order to prevail on its "deception" claims (Counts 2, 3 and 6), the FTC must prove that DLS (1) made a "representation"; that (2) is "likely to mislead consumers acting reasonably under the circumstances"; and (3) is "material." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *see also Sw. Sunsites v. Fed. Trade Comm'n*, 785 F.2d 1431, 1436 (9th Cir. 1986).

As a general matter, statements of <u>opinion</u> and other <u>subjective</u> claims cannot form the basis for deception liability.[1] *See, e.g.*, *Carlay Co. v. Fed. Trade Comm'n*, 153 F.2d 493, 496 (7th Cir. 1946) ("[S]uch words as 'easy,' 'perfect,' 'amazing,' 'prime,' 'wonderful,' 'excellent,' are regarded in law as mere puffing or dealer's talk upon which no charge of misrepresentation can be based."). And although proof of actual deception is not necessary for a liability finding, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *Fed. Trade Comm'n v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

---

[1] As this Circuit has explained in an analogous context, "the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990)). "Thus, a statement that is quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,' may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery." *Id.* (citing *Cook*, 911 F.2d at 246).

1    "When representations or sales practices are targeted to a specific audience, the Commission

2    determines the effect of the practice on a reasonable member of that group." *In re Cliffdale Assocs.,*

3    *Inc.*, 103 F.T.C. 110, 1984 WL 565319 (1984), at *46 [hereinafter FTC "Deception" Statement].[2]  It

4    is also necessary to "evaluate <u>the entire advertisement, transaction, or course of dealing</u> in

5    determining how reasonable consumers are likely to respond."  *Id.* at *48 (emphasis added); *accord*

6    *Fed. Trade Comm'n v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) ("It is therefore

7    necessary . . . <u>to consider the advertisement in its entirety</u> and not to engage in disputatious

8    dissection.  <u>The entire mosaic should be viewed rather than each tile separately</u>." (emphasis added)).

9        A representation is "material" if it is important to a reasonable consumer's decision whether

10   to purchase the product or, alternatively, how the product is used.  *See Cyberspace.com*, 453 F.3d at

11   1201.

12   **III.   ARGUMENT**

13        **A.    There are Genuine Issues of Material Fact that Preclude Summary Judgment
            In Favor of the FTC on Count 2.**

14
            **1.    <u>There Are Material Factual Disputes as to the Representations Made in the
            DLS Security Advisory Website.</u>**
15

16        The FTC's claim in Count 2 of its Complaint is based entirely on PX 1, the Security

17   Advisory Website, <u>as it existed in September 2015</u>.  The record before the Court establishes that

18   there are genuine material of issues of fact involving both the purported express  and implied claims

19   that the FTC contends are made in PX 1.[3]  *Compare* FTC MSJ at 7–8, *with* Seitz Decl. ¶¶ 3–-4, Ex.

20   B (Rebuttal Report) at pp. 17–19.

21                **a.    The "Express Claims."**

22        With respect to the alleged "express claims," DLS disputes that any of the express claims

23   along the lines of what the FTC contends exist in PX 1 at all.  For example, at most PX 1 states

24   expressly that it "prohibits . . . any <u>intentional</u> features or behaviors which allow unauthorized

25   ────────────────

26   [2]  For example, "a practice or representation directed to a well-educated group, such as a
     prescription drug advertisement to doctors, would be judged in light of the knowledge and
     sophistication of that group."  FTC "Deception" Statement, 1984 WL 565319, at *47.

27   [3]  "Express claims directly represent the fact at issue while implied claims do so in an oblique or
28   indirect way."  *Kraft, Inc. v. Fed. Trade Comm'n*, 970 F.2d 311, 318 n.4 (7th Cir. 1992).

access to the device or network." *See* PX 1; Compl. ¶ 20. The FTC, however, reads the critical word "intentional" out of PX 1, *see* FTC MSJ at 7:9–10, in an attempt to hold DLS to purported express promises that simply are not present in PX 1.[4] DLS never expressly (or otherwise) guaranteed that its products would be free from all vulnerabilities, including any "prohibited" features. Indeed, the FTC's own marketing expert agreed with DLS that PX 1 implies that the "prohibited" features and behaviors may occur, Ex. 9[5] (Shimp Tr.) 142:14–143:13, and does not communicate that DLS products are free from vulnerabilities. *Id.* at 147:5–15. PX 1, when read as a whole, instead communicates that DLS' products, like all such Internet of Things ("IoT") products that can be connected to the Internet, will at times have potential vulnerabilities, which are fixed via firmware upgrades as they are discovered. *See* Supp. Brown Decl. ¶¶ 27-37 & Exs. E-G.

The remainder of the alleged "express claims" are nonactionable as a matter of law, and cannot serve as the basis for judgment on Count 2. For example, PX 1 states that any prohibited "features and behaviors are considered serious and will be given the highest priority." *See* PX 1; Compl. ¶ 20. This is not an actionable deceptive statement. *See, e.g., Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (statement of "high priority" is "mere 'puffery'"); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-02752, 2017 WL 3727318, at *26 (N.D. Cal. 2017) ("The Court agrees with Defendants that the first alleged misrepresentation—that 'protecting our systems and our users' information is paramount to ensuring Yahoo users enjoy a secure user experience and maintaining our users' trust'—constitutes non-actionable puffery."); *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) ("very seriously" is nonactionable puffery). For the same reason, "D-Link's Commitment to Product Security" is also not an actionable deceptive statement. *See* PX 1; Compl. ¶ 20.

---

[4] The FTC further faults DLS in its MSJ for an alleged failure to disclose vulnerabilities. *See* FTC MSJ at 7:11–12. But the Complaint does not allege that DLS committed deception based on a failure-to-disclose theory, as the FTC's 30(b)(6) witness has admitted. Ex. 6 (FTC 30(b)(6) Tr.) at 276:15–277:2, 319:15–320:10.

[5] Exhibits are attached to the Declaration of Michael Pepson, unless otherwise indicated, and are designated numerically.

1    Moreover, while disclaimers do not automatically immunize statements that might otherwise

2  be deceptive, *see* Dkt. No. 90 at 5, the FTC's own marketing expert has testified that the only

3  people that PX 1 would have any impact on would be "highly motivated consumers" who are

4  "vigilant, diligent information processor[s]," Ex. 9 (Shimp Tr.) at 107:23–108:17, 113:2–9, 123:16–

5  23, 128:14–17, 144:10–14, suggesting they would review the disclaimers directly below the

6  challenged statement.[6]  That alone, at a minimum, raises a factual dispute as to the effect the

7  disclaimers would have on the "highly motivated consumer," particularly because the operative

8  disclaimers here are on the same page as the challenged statements <u>directly below</u> the allegedly

9  express claims.  *See* PX 1.

10                     **b.**      The "Implied" Claims.

11       In addition, the "net impression" of PX 1 must also take into account the full gamut of

12  information presented to visitors to DLS' Security Advisories website, as well as the intended

13  audience, as the FTC's administrative decisions make clear.  To determine what representations

14  were made, "the Commission examines the entire advertisement and assesses the overall 'net

15  impression' it conveys."  Opinion of Commission, *In re POM Wonderful LLC*, No. 9344, 2013 FTC

16  LEXIS 6, *21–22 (F.T.C. Jan. 10, 2013) (citing FTC "Deception Statement," 103 F.T.C. at 178);

17  *see also* FTC "Deception" Statement, 1984 WL 565319, at *48 (it is necessary to "evaluate <u>the</u>

18  <u>entire advertisement, transaction, or course of dealing</u> in determining how reasonable consumers are

19  likely to respond")  "The entire mosaic should be viewed rather than each tile separately."  *Sterling*

20  *Drug, Inc*., 317 F.2d at 674.  "When representations or sales practices are targeted to a specific

21  audience . . . the Commission determines the effect of the practice on a reasonable member of that

22  group."  FTC "Deception" Statement, 1984 WL 565319, at *47.  Thus, "a practice or representation

23  directed to a well-educated group, such as a prescription drug advertisement to doctors, would be

24  judged in light of the knowledge and sophistication of that group."  *Id.*

25

26

27  _____

    [6]  Indeed, the FTC's marketing expert pinned his entire analysis to this assumption: "As I've
28  emphasized, all of this is predicated that only that subset of highly motivated consumers will have
    read carefully and understood the SERP."  Ex. 9 (Shimp Tr.) at 144:10–13.

1       PX 1, on its face, shows that DLS' website then had a "Security Advisories List" and a

2 "Security Advisories" section. *See* PX 1. As even the FTC's own supporting exhibits show, *see*

3 Jarad Brown Decl. Exs. 25, 28–32, 40-41, DLS' website policy was inextricably linked to DLS'

4 overarching efforts to transparently inform of potential security vulnerabilities (and, more

5 importantly, the status and availability of firmware fixes) through these "Security Advisories,"

6 while also providing security researchers with the customary "credit" for their research. *See* Supp.

7 Brown Decl. ¶¶ 27, 39-45 & Ex. F.[7] These materials all shape the "net impression" of PX 1 and

8 would underscore to a "highly motivated consumer" that PX 1 does not in any way suggest that

9 DLS products are somehow "perfectly secure"—an unattainable standard, as the FTC admits. *See*

10 Ex. 8 (FTC RFA Resp.) at 35–36 (Nos. 61–62)  Ex. 16 (Graff Rebuttal) at 20, ¶ 32.  This is

11 particularly true here because the primary (and intended) audience reached by the Security

12 Advisories site consisted of security researchers and technical people.  Ex. 3 (Brown Tr.) at 76;

13 Supp. Brown Decl. ¶¶ 33, 37-38.  The FTC cannot, on the one hand, accuse DLS of <u>deception</u> for

14 "not disclos[ing] the existence of [certain] vulnerabilities," (of which DLS was not even aware),

15 FTC MSJ 7:11–12, while simultaneously claiming that "D-Link has publicly acknowledged many

16 such vulnerabilities through its 'Security Advisories." *Id.* at 12 n.50.

17       For these reasons, and particularly because the FTC proffers no extrinsic evidence—expert

18 or otherwise—as to the "net impression" of the Security Advisories website, summary judgment

19 should be denied as to Count 2.  The cases that the FTC relies on to suggest that extrinsic evidence

20 is unnecessary are inapposite.  For instance, the FTC's reliance on dicta from *Federal Trade*

21 *Commission v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009), is misplaced. *See* FTC MSJ at

22 8:9–10. *Medlab*, unlike here, involved a number of specific weight loss claims, and the court

23 observed in passing that even if the representations were implied, "these advertisements are capable

24 of only one interpretation." *Id.* at 1077–78.  The FTC's reliance on *Simeon Management Corp. v.*

25

---

[7]  The FTC's MSJ relies heavily on emails and "Security Advisements" reflecting DLS', and Mr.
Brown's, efforts to act in accordance with the unique customs and practices of the security
researcher community (that is, "white hat hackers") and navigate delicate interactions with "grey
hat" hackers making sales pitches to DLS or otherwise seeking to monetize purported discoveries of
vulnerabilities.  See Supp. Brown Decl. ¶¶ 39-45.  Ex. 10 (Brown IHT) at 620:7–22

1  *Federal Trade Commission*, 579 F.2d 1137 (9th Cir. 1978), which, unlike here, involved a petition

2  for review of an administrative order issued by the Commission, is equally unavailing.  *See* FTC

3  MSJ at 8:10–12.  That case predated changes to the Commission's deception standards that raised

4  the FTC's burden of showing liability.  *See Sw. Sunsites*, 785 F.2d at 1436.

5        The FTC's arguments as to "implied claims" made in PX 1 also fail as a matter of law.  For

6  implied claims that are not reasonably inferred from the face of the advertisement, the FTC has

7  stated before that it "will not find the ad[vertistment] to make the implied claim unless extrinsic

8  evidence allows . . . [the FTC] to conclude that such a reading of the ad is reasonable."[8]  *In re*

9  *Thompson Med. Co.*, 104 F.T.C. 648, 1984 WL 565377 (1984), at *102 & 102 n.8 (discussing use

10  of surveys); *see also United States v. Bayer Corp.*, 2015 WL 5822595, at *11, *13 (D.N.J. Sept. 24,

11  2015) (discussing role of extrinsic evidence); *Fed. Trade Comm'n v. Nat'l Urological Grp., Inc.*,

12  645 F. Supp. 2d 1167, 1193 (N.D. Ga. 2008) (rejecting the FTC's implied claim because it was

13  unsupported by extrinsic evidence).  In this case, the FTC has not proffered any objective extrinsic

14  evidence to suggest that PX 1 somehow impliedly claimed that "reasonable steps" were taken to

15  secure the products.

16        Moreover, even if the FTC were correct, this purportedly implied message would be nothing

17  more than an utterly subjective, non-actionable statement of opinion.  *Cf. Glen Holly Entm't.*, 352

18  F.3d at 379 (statement of "high priority" is puffery); *In re Yahoo!*, 2017 WL 3727318, at *26;

19  *Lopez*, 173 F. Supp. 3d at 28.

20        **2.**   There are Material Factual Disputes Regarding the "Reasonableness" of the

          Practices Used for DLS Products

21

22        Likewise, the central question whether the security practices used for the accused DLS IP

23  cameras and routers were "reasonable" during the time period when PX 1 was posted on DLS'

24  support website involves not only conflicting expert opinions on either side, but is also subject to

25  vigorous factual disputes requiring credibility determinations.  Summary judgment as to Count 2 in

26  therefore inappropriate on these grounds as well.

27

28  [8] *See also* FTC "Deception" Statement, 1984 WL 565319, at *37 (noting situations where "the Commission will require extrinsic evidence" for implied claims).

i.     There Is Conflicting Expert Testimony on Critical Issues.

DLS' expert opinion evidence as to the reasonableness of the security practices used for DLS products, standing alone, is more than sufficient to defeat summary judgment on Count 2.  As the FTC has previously (and unanimously) recognized in its own administrative proceedings, "conflicting expert opinion" regarding "appropriate data security measures" is sufficient to defeat summary judgment, particularly because this "is precisely the type of dispute that evidentiary hearings are held to resolve."  *See In re LabMD, Inc.*, 2014 WL 2331027, at *6.  So too here. *Compare* Jarad Brown Decl., Ex. 57 (Graff Report), *with* Ex. 13 (Schaumont Tr.) at 225:16–229:21 (reaffirming all opinions in expert reports); Schaumont Decl. ¶¶ 1–4, Ex. A (Schaumont Report); Ex. B (Schaumont Rebuttal); Ex. 12 (Radcliffe Tr.) at 259:20–260:3 (reaffirming all opinions in expert reports); Radcliffe Decl. ¶¶ 1–4, Ex. A (Radcliffe Report), App. B; Ex. B (Radcliffe Rebuttal).[9]

Moreover, the FTC's MSJ should further be denied because the FTC cannot even establish what specific "reasonable steps" should have been taken by DLS.  *See Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 852 (11th Cir. 2016) (unpublished) (defendant entitled to summary judgment on plaintiff's negligent data-security practices claim because plaintiff's expert did not establish the standards ordinarily employed in defendant's industry and plaintiff presented no evidence to establish that the challenged practices failed to meet the applicable standard of care); *cf. S&H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Comm.*, 659 F.2d 1273, 1282–85 (5th Cir. 1981) (due process may require objective industry-specific practice standard of care for general "reasonableness" inquiry).  The need to identify what was allegedly "reasonable" (and when)—measured against the baseline industry-wide practices for consumer IP camera and router companies—is particularly important in the data-security context, because as the FTC has previously recognized, "no one static standard can assure appropriate

---

[9]  The 148-page report of the FTC's expert Mark Graff (Jarad Brown Decl. Ex. 57) makes a host of additional disputed factual assertions, which are unsupported by any of the admissible exhibits to FTC's MSJ.  DLS does not address each of those disputed factual assertions herein because "an expert report cannot be used to prove the existence of facts set forth therein" on summary judgment. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999).

security, as security threats and technology constantly evolve . . . in this rapidly changing area." *In re LabMD, Inc.*, No. 9357, 2014 WL 253518, at *12 (F.T.C. Jan. 16, 2014). Here, the FTC cannot even establish what the applicable standard of care is for the IoT consumer-embedded device industry at any given points in time. *See generally* Jarad Brown Decl. Ex. 57 (Graff Report); *cf.* Ex. 7 (Graff Tr.) 101:7–8 ("there are no literal standards, legally binding standards in the U.S. on secure coding"). In any event, one of DLS' experts, Jay Radcliffe, specifically opined in March 2015 that, in his "expert opinion, the security practices with respect to these [DLS] products are more than reasonable" for the IoT consumer-embedded device industry and that "D-Link's security practices are in the top tier of the industry, represent a reasonable and appropriate concern for security, and have appropriately evolved as new threats have come to be understood." Radcliffe Decl., ¶ 2, Ex. A (Report) App. B (2015 Decl.) ¶ 4.

ii.     <u>There Are Genuine Factual Disputes as to the Practices Used by DLS.</u>

Even if this conflicting expert evidence were not sufficient to defeat summary judgment, there are numerous additional factual disputes regarding the practices used for DLS products that independently preclude summary judgment here.

Many of the purported "facts" the FTC identifies as material are, at a minimum, genuinely disputed. For example, contrary to the facts recited in the FTC's MSJ (on pages 9–13):

- DLS and DKC prohibited vendors from intentionally leaving persistent user credentials and other such features in products during the entire period PX 1 was posted on DLS' support website, and continue to do so. Ex. 10 (Brown IHT) at 318:3–16; Ex. 5 (Wang Tr.) at 159:15–163:16; *see also* Supp. Brown Decl. ¶¶ 2-4; Supp. Tsai Decl. ¶¶ 12-14.

- DLS did not "knowingly" sell consumer IP cameras with hidden persistent user credentials during the period that PX 1 was on DLS' support website. There is no dispute that the persistent user account issue was fixed in June 2013,[10] before PX 1 was posted on the support website, and which, in any event, was not a persistent *credential* but rather a

---

[10]  Exhibit 18 (cited at 9 n.32 in the FTC MSJ) reflects that although it was forwarded without comment in August 2014, the attached document and substantive communications occurred in May 2013. Consumer IP cameras manufactured after June 2013 did not have this issue. *See* Tsai Decl., Dkt. No. 184-3, ¶ 14; Supp. Tsai Decl. ¶¶ 16-20 & Exs. B-C; Supp. Brown Decl. ¶¶ 6-8 & Ex. B.

persistent *account* that originally had a business purpose. Supp. Brown Decl. ¶¶ 2-7 & Ex. A; Supp. Tsai Decl. ¶¶ 12-16 & Exs. B-C; Ex. 10 (Brown IHT) at 561:16–586:2; Ex. 5 (Wang Tr.) at 228–32. Even before then, in May 2013, DLS posted on its website (and otherwise disseminated) instructions for end users to change the password themselves. Supp. Brown Decl. ¶9; *see* Jarad Brown Decl. Ex. 16.

- DLS did not sell IP cameras with an "undisclosed" guest/guest account feature when PX 1 was posted, nor does it do so today. The firmware fix for this issue has been available since June 2013, and was automatically implemented when end users followed the instructions and recommendations set forth in the Quick Install Guide ("QIG") for the cameras during the period when PX 1 was posted. Supp. Brown Decl. ¶¶ 6-20 & Exs. A-C; Supp. Tsai Decl. ¶¶ 17-19, Exs. B-C.

- During the period when PX 1 was posted, end users were made aware of updated firmware versions by many methods, including through the "mydlink" mobile applications, the Security Advisories webpage, the forums webpage, by logging into mydlink.com, on the general product support page, and by DLS customer support personnel trained to notify users of the latest firmware version when users call customer support. Ex. 10 (Brown IHT) at 620:7–22, 773:24–774:5; Brown Decl. ¶ 7, Ex. B; *see also* Tsai Decl., Dkt. No. 184-3, ¶¶ 29–30.

- During the period when PX 1 was posted, end users who activated the "mydlink" cloud service would be alerted to firmware updates upon logging into their mydlink account or during device activation. Brown Decl., Dkt. 190, ¶ 29; Tsai Decl., Dkt. No. 184-3, ¶ 29. For DLS products that use the "mydlink" lite mobile applications, the end-user would be automatically notified of firmware updates through the mobile application. Brown Decl., Dkt. 190, ¶ 29; Tsai Decl., Dkt. No. 184-3, ¶ 30; Supp. Brown Decl. ¶ 7, Ex. B;

- DLS was not put on notice of potential vulnerabilities affecting the DIR-855L (first sold March 8, 2013) and DIR-826L (first sold May 2012) cameras before these products were sold. *Compare* Brown Decl. ¶¶ 48-49 (sales dates), *with* Jarad Brown Decl. Ex. 26 (test date). In any event, these potential vulnerabilities—which the FTC MSJ admits were later

1    fixed—did not render the products insecure before then.  *See* Radcliffe Decl., ¶ 3, Ex. B

2    (Rebuttal), ¶ 10.c (Lovett); Schaumont Decl. ¶ 3, Ex. B (Rebuttal) ¶¶ 33–35 & n.67.

3    • Mr. Radcliffe's email is taken out of context by the FTC, as explained in his rebuttal expert

4    report.  Radcliffe Decl., ¶ 3, Ex. B pp. 12–13, ¶ 15.

5    • A one-off vendor oversight resulted in the private key issue, which, in any event, was

6    revoked within a week after the issue was publicly reported and did not create the security

7    risks FTC describes.  Ex. 5 (Wang Tr.) at 193–200 (explaining "it wasn't a security issue");

8    Ex. 3 (Brown Tr.) at 279–84.

9    • Since long before PX 1 was posted on DLS' website, <u>all</u> DLS products and firmware

10   underwent systematic prerelease testing by DKC's D-Lab, which included both functional

11   and security test points.  Supp Tsai Decl. ¶¶ 6-8, 16, Exs. A-C; Tsai Decl., Dkt. No. 184-3, ¶

12   5; Ex. 2 (DLS 30(b)(6) Tr.) at 37:10–40:18, 63:23–66:24, 80:21–25, 153:1–25; Ex. 1 (Tsai

13   Tr.) at 36:14–37:12, 68:9–72:3, 94:9–95:3; Ex. 4 (Hsu Tr.) at 20:12–25:7, 36:24–43:11.

14   This included systematic testing for persistent user credentials.  *See* Tsai Decl., Dkt. No.

15   184-3, ¶ 12; Supp. Tsai Decl. ¶¶ 16-20, Exs. B-C.

16   • For the entire time that PX 1 was posted, DLS products were developed using processes that

17   were designed to detect and, when appropriate depending on level of risk, fix potential

18   vulnerabilities before the products were shipped/sold.  *See* Ex. 1 (Tsai Tr.) 219–28; Ex. 4

19   (Hsu Tr.) at 39–40, 100–06; Supp. Tsai Decl. ¶¶ 6-11, 20.

20   • DLS, DKC, and Mr. Brown diligently and proactively reached out to and worked with the

21   security researcher community and were praised by these researchers for diligently and

22   aggressively investigating potential theoretical vulnerabilities and, when necessary, ensuring

23   that vendors promptly issue firmware fixes.  *See* Supp. Brown Decl. ¶¶ 33, 40 & Ex. H.

24   • DLS actively investigated potentially security issues on its own.  Ex. 3 (Brown Tr.) at 70–

25   74.

26   The FTC's reliance on testimony from one of its attorneys, Jamie Hine, to claim that DLS

27   continues to sell vulnerable devices fails for numerous reasons.  For one thing, the FTC falsely

28   claims that the cameras Mr. Hine supposedly "tested" were purchased from entities that have a

business relationship with DLS. *See* FTC MSJ 10:1-2. At his deposition, however, Mr. Hine admitted the cameras were purchased from "Great Daily Buys" and "AtoZ Wireless," Ex. 14 (Hine Tr.) at 39, 114–15, which are third parties that DLS has no business relationship with whatsoever. Supp. Brown Decl. ¶ 20.

Moreover, the only way it was possible for Mr. Hine to "test" the camera, as he describes, was through the use of a highly irregular setup process that effectively prevented the camera from functioning as intended because he did not allow the camera to connect to the Internet and update its firmware automatically as would normally occur. Indeed, at his deposition, Mr. Hine admitted that the IP cameras he tested were not accessible outside the local network he set up because they were not registered with mydlink.com. Ex. 14 (Hine Tr.) at 68; *see id.* at 69–70, 76, 94, 108–09 (showing private IP address behind router); *see also* Supp. Brown Decl. ¶ 9. This defeats the purpose of the DCS-2310L, which was designed to operate in tandem with mydlink.com and the mydlink mobile apps. Supp. Brown Decl. ¶ 11. In order to take advantage of these features, an end user is required to update the camera's firmware, which would have resolved the issue. Supp. Brown Decl. ¶¶13-15.

Indeed, In order to force the legacy DCS-2310L camera to operate without updating its firmware, Mr. Hine ignored DLS' setup instructions and common sense. He admitted he did not follow instructions to set up a mydlink.com account, Ex. 14 (Hine Tr.) at 31:5–25; chose not to register the test cameras with mydlink.com, *id.* at 33, 121; chose to use a legacy Microsoft Windows Setup Wizard, *see id.* at 30, which was downloaded from the same webpage as the latest available firmware fix, *see id.* at 59–60; ignored a pop-up screen prominently recommending use of the free mydlink mobile app to set up the camera, *see id.* at 61–62; ignored another popup during the setup process informing him that in order to use the mydlink cloud service he would need to set up a mydlink account, *id.* at 67; chose to disable the mydlink cloud service, *id.* at 67; *see id.* at 116–17; ignored web browser security warnings and did not take further steps to troubleshoot, *id.* at 71–73; did not check for the most recent firmware as advised, *id.* at 95–103; and did not update the firmware, *see id.* at 121:19–21. In short, Mr. Hine crashed through every warning sign and off-

1 | ramp DLS provided to force him to use the latest firmware, and then the FTC claims he ended up
2 | with a vulnerable camera.

3 |      Mr. Hine's "tests" confirm that, contrary to the facts asserted in the FTC's MSJ, *see* FTC
4 | MSJ:1–19, during the time period PX 1 was posted, DLS made it extremely simple and easy for
5 | end-users to learn about software patches, particularly during the initial setup process.  See Ex. 18
6 | (screenshots of FTC video of setup process).  It is common sense that products sit on store shelves
7 | or in warehouses and thus may not be installed with the most recent firmware.  Therefore, as Mr.
8 | Hine himself demonstrated, DLS effectively forced all normal end users of its consumer IP cameras
9 | to upgrade the firmware during the initial setup process.  *See also E*xs. 17-19; Brown Decl. ¶¶ 9-18.

10 |      The FTC's reliance on certain emails drafted by a DLS employee, William Brown, and
11 | "Security Advisories" created by Mr. Brown, and the FTC's complete disregard of Mr. Brown's
12 | deposition testimony relating to these documents, further underscores why summary judgment is
13 | inappropriate.  At a bare minimum, the Court must make credibility determinations if it is to ignore
14 | a witness's testimony regarding relevant documentary evidence and contradicting the FTC's
15 | interpretation of the evidence.  *See* Ex. 5 (Wang Tr.) at 182:8–183:18, 194:9–196:21, 205:24–206:4;
16 | Ex. 3 (Brown Tr.) at 193:1–195:14; Ex. 2 (DLS 30(b)(6) Tr.) at 72, 99:9–100:23. 116:25–117:6,
17 | 139:9–25, 153, 194–96, 210:10–211:12, 238:11–22.

18 |      The FTC's reliance on certain emails drafted by a DLS employee, William Brown, and
19 | "Security Advisories" created by Mr. Brown, and complete disregard of Mr. Brown's deposition
20 | testimony relating to these documents, further underscores why summary judgment is inappropriate
21 | here.  At a bare minimum, the Court must make credibility determinations if it is to ignore a
22 | witness's testimony regarding relevant documentary evidence and contradicting the FTC's
23 | interpretation of the evidence.  See Ex. 5 (Wang Tr.) at 182:8-183:18, 194:9-196:21, 205:24-206:4;
24 | Ex. 3 (Brown Tr.) at 193:1-195:14; Ex. 2 (DLS 30(b)(6) Tr.) at 72, 99:9-100:23. 116:25-117:6,
25 | 139:9-25, 153, 194-96, 210:10-211:12, 238:11-22.

26 |      A perfect example is the email Mr. Brown sent in May 2013 regarding the persistent guest
27 | user account that is the focal point of the FTC's MSJ.  *See* FTC MSJ 24:2-16 & Ex. 52.  As
28 | addressed in detail further below (pp. 22-23), the FTC's characterization of that email is

1  categorically refuted by (a) Mr. Brown's testimony in 2014, *see* Ex. 10 (Brown IHT) at 755–84; (b)

2  Mr. Brown's testimony in 2018, *see* Ex. 3 (Brown Tr.) at 205–09; (c) Mr. Wang's testimony, see

3  also Ex. 5 (Wang Tr.) at 228–32; Mr. Brown's declaration, Supp. Brown Decl. ¶¶ 9, 19; and Mr.

4  Tsai's declaration, *see* Supp. Tsai Decl., ¶¶ 12-20.  Likewise, the FTC's reliance on "security

5  advisories" to support its core factual claims regarding the purported vulnerabilities, *see, e.g.,* FTC

6  MSJ 12:3-4, 20:11-13 & Jarad Brown Decl. Exs. 31 & 40, is plainly contradicted by the context in

7  which these materials were created.  *See* Supp. Brown Decl. ¶¶ 25-45; *see also* Jarad Brown Decl.

8  Ex. 40 ("We offer the following as a summary pulled from the authors linked document.").  Yet

9  another example is the FTC's citation to an email Mr. Brown sent about the "private key," FTC

10  MSJ 12:9-10 & Jarad Brown Decl. Ex.34, which is put in context by Mr. Brown's testimony, *see*

11  Ex. 3 (Brown Tr.) at 279-84, and Mr. Wang's testimony, *see* Ex. 5 (Wang Tr.) at 193-200

12  (explaining "it wasn't a security issue").  Finally, the FTC's claims about Mr. Brown's purported

13  agreement with FTC as to the "core purpose" of IP cameras is also contradicted by objective facts,

14  as explained by Mr. Brown in his declaration.  *See* Supp. Brown Decl. ¶¶ 21-24.

15      The FTC's reliance on a list of vulnerabilities created by a nonprofit organization known as

16  "OWASP," *see* FTC MSJ 10:13–16, also is subject to numerous material factual disputes.[11]  As an

17  initial matter, it is entirely improper for the FTC to rely at the summary judgment stage on its own

18  Complaint as evidence that the alleged vulnerabilities are "critical," as it attempts to do here.  *See*

19  FTC MSJ 10:16–17 & n. 42.  This is particularly true because DLS <u>denied</u> the allegation.  *See* Ans.

20  ¶ 15, Dkt. No. 92.  In any event, the evidence in the record suggests that the OWASP list is used

21  primarily by "the security test industry" (and <u>not</u> the consumer router and IP camera industry), and

22  even for the security test industry, this list is "not considered to be the standard in the industry."  Ex.

23  1 (Tsai Tr.) at 77–79.  To the contrary, according to DLS' witnesses, the OWASP list is not even a

24  "must follow-up," meaning that "there was not any industrial standard to indicate that if you do not

25  follow OWASP top ten test items, then the device cannot be used."  Ex. 1 (Tsai Tr.) at 77–79.  Indeed,

26

---

27  [11]  Contrary to the FTC's MSJ, *see* FTC MSJ 10:13–16 & n.41, the purported OWASP rankings are
     not an industry standard even in the security testing industry, nor is this list binding.  *See*
28  Schaumont Decl. ¶¶ 3–4, Ex. A (Schaumont Report) ¶¶ 65, 67 (no industry standard; only best
     practices); *accord* Ex. 7 (Graff Tr.) 101:7–9.

1   DLS' former CEO, A.J. Wang, who has extensive and deep experience in the consumer router and IP

2   camera industry, was unfamiliar with OWASP and its list.  Ex. 5 (Wang Tr.) at 168–69.

3          Nor can the FTC rely on changes to the security-related practices used for DLS products,

4   *see, e.g.*, FTC MSJ at 12:24–28 n.53, 13:3–6 & n.54; releases of firmware fixes, *see, e.g.*, *id.* at

5   9:13–14 & n.33; posting of security advisories, *see, e.g.*, *id.* at 11:6–14 & nn.46, 49, to support any

6   of its liability claims in this case based on alleged events occurring before these measures were put

7   in place.  Fed. R. Evid. 407 (subsequent remedial measures cannot be used to prove negligence,

8   culpable conduct, defect in a product or its design, or need for a warning or instruction).

9          **3.**  There are Material Factual Disputes Regarding the "Materiality" of the
            Alleged Representations.

10

11         Finally, the FTC argues that the alleged representations at issue in Count 2 should be

12   presumed by the Court to be material.  *See* FTC MSJ at 13–15.  This is wrong for several reasons.

13         First, as discussed above, PX 1 does not make any actionable "express" claims.  Second,

14   cybersecurity is <u>not</u> the central characteristic of routers and IP cameras any more than it is for other

15   IoT devices like smart "appliances" or "connected cars" or medical devices.[12]  A toaster is a toaster,

16   whether connected to the Internet or not.  And a camera is a camera.

17         Regardless, even if this light presumption did properly apply (which it does not), it may be

18   rebutted with evidence tending to disprove the predicate fact from which the presumption arises or

19   evidence contradicting the initial presumption of materiality.  *See In re POM Wonderful LLC*, 2013

20   FTC LEXIS 6, at *121–22. "This is not a high hurdle." *Id.* at *122.

21         In this case, DLS' marketing expert disputes the materiality of PX 1, offering opinions that

22   squarely conflict with those of the FTC's marketing expert, Dr. Shimp.[13]  *See* Seitz Decl. ¶ 3, Ex. B

23

24

25   [12]  Underscoring this, the vast majority of DLS advertisements, packaging, and other documents
     relating to routers and IP cameras do not mention or focus on security—there is no reason to.  Supp.
26   Brown Decl. ¶¶21-24.  *See, e.g.,* Jarad Brown Decl. Ex. 54, Dkt. No. 178-56; Brown Decl., Dkt. No.
     190, Ex. A.

27   [13] The FTC's MSJ purports to rely on the FTC's <u>security</u> expert to establish the <u>materiality</u> of the
     alleged representations.  *See* FTC MSJ at 15:3 & n.64.  However, Mr. Graff is not qualified to, was
28   not asked to, and did not opine on this issue.  *See* Jarad Brown Decl. Ex. 57 (Graff Report) ¶¶ 1–22.

at 17–19 (disputing claim that PX 1 is material); *see also* Poret Decl., ¶ 3, Ex. B at 22–24 (noting

lack of empirical data).  Standing alone, this precludes summary judgment here as to Count 2.

## B.  There are Genuine Issues of Material Fact that Preclude Summary Judgment In Favor of the FTC on Count 3.

### 1.  The DLS Datasheets At Issue In Count 3 Either Contain Nonactionable Opinions or are Literally True.

To begin with, the FTC's Motion should be denied as to Count 3 because <u>all</u> of the allegedly

"deceptive" express claims made in PX 2–PX 5 are, in fact, either nonactionable statements of

opinion <u>or indisputably true</u>.  *See* FTC MSJ at 16:1–4, 17:5–7, 18:4–7, 19:4–7.

Statements couched in language like "easy" and "advanced," such as "Easy to Secure" and

"Advanced Network Security," are classic examples of non-actionable statements of opinion.

*Carlay Co*., 153 F.2d at 496 ("'[E]asy,' 'perfect,' 'amazing,' 'prime,' 'wonderful,' 'excellent,' are

regarded in law as mere puffing or dealer's talk upon which no charge of misrepresentation can be

based."); *see, e.g.*, *Atari Corp. v. 3DO Co.,* No. 94–20298, 1994 WL 723601, at *1–3 (N.D. Cal.

May 16, 1994) ("the most advanced home gaming system in the universe" is puffery); *see also*

*Allen v. FCA US LLC*, No. 17-00007, 2017 WL 1957068, at *3 (W.D. Va. May 10, 2017) (phrase

"'you're surrounded by advanced features designed to keep you safe and secure' is nonactionable

puffery); *Donachy v. Playground Destination Props., Inc*., No. 10-4038, 2013 WL 3793033, at *7

(D.N.J. July 19, 2013) ("Secure, no brainer" is nonactionable puffery); *Lenscrafters, Inc. v. Vision*

*World*, 943 F. Supp. 1481, 1498 (D. Minn. 1996) ("the most advanced equipment available" is

nonactionable puffery).

Likewise, additional statements in PX 2 expressing qualitative opinions like "best possible,"

"latest," and "help prevent" cannot form the basis of liability under the FTC Act as a matter of law.

*See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig*., 601 F. Supp. 2d 1201,

1217–18 (S.D. Cal. 2009) ("best" is nonactionable puffery); *see also Intermountain Stroke Ctr., Inc.*

*v. Intermountain Health Care*, *Inc*., No. 13-00909, 2014 UWL 1320281, at *4–5 (D. Utah Mar. 31,

2014) ("best possible" is nonactionable puffery under Lanham Act), *aff'd* 638 F. App'x 778, 788

n.4 (10th Cir. 2016) (listing numerous other Circuit decisions in accord).

1    This Court should similarly conclude that the phrase "one of the safest," as used in the

2  context of PX 5, is a nonactionable statement of opinion as a matter of law.  *See also Greater Hous.*

3  *Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015); *Allen*, 2017 WL

4  1957068, at *3.  *But see L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 860–62

5  (N.D. Cal. 2015).

6    The FTC cannot point to any evidence that the remaining statements contained in PX 2–PX

7  5 are not literally true.  *See* Ex. 15 (FTC Resp. to DLS 2d Set Rogs) at 10–16 (Nos. 12 &13); Ex. 6

8  (FTC 30(b)(6) Tr.) at 361–62.  Although it is not DLS's burden to do so, DLS can.  *See, e.g.,* Supp.

9  Brown Decl. ¶ 46.

10    In addition, DLS's marketing expert, Dr. Victoria Seiz, disputes the FTC's claim that these

11  DLS router datasheets either expressly or impliedly communicated to anyone that the routers were,

12  in fact, "secure from unauthorized access," Seitz Decl. ¶ 3, Ex. B (Rebuttal) at 1–6, 9–10, 11–17,

13  19, in the sense FTC apparently means in its Complaint.  Tellingly, the FTC's MSJ is also

14  unsupported by evidence of actual consumer deception as to Count 3.   Notably, the actual DLS

15  router retail packaging is not accused as deceptive by FTC and is not at issue in this case.

16      **2.**    <u>There are Material Factual Disputes Regarding the Security of the Accused</u>
17              <u>Routers.</u>

18    As with Count 2, a central factual issue for Count 3—the security of the accused products—

19  is likewise subject to genuine factual disputes and conflicting expert opinion evidence.

20    The FTC's MSJ essentially argues that because of an alleged failure "to take reasonable

21  steps," the DLS routers at issue contained potential "vulnerabilities" discovered by security

22  researchers, which rendered the product insecure.  *See* FTC MSJ at 20–21.  But the discovery of a

23  theoretical vulnerability by a security researcher (frequently using sophisticated tools in lab

24  conditions) does not mean that a product is "insecure," as DLS' security experts have explained.

25  *See* Radcliffe Decl., ¶¶ 2–4, Ex. A (Report) App. B (2015 Decl.) ¶¶ 4–13, Ex. B (Rebuttal Report)

26  ¶¶ 5–11; Schaumont Decl. ¶¶ 3–4, Ex. B (Rebuttal Report) ¶¶ 3.c, 4.a–c, 16–62.  And indeed, even

27  the FTC agrees that "there is no such thing as perfect security," Ex. 8 (FTC RFA Resp.) at 35–36

28

1  (Nos. 61-62), and that "it is impossible to eliminate all security vulnerabilities[.]"  Ex. 16 (Graff

2  Rebuttal) at p. 20, ¶ 32.

3         As DLS' expert opines, therefore, "[t]he mere presence of a vulnerability in a router does

4  not imply that the router suffers from unauthorized access and control."  Schaumont Decl. ¶ 3,

5  Ex. B (Rebuttal) ¶ 50.  Here, the purported potential vulnerabilities overwhelmingly share three

6  common features that illustrate why:

7  •      The vulnerability is theoretical (that is, proof of concept ("PoC") and was "discovered"

8         by researchers in lab conditions using sophisticated tools (and often reverse

9         engineering).  *E.g.*, Ex. 11 (Rapid 7 30(b)(6) Tr.) at 46; Ex. 4 (Hsu Tr.) at 127–29

10        (discussing "proof of concept"), 133–35 (discussing use of "emulator"); *see also*

11        Radcliffe Decl. ¶¶ 2–3, Ex. B (Rebuttal) ¶ 10.

12 •      Multiple steps and events, often involving end user error—such as falling for a phishing

13        attack or leaving a mobile phone unlocked at a coffee shop—must occur before the

14        theoretical vulnerability could conceivably be exploited.  *See* Schaumont Decl. ¶ 3, Ex.

15        B (Rebuttal) ¶¶ 17–50; Radcliffe Decl. ¶ 3, Ex. B (Rebuttal) ¶ 10; *cf.* Ex. 7 (Graff Tr.) at

16        232:8–249:16; Jarad Brown Decl Ex. 57 (Graff Report) at pp. 104, ¶ 202 ("But

17        regardless of whether we call it CSRF or not, it could be exploited if an attacker could

18        trick someone on the router's network to visit a website containing properly-styled

19        attack code.").

20 •      The vulnerability can only theoretically be "exploited" if the attacker is on the exact

21        same local area network (LAN) (for example, if multiple people in the same house are

22        connected to or within range of the same router).[14]  *See* Ex. 5 (Wang Tr.) at 208:1–23

23        (discussing Jarad Brown Decl. Exs. 32 & 41), 100:18–101:16; Ex. 12 (Radcliffe Tr.) at

24

25

---

26  [14]  In addition, it is important to assess what, precisely, a hypothetical attacker could theoretically do
by exploiting the potential vulnerability.  For many such purported vulnerabilities, the consequence
would be no more than a functional nuisance, such as reduced performance speed or a reboot.  Ex. 2

27  (DLS 30(b)(6) Tr.) at 70:22–71:20, 220:20–221:9; Supp. Brown Decl. ¶ 44; Supp. Tsai Decl. ¶ 11.
That is drastically different than the types of harms the FTC's Complaint alleges could theoretically

28  occur.  *See* Compl. ¶¶ 16–18.

207:6–210:23, 216:14–217:5; Radcliffe Decl. ¶ 3, Ex. B (Rebuttal) ¶ 10; Schaumont Decl. ¶ 3, Ex. B (Rebuttal) ¶¶ 26–36; see also Ex. 1 (Tsai Tr.) at 223:4–24

It is therefore not surprising that the FTC's expert agrees with DLS that there is no evidence that any of the accused products have been compromised or exploited in the real world. *See* Jarad Brown Decl. Ex. 57 (Graff Report) ¶¶ 167, 173; Ex. 7 (Graff Tr.) at 200:5–10, 173:11–13, 199:8–10, 221:11–13, 225:6–8, 228:5–-10, 223:13–21, 236:18–237:5, 265:10–13, 266:11–14, 267:22–268:3, 268:13–-17, 270:1–4, 271:1–4, 271:17–272:2. Indeed, the FTC MSJ's claim that "[t]he DIR-615 suffered from vulnerabilities that could allow a remote attacker to gain unauthorized access," FTC MSJ at 21:1–2, is refuted by the FTC's security expert. *See* Jarad Brown Decl. Ex. 57 (Graff Report) ¶ 298 ("none of the documents or testimony I have reviewed have confirmed that the DIR-615 versions sold by D-Link Systems could have been remotely compromised").

As this Court observed in September 2017:

> The FTC does not identify a single incident where a consumer's financial, medical or other sensitive personal information has been accessed, exposed or misused in any way, or whose IP camera has been compromised by unauthorized parties, or who has suffered any harm or even simple annoyance and inconvenience from the alleged security flaws in the DLS devices. The absence of any concrete facts <u>makes it just as possible that DLS's devices are not likely to substantially harm consumers</u>[.]

Order Re DLS Mot. to Dismiss at 8:26-9:3, Dkt. No. 90 (emphasis added). A year later, and after costly, burdensome discovery in the United States and abroad, <u>the FTC indisputably *still* cannot do so</u>. *See* DLS MSJ at 15:1-9, Dkt. No. 183. This, too, shows why the FTC's Motion should be denied.

**3.** <u>There are Material Factual Disputes Regarding the "Materiality" of the Alleged Representations.</u>

Finally, the FTC simply has <u>no</u> evidence, apart from bare unsupported assertions of its expert, that the datasheets at issue in PX 2 – PX 5 are in any way material. *See* Poret Decl. ¶ 3, Ex. B (Poret Rebuttal) at 22–24. Conversely, DLS has proffered survey data showing that the challenged statements in the archived DLS datasheets are <u>not</u> material, *see* Poret Decl. ¶ 2, Ex. A (Poret Report) at 4–43, 47, which is further supported by DLS' marketing expert. *See* Seitz Decl. ¶ 3, Ex. B

1    (Rebuttal) at 1–6, 9–10, 11–17, 19.  This alone is sufficient to defeat summary judgment as to Count

2    3.

3        **C.    There are Genuine Issues of Material Fact that Preclude Summary Judgment**
             **In Favor of the FTC on Count 6.**
4
5            1.    There Are Material Factual Disputes as to the Representations Made       in
                   the DLS Business and Consumer IP Camera User Manuals and        Graphical
6                  User Interfaces.

7            As with Count 2, the FTC claims as to the representations made by PX 10 and PX 11, *see*

8    FTC Motion at 22–23, are divorced from the context in which these images appeared and, in any

9    event, are contradicted by evidence in the record.  Notably, the actual DLS IP camera retail

10   packaging is not accused as deceptive by FTC and is not at issue in this case.

11           Most troublingly, the FTC's MSJ does not even provide the Court with the full, complete

12   materials and information required to conduct a proper "facial" net impression analysis, even under

13   the FTC's administrative case law.  The FTC's MSJ fails to present the full actual setup process that

14   end users would follow when using Microsoft Windows GUIs containing PX 10 (used exclusively

15   for business cameras) or PX 11.  Nor does the FTC's MSJ present a complete User Manual

16   containing within it PX 10.[15]

17           This failure alone is fatal to the FTC's MSJ with respect to Count 6.  To determine what

18   representations were allegedly made, even the FTC examines the entire advertisement and assesses

19   the overall 'net impression' it conveys."  *In re POM Wonderful LLC*, 2013 FTC LEXIS 6, at *21–

20   22 (citation omitted and emphasis added).  Advertisements are not at issue in Count 6.  Brown

21   Decl., Dkt. No. 190, ¶ 24.  Instead, Count 6 is based on isolated images that appear in outdated (and

22   voluminous) DLS user manuals that were posted on DLS' technical support website,[16] and which

23   would also briefly be seen by end users (for PX 10, mainly businesses working with professional

24   installers)  as one of many images in the GUI during the middle of the camera setup process.

25   _____

26   [15] The image in PX11 of the Complaint was reproduced from one example of a User Manual for a
     DLS IP Camera that [an] FTC Investigator … downloaded from a DLS website."  Ex. 8 (FTC RFA
     Resp.) at 41 (Nos. 79, 81).   The FTC then copied and pasted this image from a page of a DLS User
27   Manual into a new document, and enlarged it for better viewing."  *Id.* at 42 (No. 81).

28   [16]  Most end users would have no need to consult these user manuals, which were not even shipped
     with many of the products.  *See also* Supp. Brown Decl. ¶ 17.

---

1 Brown Decl., Dkt. No. 190, ¶¶ 24-33, Exs. C, E–G; Ex. 2 (DLS 30(b)(6) Tr.) at 187:6–188:13,

2 189:1–24; Ex. 8 (FTC RFA Resp.) at 41–42 (Nos. 78-82 (PX11)).  Thus, in order to conduct a

3 proper net impression analysis of the challenged images, the <u>entire</u> user manuals must be read, and

4 the entire GUI setup process and associated information—such as the End User License

5 Agreements ("EULA") presented before setup, and the relevant product's packaging and quick

6 install guides—must be considered. The FTC has never even attempted to do this, instead relying

7 solely on the challenged images.

8       The FTC has not submitted any extrinsic evidence regarding the net impression an end user

9 would have based on reading the entirety of the user manuals containing the challenged images.

10 Likewise, FTC has not submitted any extrinsic evidence regarding the net impression an end user

11 would have of the full graphical user interface (GUI) setup process—including the disclaimers and

12 disclosures—as well as the other information the end-user would be exposed to before encountering

13 the challenged images (*e.g.*, the product packaging, quick install guides).   Nor does the FTC have

14 any evidence that even a single person was actually "deceived" by the challenged images in the real

15 world.

16       The absence of this extrinsic evidence underscores why FTC cannot possibly meet its

17 burden of showing that the DLS ever represented in the user manuals or GUIs that the business and

18 consumer IP cameras "were secure from unauthorized access or control," *see* Compl. ¶ 43, which is

19 the representation the FTC's Complaint alleges was false or misleading.  *See* Compl. ¶¶ 44–45.

20       Furthermore, end users of the now obsolete DLS consumer IP cameras that could be set up

21 using a Microsoft Windows Setup Wizard that would briefly show the end-user PX 11 would first

22 encounter and agree to a EULA, which, among other things, advises that neither perfect security nor

23 the absence of vulnerabilities can be guaranteed and in bolded, all-capitalized text offers end users a

24 refund, should they chose not to agree to the terms of the EULA.  *See* Brown Decl., Dkt. No. 190,

25 ¶ 27, Ex. E.  The FTC does not allege that the disclaimers and disclosures that end users would

26 necessarily see before encountering the challenged images (PX 10 and PX 11) were in any way

27 inadequate. Ex. 6 (FTC 30(b)(6) Tr.) at 321:3–15.  Nor is the FTC alleging that DLS committed

28

"deception" by failing to disclose to end users any information that it should have. Ex. 6 (FTC 30(b)(6) Tr.) at 276:15–277:2, 319:15–320:10.

Although FTC suggests otherwise, *see* FTC MSJ at 22:12–23:10, 24:19–23, it is the <u>FTC's burden to show, with evidence,</u> what representations were made. *See DIRECTV, Inc.*, 2018 WL 3911196, at *2 (as Plaintiff, FTC bears burden of proving each element of its case by preponderance of evidence); *see also id.* at *12–19 (FTC failed to meet burden of proving defendant's print advertisements were likely to mislead reasonable consumer). The FTC cannot do so here, and its summary judgment should be denied as to Count 6 on this basis. At a minimum, as shown in the deposition testimony, DLS' supporting declarations, and exhibits providing evidence of the actual materials that PX 10 and PX 11 were derived from, there are factual questions whether the actual GUIs and user manuals could possibly create the "net impression" urged by the FTC, and even if so, whether this would be important to consumers. *See, e.g.,* Jarad Brown Decl. Ex. 19, Dkt. No. 178-21; Brown Decl., Dkt. No. 190, Exs. E-F; Ex. 14 (Hine Tr.) at 62-63.

          2.   <u>There are Material Factual Disputes Regarding the Security of the  Accused IP Cameras.</u>

Contrary to the FTC's MSJ, *see* FTC MSJ at 23:13–24:16, DLS and its security experts also dispute the FTC's claim that the IP cameras at issue in Count 6 were not secure from unauthorized access.

To begin with, both of DLS' security experts offer opinions contradicting the FTC's claim that IP cameras at issue in Count 6 were insecure, as a practical matter. *See, e.g*., Radcliffe Decl. ¶ 3, Ex. B (Rebuttal) ¶¶ 9, 10; Schaumont Decl. ¶¶ 3, Ex. B (Rebuttal) ¶¶ 18, 26, 51–52. This alone defeats summary judgment as to Count 6.

Regardless, there are additional genuine disputes of material fact that independently warrant denial of FTC's MSJ. For instance, the FTC inaccurately relies on one of Mr. Brown's emails as proof that "the guest/guest vulnerability was trivially easy to exploit" through use of a controversial website. *See* FTC MSJ at 24. But this is not true, as Mr. Brown has testified to at length. *See* Ex. 10 (Brown IHT) at 755–84 (discussing business need for default enabled guest account for business products, which may be made intentionally public like "surf line camera[s]"; explaining that

consumer IP cameras are behind routers and thus have private IP addresses, absent extraordinary circumstances); Ex. 3 (Brown Tr.) at 205–09 (discussing email about the website); *see also* Ex. 5 (Wang Tr.) at 228–32 (explaining why hidden user account enabled by default was necessary for business cameras to function properly and also "industry standard").  Most consumer IP cameras and most business IP cameras sit behind routers and use private IP addresses.  Ex. 10 (Brown IHT) at 561:16–586:2; Supp. Brown Decl. ¶ 9; *see also* Schaumont Decl. ¶¶ 3, Ex. B (Rebuttal) ¶¶ 30–31. This means that they are not directly visible as Internet hosts.  *See* Schaumont Decl. ¶¶ 3, Ex. B (Rebuttal) ¶ 30.  In other instances, IP addresses are dynamic, which prevents any potential attacker from associating a specific IP camera with a specific IP address.  *See* Schaumont Decl. ¶¶ 3, Ex. B (Rebuttal) ¶ 30.   Therefore, the website discussed in Mr. Brown's email would be ineffective, except theoretically in instances where, for example, a business camera was intentionally made publicly accessible via the Internet.[17]

Moreover, the persistent guest account issue was resolved in June 2013, one month after the email was sent, as explained above.  *See* Supp. Brown Decl. ¶¶ 6-8 & Ex. A; Supp. Tsai Decl. ¶¶ 12-20 & Exs. B-C.

In any event, there is no evidence in the record that even a single DLS camera in the U.S. was accessible via the website, or that any DLS IP camera was compromised in the real world. Indeed, the FTC's 30(b)(6) witness and security expert both admitted the FTC has no such evidence.  *See* Ex. 6 (FTC 30(b)(6) Tr.) at 100:12–101:21, 352:11–15; Ex. 7 (Graff Tr.) at 200:5–10, 271:17–272:2 (Count 6 IP Cameras); Jarad Brown Decl. Ex. 57 (Graff Report) at p.88 ¶ 173.[18]

        3.     There are Material Factual Disputes Regarding the "Materiality" of Challenged Images.

Likewise, the FTC's MSJ is not supported by any extrinsic evidence that the challenged statements, as viewed by end users using the full actual GUI or reading the entirety of the user

---

[17] Some businesses choose to make IP camera feeds publicly viewable over the Internet (*e.g.*, ski resort webcams, surf cams).

[18]  The FTC has never differentiated between "consumer" and "business" cameras in this action. Congress did not intend for the "consumer" protection provisions of Section 5 to apply to commercial practices and products.

manuals, are at all important to the businesses and individuals that purchase and use those products. The FTC appears to have abandoned its reliance on the hypothetical popup "disclaimers" survey of PX 11 conducted by Dr. Kent Van Liere using a heavily modified hypothetical GUI setup wizard. *Cf. Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("[D]istrict court[s] need not consider arguments raised for the first time in a reply brief."); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond.") (original brackets omitted).  In any case, this survey does not support FTC's MSJ, as DLS's survey expert has explained, *see* Poret Decl. ¶¶ 3–4, Ex. B (Rebuttal Report), and for the reasons set forth in DLS's Motion to Exclude the Expert Report and Opinions of Dr. Kent D. Van Liere, Dkt. No. 182.  Simply put, this survey is utterly irrelevant to the facts of this case and did not even purport to test the "net impression" of either the full setup process of the actual GUIs, including the actual disclosures presented by the EULA, or the "net impression" of the full User Manuals.  *See* Brown Decl., Dkt. No. 190, Ex. E (screenshots of setup process); Jarad Brown Decl. Ex. 19 (full DCS-2310L User Manual); *see* Poret Decl. ¶¶ 3–4, Ex. B (Rebuttal Report) at pp. 20–21.  The FTC's Complaint does not allege that DLS committed deception because its disclaimers were inadequate or because DLS did not adequately disclose information it should have, as the FTC 30(b)(6) witness admitted.  Ex. 6 (FTC 30(b)(6) Tr.) at 276:15–277:2, 319:15–320:10, 321:3–15.

## IV.    CONCLUSION

For the foregoing reasons, DLS respectfully requests that the Court deny the FTC's Motion for Summary Judgment.

Dated:  October 5, 2018

Respectfully submitted,

CAUSE OF ACTION INSTITUTE

By: _____*/s/ John Vecchione*_____
JOHN VECCHIONE [admitted *pro hac vice*]

*Attorneys for Defendant*
*D-Link Systems, Inc.*
*(Additional counsel listed on caption page)*