**CAUSE OF ACTION INSTITUTE**
JOHN J. VECCHIONE [admitted *pro hac vice*] [Lead Counsel]
john.vecchione@causeofaction.org
MICHAEL D. PEPSON [admitted *pro hac vice*]
Admitted only in Maryland.
Practice limited to matters and proceedings before United States Courts and agencies.
michael.pepson@causeofaction.org
JESSICA LEE THOMPSON [admitted *pro hac vice*]
jessica.thompson@causeofaction.org
ASHLEY SALVINO [admitted *pro hac vice*]
ashley.salvino@causeofaction.org
JOSHUA N. SCHOPF [admitted *pro hac vice*]
josh.schopf@causeofaction.org
NICHOLE C. WILSON [admitted *pro hac vice*]
nichole.wilson@causeofaction.org
KARA E. MCKENNA [admitted *pro hac vice*]
kara.mckenna@causeofaction.org
CYNTHIA CRAWFORD [admitted *pro hac vice*]
cynthia.crawford@causeofaction.org
1875 Eye Street N.W., Suite 800
Washington, DC  20006
Telephone: (202) 422-4332/Facsimile: (202) 330-5842

Christine Yang (SBN 102048)
  chrisyang@sjclawpc.com
**LAW OFFICES OF S.J. CHRISTINE YANG**
17220 Newhope Street, Suites 101 &102
Fountain Valley, CA  92708
Telephone:  714.641.4022
Facsimile:   714.641.2082

Christopher Kao (SBN 237716)
  christopher.kao@pillsburylaw.com
Brock S. Weber (SBN 261383)
  brock.weber@pillsburylaw.com
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, CA  94111-5998
Tel.: 415.983.1000 / Facsimile: 415.983.1200

*Attorneys for Defendant D-Link Systems, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>D-LINK SYSTEMS, INC.,<br><br>Defendants. | Case No. 3:17-cv-00039-JD<br><br>**D-LINK SYSTEMS' TRIAL BRIEF**<br><br>Judge:      Honorable James Donato<br>Date:       January 14, 2019<br>Time:       9:00 a.m.<br>Ctrm.:      11; 19th Floor<br><br>Complaint Filed: January 5, 2017 |

1    Defendant D-Link Systems, Inc. ("DLS") respectfully submits the following trial brief

2 specifying the remaining causes of action at issue, the applicable legal standard, and the relevant

3 defenses.  As narrowed by the Court, *see* Dkt. No. 90, Plaintiff Federal Trade Commission's

4 ("FTC") Complaint asserts three remaining "deception" claims (Counts II, III, and VI) against DLS

5 under Section 5 of the FTC Act, 15 U.S.C. § 45(a), for which Plaintiff solely seeks a forward-

6 looking permanent injunction under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

7 **I.    INTRODUCTION**

8    The FTC's remaining "deception" claims do not have merit.  The three sets of statements

9 that the FTC relies on in Counts II, III and VI were not deceptive, particularly when viewed in the

10 proper context.  The FTC has no evidence—and will present none at trial—that even a single

11 consumer was deceived by DLS' statements, or suffered any injury as a result of any alleged

12 deception.  Nor does the FTC have any evidence—and will present none at trial—that any of the

13 DLS routers and IP cameras at issue in this case were ever actually compromised in the real world.

14 The trial will show that the FTC cannot meet its burden of proving by a preponderance of the

15 evidence that DLS committed any actionable "deception" under Section 5 the FTC Act.

16    Nor can the FTC meet its burden under Section 13(b) of the FTC Act to establish that this is

17 a "proper case" in which this Court can enter a permanent injunction against DLS (the sole relief

18 FTC seeks), based on the current marketing and security practices used for the products DLS sells.

19 Even though DLS bears no burden, the trial will show that DLS' routers and IP cameras have

20 consistently performed as represented, and that the security practices used for these products have

21 always been industry-leading.

22 **II.    Legal Standard for Plaintiff's Remaining "Deception" Claims (Counts II, III, and VI)**

23    **A.    FTC's Burden of Proof as to "Deception" Liability for Counts II, III, and VI**

24    "As the plaintiff, the FTC bears the burden of proof and must prove each element of its case

25 by a preponderance of the evidence."  *FTC v. DIRECTV, Inc.*, No. 15-cv-01129, 2018 WL 3911196,

26 at *2 (N.D. Cal. Aug. 16, 2018) (citing *U.S. v. F/V Repulse*, 688 F.2d 1283, 1284 (9th Cir. 1982)). To

27 prevail on its "deception" claims, the FTC must prove three elements: DLS (1) made a

28 "representation"; that (2) is "likely to mislead consumers acting reasonably under the circumstances";

1   and (3) is "material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). The FTC has the

2   burden to "show probable, not possible, deception" of "'<u>consumers acting reasonably in the</u>

3   <u>circumstances</u>,' not just any consumers. " *Southwest Sunsites, Inc. v. F.T.C.*, 785 F.2d 1431, 1436 (9th

4   Cir. 1986) (emphasis added).  Although proof of actual deception is unnecessary, "such proof is

5   highly probative to show that a practice is likely to mislead consumers acting reasonably under the

6   circumstances." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

7        As part of its analysis, this Court must examine the "net impression" of the allegedly

8   deceptive statements made by DLS, and what express or implied claims were made.  In other words,

9   the Court must "evaluate the entire advertisement, transaction, or course of dealing in determining

10  how reasonable consumers are likely to respond."  FTC Deception Statement, *appended to In re*

11  *Cliffdale Assocs., Inc*., 103 F.T.C. 110 (1984), 1984 WL 565319, at *48; *accord FTC v. Sterling*

12  *Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) ("It is … necessary . . . to consider the advertisement

13  in its entirety and not to engage in disputatious dissection.  The entire mosaic should be viewed

14  rather than each tile separately.").  Thus, the challenged statements should be evaluated in their full

15  and proper context.  *See Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1143-44 (9th Cir.

16  1997); *see also* FTC Deception Statement, 1984 WL 565319, at *46 ("[T]he totality of the practice"

17  should be considered "in determining how reasonable consumers are likely to respond.").

18        "Express claims directly represent the fact at issue while implied claims do so in an oblique

19  or indirect way."  *Kraft, Inc. v. FTC*, 970 F.2d 311, 318 n.4 (7th Cir. 1992).  To determine what, if

20  any, implied claims were made, this Court should consider the contents of the challenged

21  statements, the circumstances surrounding them, and interaction of all the different elements in

22  them.  *In re Thompson Med. Co*., 104 F.T.C. 648 (1984), 1984 WL 565377, at *102.  For implied

23  claims that are not reasonably inferred from the face of an advertisement, the FTC has stated that it

24  "will not find the ad[vertisement] to make the implied claim unless extrinsic evidence allows …

25  [the FTC] to conclude that such a reading of the ad is reasonable." *Id*. at *102 & n.8 (discussing

26  surveys); *see also United States v. Bayer Corp*., 2015 WL 5822595, at *11, *13 (D. N.J. Sept. 24,

27  2015) (role of extrinsic evidence); *FTC v. Nat'l Urological Grp., Inc*., 645 F. Supp. 2d 1167, 1193

28  (N.D. Ga. 2008).  Statements of <u>opinion</u> and other <u>subjective</u> claims cannot form the basis for

1    deception liability.  *See, e.g.*, *Carlay Co. v. FTC*, 153 F.2d 493, 496 (7th Cir. 1946) ("[S]uch words

2    as 'easy,' 'perfect,' 'amazing,' 'prime,' 'wonderful,' 'excellent,' are regarded in law as mere

3    puffing or dealer's talk upon which no charge of misrepresentation can be based."); *see generally*

4    *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008).

5            In addition, the sophistication of the primary or intended audience must be considered when

6    determining whether a purported representation is likely to mislead consumers acting reasonably

7    under the circumstances.   "When representations or sales practices are targeted to a specific

8    audience, the Commission determines the effect of the practice on a reasonable member of that

9    group[,] … judged in light of the knowledge and sophistication of that group."  FTC Deception

10   Statement, 1984 WL 565319, at *46-*47.  For example, "a practice or representation directed to a

11   well-educated group, such as a prescription drug advertisement to doctors, would be judged in light

12   of the knowledge and sophistication of that group."  *Id.* at *47.

13           Finally, with respect to the third element, "injury and materiality are different names for the

14   same concept."  FTC Deception Statement, 1984 WL 565319, at *50; *Cliffdale*, 1984 WL 565319, at

15   *43 n.11 (accused practices must "be likely to cause injury to be considered deceptive.").  Only

16   representations "likely to cause injury to a reasonable relying consumer" are material.  *Southwest*

17   *Sunsites*, 785 F.2d at 1436.  "Express" claims may be subject to a light presumption of materiality.

18   *See Pantron I,* 33 F.3d at 1095-96.  The Commission has also indicated that, "[d]epending on the

19   facts," objective health and safety claims, claims regarding the central characteristic of the product

20   can be presumed material.  *See* FTC Deception Statement, 1984 WL 565319, at *49.  Even when

21   this light presumption does properly apply, it may be rebutted by the defendant with evidence

22   tending to disprove the predicate fact from which it arises or evidence contradicting the initial

23   presumption of materiality.  *See In re POM Wonderful LLC*, FTC No. 9344, 2013 FTC LEXIS 6, at

24   *121-22 (F.T.C. Jan. 10, 2013). "This is not a high hurdle."  *Id.* at *122.

25           **B.      FTC's Burden of Proof as to Permanent Injunctive Relief Under Section 13(b)**

26           In this case, the FTC is solely seeking a forward-looking permanent injunction under

27   Section 13(b) of the FTC Act.  To obtain this relief, in addition to establishing "deception" liability,

28   the FTC must also prove that DLS is currently violating the Act or is likely to do so in the future.

1    "The text of § 13(b) limits injunctive relief to 'proper cases[.]'" *FTC v. AMG Capital Mgmt.,*

2    *LLC*, No. 16-17197, 2018 WL 6273036, at *8 (9th Cir. Dec. 3, 2018). The FTC cannot seek an

3    injunction unless DLS "is violating, or is about to violate" the FTC Act. 15 U.S.C. § 53(b); *see also*

4    *AMG Capital*, 2018 WL 6273036, at *9 (O'Scannlain, J., specially concurring).  "Past wrongs are

5    not enough for the grant of an injunction; an injunction will issue only if the wrongs are ongoing or

6    likely to recur." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985); *see also Enrico's,*

7    *Inc. v. Rice*, 730 F.2d 1250, 1253 (9th Cir. 1984).  This is true regardless of whether any alleged

8    "injury flowing from that violation" may be "continuing today."  *Evans Prods.*, 775 F.2d at 1088.

9    *De minimis* potential ongoing violations are also insufficient to support an injunction.  *See, e.g.*,

10    *FTC v. Amazon.com*, No. C14-1038-JCC, 2016 WL 10654030, at *5-6 (W.D. Wash. 2016).

11    Permanent injunctive relief under Section 13(b) of the FTC Act requires "proper proof." 15

12    U.S.C. § 53(b).  It is therefore the FTC's burden to show with credible evidence that injunctive

13    relief under Section 13(b) is appropriate by establishing, with evidence, that DLS is currently

14    violating or is likely to violate Section 5.  *Evans Prods. Co.*, 775 F.2d at 1087; *CFPB v. Gordon*,

15    819 F.3d 1179, 1197 n.9 (9th Cir. 2016); *see, e.g., Amazon.com, Inc.*, 2016 WL 10654030, at *4-6

16    ("inquiry … hinges upon whether the FTC has established, with evidence, a cognizable danger of a

17    recurring violation"); *see also U.S. v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854 (9th Cir. 1995).

18    Where challenged conduct has ceased, courts consider a variety of factors to determine

19    whether prospective injunctive relief is warranted, including the degree of the defendant's scienter,

20    the sincerity of the defendant's assurances against future violations, and the genuineness and

21    success of efforts to comply.  *See FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009);

22    *see also Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982) (considering "the

23    deliberateness and seriousness of the present violation, and the violator's past record with respect to

24    unfair advertising practices.").

25    The FTC must also prove that injunctive relief will remedy the harm alleged and is "in the

26    interest of the public."  15 U.S.C. § 53(b)(1)-(2).  In addition, although Section 13(b) relieves the

27    FTC of having to prove irreparable injury to obtain a preliminary injunction, *see, e.g., FTC v.*

28    *Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999), Section 13(b) should nonetheless be

1  construed to require FTC to prove irreparable injury to obtain a permanent injunction.  *See eBay*

2  *Inc. v. MercExchange, LLC,* 547 U.S. 388, 391-92 (2006).

3  **III.     Plaintiff's Remaining Causes of Action**

4        **A.     Count II (PX 1): Old Webpage From Security Advisories Support Website**

5             At issue in Count II is a Security Event Response Policy (Exhibit PX 1) that was previously

6  available on the "Security Advisories" section of DLS' technical support website, and which

7  provided a link to a form for independent, third-party researchers to report to DLS any security

8  concerns they might have with any DLS product.  This webpage was never used by DLS for

9  marketing purposes, and DLS removed the page from its website three years ago.

10            **1.     The Webpage Was Not Deceptive.**

11            As an initial matter, the FTC incorrectly asserts that PX 1 must be analyzed in isolation, and

12  that the Court should ignore all of the other prominently linked information a visitor to DLS'

13  technical support website would encounter (including the "Vulnerabilities List" and "Report a

14  Vulnerability" tabs on PX 1).  This is counter to the law, and the FTC's own Policy Statement,

15  which requires examination of "the entire advertisement, transaction, or course of dealing." 1984

16  WL 565319, at \*46.  The Court should not analyze PX 1 in isolation and should instead consider its

17  context and purpose, as well as all of the other information a website visitor would necessarily see

18  before encountering PX 1, including the entire Security Advisories series of webpages,

19  "Vulnerabilities List," "Report Vulnerabilities" form, and disclaimers set forth in PX 1.

20            The Court should also consider the technical sophistication, knowledge, and experience of

21  the intended audience—here, computer "security researchers" and other technicians—as part of the

22  "net impression" analysis.  *See In re Telebrands*, 140 F.T.C. 278, 2005 WL 6241018, at \*7-8

23  (F.T.C. 2005) ("If an ad is targeted at a particular audience, the Commission analyzes ads from the

24  perspective of that audience." (citing Deception Statement, 103 F.T.C. at 178-79)).

25            Viewed in full context, DLS' old webpage was not deceptive in the least.  Indeed, the

26  statements in PX 1 were (and remain) <u>true</u>—any reported or otherwise discovered potential security

27  vulnerabilities are taken seriously and, if validated by DLS, are fixed or otherwise resolved.

28

Any subjective language found within PX 1, like "highest priority" and "serious," constitute nonactionable statements of opinion in any event.  *See, e.g., Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) ("high priority" is "mere 'puffery'"); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-02752, 2017 WL 3727318, at *26 (N.D. Cal. 2017); *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) ("very seriously").

To the extent PX 1 impliedly claimed that DLS adhered to "reasonable" practices as the FTC asserts (it did not), to meet its burden of proving "unreasonableness," the FTC must show (a) what the applicable standard of care for consumer IP cameras and routers required (and when); and (b) deviations therefrom at specific points in time.  *See Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 852 (11th Cir. 2016) (unpublished); *cf. S&H Riggers & Erectors, Inc. v. Occ. Safety & Health Review Comm.*, 659 F.2d 1273, 1282–85 (5th Cir. 1981).  The FTC cannot do so.  As DLS' fact and expert witnesses will testify at trial, DLS, and its parent company D-Link Corporation ("DKC"), on their own and working with third-party security experts and vendors, have always voluntarily employed industry-leading security practices.

### 2.      The Webpage Was Not Material

The FTC must also establish that the allegedly "deceptive" claims drawn from the "net impression" of PX 1 would be important to "reasonable" consumers' decisions whether to purchase DLS' routers and IP cameras.  It cannot, particularly because PX 1's primary audience was technically sophisticated security researchers performing tests on DLS products in search of theoretical, undiscovered security vulnerabilities, not ordinary consumers.  *See Telebrands*, 2005 WL 6241018, at *7-8.  Regardless, there is no evidence that any ordinary consumer would review a technical support website before deciding to purchase a DLS router or IP camera.

### B.      Count III (PX 2-PX 5): Datasheets for Obsolete Routers DLS No Longer Sells.

The DLS "datasheets" at issue in Count III were created six or more years ago to provide information about the features of four obsolete router models (DIR-412, DIR-615, DIR-645, DIR-815), all of which DLS stopped selling before the Complaint was filed.  The datasheets were long ago archived on DLS' technical support website as historical documentation for discontinued products, and have not been used for marketing purposes for years.

1

          **1.**       **The Datasheets Were Not Deceptive.**

2

      The datasheets (PX2-PX5) at issue were not (and are not) deceptive.  They truthfully

3

describe the various functions and features of the DLS products at issue, including security-related

4

features such as firewalls and WPA2.  Any subjective language contained in the datasheets, such as

5

"Easy to Secure" and "Advanced Network Security," cannot form the basis for "deception" liability.

6

These are non-actionable statements of opinion about these models of DLS products, as compared

7

to prior versions of the products.  *See Carlay Co.*, 153 F.2d at 496.  Product superiority claims like

8

these that are vague or highly subjective are not actionable.  *See Southland Sod Farms*, 108 F.3d at

9

1145.  As to any implied claims the FTC asserts are made in the datasheets, the Court should not

10

artificially analyze the datasheets in isolation and ignore the other information any reasonable

11

customer would necessarily see during the purchasing process.

12

      In any event, the trial will show that the accused routers described in PX 2-PX 5 performed

13

as represented.  Further, all the theoretical security vulnerabilities identified by or to DLS were

14

fixed or otherwise resolved long ago, consistent with industry practice.

15

          **2.**       **The Datasheets Were Not Material.**

16

      The FTC has no evidence—and will not present any at trial—that a single purchaser of the

17

DLS routers described in the relevant datasheets noticed, cared about, or relied on the accused

18

language in the datasheets in making their purchase decision.  Instead, the FTC incorrectly claims

19

that the presumption of materiality applies to these datasheets.  It does not. Regardless, any such

20

light presumption can be rebutted by extrinsic evidence, including survey evidence.  *See In re POM*

21

*Wonderful LLC*, 2013 FTC LEXIS 6, at *121–22.  At trial DLS will present expert empirical survey

22

evidence showing that the challenged statements are not important to consumers.

23

      **C.**      **Count VI (PX 10-PX 11): Images from Obsolete Setup Displays**

24

      At issue in Count VI are isolated images from obsolete Microsoft Windows Set-Up Wizards

25

that end-users would have briefly seen as part of the set-up process for certain DLS IP cameras after

26

the product was purchased.  The same images also appeared in old DLS user manuals for these IP

27

cameras that were archived into DLS' technical support website long ago.  PX 10 was displayed

28

during the setup of DLS Business Class IP cameras sold through specialty outlets for use by

1  commercial enterprises for store surveillance, and which were intended to be installed by trained

2  professional installers.  PX 11 was displayed during the setup of certain consumer IP camera

3  models, all of which are no longer sold.  Indeed, the old Microsoft Windows Setup Wizard for these

4  cameras is not compatible with and cannot be used for any DLS consumer IP cameras manufactured

5  after 2015.  And to the extent a consumer somehow obtains today an obsolete DLS consumer IP

6  camera (made before 2015) and follows the set up instructions that come with the camera, he would

7  be prompted to use the "mydlink" mobile application instead of the old Microsoft Windows Setup

8  Wizard, and would not see the display images of PX 11.

9         **1.**     **The Post Purchase Setup Displays Were Not Deceptive.**

10       Neither PX 10 nor PX 11 can be considered deceptive at all.  They simply provide an input

11  field for a consumer to set a password for the device during setup.  This is particularly true, given

12  that the "net impression" of PX 10 and PX 11 must necessarily include the full setup process

13  displayed to users, including the disclaimers contained in the End User License Agreements

14  ("EULAs") a consumer would necessarily see and agree to before viewing the challenged images,

15  as well as the User Manuals in their entirety.  In addition, the Court should also consider the other

16  information a consumer would necessarily see during the purchasing and setup process before

17  encountering the challenged image.  And with respect to PX 10—which was exclusively used for

18  commercial business products—the sophistication of the typical intended end-users (professionally

19  trained installers and businesses) must also be taken into account.

20       In any event, the trial will show that the accused IP cameras performed as represented.  To

21  the extent there were any potential security issues with the cameras—which there were not—DLS

22  fixed the purported issue in June 2013.  The FTC's claim, based on the purported "testing" of one

23  camera by an FTC attorney, that potential security issues still exist today is completely

24  disingenuous.  This "testing" was based on the FTC attorney's acquisition through a third party of

25  an obsolete, discontinued camera, and a process during which the FTC attorney knowingly and

26  <u>intentionally, as no reasonable consumer would do,</u> refused to update the camera's software when

27  prompted, which would have immediately corrected the problem that the FTC claims to exist with

28  the camera.

### 2. The Post-Purchase Setup Displays Were Not Material.

The FTC cannot prove that the challenged setup display images—which <u>by definition</u> would only be seen post-purchase (either during the initial setup process or in the user manual on DLS' technical support website)—were material to "reasonable" consumers' decisions to purchase the cameras. The popup "disclaimers" survey of PX 11 conducted by the FTC's expert, Dr. Kent Van Liere, does not establish materiality, as the FTC contends. The survey utilized a heavily modified, hypothetical setup wizard that did not accurately mirror what actual consumers would have seen, and should not be entitled to any weight at all. *Cf. DIRECTV, Inc*., 2018 WL 3911196, at *10-11 (rejecting similarly flawed study). Nor does the presumption of materiality apply to these images, particularly in their full context. Cybersecurity is <u>not</u> the central characteristic of IP cameras, any more than it is for other IoT devices like smart "appliances."

### D. The FTC Is Not Entitled To a Permanent Injunction Even If DLS Had Committed Violations of the FTC Act In The Past.

Even if the FTC could establish past "deception," the FTC still cannot show that a permanent injunction is appropriate in this case under Section 13(b) of the FTC Act. There is simply no evidence that DLS is currently violating or is about to violate Section 5. DLS voluntarily ceased each of the practices long before the Complaint was filed. For Count I, DLS removed the challenged webpage from its technical support website in 2015. For Count II, DLS stopped selling all of the router models described in the relevant datasheets before 2017. For Count VI, no DLS mydlink-enabled IP cameras manufactured after 2015 use the obsolete Microsoft Windows Setup Wizard at issue—the new setup process does not include the challenged image.

The security practices used for DLS' products continue to improve and evolve as technology changes, and remain state of the art, as DLS will show at trial. DLS and its parent DKC, on their own and in consultation with a third-party security expert, Onward Security, have for years voluntarily implemented at great expense security practices that meet or exceed the types of practices the FTC appears to request as injunctive relief. Examples of such practices include continually adopting new security procedures and using increasingly advanced security testing tools to counter emerging security threats; seeking out and hiring the top independent experts to conduct

1    training, perform pre- and post-release testing, and undertake audits; and by undertaking great

2    efforts to investigate and resolve reported potential vulnerabilities.

3    **IV.    DLS' ADDITIONAL DEFENSES**

4           Even if there was a proper basis for the Court to enter some type of permanent injunction in

5    this case, the injunction requested by the FTC is not sufficiently specific to be enforceable under

6    Rule 65(d) of the Federal Rules of Civil Procedure, and is inconsistent with the FTC Act and due

7    process.  *See LabMD, Inc. v. FTC*, 891 F.3d 1286, 1299-1302 (11th Cir. 2018).

8           "Rule 65(d) requires '[e]very order granting an injunction' to 'state its terms specifically'

9    and to 'describe in reasonable detail—and not by referring to the complaint or other document—the

10   act or acts restrained or required.'"  *Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020, 1047-

11   48 (9th Cir. 2013) (quoting Fed. R. Civ. P. 65(d)(1)(B)-(C)).  Specificity is particularly "important

12   in the fashioning and enforcement of an injunction consequent to an action brought in district court

13   under Section 13(b)."  *LabMD*, 891 F.3d at 1300; *see id.* at 1299-1303 & n.40.  The injunction FTC

14   seeks here cannot meet Rule 65(d) and Section 13(b)'s specificity requirements, and would require

15   this Court to become the constant arbiter of the appropriateness of ever-changing security practices

16   and policies for the next 20 years.

17          The relief FTC seeks is also barred by Section 13(b) because it is a mandatory injunction

18   that would affirmatively require DLS (and other third parties) to take a number of actions.

19   Although the Ninth Circuit has not decided this question yet, *see FTC v. Neovi, Inc.*, 604 F.3d 1150,

20   1160 & n.10 (9th Cir. 2010), the FTC Act forecloses this type of relief.  This is confirmed by

21   Section 13(b)'s purpose: "permit[ing] the Commission to bring an immediate *halt* to unfair or

22   deceptive acts or practices[.]"  *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982)

23   (citing S.Rep. 93-151, 30-31) (emphasis added); *see also Evans Products*, 775 F.2d at 1087.

24          Finally, the relief sought by the FTC should be denied because the FTC lacks statutory

25   authority under Section 5 and Section 13(b) to pursue it; a permanent injunction is not in the public

26   interest as required under Section 13(b); and the FTC cannot prove irreparable harm.

27

28

Dated:  December 20, 2018

Respectfully submitted,
CAUSE OF ACTION INSTITUTE

By: _____ */s/ John Vecchione* _____
JOHN VECCHIONE [admitted *pro hac vice*]

*Attorneys for Defendant*
*D-Link Systems, Inc.*
*(Additional counsel listed on caption page)*

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 20, 2018, the foregoing document was electronically filed with the Clerk of the Court for the UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, using Court's Electronic Case Filing (ECF) system. The ECF system routinely sends a "Notice of Electronic Filing" to all counsel of record who have consented to accept this notice as service of this document by electronic means. Any party not receiving the Court's electronic notification will be sent a copy of the foregoing document.

Dated: December 20, 2018

*/s/ John Vecchione*
John Vecchione