REDACTED
PUBLIC VERSION

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

FEDERAL TRADE COMMISSION,

              Plaintiff,

      v.

D-LINK SYSTEMS, INC.,

              Defendant.

CIVIL ACTION NO.
3:17-CV-00039-JD

## EXPERT REPORT OF MARK G. GRAFF, CISSP

Dated:  July 6, 2018

Mark G. Graff, CISSP

## TABLE OF CONTENTS

I.    Introduction ................................................................................................ 5

      A.    Summary of Experience and Qualifications ................................... 5

      B.    Scope of Opinion ............................................................................. 8

      C.    Materials Considered in Forming My Opinion ................................ 9

      D.    Compensation ................................................................................. 9

II.   Summary of Expert Opinion ..................................................................... 9

III.  Expert Opinion ......................................................................................... 11

      A.    Background on Software ................................................................ 11

            1.    Software is a Critical Component of Routers and IP Cameras ............. 11

            2.    Software Vulnerabilities ...................................................... 17

            3.    Formalization of the Expert Field of Software Security ........................... 22

            4.    Industry Checklists and Protocols for Secure Software Development
                  Cycles ............................................................................... 24

            5.    Maturity Models and Secure Development Lifecycles ........................... 28

      B.    D-Link Systems, Inc. and D-Link Corporation: The Organizations and
            Their Respective Responsibilities ............................................... 29

            1.    D-Link Corporation ............................................................. 30

            2.    D-Link Systems .................................................................. 33

      C.    D-Link Systems Lacked the Practices and Controls to Develop Software
            in a Secure Way and to Systematically Address Vulnerabilities ................ 38

            1.    Absence of Indications of Seriousness .................................... 38

            2.    ██████████████████████████████████████████████
                  ████████████████████████ ....................................... 42

            3.    No Independent Ability to Determine Safety of Products ...................... 47

            4.    No Internal Procedures to Track Vulnerabilities .............................. 48

            5.    Ignored Repeated Warnings that Security Practices Were
                  Inadequate ....................................................................... 54

            6.    "Trust" Is Not Enough ........................................................ 56

      D.    The Fundamental Code Development Failures that Repeatedly Appeared
            in D-Link Routers and IP Cameras Demonstrate that D-Link Systems'
            Trust in D-Link Corporation and its Vendors was Misplaced ................... 58

            1.    ██████████████████████████████████████████████
                  ████ ............................................................... 59

2.    ████████████ ....................................................... 64

3.    Unnecessary *System()* Library Calls .............................. 70

4.    Unnecessary Protocols and Services ............................... 72

5.    Backdoors: Hard-Coded and Undocumented Credentials ..... 74

6.    Clear Text Passwords ................................................. 78

7.    Code Maintenance Failures ......................................... 80

8.    Private Key Exposure ................................................ 83

E.    Critical Vulnerabilities that Appear in D-Link Routers and IP Cameras .... 87

1.    Router Vulnerabilities ............................................... 89

2.    Camera Vulnerabilities .............................................. 108

3.    Failing to Encrypt Mobile App Credentials ..................... 117

4.    Code Signing Key Exposure ....................................... 119

F.    D-Link Systems' Limited Affirmative Processes and Procedures Were Inadequate .......................................................... 122

1.    D-Lab and Vendor Testing ......................................... 124

2.    III/Onward Security ................................................. 127

3.    Short-Lived Bug Bounty Program ................................ 132

4.    Other Security Practices ............................................ 134

5.    Recent Efforts to Address Security ............................... 135

G.    Many D-Link Routers and IP Cameras Were Not Secure From Unauthorized Access or Control .................................... 146

1.    From December 2013 to September 2015, D-Link Systems Failed to Take Reasonable Steps to Secure D-Link Routers and IP Cameras From Unauthorized Access ................ 146

2.    The DIR-615 Was Not Secured From Unauthorized Access or Control .......................................................... 146

3.    The DIR-412 Was Not Secured From Unauthorized Access or Control .......................................................... 147

4.    The DIR-815 Was Not Secured From Unauthorized Access or Control .......................................................... 148

5.    The DIR-645 Was Not Secured From Unauthorized Access or Control .......................................................... 148

6.    Many D-Link IP Cameras Were Not Secure From Unauthorized Access or Control .................................. 148

Appendix A    List of Router and IP Cameras ................................ A-1

3

**Appendix B   Experience, Qualifications, Testimony, and Publications**.............................**B-1**

**Appendix C   Materials Considered**........................................................................... **C-1**

**Appendix D   Bibliography of Selected Secure Coding Books** ........................................... **D-1**

## I.    Introduction

### A.    Summary of Experience and Qualifications

1.      I have worked as an Information Technology professional since 1975, and completed a

Bachelor of Science degree in computer science in 1978.  I first worked professionally in cyber

security in 1986, and have specialized in security since 1994.  My areas of focus include the

cyber defense of enterprise networks; secure coding, including the prevention and detection of

software vulnerabilities; and the protection of election systems against cyber attack.  I have

written several books in the field, including the seminal *Secure Coding* (2003), with Kenneth van

Wyk.[1]

2.      I am a Certified Information Systems Security Professional (CISSP).  The CISSP is the

primary international credential establishing information security expertise.  The international

body that certifies information security professionals, awarding the CISSP credential, is called

$(ISC)^2$.  The $(ISC)^2$ publishes a "common body of knowledge" on information security called the

"The Official $(ISC)^2$ Guide CISSP CBK Reference."  I recently authored the chapter on

Identification and Access Control in the fifth edition of this book (forthcoming 2018).[2]

3.      Currently, I am working as the head of Tellagraff LLC, a consulting firm.  Prior to this

role, I served for three years as the Chief Information Security Officer for NASDAQ, leaving in

2015.  I was responsible for both cyber defense and application security at NASDAQ.  From

---

[1] MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES (2003), http://securecoding.org.  My book with Mr. van Wyk is cited broadly.  Indeed, I was pleased to see that III/Onward Security, whom I discuss in greater detail below at Section III.F.2, cited our book in a 2016 presentation to D-Link Corporation about secure software development.  See III/Onward Secure Coding Presentation (Sept. 8, 2016) (DKC0005191–287, at DKC0005283) (citing our book, SECURE CODING, as the first resource in the section of the presentation titled "Reference").  The presentation is partially in Chinese, but the English content makes clear that it is a software security training presentation.

[2] THE OFFICIAL $(ISC)^2$ GUIDE CISSP CBK REFERENCE (5th ed. forthcoming 2018) (ISBN 9781119423348).

2003 to 2012, I was head of cyber security at Lawrence Livermore National Laboratory, responsible for unclassified as well as classified national security matters.

4.      My formal experience as a cyber security professional began during my employment with Sun Microsystems (1992–2000).  At Sun Microsystems ("Sun"), I became deeply involved in the question of how software developers could consistently design and code software resistant to exploitation by attackers.  In 1994, I became the Security Coordinator for Sun.

5.      As Security Coordinator, I collected reports of all vulnerabilities in Sun products, as well as in related technologies such as the UNIX operating system.  In this capacity, I worked with internal engineers as well as with reports from customers, external security groups (e.g., Carnegie Mellon's CERT), and law enforcement agencies such as the FBI.  I was then responsible for ensuring that all Sun vulnerabilities were fixed—sometimes doing the maintenance myself, sometimes monitoring the work of other Sun teams—and then releasing and announcing the updated software in the form of "patches" to the worldwide Sun customer base.  In the course of this work focusing on software vulnerabilities, I became acquainted with (and often coordinated code fixes and bug reports with) many of the teams and agencies leading the development of improved processes to prevent, detect, and respond to security vulnerabilities.  One of my personal contributions to the developing state of the art was the use of cryptographic checksums as part of the release of new Sun software and patches.[3]  I believe I was the first to institute the practice, in 1997.  Such checksums are now ubiquitous.

---

[3] Checksums allow users to verify that the patch has not been altered in transit.  In terms of confidentiality, integrity, and availability, checksums guard against attacks on integrity.  See ISO 27002, *Section 10.1 Cryptographic controls* ("There should be a policy on the use of encryption, plus cryptographic authentication and integrity controls such as digital signatures and message authentication codes, and cryptographic key management."), http://www.iso27001security.com/html/27002.html.

6.      From 1992 to 1998, I served as a member of the Steering Committee of the Forum of Incident Response and Security Teams ("FIRST"), the first international association of security specialists.[4]  I served as chair of FIRST for two years in the mid-1990s.  In this capacity, I was in frequent contact with many of the top security practitioners in the world.

7.      These connections into the emerging world of software security remained useful when, after leaving Sun, I worked for two years as Chief Scientist of the security startup Para-Protect. In 2001, I researched and wrote for a Para-Protect client my first summary of the history, best practices, and challenges inherent to security-conscious programming, "Secure Coding: the State of the Practice."[5]  This white paper served as the foundation for the 2003 book *Secure Coding*, which I co-wrote with Kenneth R. van Wyk.[6]  *Secure Coding* was well received and, since its release in 2003, has been used in several universities around the world as a reference for sound programming practice.  It has also been recommended at various times for study by companies such as Microsoft, Google, and Veracode, as well as by many security researchers and associations.

8.      As the Chief Information Security Officer for NASDAQ, I was responsible both for the information security of the company and the secure development of the software produced and sold by NASDAQ.  NASDAQ is, in part, a software company; it supplies, in my understanding, approximately eighty percent of global stock exchange software.  Members of my security groups functioned as internal consultants to the development teams.  There were several software

---

[4] See FIRST, *The global Forum of Incident Response and Security Teams* ("The purpose of FIRST was to foster cooperation and coordination in incident prevention, to stimulate rapid reaction to incidents, and to promote information sharing among members and the community at large"), https://www.first.org/.

[5] MARK G. GRAFF, SECURE CODING: THE STATE OF THE PRACTICE (Para-Protect Services, Inc., White Paper, 2001).

[6] MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES (2003), http://securecoding.org.

development groups there, some quite large.  As I recall, a single group I supported had 450 developers.

9.      I have twice testified as an expert before Congress, once in 2000 (representing Sun Microsystems, on the subject of Internet security and software vulnerabilities) and again in 2012 (appearing for NASDAQ, discussing the vulnerability of stock markets and other critical financial systems to attack).  I also served as an expert witness for the state of California in a civil matter, relating to election security, during 2008 and 2009.[7]

**B.      Scope of Opinion**

10.     I was asked to evaluate the materials provided to me in this case and render an opinion as to:

(a) whether, from December 2013 to September 2015, D-Link Systems, Inc. ("D-Link Systems") took reasonable steps to secure their routers and IP cameras[8] from unauthorized access;

(b) whether the following routers, DIR-645, DIR-615, DIR-412, and DIR-815, were secure from unauthorized access or control; and

(c) whether two sets of IP cameras—the (1) DCS-2132L, DCS-2210, DCS-2230, DCS-2310L, DCS-2332L, DCS-3112, DCS-3710, DCS-3716, DCS-6010L, DCS-6210, DCS-6510, DCS-6511, DCS-6513, DCS-6616, DCS-6818, DCS-7010L, DCS-7413, and DCS-7513, and the (2) DCS-1100/1100L, DCS-1130/1130L, DCS-3410, DCS-3411, DCS-3430, DCS-5605, and DCS-5635—were secure from unauthorized access or control, particularly whether they were secure from access using credentials other than the

---

[7] Attached hereto as Appendix B is my Curriculum Vitae with relevant publications and professional experience.

[8] The FTC's attorneys have advised me that discovery in this case was structured around a list of selected routers and IP cameras, attached hereto as Appendix A.  My opinions are based on the materials I considered.

credentials set by the user on the administrator account.  I will refer to these two sets of cameras, collectively, as the "Specified IP Cameras" later on.

11.     I was also asked to determine, even in cases where D-Link routers and IP cameras were not secure from unauthorized access or control, whether D-Link had taken reasonable steps, from 2011 to the end-date of the discovery materials available to me,

    (a) to secure those devices from unauthorized access or control, or

    (b) to corroborate that those devices were secure from unauthorized access or control.

### C.     Materials Considered in Forming My Opinion

12.     In forming my opinion, I considered materials that are cited in this report and listed in Appendix C.  In addition, in forming my opinion, I had access to the database of all documents produced in this case by D-Link Systems, D-Link Corporation, and third parties.  In order to review this large number of documents, I ran targeted searches using keywords to call up a variety of documents relevant to proving or disproving my opinion.

### D.     Compensation

13.     I am compensated at a rate of $450 per hour for my consulting work.  I am compensated at a rate of $600 per hour for testimony time.

## II.     Summary of Expert Opinion

14.     From December 2013 to September 2015, D-Link Systems did not take reasonable steps to secure its routers and IP cameras from unauthorized access, such as through back doors or other means of unauthorized access.  See Sections III.C, III.D, III.E, and III.F below.

15.     From December 2013 to September 2015, D-Link Systems did not take reasonable steps to corroborate, through entities such as D-Link Corporation or third-party vendors, that its routers and IP cameras were secure from unauthorized access, such as through back doors or other means of unauthorized access.  See Sections III.C and III.F below.

16.     The DIR-645, DIR-615, DIR-412, and DIR-815 contained software vulnerabilities that rendered them not secure from unauthorized access or control.  See Sections III.D and III.E.1 below.

17.     D-Link Systems did not take reasonable steps during the development and maintenance to secure the DIR-645, DIR-615, DIR-412, and DIR-815 from unauthorized access or control. See Sections III.C, III.D, III.E.1, and III.F below.

18.     D-Link Systems did not take reasonable steps to corroborate, through entities such as D-Link Corporation or third-party vendors, that the DIR-645, DIR-615, DIR-412, and DIR-815 were secure from unauthorized access or control.  See Sections III.C and III.F below.

19.     The Specified IP Cameras were not secure from unauthorized access or control.  See Section III.E.2 below.

20.     In particular, the Specified IP Cameras credentials contained at least two undocumented credentials that would permit any user with knowledge of those credentials to get unauthorized access to the video feed of the cameras without knowing the "admin" password set by a user during the set-up process.  See Sections III.E.2.a and III.E.2.b below.

21.     D-Link Systems did not take reasonable steps to secure the Specified IP Cameras from unauthorized access or control.  See Sections III.C, III.D, III.E, and III.F below.

22.     D-Link Systems did not take reasonable steps to corroborate, through entities such as D-Link Corporation or third-party vendors, that the Specified IP Cameras were secure from unauthorized access or control.  See Sections III.C and III.F below.

### III.    Expert Opinion

23.     My opinion below is in six sections.  First, I explain the importance of software, in particular in the context of routers and IP cameras, and the maturation of thinking about secure software coding over the last three decades or so.  See Section III.A.  Second, I explain the respective roles of the companies involved in the development of the D-Link routers and IP cameras.  See Section III.B.  Third, I explain how D-Link Systems lacked many of the ordinary means of developing and maintaining secure code.  See Section III.C.  Fourth, I give some examples of the basic failures that were routinely found in D-Link Systems' routers and IP cameras, which should have raised alarm bells and eroded the basis of any "trust" D-Link Systems had in D-Link Corporation and the vendors.  See Section III.D.  Fifth, I walk through some illustrative vulnerabilities, in which security researchers identified ways to exploit the code development failures to take over D-Link devices.  See Section III.E.  Sixth, I examine the affirmative steps that D-Link Systems (and its parent) have taken, including some that they have implemented recently, only after years of shipping devices with preventable vulnerabilities, to secure D-Link Systems' routers and IP cameras.  See Section III.F.  Finally, I provide a summary of my opinions specific to certain devices that I am told are at issue in this matter.  See Section III.G.

### A.    Background on Software

#### 1.  Software is a Critical Component of Routers and IP Cameras

24.     Software is a critical component of all routers and IP cameras.  The software on D-Link Systems routers and IP cameras is essential for them to operate as intended.  Without software, routers and IP cameras are just boxes with computer chips, cable connections, and radio antennas.  Software is what allows a router to route network packets and connect a consumer's

home network to the Internet.  Software is what allows a consumer to view a video feed, either from within their home or remotely.

### a. Routers

25.     Consumer routers are electronic devices that connect computers and mobile phones inside a home to each other, and to the Internet.  Normally, routers are connected on one side to a modem supplied by a cable company or Internet Service Provider (ISP).  On the other side, the router is connected physically or wirelessly to all other networked devices, such as computers, tablets, and mobile phones within a consumer's home.  These devices, connected together by the router, form what is called the local area network (LAN).  Routers are particularly important to the smart home.  Consumers with Internet-connected thermostats, ovens, door locks, and cameras connect those devices as well to the Internet through their routers.  In addition, consumers sometimes connect data storage devices to routers to permit access to files from multiple computers within the same LAN.[9]  Accordingly, routers have total access to sensitive information being either transmitted or stored within a consumer's home.  In an ordinary home LAN, the router may be able to "see" banking transactions, email contents, movie selections, and web browsing sessions for all such interactions pass through the router (sometimes, in encrypted form) on their way to the Internet and back.

26.     Although the purpose of a router is to route IP packets, it is a security device of critical importance as well.  Security is necessarily a core feature of routers.  Just as routers must *pass along* data between the LAN and the Internet to make email, Web browsing, and camera viewing possible, consumer routers must also *stop* some data to protect the theft of personal information

---

[9] At least some D-Link Systems routers provide this function.  E.g., DIR-645 User Manual, v. 1.0 (May 26, 2011) (DLS0008663–8801, at DLS0008751) (describing how to share media from a storage device connected to the router's USB port to other computers on the network).

or a successful cyber attack.  In other words, part of routing data to the right place is *not routing* data that does not belong there.  Since the router must necessarily be able to communicate with the devices within a LAN, it should itself, concomitantly, be secure from attack and compromise, and afford security protection so as to prevent a malicious actor from using that same access to steal data and misuse devices on the LAN.  Router manufacturers (including D-Link) acknowledge the centrality of security because they include on their devices certain security features:  firewalls to stop certain incoming data and encryption for wireless connections on the LAN (e.g., WPA2).

27.     These safety precautions become virtually useless if router software is not secure.  Vulnerabilities in router software can permit attackers to get unauthorized access to sensitive information in a variety of ways.  For example, some vulnerabilities, discussed below, might permit an attacker to access a device remotely from the Internet.  Others would only allow an attacker to exploit the device from within the same LAN.  Sometimes it might take multiple steps—an attacker cannot access the device remotely directly, but if the attacker is able to get a user on the local network to click on a malicious link containing malware, then the attacker might be able to remotely take over the device.

28.     An attacker may be able to take over a router by performing what is known as a command injection.  If an attacker takes over a consumer's router, the attacker has the potential to do immeasurable harm.[10]  In the case of a router, an attacker could have access to all the

---

[10] GREG HOGLUND & GARY MCGRAW, EXPLOITING SOFTWARE: HOW TO BREAK CODE 7 (2004);

MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 196 (2006) ("a vulnerability . . . could be used to cause a denial of service—to crash the application or the underlying operating system—whereas a more sophisticated exploit could run hostile code and allow an attacker to "own" the system."), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/;

network traffic flowing through that router.  The attacker could eavesdrop on that traffic if it were unencrypted and gain information about the internal network.  The attacker could redirect traffic from the desired site that you were attempting visit—say, Google.com—to a different malicious website.  If you store any confidential information on devices connected to your router, like financial information, or passwords to e-commerce sites or banks, the attacker could steal your confidential information to commit identity theft.[11]

29.     The attacker could flood your router with so many requests that it would prevent any traffic from going through the router at all.  This is called a denial-of-service (DoS) attack.  The attacker could also use your router, and thousands of other routers with the same vulnerabilities, to attack another target.  The attacker could force your computer to send huge amounts of data to a website or send spam to particular email addresses.  This kind of attack is called a distributed denial-of-service (DDoS).[12]  The attack is "distributed" because the attacker is using multiple computers, including yours, to launch the denial-of-service attack.

30.     The attacker could use your router as a stepping stone to get inside your internal network and access all of the machines that are connected to your router, such as your IP camera, your smart thermostat, your smart door key, or other connected devices.  The attacker could watch your baby through your IP camera, turn your thermostat up to 100 degrees, or unlock your door.

---

CERT, SEI, Carnegie Mellon, Vulnerability Note VU# 950576, VULNERABILITY NOTES DATABASE (2015) ("A remote attacker may utilize these credentials to gain administrator access to the device."), https://www.kb.cert.org/vuls/id/950576.

[11] ED SKOUDIS & TOM LISTON, COUNTER HACK RELOADED 8 (2002).

[12] ED SKOUDIS & TOM LISTON, COUNTER HACK RELOADED 534–35 (2002) (describing a DDoS attack); JOEL LAND, SYSTEMIC VULNERABILITIES IN CUSTOMER-PREMISES EQUIPMENT (CPE) ROUTERS, CERT, SEI, CARNEGIE MELLON 1 (July 2017) ("In August 2016, Mirai malware spread using default credentials on Internet-connected devices, including CPE routers.  The Mirai botnet was involved in significant distributed denial-of-service attacks . . . [In August 25, 2015,] [a]t least five geographically disparate router vendors shown likely to be using a common source for firmware due to use of the same hardcoded password."), https://resources.sei.cmu.edu/asset_files/SpecialReport/2017_003_001_502618.pdf.

### b.  IP Cameras

31.     Internet protocol (IP) cameras are intended to be viewed over the Internet.[13]  Like routers, IP cameras are a combination of software and hardware.  Although IP cameras have a narrow purpose—to display a camera feed across a network connection—if a bad actor takes over a consumer's IP camera, they are able to monitor a consumer's whereabouts or to observe and record personal activities and conversations.  IP cameras indeed are computers that reside on a consumer's home network.  As such, if they are inadequately secured, not only can they be misused by a malicious actor to view the IP camera feed, they also can be misused as launch points for attacks on other parts of a consumer's home network—either the router, other computers, data storage units, or networked home control devices such as thermostats and doors. IP cameras can be used as nodes in botnets to attack servers outside a consumer's home network, as in the 2016 Mirai botnet case I previously referenced.

32.     Some IP cameras are configured for viewing only over the LAN, the local network.  But IP cameras are commonly set up to be viewed remotely, over the Internet (a Wide Area Network, or WAN).  IP cameras that are exposed to the Internet can be attacked over the Internet.  IP cameras trained on subjects inside a home are perhaps the most sensitive information a consumer might have—a child's bedroom, for example.[14]  Accordingly, software security is a critical component of IP cameras.

33.     For both routers and IP cameras, devices with known software vulnerabilities can be recruited through malware into botnets.  Botnets are armies of devices (sometimes, hundreds of

---

[13] D-Link Systems provides remote access to cameras through its mydlink service, and also provides instructions on how camera owners can connect their IP cameras directly to the Internet.  E.g., DCS-2310L User Manual v.1.0 (Jul. 10, 2012) (DLS0005107–95, at DLS0005136 (remotely access camera through mydlink service), DLS0005149 (setup IP camera to have its own IP address for access over the Internet)).

[14] Doug Gross, *Foul-mouthed hacker hijacks baby's monitor*, CNN (Aug. 14, 2013), https://www.cnn.com/2013/08/14/tech/web/hacked-baby-monitor/index.html.

thousands of devices) that can be commanded from afar to suddenly start sending requests to a single server, thereby overwhelming the server with tasks and preventing it from doing its job. (Such as an attack is often referred to as a distributed denial-of-service attack, or DDoS.)  This could stop a small business retailer from taking orders during a critical few days;[15] could attempt to silence a publication reporting on issues disfavored by the operator of the botnet;[16] or, in extreme cases, could take down parts of the Internet by targeting an Internet infrastructure company.[17]

### c.  Software Vulnerabilities and Patches

34.     In my experience, consumers rarely patch their routers and IP cameras (as well as other "Internet of Things" devices).[18]  I believe consumers are less likely to update firmware of these "things" because, unlike computers or phones, consumers do not ordinarily interact with the screens of these devices, if they even have screens, and they expect them to "just work." Accordingly, to the extent that businesses are serious about ensuring that their consumers have secure devices, they are advised, especially in the context of devices that are not frequently patched, to identify and address vulnerabilities prior to the release of the device.[19]

---

[15] AdWeek Staff, *Massive Cyberattacks Dramatically Hurt Revenues for All Kinds of Internet Players*, ADWEEK (Oct. 22, 2016), https://www.adweek.com/digital/massive-cyberattacks-dramatically-hurt-revenues-all-kinds-players-174220/.

[16] Dan Goodin, *How Google fought back against a crippling IoT-powered botnet and won*, ARSTECHNICA (Feb. 2, 2017), https://arstechnica.com/information-technology/2017/02/how-google-fought-back-against-a-crippling-iot-powered-botnet-and-won/.

[17] Brian Krebs, *Hacked Cameras, DVRs Powered Today's Massive Internet Outage*, KREBSONSECURITY (Oct. 21, 2016), https://krebsonsecurity.com/2016/10/hacked-cameras-dvrs-powered-todays-massive-Internet-outage/.

[18] See, e.g., Sally Feller & Jeffrey Tang, *86 Percent of Consumers Never Update Their Router's Firmware*, THREATVECTOR, CYLANCE (Apr. 24, 2018), https://threatvector.cylance.com/en_us/home/86-percent-of-consumers-never-update-router-firmware.html.

[19] JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE: HOW TO AVOID SECURITY PROBLEMS THE RIGHT WAY 15–16 (1st ed. 2002) ("In simple economic terms, finding and removing bugs in a software system before its release is orders of magnitude cheaper and more effective than trying to fix systems after the release." . . . "Then they rush out a patch instead of coming to the realization that designing security in from the start may be a better idea.").

### d.  Multiple Ways to Exploit

35.     The dangers of vulnerable software on routers and IP cameras are enhanced by the

myriad techniques that hackers have developed to exploit these vulnerabilities.  For example,

routers and IP cameras with software vulnerabilities, in most cases, can be exploited on the local

area network.  Beyond that, in some cases, vulnerabilities can be exploited remotely, over the

Internet, from anywhere in the world.  Lastly, even in circumstances where a vulnerability

cannot be directly exploited over the Internet, hackers have developed techniques to be able to

mimic being on the local area network by tricking a user on the local area network to click a

malicious link, using techniques such as a cross-site scripting attack[20] or a cross-site request

forgery attack.[21]  Using either of these techniques, both of which are well known, a hacker can

exploit over the Internet a vulnerability that might otherwise only be able to be exploited on the

local area network.

### 2.  Software Vulnerabilities

36.     Long before D-Link, long before the proliferation of consumer home networks, and long

before the Internet of things, professionals have thought about how software can be misused.

For more than forty years, academics and practitioners alike have been exploring, documenting,

---

[20] *Top 10 2010-A2-Cross-Site Scripting (XSS)*, OWASP (2010) ("Attacker sends text-based attack scripts that exploit the interpreter in the browser.  Almost any source of data can be an attack vector, including internal sources such as data from the database.  XSS is the most prevalent web application security flaw.  XSS flaws occur when an application includes user supplied data in a page sent to the browser without properly validating or escaping that content. There are three known types of XSS flaws: 1)  Stored, 2)  Reflected, and 3)  DOM based XSS.  Detection of most XSS flaws is fairly easy via testing or code analysis."), https://www.owasp.org/index.php/Top_10_2010-A2-Cross-Site_Scripting_(XSS).

[21] *Top 10 2010-A5-Cross-Site Request Forgery (CSRF)*, OWASP (2010) ("Attacker creates forged HTTP requests and tricks a victim into submitting them via image tags, XSS, or numerous other techniques. If the user is authenticated, the attack succeeds.  CSRF takes advantage of web applications that allow attackers to predict all the details of a particular action.  Since browsers send credentials like session cookies automatically, attackers can create malicious web pages which generate forged requests that are indistinguishable from legitimate ones. Detection of CSRF flaws is fairly easy via penetration testing or code analysis."), https://www.owasp.org/index.php/Top_10_2010-A5-Cross-Site_Request_Forgery_(CSRF).

and lamenting the many ways that attackers might compromise the security of computer systems. Substantial progress in detecting, or even preventing, the development of insecure code has been made over the ensuing decades.  I will begin a brief survey of this history by describing some of the earliest published efforts.

37.     Beginning in the 1950s and 1960s, associations of computing practitioners such as the Association of Computing Machinery (ACM, founded in 1947) and the American Federation of Information Processing Societies (AFIPS, 1961) sponsored conferences and colloquia to advance the state of the art of data processing and computer science.  One particular focus of academic research that emerged in that era was the question of software reliability—that is, whether programs could be proven to be "correct," or beyond the ability of attackers to subvert them. One early inquiry along this line was the research paper, *An Axiomatic Basis for Computer Programming*, by the Irish professor C.A.R. Hoare, published in 1969.[22]

38.     By 1973, AFIPS had amalgamated various annual conferences into a single prestigious annual event, the National Computer Conference (NCC).  In 1975, Richard Linde presented at the NCC a thorough analysis of attack scenarios and strategies, appending to his paper, *Operating System Penetration*, analyses of dozens of "generic system functional flaws" and "generic operating system attacks."  He warned, for example, of the danger of weak passwords.[23]

39.     Here is the way Linde described one issue: "Legality Checking—User parameters may not be checked adequately; addresses may overlap each other or refer to system areas; condition code checks may be omitted; and unusual or extraordinary parameters may not be anticipated by

---

[22] C.A.R. Hoare, *An Axiomatic Basis for Computer Programming*, Communications of the ACM 12 (10), 576–83 (Oct. 1968), https://www.cs.cmu.edu/~crary/819-f09/Hoare69.pdf.

[23] RICHARD R. LINDE, OPERATING SYSTEM PENETRATION 367 (AFIPS National Computer Conference, May 19–22, 1975), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

the designer or implementer."[24]  As we will see later, the checking of user-supplied parameters, which Linde articulated in 1975 and later became known as "input validation," is implicated in several of the vulnerabilities found in D-Link devices by security researchers.  See Section III.D.1 (input filtering).

40.     Another issue Linde described in this paper related to the potential abuse of "utilities."[25] Utilities are programs that carry functions commonly needed on a computer system, for example, a file printing routine or a mathematical calculator.  Many utilities are provided as an adjunct to the operating system itself, and perform some of the functions needed to operate the computer or make it useful.  "The operational management and control of system utilities is often neglected by the system manager.  This area is fraught with Trojan Horse attack potential.  Frequently, utility designers are not aware of security design issues.  For example, inadequate boundary checking at compile time may allow a user to execute machine code disguised as data in a data area."[26]  An inattention of utility designers—as, for example, the utility scripts used to process login actions as an administrator—to potential buffer overflow attacks is a cause of another set of vulnerabilities in the relevant D-Link products.  See Section III.D.

41.     A watershed event in the quest for more secure computer systems occurred in 1983 with the issuance by the National Computer Security Center of the *Department of Defense Trusted*

---

[24] RICHARD R. LINDE, OPERATING SYSTEM PENETRATION 366 (AFIPS National Computer Conference, May 19–22, 1975), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

[25] RICHARD R. LINDE, OPERATING SYSTEM PENETRATION 364 (AFIPS National Computer Conference, May 19–22, 1975) ("In a temporal sense, operating system controls are only effective during the period of system execution and must be augmented by static procedural controls, such as . . . building of software utilities. . . . Because control of this function is apart from the operating system in a temporal and physical sense, it is particularly vulnerable to interdiction and corruption of system code by planting trap doors and Trojan Horse routines.  Personnel inefficiency and inadequate procedural controls account for this susceptibility."), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

[26] RICHARD R. LINDE, OPERATING SYSTEM PENETRATION 367 (AFIPS National Computer Conference, May 19–22, 1975), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

*Computer System Evaluation Criteria* (TCSEC), known as the Orange Book,[27] which suggested

guidelines for system developers, including programmers, on security issues.[28]  Topics for the

standards included authentication means and assurance mechanisms, such as change control.

TCSEC was superseded in 2005 by the federally sponsored Common Criteria, a more advanced

and more prescriptive set of requirements, designed to standardize an evaluation approach across

nations and technologies.[29]  The Common Criteria is an International Standard Organization

(ISO) standard (15408, version 2.1).[30]

42.     In 1988, a more disruptive security event occurred, which spurred both the formation of

formal incident response teams and increased research in software security quality.  Known as

the "Morris worm," attack software written and launched by Cornell student Robert Tappan

Morris ripped its way across the Internet on November 2, infecting and disrupting perhaps ten

---

[27] DEPARTMENT OF DEFENSE, TRUSTED COMPUTER SYSTEM EVALUATION CRITERIA (2nd ed. l985) https://csrc.nist.gov/csrc/media/publications/conference-paper/1998/10/08/proceedings-of-the-21st-nissc-1998/documents/early-cs-papers/dod85.pdf; FEDERATION OF AMERICAN SCIENTISTS, NSA/NCSC RAINBOW SERIES, https://fas.org/irp/nsa/rainbow.htm; Steve Lipner, *The Birth and Death of the Orange Book*, IEEE Annals of the History of Computing 37(2):19–31 (June 2015), https://www.researchgate.net/publication/277723752_The_Birth_and_Death_of_the_Orange_Book; JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE: HOW TO AVOID SECURITY PROBLEMS THE RIGHT WAY 43 (1st ed. 2002).

[28] DEPARTMENT OF DEFENSE, TRUSTED COMPUTER SYSTEM EVALUATION CRITERIA (l985) https://csrc.nist.gov/csrc/media/publications/conference-paper/1998/10/08/proceedings-of-the-21st-nissc-1998/documents/early-cs-papers/dod85.pdf; NATIONAL COMPUTER SECURITY CENTER, A GUIDE TO UNDERSTANDING DISCRETIONARY ACCESS CONTROL IN TRUSTED SYSTEMS (1987) ("The guidelines defined in this document are intended to be used by computer hardware and software designers who are building systems with the intent of meeting the requirements of the Department of Defense Trusted Computer System Evaluation Criteria, DoD 5200.28-STD."), https://csrc.nist.gov/csrc/media/publications/white-paper/1985/12/26/dod-rainbow-series/final/documents/tg003.txt.

[29] COMMON CRITERIA FOR INFORMATION TECHNOLOGY SECURITY EVALUATION ("COMMON CRITERIA"), https://www.commoncriteriaportal.org/; COMMON CRITERIA FOR INFORMATION TECHNOLOGY SECURITY EVALUATION, VERSION 2.3, CCMB-2005-08-001 (Aug. 2005), https://www.commoncriteriaportal.org/files/ccfiles/ccpart1v2.3.pdf; MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 28 (2006), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/.

[30] JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE: HOW TO AVOID SECURITY PROBLEMS THE RIGHT WAY 44 (1st ed. 2002).

percent of the 60,000 or so total systems making up the Internet at that time.[31]  It was the first demonstration of the widespread vulnerability of Internet systems, and its impact—far beyond the $10 million the General Accounting Office estimated as a potential direct loss, and Morris' conviction under the new Computer Fraud and Abuse Act[32] was immediate.  The Morris worm exploited, among other vulnerabilities, all three of the issues—poor input validation, buffer overflows, and weak passwords—I mentioned earlier in talking about in the 1975 Linde paper.

43.     During the next decade, the Internet exploded in size.  Web browsing was invented, and became commonplace.  Cyber attacks grew explosively and also became commonplace.  I was a cyber security leader at Sun Microsystems during most of the 1990s, and had a front-row seat to these changes.  As Security Coordinator in the early 1990s, responsible for finding and fixing vulnerabilities in Sun products, I watched as attackers' methods for finding weaknesses and flaws grew more sophisticated and became automated.[33]

44.     As the head of Sun's network defense team in the last years of the decade, I saw attacks against our worldwide network (we had an online corporate presence in, as I recall, about 130 countries) escalate in both number and severity.  Computer viruses, self-propagating "worms," and "denial-of-service" attacks designed to take down or render incommunicado our systems: all these methods were invented or substantially refined in the 1990s.[34]

---

[31] John Markoff, *Author of Computer "Virus" is Son of N.S.A. Expert on Data Security*, N.Y. TIMES (Nov. 5, 1988), https://www.nytimes.com/1988/11/05/us/author-of-computer-virus-is-son-of-nsa-expert-on-data-security.html; Ted Eisenberg, et al., *The Cornell Commission: On Morris and the Worm*, Communications of the ACM 32 (6) (June 1989), http://www.cs.cornell.edu/courses/cs1110/2009sp/assignments/a1/p706-eisenberg.pdf.

[32] *United States v. Robert Tappan Morris*, 928 F.2d 504 (2d Cir. 1991).

[33] Aleph One, *Smashing the Stack For Fun and Profit*, PHRACK 7 (49) (1996), http://phrack.org/issues/49/14.html.

[34] GREG HOGLUND & GARY MCGRAW, EXPLOITING SOFTWARE: HOW TO BREAK CODE, 19–20 (Addison-Wesley Software Security Series 2004) ("Viruses became very popular in the 1990s and were mostly spread through infected executable files shuffled around on disks.  A worm is a special kind of virus that spreads over networks and does not rely on file infection.  Worms are a very dangerous twist on the classic virus and are especially important

45.     By the turn of the century, the online world had seen viruses such as "Melissa" (1999)
become almost routine, tying up thousands or tens of thousands of computers around the world at
the whim of a single miscreant or criminal.[35]  Defensive methods improved, too: firewall
techniques were strengthened, software to allow defenders to scan systematically for
vulnerabilities and superfluous services began to emerge, and many insecure coding practices
were identified and highlighted for change by security practitioners.[36]

### 3.  Formalization of the Expert Field of Software Security

46.     Beginning in 2002, these ideas began being compiled into standards and literature that
defined the idea of secure coding.  Although experts and scholars had understood the need for
software security for decades, their ideas had not been formalized into a field.

47.     This changed with the development by Microsoft, the world's largest software company,
of the Secure Development Lifecycle ("SDL") in 2002.  The SDL was the seminal event in
bringing technical issues well understood by security experts into the mainstream of software
development.[37]  The importance of Microsoft's commitment to the SDL cannot be overstated.
By committing to this framework, Microsoft changed the way software developers thought about
security, and provided a language for developers to incorporate secure coding techniques into the
development process.

---

given our modern reliance on networks.  Worm activity became widespread in the late 1990s, although many
dangerous worms were neither well publicized nor well understood.").

[35] JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE: HOW TO AVOID SECURITY PROBLEMS THE RIGHT
WAY 21 (1st ed. 2002).  See also MICHAEL NEWTON, THE ENCYCLOPEDIA OF HIGH-TECH CRIME AND CRIME-
FIGHTING: FROM AIRPORT SECURITY TO XYZ COMPUTER VIRUS 197 (2004).

[36] JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE: HOW TO AVOID SECURITY PROBLEMS THE RIGHT
WAY (1st ed. 2002).

[37] More history regarding the development of the SDL is found on Microsoft's website.  MICROSOFT SECURE
DEVELOPMENT LIFECYCLE, https://www.microsoft.com/en-us/sdl.

48.    In addition to the SDL, other literature came out that discussed secure coding.  In 2002, John Viega and Gary McGraw published their seminal book on coding.[38]  McGraw later went on to found the Building Security in Maturity Model ("BSIMM") in 2009.[39]  In their 2002 book, Viega and McGraw focus on things you should know about software security before you even think about producing code.  The authors emphasize methodologies and principles that reduce security risk by designing security into a system from the beginning.  The book then moves to implementation-level issues, and shows developers how to recognize and avoid common implementation-level problems, such as buffer overflows and race conditions.[40]

49.    In my 2003 book, written with Ken van Wyk, *Secure Coding*, van Wyk and I articulated an approach to software development that, when applied, helps minimizes the risk that the software will be compromised by attackers.[41]  We also laid out several design principles and architectural elements that strengthen the security of any software in which they are applied.  Other key elements of the book provide insights into the psychological, economic, and technical factors that contribute to the production of insecure software, and methods of developing, operating, and maintaining software systems, so as to promote security.  This book has been included on the syllabi of several dozen courses on software development, software engineering, and information security, in many countries.  This book is cited frequently in peer-reviewed technical papers in the Association of Computing Machinery ("ACM"), technical documents on these subjects, and by Microsoft, NIST, and others.

---

[38] JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE:  HOW TO AVOID SECURITY PROBLEMS THE RIGHT WAY (1st ed. 2002).

[39] Building Security In Maturity Model ("BSIMM"), https://www.bsimm.com/.

[40] JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE: HOW TO AVOID SECURITY PROBLEMS THE RIGHT WAY xxiv–xxv (1st ed. 2002).

[41] MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES (2003), http://securecoding.org.

50.    Appendix D is a selected bibliography of secure coding books.

**4.    Industry Checklists and Protocols for Secure Software Development Cycles.**

51.    In addition to the literature on secure coding, standards began to be popularized to help software developers create safe, responsible code.  In the United States there are four sets of recommendations widely recognized by experts in the field and reflecting sound practices:  The Open Web Application Security (OWASP) Secure Coding practices;[42] the SAFECode body of recommendations;[43] the SANS Institute and its Top 25;[44] and the "standards" (truly, guidelines) developed and promulgated by the Software Engineering Institute out of Carnegie Mellon University.[45]  Resources from each of these sources, discussed below, are freely-available online.

52.    For companies seeking guidance on organizational steps to manage secure development, the International Organization for Standardization ("ISO") has published a series of information security management standards in its 27000 series.[46]

**a.    SANS Top 25**

53.    The SANS Institute was established in 1989 with a mission of engaging in research and education for security professionals around the world.  It is a well-known and well-regarded organization in the information security field.[47]  Every year, SANS publishes the Top 25 Software Errors, in three categories:  (1) Software Error Category: Insecure Interaction Between Components; (2) Software Error Category: Risky Resource Management; (3) Software Error

---

[42] OPEN WEB APPLICATION SECURITY PROJECT ("OWASP"), https://www.owasp.org.

[43] SOFTWARE ASSURANCE FORUM FOR EXCELLENCE IN CODE ("SAFECode"), https://safecode.org.

[44] THE SANS INSTITUTE, https://www.sans.org/about/.

[45] SOFTWARE ENGINEERING INSTITUTE, CARNEGIE MELLON UNIVERSITY ("SEI-CMU"), https://www.sei.cmu.edu/.

[46] INTERNATIONAL ORGANIZATION FOR STANDARDIZATION ("ISO"), https://www.iso.org/isoiec-27001-information-security.html.

[47] THE SANS INSTITUTE, https://www.sans.org/about/.

Category: Porous Defenses.  ("Click on the CWE ID in any of the listings and you will be directed to the relevant spot in the MITRE CWE. . . . Each entry at the Top 25 Software Errors site also includes fairly extensive prevention and remediation steps that developers can take to mitigate or eliminate the weakness.").[48]

### b.  OWASP Secure Development Publications

54.     The Open Web Application Security Project ("OWASP") began in December 2001.[49] The OWASP non-profit foundation was started in 2004.[50]  OWASP has published several guides contributing to secure software development.  Key among these is the OWASP Top Ten.[51]  The OWASP Top Ten Most Critical Web Application Security Risks was first published in 2003 and is regularly updated by a global community of software security professionals.  The goal of the OWASP Top Ten is to raise awareness about application security by identifying some of the most critical risks facing organizations.[52]  Although the list is specific to web applications, many of the enumerated vulnerabilities, and the mitigation techniques, are found in software deployed in non-web environments.[53]  It is also widely respected as source of the most serious application

---

[48] SANS, CWE/SANS TOP 25 Most Dangerous Software Errors, https://www.sans.org/top25-software-errors/.  The Top 25 makes use of Common Weakness Enumerations (CWEs)—a well-known list of categories of software flaws maintained by the Mitre Corporation.  MITRE, Common Weakness Enumeration:  A Community-Developed List of Software Weakness Types, https://cwe.mitre.org/index.html.  CWE is sponsored by US-CERT in the office of Cybersecurity and Communications at the U.S. Department of Homeland Security.  Ibid.

[49] OPEN WEB APPLICATION SECURITY PROJECT ("OWASP"), https://www.owasp.org.

[50] Ibid.

[51] OWASP Top 10 Project, OWASP ("The OWASP Top 10 is a powerful awareness document for web application security. It represents a broad consensus about the most critical security risks to web applications. Project members include a variety of security experts from around the world who have shared their expertise to produce this list."), https://www.owasp.org/index.php/Category:OWASP_Top_Ten_Project.

[52] OWASP has recently published a separate list of "Top Ten" for IoT.  OWASP Top 10 IoT Vulnerabilities, OWASP (2014), https://www.owasp.org/index.php/Top_10_IoT_Vulnerabilities_(2014).  This list is largely derivative of other Top Ten lists.

[53] Where OWASP has chosen to remove issues that would be pertinent to non-web application developers, it provides references to applicable OWASP resources on the issue.  For example, when the category of "" was removed from the 2007 Top Ten list, OWASP noted that "Buffer overflows, integer overflows and format string

security trends, and directs readers to a number of related sources to address them.[54]  In addition

to the Top Ten, there are a number of other invaluable, free resources available to developers.[55]

### c.  SAFECode

55.     The Software Assurance Forum for Excellence in Code ("SAFECode") is a non-profit

organization "dedicated to increasing trust in information and communications technology

products and services through the advancement of effective software assurance methods."[56]

SAFECode is a consortium of software developers from various industries that currently is run

by Steven Lipner, who is one of the progenitors of the secure software development movement.

SAFECode offers a number of products, including *Fundamental Practices for Secure Software*

*Development*.[57]  In addition, there are many other valuable documents.[58]

---

[54] issues "are extremely serious vulnerabilities for programs written in languages such as C or C++. …  If your code is written in a language that is likely to suffer buffer overflows, we encourage you to read the buffer overflow content on OWASP," and providing links to that content.  *The Ten Most Critical Web Application Security Vulnerabilities 2007 Update* 5, OWASP, https://www.owasp.org/images/e/e8/OWASP_Top_10_2007.pdf.  As discussed in Sections III.D and E below, D-Link Systems' software was written primarily in C, and its routers and IP cameras continued to be vulnerable to critical overflow vulnerabilities as recently as 2016.  E.g., Sections III.E.1.g and III.E.2.c, below.

[54] OWASP also publishes translated versions of its Top 10 in many other languages.  See *Category: OWASP Top Ten Project-OWASP Top 10 for 2010*, OWASP, https://www.owasp.org/index.php/Category:OWASP_Top_Ten_Project#OWASP_Top_10_for_2010 (including section with "2010 Translations").

[55] See, e.g., *OWASP Development Guide*: The Development Guide provides practical guidance and includes J2EE, ASP.NET, and PHP code samples.  The Development Guide covers an extensive array of application-level security issues, from SQL injection through modern concerns such as phishing, credit card handling, session fixation, cross-site request forgeries, compliance, and privacy issues.  *OWASP Testing Guide*: The OWASP Testing Guide includes a "best practice" penetration testing framework that users can implement in their own organizations and a "low level" penetration testing guide that describes techniques for testing most common web application and web service security issues.  Version 4 was published in September 2014, with input from 60 individuals.  *OWASP Code Review Guide*: The Code Review Guide is currently at release version 1.1 and the second best-selling OWASP book in 2008.  *OWASP Application Security Verification Standard (ASVS)*: The ASVS is a standard for performing application-level security verifications.  *WebGoat*: WebGoat is a deliberately insecure web application created by OWASP as a guide for secure programming practices.  Once downloaded, the application comes with a tutorial and a set of different lessons that instruct students how to exploit vulnerabilities with the intention of teaching them how to write code securely.

[56] SOFTWARE ASSURANCE FORUM FOR EXCELLENCE IN CODE ("SAFECode"), https://safecode.org.

[57] SAFECODE FUNDAMENTAL PRACTICES FOR SECURE SOFTWARE DEVELOPMENT, https://safecode.org/publications/#safecodepublications-186;

**d.  Software Engineering Institute**

56.     The Software Engineering Institute, affiliated with Carnegie Mellon University, provides training and publications over a wide range of cybersecurity topics, in coordination with the CMU-based organization CERT, the original Computer Emergency Response Team.[59]  In addition to training courses on such topics as "Network & Software Security," "Risk Assessment & Insider Threat," and "Software Architecture,"[60]  SEI has contributed more than a hundred publications to the corpus of de facto security standards.[61]

---

SAFECODE FUNDAMENTAL PRACTICES FOR SECURE SOFTWARE DEVELOPMENT 2ND EDITION, https://safecode.org/publications/#safecodepublications-190;

SAFECODE FUNDAMENTAL PRACTICES FOR SECURE SOFTWARE DEVELOPMENT 3RD EDITION,https://safecode.org/publications/#safecodepublications-2362.

[58] See, e.g., SAFECODE TACTICAL THREAT MODELING, https://safecode.org/publications/#safecodepublications-1441;

SAFECODE MANAGING SECURITY RISKS INHERENT IN THE USE OF THIRD-PARTY COMPONENTS, https://safecode.org/publications/#safecodepublications-1437;

SAFECODE PRINCIPLES OF SOFTWARE ASSURANCE ASSESSMENT, https://safecode.org/publications/#safecodepublications-503;

SAFECODE PRACTICES FOR SECURE DEVELOPMENT OF CLOUD APPLICATIONS, https://safecode.org/publications/#safecodepublications-193;

SAFECODE GUIDANCE FOR AGILE PRACTITIONERS, https://safecode.org/publications/#safecodepublications-192;

SAFECODE INTERPRETING THE BSIMM, https://safecode.org/publications/#safecodepublications-191;

SAFECODE OVERVIEW OF SOFTWARE INTEGRITY CONTROLS, https://safecode.org/publications/#safecodepublications-189;

SAFECODE FRAMEWORK FOR SOFTWARE SUPPLY CHAIN INTEGRITY, https://safecode.org/publications/#safecodepublications-188;

SAFECODE SECURITY ENGINEERING TRAINING, https://safecode.org/publications/#safecodepublications-187;

SAFECODE SOFTWARE ASSURANCE: AN OVERVIEW OF CURRENT INDUSTRY BEST PRACTICES, https://safecode.org/publications/#safecodepublications-185.

[59] SOFTWARE ENGINEERING INSTITUTE, CARNEGIE MELLON UNIVERSITY ("SEI-CMU"), https://www.sei.cmu.edu/.

[60] SEI-CMU COURSES INDEX, https://www.sei.cmu.edu/education-outreach/courses/index.cfm.

[61] SEI-CMU PUBLICATIONS INDEX, https://www.sei.cmu.edu/publications/index.cfm;

SEI CERT C CODING STANDARD: RULES FOR DEVELOPING SAFE, RELIABLE, AND SECURE SYSTEMS (SEI-CMU, 2016 ed., June 2016), https://resources.sei.cmu.edu/library/asset-view.cfm?assetid=454220;

ROBERT C. SEACORD, SECURE CODING IN C AND C++, (SEI-CMU, 2nd ed., Apr. 2013), https://resources.sei.cmu.edu/library/asset-view.cfm?assetid=54183;

## 5.  Maturity Models and Secure Development Lifecycles

57.     While ad hoc principles and processes can occasionally be effective for casual projects of limited risk, modern software developers predominantly use a formally defined software development lifecycle ("SDLC").  Typically, the SDLC to be used will be selected by company managers and imposed upon the development staff.  It can be tailored to the corporation's resources, history, and the priority the company gives to security.  Whatever the process settled upon, it's very important to have a concrete and repeatable set of rules that all developers will follow.  An agreed-upon SDLC promotes consistency and quality, and facilitates proper testing, scheduling, and code maintenance.

58.     Hundreds of organizations have developed guidelines relating to software development, with the purpose of facilitating the development of hard-to-exploit software.  A few key exemplars (with descriptive quotes from their sponsoring organizations) include:

   a.  BSIMM ("Building Security In Maturity Model").[62]  BSIMM studies existing software security initiatives, quantifying the practices of many different software development organizations to develop a descriptive statistical model of modern real-world practice.

---

C CODING STANDARD: RULES FOR DEVELOPING SAFE, RELIABLE, AND SECURE SYSTEMS (SEI CERT 2016 ed., June 2016), https://resources.sei.cmu.edu/library/asset-view.cfm?assetid=454220;

C++ CODING STANDARD: RULES FOR DEVELOPING SAFE, RELIABLE, AND SECURE SYSTEMS (SEI CERT, 2016 ed., Mar. 2017), https://resources.sei.cmu.edu/library/asset-view.cfm?assetid=494932;

Fred Long, Dhruv Mohindra, Robert C. Seacord, Dean F. Sutherland & David Svoboda, The CERT Oracle Secure Coding Standard for Java (SEI-CMU, Sept. 2011), https://resources.sei.cmu.edu/library/asset-view.cfm?assetid=30320;

SEI-CMU, ANDROID SECURE CODING STANDARD (currently a work in progress), https://wiki.sei.cmu.edu/confluence/display/android/Android+Secure+Coding+Standard.

[62] BUILDING SECURITY IN MATURITY MODEL, https://www.bsimm.com/about.html.

b.  OWASP Software Assurance Maturity Model ("SAMM").[63]  SAMM is an open

framework to "help organizations formulate and implement a strategy for software

security that is tailored to the specific risks facing the organization."

c.  Microsoft Secure Development Lifecycle ("SDL").  Developed internally at Microsoft

and later offered for industry-wide use, the SDL "is a software development process that

helps developers build more secure software and address security compliance

requirements while reducing development cost."[64]

59.     The use of a maturity model such as these reflects the current wisdom for competent

secure software development.  Between the various books, checklists, guidelines, and models

discussed above, there is an abundance of information that is useful for the development and

maintenance of secure software.  These approaches are not all identical, but many of the

underlying design and architectural principles behind all these methods are commonly held.

Companies that use these methods produce measurably fewer of the types of errors discussed

below.

B.     **D-Link Systems, Inc. and D-Link Corporation: The Organizations and Their Respective Responsibilities**

60.     In this section, I will briefly describe what I understand to be the roles and

responsibilities of the different entities and their employees that are involved with D-Link IP

cameras and routers.[65]

---

[63] OWASP SOFTWARE ASSURANCE MATURITY MODEL (SAMM),
https://www.owasp.org/index.php/OWASP_SAMM_Project.

[64] *Microsoft Secure Development Lifecycle*, MICROSOFT ("SDL"), https://www.microsoft.com/en-us/sdl.

[65] Throughout this report, I refer to "D-Link" routers and "D-Link" IP cameras.  When I do so, I am intending to refer to routers and IP cameras of the D-Link brand that are developed, manufactured, marked, and sold with the involvement of both D-Link Corporation and D-Link Systems, consistent with the process described in this section of the report.  The nomenclature "D-Link routers" and "D-Link IP cameras" is not intended to presume any legal

61.    There are three main "players":  First, D-Link Corporation is the parent corporation, and is based in Taiwan.[66]  Second, D-Link Systems is the U.S.-based subsidiary of D-Link Corporation.[67]  Third, there are the third-party vendors, such as Alpha Networks, Cameo Networks, APPRO Tech, and Fitivision, based in Asia, which manufacture and develop the hardware and software for D-Link routers and IP cameras.[68]

### 1.   D-Link Corporation

62.    D-Link Corporation, based in Taiwan, is the parent corporation of D-Link Systems.[69]  D-Link Corporation works with third-party vendors in Asia to develop a number of technology products, including D-Link routers and IP cameras.[70]  D-Link Corporation does not sell D-Link routers and IP cameras in the United States.[71]  Instead, it sells these products through its U.S. subsidiary, D-Link Systems.[72]  The relevant employees at D-Link Corporation are as follows:

---

significance about the particular corporate entities, but rather simply refers to routers and IP cameras of the D-link brand.

[66] Decl. of Chung-Chieh Lin in Supp. of Def. D-Link Corp.'s Mot. to Dismiss ¶3 (Apr. 3, 2017) (ECF 50-3) ("D-Link Corp. is a company organized under the laws of Taiwan.  D-Link Corp. has its principal place of business in Taipei City, Taiwan.").

[67] Decl. of William Brown in Supp. of Def. D-Link Corp.'s Mot. to Dismiss ¶¶ 3–4 (Apr. 3, 2017) (ECF 50-2)  (D-Link Systems is a subsidiary of D-Link Corp. with its principal place of business in Fountain Valley, California).

[68] D-Link Corp. 30(b)(6) Dep. 37:13–14, 38:7–14 (Jan. 30, 2018); Wang Dep. 73:1–25 (Dec. 6, 2017); Brown Dep. 92:15–23 (Mar. 14, 2018); Decl. of William Brown in Supp. of Def. D-Link Corp.'s Mot. to Dismiss ¶ 17 (Apr. 3, 2017) (ECF 50-2) ("Instead, D-Link Systems receives the products it sells (including IP cameras and routers) directly from the independent third party vendors that manufacture and create and provide firmware updates for those products."); ¶ 26 ("D-Link Systems products (including IP cameras and routers) are from third-party vendors (not D-Link Corp.) that manufacture those products and then ship those products to D-Link Systems."); ¶ 27 ("All of the third-party vendors that manufacture, ship, and create firmware updates for the routers and IP cameras that D-Link Systems sells in the United States are located in China, Hong Kong, or Taiwan.").

[69] Decl. of William Brown in Supp. of Def. D-Link Corp.'s Mot. to Dismiss ¶ 4 (Apr. 3, 2017) (ECF 50-2) ("D-Link Systems is a subsidiary of D-Link Corp.").

[70] Brown Dep. 97:13–22 (Mar. 14, 2018) (stating that D-Link Systems did not have contracts with the vendors).

[71] Decl. of Chung-Chieh Lin in Supp. of Def. D-Link Corp.'s Mot. to Dismiss ¶ 4 (Apr. 3, 2017) (ECF 50-3) ("D-Link Corp. sells products domestically in Taiwan and does not sell any products to the United States."); ¶ 13 ("D-Link Corp. does not currently sell in and has not sold any goods into the United States since May 2006.").

[72] Decl. of William Brown in Supp. of Def. D-Link Corp.'s Mot. to Dismiss ¶ 5 (Apr. 3, 2017) (ECF 50-2).

a. Peter Tsai is an employee in the Corporate Technology Office of D-Link Corporation.[73] In 2013, Peter Tsai negotiated the contract with D-Link Corporation's third-party security company, a company originally called the Institute for Information Industry ("III"), and later called Onward Security Corporation ("III/Onward").[74]  As the principal contact with III/Onward, Peter Tsai received its security reports.[75]

b. Robert Lin is the head of the IP camera product department for D-Link Corporation.[76] From approximately 2013 to the present, Robert Lin has been the go-between for IP camera issues, including IP camera security issues, with D-Link Systems.[77]

c. Daniel Hsu is the Project Manager for the wireless router division of D-Link Corporation.[78]  From 2013 to the present, Mr. Hsu has served as the go-between for router issues, including router security issues, with D-Link Systems.[79]

63. Based on the information I have reviewed, D-Link Corporation has responsibility to coordinate everything related to the security of D-Link routers and IP cameras.[80]  D-Link Corporation has its own in-house Quality Assurance department, called D-Lab, which includes

---

[73] Email from Peter Tsai to Chris Chen et al. (Jan. 8, 2015) (DKC0494466–74, at DKC0494466) (signature line).

[74] For simplicity, I will refer to this company as III/Onward.  D-Link Corp. 30(b)(6) Dep. 28:1–9, 116:13–17 (Jan. 30, 2018).  Although not perfectly clear, Mr. Tsai described Onward as a "spin off" of III, rather than a mere name change.

[75] D-Link Corp. 30(b)(6) Dep. 174:2–25, 175:1–19 (Jan. 30, 2018).

[76] D-Link Corp. 30(b)(6) Dep. 230:15–22 (Jan. 30, 2018); Wang Dep. 202:5–8 (Dec. 6, 2017).

[77] Wang Dep. 209:2–6 (Dec. 6, 2017); Brown Dep. 58:4–20, 61:1–16 (Mar. 14, 2018).

[78] Hsu Dep. 11:18–16:25 (Jan. 31, 2018); Brown Dep. 61:14–16 (Mar. 14, 2018).

[79] Hsu Dep. 17:1–23:4 (Jan. 31, 2018); D-Link Corp. 30(b)(6) Dep. 174:12–21, 231:1–5 (Jan. 30, 2018); Brown Dep. 58:4–20, 60:23–25, 61:1–16 (Mar. 14, 2018).

[80] D-Link Corp. 30(b)(6) Dep. 41:5–17; 42:21–25; 43:1–24, 218:1–25; 219:1–25, 220:1–9 (Jan. 30, 2018); Cline Dep. 30:1–3 (Apr. 24, 2018) ("D-Link Corporation performed the [product] testing—or they produced the test reports to me."); Brown Dep. 90:25, 91:1–21 (Mar. 14, 2018) (explaining that he elevated all his communications through D-Link Corp., and D-Link Corp. communicated in Chinese with the vendors).

basic security checking[81] as part of its other tests (which also include things like heat resistance, etc.).[82]

64.     D-Link Corporation, and not D-Link Systems, interfaces with III/Onward, which ran security tests on selected D-Link routers and IP cameras.[83]  III/Onward is a Taiwanese software security company.[84]  They have provided device security testing reports to D-Link Corporation, and not D-Link Systems, since August 2012.[85]  III/Onward provided these security tests, which are originally written in Chinese, to D-Link Corporation.[86]

---

[81] Hsu Dep. 20:12–25, 21:1–25, 22:1–2 (Jan. 31, 2018); D-Link Corp. 30(b)(6) Dep. 68:1–72:23, 104:7–12 (Jan. 30, 2018) (D-Lab reports were not provided to D-Link Systems, unless D-Link Systems requested them).  D-Lab is discussed further below, at Section III.F.1.

[82] D-Link Corp. 30(b)(6) Dep. 48:25, 49:1–15, 62:19–25, 63:1–24, 68:6–25, 69:1–25, 70:1–25, 71:1–25, 72:4–24, 94:9–25, 95:1–22 (Jan. 30, 2018).

[83] Decl. of Chung-Chieh Lin in Supp. of D-Link Corp.'s Mot. to Dismiss ¶ 28 (Apr. 3, 2017) (ECF 50-3) ("At times, D-Link Corp. . . . has retained an independent third party security company to test various D-Link brand products, which independent subsidiaries that sell variants of D-Link brand products in other parts of the world, such as D-Link Systems, may also choose to use. This independent third party security company—formerly known as the Institute for Information Industry, or 'III,' and renamed 'Onward Security Corporation' in late 2014—is located in Taipei, Taiwan, and conducts all of its security testing of D-Link brand products in Taiwan.  Because the third party security company reports the test results in the Chinese language, D-Link Corp. personnel will sometimes translate the results of such testing into the English language when D-Link Systems decides to use its testing services and relay the results."); D-Link Corp. 30(b)(6) Dep. 27:5–24 (Jan. 30, 2018).

[84] Decl. of Chung-Chieh Lin in Supp. of D-Link Corp.'s Mot. to Dismiss ¶ 28 (Apr. 3, 2017) (ECF 50-3).

[85] D-Link Corp. 30(b)(6) Dep. 68:12–17, 73:20–74:14 (testing began in 2012), 85:6–16, 86:5–16, 91:21–25, 109:12–18, 110:22–112:3 (D-Link Corp. will share III/Onward reports if D-Link Systems requests), 175:1–19 (Tsai has not discussed content of III/Onward quarterly security reports with D-Link Systems) (Jan. 30, 2018); Decl. of William Brown in Supp. of D-Link Corp.'s Mot. to Dismiss ¶ 34 (Apr. 3, 2017) (ECF 50-2) (III/Onward "conducts tests on D-Link Systems products overseas in Taiwan; [III/Onward] does not perform tests on D-Link Systems products in the United States.  Because [III/Onward] is located in Taiwan, it can promptly communicate with the manufacturers in Taiwan, China and Hong Kong to identify the vulnerabilities, propose recommendation to address the issues and conduct further testing on the update fix firmware to ensure the proper function of firmware.  When the testing reports are issued by [III/Onward], they are mostly reported in the Chinese language for the manufacture's engineers to review and evaluate.  At D-Link Systems' request, D-Link Corp. personnel will sometimes translate the results of such testing into the English language and relay the results.").

[86] ████████████████████████████████████████████████████████████

## 2.  D-Link Systems

65.     D-Link Systems, based in California, is the U.S. subsidiary of D-Link Corporation.[87]  It is responsible for marketing and selling D-Link devices, including D-Link routers and IP cameras, in the United States.[88]  The relevant employees at D-Link Systems are as follows:

a.   AJ Wang served in several leadership positions at D-Link Systems.  He held the title of Chief Technology Officer for 13 or 14 years, starting in the late 1990s.[89]  In December 2011, AJ Wang took over the role of CEO of D-Link Systems, while continuing to serve as the Chief Technology Officer.[90]  In 2016, AJ Wang left the company.[91]

b.   William Brown joined D-Link Systems in 1992.[92]  In 2010, William Brown became D-Link Systems' Associate Vice President of Technology.[93]  He was a member of the U.S. Product Management team, where he served as an advisor to the sales team about new products.[94]  In 2013, Chief Technology Officer, AJ Wang, formed a new group called the Office of the Chief Technology Officer, or OCTO, whose purpose was to find ways to improve the quality and usability of D-Link's products.[95]  AJ Wang invited William

---

[87] Decl. of William Brown in Supp. of D-Link Corp.'s Mot. to Dismiss ¶ 4 (Apr. 3, 2017) (ECF 50-2) ("D-Link Systems is a subsidiary of D-Link Corp.").

[88] Decl. of William Brown in Supp. of D-Link Corp.'s Mot. to Dismiss ¶¶ 5, 20, 22, 26–27 (Apr. 3, 2017) (ECF 50-2).

[89] Wang Dep. 13:11–12, 18:21–22 (Dec. 6, 2017) (stating that he was the CTO of D-Link Systems for about 13 or 14 years).

[90] Wang Dep. 13:11–18, 18:5–22 (Dec. 6, 2017).

[91] Wang Dep. 150:18–23 (Dec. 6, 2017); Brown Dep. 53:8–11 (Mar. 14, 2018).

[92] Brown Dep. 41:1–3 (Mar. 14, 2018).

[93] Brown Dep. 42:10–14 (Mar. 14, 2018); Brown Investigational Hr'g. Tr. 24:1–8 (July 29, 2014); D-Link Sys. 30(b)(6) Dep. 12:25–13:12 (Apr. 25, 2018).

[94] D-Link Sys. 30(b)(6) Dep. 11:6–17 (Apr. 25, 2018).

[95] D-Link Sys. 30(b)(6) Dep. 11:21–12:16 (Apr. 25, 2018); Brown Dep. 53:4–7 (Mar. 14, 2018); Wang Dep. 20:3–25:3 (Dec. 6, 2017); Brown Investigational Hr'g. Tr. 25:9–10 (July 29, 2014).

Brown to join OCTO, at which point Brown became responsible for product security.[96]

In 2015, when AJ Wang went to D-Link Corporation, William Brown assumed the

responsibilities of CTO and President of D-Link Systems on an acting basis.[97]  On

January 3, 2017, William Brown assumed his current position of Senior Vice President

and Chief Information Security Officer for D-Link Systems.[98]

    c.   John Jimenez and Patrick Cline.  John Jimenez joined OCTO along with William Brown

in 2013, and worked there until transferred to another group in late 2014.[99]  When John

Jimenez left OCTO, he was replaced by an engineer named Patrick Cline.[100]  Patrick

Cline worked as a senior network engineer in OCTO from January 2015 to April 2016.[101]

After he left, his position was eliminated.[102]

    d.   Ted Kuo is responsible for the twice-a-year audits of the Mydlink service, carried out by

III/Onward.[103]

66.    D-Link Systems appears to be responsible for very little with respect to the security of

D-Link routers and IP cameras.  Indeed, Mr. Wang testified that it would not make sense for D-

---

[96] D-Link Sys. 30(b)(6) Dep. 15:9–25 (Apr. 25, 2018).

[97] Brown Dep. 41:15–23 (Mar. 14, 2018); D-Link Sys. 30(b)(6) Dep. 17:5–25, 18:3–12 (Apr. 25, 2018); Wang Dep. 20:3–25:14 (Dec. 6, 2017).

[98] Brown Dep. 41:7–14 (Mar. 14, 2018); Decl. of William Brown in Supp. of D-Link Corp.'s Mot. to Dismiss ¶ 1 (Apr. 3, 2017) (ECF 50-2); D-Link Sys. 30(b)(6) Dep. 19:10–14 (Apr. 25, 2018).

[99] Brown Dep. 49:1–6 (Mar. 14, 2018); Wang Dep. 20:20–21:2 (Dec. 6, 2017); D-Link Sys. 30(b)(6) Dep. 12:13–16, 148:13–19 (Apr. 25, 2018).

[100] Cline Dep. 144:7–22 (Apr. 24, 2018); Wang Dep. 20:20–21:9 (Dec. 6, 2017); D-Link Sys. 30(b)(6) Dep. 148:13–22 (Apr. 25, 2018).

[101] Cline Dep. 10:7–16 (Apr. 24, 2018); D-Link Sys. 30(b)(6) Dep. 149:4–25, 227:1–4 (Apr. 25, 2018).

[102] D-Link Sys. 30(b)(6) Dep. 149:4–21, 227:1–4 (Apr. 25, 2018).

[103] Brown Investigational Hr'g. Tr. 209:5–14 (July 29, 2014).

Link Systems to have a primary role, because security was an issue that affected all D-Link products, globally, and therefore should be handled at the D-Link Corporation level.[104]

67.     D-Link Systems' employees admitted that they did not receive III/Onward security testing reports from D-Link Corporation as a matter of course.[105]  If they received the security reports at all, it was only upon request.[106]  My understanding from the FTC's attorneys is that D-Link Systems was asked to produce, as part of this litigation, any testing reports it had, and it produced none.  D-Link Systems' employees also admitted that they do not have the ability to do security testing on their own.[107]  As discussed in detail below (see Section III.C.1 below), D-Link Systems' employees also admitted that they understand little, if anything, about the development process.

68.     D-Link Systems' role appears to have been to interface with third-party security researchers who reported bugs in D-Link products, beginning in late 2012 and early 2013.[108] Their primary role, however, was to pass this information along to D-Link Corporation, and then pass any fixes back along to the security researcher to see if their concerns were addressed.[109] Accordingly, in my opinion, the primary skill that D-Link Systems' employees brought to the equation was to be a corporate pass-through that could speak English.

---

[104] Wang Dep. 93:10–94:3, 204:20–205:3 (Dec. 6, 2017).

[105] Wang Dep. 94:14–95:8 (Dec. 6, 2017); Brown Dep. 229:2–234:10 (Mar. 14, 2018); Cline Dep. 34:5–13 (Apr. 24, 2018) (testifying that he did not recall receiving testing reports for the products for which he was responsible).

[106] Wang Dep. 87:5–10, 94:14–95:8 (Dec. 6, 2017); Brown Dep. 229:2–235:25 (Mar. 14, 2018); D-Link Sys. 30(b)(6) Dep. 52:22–54:15; 67–68; 82:1–87:24, 100:15–23 (Apr. 25, 2018).

[107] Wang Dep. 102:19–25 (Dec. 6, 2017).

[108] D-Link Sys. 30(b)(6) Dep. 46:11–19, 61:18–25, 65:21–25, 66:1–25, 68:12–24, 70:1–25 (Apr. 25, 2018).

[109] D-Link Sys. 30(b)(6) Dep. 75:14–24, 76:1–77:1, 78:17–20, 81:12–21 (Apr. 25, 2018); Brown Dep. 55:17–24, 90:15–91:24 (Mar. 14, 2018) (describing how Brown would work with D-Link Corporation's large staff, who facilitated fixes from the vendors); Brown Investigational Hr'g. Tr. 79, 81:16–25, 82–87 (July 29, 2014); Cline Dep. 13:4–10, 26:24–25, 81:5–23 (Apr. 24, 2018) ("The broad strokes is they fix it, but I wouldn't be able to tell you what they did exactly.").

69.     I understand that D-Link Systems has formally taken the position in this litigation that D-Link Systems, not D-Link Corporation, is responsible for addressing security vulnerabilities:

> D-Link Systems is responsible for addressing any potential security vulnerabilities for any products that are sold by D-Link Systems in the United States.  D-Link Corp. will sometimes inform D-Link Systems of potential vulnerabilities to be aware of; for example, if a product sold in other parts of the world might potentially have an issue, analogous products we sell in the United States may also potentially need to be evaluated to determine whether similar issues may be present.  But D-Link Systems is responsible for addressing any potential security vulnerabilities for any products that are sold by D-Link Systems.[110]

70.     As a security professional, I struggle to understand this position.  Mr. Brown states that, for D-Link Systems, he is the "expert in the software security field."[111]  It would be inconceivable for all security vulnerabilities on the long list of devices D-Link Systems has been selling (e.g., Appendix A) to be handled by William Brown—who lacks any formal security training (see Section III.C.1 below),[112] cannot recall seeing a III/Onward security testing report,[113] and neither had nor has much input into or understanding the development process (see Section III.F.4.c below).

71.     Moreover, this position in this litigation appears at odds with how D-Link Systems' employees seem to understand their role.  As discussed above, Mr. Wang, the former D-Link Systems president, stated in his deposition:

---

[110] D-Link Systems Answers. and Objs. to FTC 1st Reqs. for Admis. Nos. 2, 3, 5 (May 18, 2018); Decl. of William Brown in Support of Def. D-Link Corp. Mot. to Dismiss ¶ 25 (Apr. 3, 2017) (ECF 50-2).

[111] Brown Dep. 109:22–24 (Mar. 14, 2018).

[112] Brown Investigational Hr'g. Tr. 107:14–109:16 (July 29, 2014).

[113] D-Link Sys. 30(b)(6) Dep. 68:8–69:1 (Apr. 25, 2018).

> [MR. WANG]:  Security is a global phenomenon.  D-Link Corporation
> should help me find that or do that work for me for D-Link Systems.[114]

In an internal email[115] when he was serving as D-Link Systems' president, Mr. Brown made a

similar, clear statement of his understanding of D-Link Systems' role, relative to that of D-Link

Corporation:



72.    Although the FTC's attorneys have asked me to accept D-Link Systems' representation

that it was solely responsible for addressing security vulnerabilities in D-Link routers and IP

cameras sold in the United States, it is impossible to evaluate the security posture without

looking at times to the practices of D-Link Corporation.  Accordingly, this report—in particular

Section III.E—inevitably looks to the practices of D-Link Corporation to understand why D-

Link devices repeatedly contained obvious, remediable flaws.  But the report also endeavors to

accept the argument that D-Link Systems is responsible for addressing security vulnerabilities.

---

[114] Wang Dep. 93:10–12, 204:20–25 (Dec. 6, 2017).

[115] Email from William Brown to Hans Liu (Apr. 13, 2015) (DLS0049148–149, at DLS0049148).

C.    **D-Link Systems Lacked the Practices and Controls to Develop Software in a Secure Way and to Systematically Address Vulnerabilities**

73.    Based on my decades of experience in security, including as a Chief Information Security Officer, Mr. Brown and D-Link Systems lacked the procedures to be able to effectively prevent or address security vulnerabilities in D-Link devices sold by D-Link Systems.

1.    **Absence of Indications of Seriousness**



75.    <u>Lack of discussions with leadership.</u>  Another way to evaluate the prioritization of security is to examine the interactions between the board of directors and the individuals responsible for security.  For example, when I was the CISO of NASDAQ, I reported to the CEO on a regular basis, presented to the board at times, and spoke with members of the board and other top leaders individually.  We routinely discussed issues and agreed on priorities.  By contrast, I learned from the deposition testimony and written discovery in this case that there

---

[116] ████████████████████████████████████████████

[117] Brown Investigational Hr'g. Tr. 26:21–22 (July 29, 2014).

[118] Brown Investigational Hr'g. Tr. 750:9–10 (July 31, 2014).

[119] D-Link Corp. 30(b)(6) Dep. 207:12–25 (Jan. 30, 2018).



, I

conclude that this is another indicator of a lack of seriousness.

76.    Lack of evidence of serious internal discussions, other than email correspondence.  In

addition to formal reporting to leadership, effective security teams should have formal,

memorialized internal meetings to discuss software security.  [redacted]

[redacted]

[redacted]

[redacted].  Without these sorts of

process-oriented efforts, companies will inevitably be reactive in their efforts to address security

issues.

77.    Lack of evaluations of security professionals.  Another indicator of seriousness is if the

security professionals are evaluated on their work.  This does not seem to have occurred at D-

---

[120] Brown Dep. 54:14–15 (Mar. 14, 2018).

[121] Wang Dep. 19:16–18 (Dec. 6, 2017).

[122] FTC First Set of Reqs. for Produc. to Def. D-Link Sys. and D-Link Corp., Req. No. 22 (Apr. 12, 2017).

[123] Wang Dep. 24:9–23:6 (Dec. 6, 2017).

Link Systems at any point.  William Brown was not evaluated by his supervisor, Mr. Wang.[124]

Mr. Wang testified that he, himself, was rarely reviewed.[125]  Evaluations are necessary to

identify where employees are failing, where they need to improve, and to inform management

about additional needs.  In my opinion, without performance reviews, a company cannot hope to

maintain an effective staff addressing security.

78.    <u>Insufficient quantity of people.</u>  Based on the premise that, as D-Link Systems asserts,

that D-Link Systems was "responsible for addressing any potential security vulnerabilities,"[126]

D-Link Systems had inadequate personnel for the job, both in terms of quantity and training.

From 2013 to the present, Mr. Brown has been responsible for software security, and has only

had one assistant during this time:  John Jimenez[127] at first and then Patrick Cline.[128]  Even this

minimal "team" was eliminated with the departure of Mr. Cline in April 2016, leaving only Mr.

Brown.[129]  Mr. Brown, in a candid email to his contacts at the parent corporation, appears

resentful of his lack of staff:  "Prior to SIM [the Security Incident Management process,

described below in Section III.F.4.b], my team which was eliminated and now just me, used this

---

[124] Wang Dep. 69:25–70:5 (Dec. 6, 2017) (Q.  Okay.  So you're saying that if anyone were to review William Brown, it would have been you?  A.  Correct.  Q.  And you're also saying you never reviewed his performance? A.  Correct.").

[125] Wang Dep. 65:22–23 (Dec. 6, 2017) ("I never got review for many years.").

[126] Decl. of William Brown in Support of Def. D-Link Corp. Mot. to Dismiss ¶ 25 (Apr. 3, 2017) (ECF 50-2); D-Link Sys. Answers to FTC 1st Set of Reqs. for Admis. Nos. 2, 3, 5 (May 18, 2018).

[127] It's not clear how much of Mr. Jimenez's job responsibilities related to security, as Mr. Brown testified: "I don't recall John working much security."  D-Link Sys. 30(b)(6) Dep. 150:12–13 (Apr. 25, 2018).

[128] Brown Dep. 48:19–51:15 (Mar. 14, 2018).

[129] "Prior to SIM, my team which was eliminated and now just me, used this tracking sheet."  Email from William Brown to Peter Tsai attaching file Security Incident Report—SitRep-022216.xlsx (Sept. 1, 2016) (DLS0036806); Cline Dep. 10:7–9 (Apr. 24, 2018).  See also D-Link Sys. 30(b)(6) Dep. 149:4–7 (Apr. 25, 2018) (Q.  When Patrick left, was he replaced? [Objection omitted] THE WITNESS:  Unfortunately, no.").

tracking sheet."[130]  In my opinion, having a fully-staffed office is necessary to effectively address security issues.

79.   <u>Insufficient experience and training</u>.  In evaluating the qualifications of a security staff, as I have often been called upon to do, one might ask whether individuals have a university degree or formal classroom training in security issues, and/or software development, formal technical training, or years of professional experience in the field.  One would also look into any formal certifications, such as CISSP, or alternatively, CISM, a certification in information security management, offered by the International Accounting Management ("ISACA").

80.



---

[130] Email from William Brown to Peter Tsai attaching file Security Incident Report—SitRep-022216.xlsx (Sept. 1, 2016) (DLS0036806–807); see also D-Link Sys. 30(b)(6) Dep. 149:4–7 (Apr. 25, 2108) (Q.  When Patrick left, was he replaced? [Objection omitted] THE WITNESS:  Unfortunately, no.")

[131] See, e.g., Brown Investigational Hr'g. Tr. 107:14–24 (July 29, 2014) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Cline Dep. 143:1–25 (Apr. 24, 2018).

[132] Wang Dep. 215:20–216:12 (arguing that a clear text password might not be a flaw because it could not be seen by consumer or casual user), 100:10–101:16 (discounting vulnerabilities that can be exploited "if I was in your house," demonstrating remarkable naiveté as to the methods attackers use to remotely leverage a local-area network vulnerability), 165:9–166:4 (confirming he means attacks from the local-area network) (Dec. 6, 2017).

[133] Brown Investigational Hr'g. Tr. 297:13–22 (July 20, 2014).

[134] Brown Dep. 180:5–25 (Mar. 14, 2018) ("just like in most hacking things, you need to be trained by people using those tools, and so that's why I just looked online and attempted to figure it out.").

Mr. Brown and Mr. Wang stated that D-Link Systems cannot keep up with threats because cyber threats are changing.[135]  But he seems genuinely ignorant that D-Link Systems is failing because of pervasive software flaws for which fixes were understood as many as 40 years ago (see Section III.C below).  Patrick Cline demonstrated some ability to the team during his short tenure, given his lack of training and experience.  But he was only able to perform basic steps to look for potential security issues, and was never replaced when he left.[136]

**2.** ████████████████████████████████████████

81.     D-Link Systems, and Mr. Brown in particular, repeatedly discussed "trusting" the vendors and D-Link Corporation.[137]  But, in the security field, we talk about *assurance*, rather than *trust* in another organization.  Assurance is grounds for confidence (to use the terminology of the Common Criteria standards I discussed earlier) that a Target of Evaluation meets the Security Functional Requirements.[138]  The drumbeat for assurance reveals the importance of

---

[135] Brown Investigational Hr'g. Tr. 334:16–336:3 (July 30, 2014); Wang Dep. 100:10–24 (Dec. 6, 2017) ("As I say, security is a[n] evolving issue, and you cannot fix everything because there are so many theoretical concept[s] to it.").  Mr. Brown also misunderstands something he has been told about chipsets providing built-in protection against buffer overflows—what he is thinking of are "traps" that can automatically reboot a device to stop a stack overflow; there are no hardware mitigations that can prevent all buffer overflows.  D-Link Sys. 30(b)(6) Dep. 220:16–19 (Apr. 25, 2018).

[136] D-Link Sys. 30(b)(6) Dep. 149:4–150:2 (Apr. 25, 2018).

[137] See, e.g., Brown Dep. 108:12–111:21, 139:3–9, 161:12–16 (Mar. 14, 2018); D-Link Sys. 30(b)(6) Dep. 73:9–21, 75:15–76:1, 87:19–88:4 ("I think it's—I don't know of any documents in—a document could never replace the relationship that I've had, and the trust relationship I have with [D-Link Corporation] and the vendors."), 108:18–109:7, 197:12–198:14 (Apr. 25, 2018).

[138] See COMMON CRITERIA, PART 1: INTRODUCTION AND GENERAL MODEL 15 (Aug. 2005) (defining "assurance" as "grounds for confidence that a Target of Evaluation ("TOE") meets the Security Functional Requirements ("SFRs")), https://www.commoncriteriaportal.org/files/ccfiles/CCPART1V3.1R5.pdf.

COMMON CRITERIA, PART 3: SECURITY ASSURANCE COMPONENTS 16 (Apr. 2017) ("The CC philosophy is to provide assurance based upon an evaluation (active investigation) of the IT product that is to be trusted.  Evaluation has been the traditional means of providing assurance and is the basis for prior evaluation criteria documents.  In aligning the existing approaches, the CC adopts the same philosophy.  The CC proposes measuring the validity of the documentation and of the resulting IT product by expert evaluators with increasing emphasis on scope, depth, and rigour."), https://www.commoncriteriaportal.org/files/ccfiles/CCPART3V3.1R5.pdf.

demonstrating not just what you think you know about the security level of software, but how you know it.[139]  The Evaluation Assurance Levels (EALs) in the Common Criteria, for example, provide an increasing scale that balances the level of assurance obtained with the cost and feasibility of acquiring that degree of assurance.[140]  For assurance to work properly, a company interacting with another company must establish written expectations; must verify compliance with those expectations; and must take steps to enforce those expectations if anything goes wrong.

82.    D-Link Systems failed to specify what it expected from D-Link Corporation or its vendors.  Typically, a recipient of software sets expectations for its vendors or business partners in written form, usually through a contract that provides verifiable, testable, requirements.

83.



This fatalist attitude is nonsense, because many of the most

[139] COMMON CRITERIA, PART 3, SECURITY ASSURANCE COMPONENTS 17–18 (Apr. 2017) ("Evaluation has been the traditional means of gaining assurance, and is the basis of the CC approach. Evaluation techniques can include, but are not limited to: (a) analysis and checking of process(es) and procedure(s); (b) checking that process(es) and procedure(s) are being applied; (c) analysis of the correspondence between TOE design representations; (d) analysis of the TOE design representation against the requirements; (e) verification of proofs; (f) analysis of guidance documents; (g) analysis of functional tests developed and the results provided; (h) independent functional testing; (i) analysis for vulnerabilities (including flaw hypothesis); (j) penetration testing."), https://www.commoncriteriaportal.org/files/ccfiles/CCPART3V3.1R5.pdf.

[140] COMMON CRITERIA, PART 3, SECURITY ASSURANCE COMPONENTS 31–46 (Apr. 2017) ("The Evaluation Assurance Levels (EALs) provide an increasing scale that balances the level of assurance obtained with the cost and feasibility of acquiring that degree of assurance.  The CC approach identifies the separate concepts of assurance in a TOE at the end of the evaluation, and of maintenance of that assurance during the operational use of the TOE."), https://www.commoncriteriaportal.org/files/ccfiles/CCPART3V3.1R5.pdf.

[141] Brown Dep. 106:22–107:15 (Mar. 14, 2018).

consequential software flaws plaguing its devices were explained at least 40 years ago.[142]  D-Link Systems could have measurably improved the security of its software by adopting a set of software security guidelines for its vendors that has been around since 2002.[143]

84.     Even had D-Link Systems imposed security standards, by contract or otherwise, it would need mechanisms to verify that its standards were being met.  This could take multiple forms for an organization seeking confidence that its products are secure.  Companies require evidence of the security practices being undertaken, or copies of evaluations of the security of devices or software.  Companies might also require verification that fixes for past problems had occurred.

85.     Many companies also require proof that products meet a prescribed level of security quality.[144]  For example, a common example of security assurance is a requirement that software not contain any flaws or vulnerabilities at or above a certain severity level (such as medium, high, or critical) and that, for vulnerabilities of other levels, an explanation be provided of why the vulnerabilities are mitigated or will be corrected in a subsequent software release.[145]

86.     ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

---

[142] RICHARD R. LINDE, OPERATING SYSTEM PENETRATION (AFIPS National Computer Conference, May 19–22, 1975), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

[143] See Section III.A.3 and 5, for the background on the development of Microsoft's SDL.

[144] This also requires an agreement as to how the software will be evaluated to determine the quality level.  Here, D-Link Systems allowed its parent D-Link Corporation to make all decisions about the appropriate testing.

[145] Notably, as discussed in Section III.F.4 below, D-Link Corporation finally seems to be imposing such a standard on vendors since this case began, in Spring 2017.  Code review brief report (DKC1756978) at Tab 2.0 ("Scanning Result Summary") ("Besides of third-party package, the result from code scanning should not be found any high-risk and above issue (such as high, critical, high-risk etc.), medium-risk should notify the reason why the patch is not applicable or following countermeasures for that.").  But this technique of gaining some assurance of the security of software has been prevalent for well over a decade before D-Link Corporation appears to have adopted it.  And D-Link Systems continues to be unaware of these requirements or able to enforce them.  D-Link Sys. 30(b)(6) Dep. 89:22–91:24 (Apr. 25, 2018).

[146] D-Link Sys. 30(b)(6) Dep. 75:15–25 (Apr. 25, 2018) (explaining that there are no requirements to disclose vulnerabilities or fixes that arise from the black box testing because "this is a 30 year trust relationship").

███████████████████████████████████  Although D-Link Systems

points to the security testing performed by III/Onward, it did not receive the reports of the

security testing conducted by this firm, and William Brown and AJ Wang could not remember

asking for them.[148]  Had they, they might have understood that, even using the limited tools that

it did, III/Onward uncovered pervasive, recurring, and well-known vulnerabilities that illuminate

the poor development practices of D-Link Systems' vendors (see Sections III.D and E below).  If

D-Link Systems had required its vendors to address systematic problems in a serious manner,

and to consider all potential instances where the same problem existed (even where III/Onward

had not detected it), it might have avoided the serious exposure of D-Link Systems' customers to

potential attack and compromise.

87.     D-Link Systems did not have other processes to evaluate vendors on security

performance, such as auditing the vendors' security practices or requiring vendors to submit

documentation of those practices to D-Link Systems.  Mr. Brown testified that D-Link Systems

did not have a process to evaluate the security performance of its vendors over time,[149] even as it

learned of serious vulnerabilities in its devices and could have monitored whether certain vendors

were the source of more or more serious vulnerabilities over time.

---

[147] Wang Dep. 94:14–25, 95:1–8 (Dec. 6, 2017); Brown Dep. 229:2–234:22 (Mar. 14, 2018); Cline Dep. 34:5–13 (Apr. 24, 2018) (testifying that he did not recall receiving testing reports for the products for which he was responsible).

[148] D-Link Sys. 30(b)(6) Dep. 52:22–54:15 (William Brown can request the reports, but says in most cases it is quicker to pick up the phone), 68:8–69:1 (Mr. Brown does not recall ever requesting a black-box testing report, and was typically satisfied by phone discussions) (Apr. 25, 2018); Brown Dep. 229:2–230:1 (Mar. 14, 2018) (Mr. Brown has never reviewed an III/Onward Security report, and relies on D-Link Corp. contacts to tell him what he needs to know);  D-Link Sys. 30(b)(6) Dep. 68:8–69:1 (Apr. 25, 2018).

D-Link Sys. 30(b)(6) Dep. 68:3–25 (Apr. 25, 2018) (testifying that he did not recall asking for either a black-box testing report or a white-box testing report); Brown Dep. 229:2–18 (Mar. 14, 2018) (testifying that he had never reviewed an III/Onward report); Wang Dep. 101:18–102:17, 104:8–105:16 (Dec. 6, 2017) (testifying that D-Link Corporation and the vendors received the III/Onward reports; and if anyone received them at D-Link Systems, it would have been Mr. Brown)

[149] Brown Dep. 161:12-16 (Mar. 14, 2018).

88.     Finally, assurance requires consequences if the desired condition is not met.  In the context of security for products a company is having developed by a vendor, this could take many forms: refusal to accept flawed software; reduction of the payment for the software; contractual remedies such as billing costs to the vendor for having the software created by properly by another company; ceasing business with the vendor; or even a lawsuit by the company enforcing its contract with the vendor.



[150] D-Link Sys. Answers to FTC 1st Set of Reqs. for Admis., No. 362 (May 18, 2018):

    REQUEST FOR ADMISSION NO. 362
    Admit that there have been no contracts in effect during the Applicable Time Period
    between D-Link Systems and any Vendors governing the manufacture of any Relevant Devices.

    RESPONSE TO REQUEST FOR ADMISSION NO. 362
    Denied to the extent that [D-Link Systems] has long-term trust relationships with the vendors that
    continuously manufacture provide firmware for the routers and IP cameras listed in Appendix A
    and assured its technical assistance and cooperation for the products.

[151] D-Link Sys. 30(b)(6) Dep. 50:13–21 (Apr. 25, 2018).



90.     It is impossible to enforce security standards when they are not written into contractual language designed to require better practices.[152] ███████████████████████

███████████████████████████████████████████████████████████

██████ ████ ████████████████████████████████████████████

███████████████████████████████████████████ ██

### 3.   No Independent Ability to Determine Safety of Products

██ ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████.[155] ███████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

---



[152] I reviewed contracts that appear be between three of D-Link Systems' main vendors— APPRO Tech, Cameo Communications, and Alpha Networks—and D-Link Corporation.  Alpha Technology, Inc. Purchase Contract (DKC0006140-T–54-T); Appro Purchase Contract (DKC0006155-T–73-T); Cameo Communications Inc. Purchase Contract (DKC0006183-T–98-T).  These documents seem to give D-Link Corporation some rights to audit, stop shipment, impose requirements, etc., although they do not describe any of these steps as to security.  The contracts for devices between the vendors and D-Link Corporation seems to contradict my understanding that D-Link Systems purchases the devices directly from the vendors.

[153] This error is discussed further below, at Section III.D.8.

[154] Wang Dep. 200:1–25 (Dec. 6, 2017).

[155] As discussed in Section III.F.4.a below, D-Link Systems came closest to this level of evaluation with its work with SEARCH-LAB Ltd., but D-Link Systems did not begin using SEARCH-LAB to assess its device software until June 2016, and so far has only assessed the software for two IP cameras.

92.     In addition, where D-Link Systems has been informed of vulnerabilities, ███████

████████████████████████████████████████████████████████████████████████████████

███████████████████.   Without this information, D-Link Systems cannot hold its vendors

accountable for addressing a particular flaw across all of its devices.

93.     Furthermore, D-Link Systems did not require, or even request, reports concerning

security testing of its devices performed by D-Link Corporation.[156]  D-Link Systems relied

entirely on assurances from D-Link Corporation and vendors that problems were addressed, and

was blind to the types of repeated flaws III/Onward identified in D-Link Systems' devices.  D-

Link Systems did not have its own contract with III/Onward, and thus relied on D-Link

Corporation to ensure that an adequate number of devices were tested and that III/Onward used

sufficient testing methods.

### 4.  No Internal Procedures to Track Vulnerabilities

94.     Organizations that take security seriously also take reports of vulnerabilities in their

software seriously.  An important part of that is managing the remediation of those

vulnerabilities to ensure they are understood, all affected software is identified, and that software

is appropriately patched. [157]  Any enterprise managing a product line as large as D-Link Systems

---

[156] Brown Dep. 112:8–113:25 (Mar. 14, 2018) (admitting that he could not recall ever asking for a report from III/Onward verifying that vendors had fixed the software vulnerability); 229:2–18 (Mr. Brown said he had never reviewed one of the III/Onward reports and had never asked to review one).

[157] MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE 72–73 (2006) ("It is critically important that security and privacy bugs be tracked correctly in your bug-tracking database.  Even more important, such bugs must be tracked in a consistent manner."); MICHAEL HOWARD & DAVID LEBLANC, WRITING SECURE CODE 46 (2d ed. 2003) ("When a security flaw is found in the design or in the code, you should log an entry in your bug-tracking database, as you would normally do.").

would have systems in place to manage this process and ensure nothing falls through the cracks.[158]

95.     When security flaws are identified, by an outside party or internally, organizations need to have a clear system to manage getting them fixed.  Flaws need to be given a unique identifier so they can be distinguished while being discussed.  III/Onward is a good model of this practice, which they applied to problems they identified.[159]  But D-Link Systems (and D-Link Corporation) did not follow III/Onward's model.

96.     Vulnerability and bug identification is especially important in an organization such as D-Link Systems, which is managing many different products and need to track corresponding security flaws simultaneously.  D-Link Systems instead relied on email threads stemming from reports provided by outside security researchers.[160]  In many cases, outside researchers disclosed a number of flaws, and D-Link Systems' failure to have assigned an identifier to each issue created a morass for D-Link Systems to determine if every issue had been researched and addressed.  Without proper tracking systems that help maintain a schedule for resolving vulnerabilities, it is easier to lose track of issues.

97.     Without a unique identifier by which to discuss a flaw, D-Link Systems created a significant challenge for itself in pressing for details on the root cause of the problem, whether the flaw exists elsewhere in its code, or whether it has been addressed in other products that

---

[158] COMMON CRITERIA, PART 3, SECURITY ASSURANCE COMPONENTS 155 (Apr. 2017) ("Flaw remediation requires that discovered security flaws be tracked and corrected by the developer.  Although future compliance with flaw remediation procedures cannot be determined at the time of the TOE evaluation, it is possible to evaluate the policies and procedures that a developer has in place to track and correct flaws, and to distribute the flaw information and corrections."), https://www.commoncriteriaportal.org/files/ccfiles/CCPART3V3.1R5.pdf.

[159] E.g., III/Onward Security, *DIR-868A1 Security Testing Report* (Apr. 25, 2017) (DKC0004054–4100, at DKC0004070) (identifying high risk, hard-coded credential, with identifier "OnSec-VUZ-106-05001").

[160] D-Link Sys. 30(b)(6) Dep. 146:23–147:5 (Apr. 25, 2018); Brown Dep. 229:2–230:11, 250:5–10 (Mar. 14, 2018).

share similar code.  This confusion is evident in multiple examples of D-Link Systems'
correspondence on flaws and fixes.[161]  In this, D-Link Systems again relied on D-Link
Corporation to manage the process of getting issues addressed,[162] and took D-Link Corporation's
word that certain firmware fixed an issue, even in the face of examples of the same problem
arising again.

98.     The negative consequences of D-Link Systems' inability to manage this process for itself
are not theoretical.  In one example, D-Link Corporation learned of vulnerabilities, addressed
them, but failed to provide the patched firmware to D-Link Systems for three years.[163]  D-Link
Systems did not get the patch to provide to its customers until after another security researcher
found the same problem and disclosed it to D-Link Systems.[164]  In order to be responsible for
security, D-Link Systems needs access to issues reported to its affiliates, in order to determine
for itself if there is an impact on its customers.

99.     Even assuming it is possible to keep track of security flaws by email, D-Link Systems'
approach would not succeed.[165] ██████████████████████████████████████

████████████████████████████████████████████████████████████

---

[161] E.g., Email from Patrick Cline to Daniel Hsu (May 13, 2015) (DKC1587274–85).

[162] Brown Dep. 106:15–21 (Mar. 14, 2018) ("So I elevate all requests through [D-Link Corporation] who then
facilitate to the vendors.").

[163] See Email from William Brown to Osanda Malith Jayathissa (Dec. 21, 2016) (DLS0023367-68) (noting a fix had
been posted on worldwide support site in 2014, but not to the United States support site)

[164] Email from Osanda Malith Jayathissa to William Brown attaching proposed public disclosure (Jan. 10, 2017)
(DLS0023351-54); Osande Malith, *D-Link DIR-615 Open Redirection and XSS*, BLOG OF OSANDA,
https://osandamalith.com/2017/01/04/d-link-dir-615-open-redirection-and-xss/; DIR-615 Firmware Release Notes
(Apr. 14, 2014) (DLS0023364) ("Fixed the exploit… that can be used for CSRF attack from LAN side. … Corrects
XSS and Open Redirect on ping_response.cgi.").

[165] In most cases, for instance, D-Link Systems simply adopts whatever email subject line was used by the security
researcher who disclosed the report.

████████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. Email is not a replacement for a centralized system that relates the vulnerabilities/flaws to affected devices, history, fixes, status, and a categorization of severity.  The use of email exchanges to track vulnerabilities is also too prone to lead to parallel competing versions of information.

100.    D-Link Corporation started rolling out an improved process called Security Incident Management (SIM), in 2015 and 2016.  As discussed in Section III.E.4.b below, although this system is much improved over D-Link Systems' tracking efforts, D-Link Systems can only read the entries, and relies on D-Link Corporation staff to create and update entries.  For this reason, it does not give D-Link Systems the tools it needs to be assured that security flaws are adequately addressed.

101.    Mr. Brown interfaced with security researchers to collect information about vulnerabilities.  Mr. Brown reported that he first created an "official process" for taking in vulnerabilities in December 2012 or January 2013.[167]  However, Mr. Brown and D-Link Systems failed to track its collection of those vulnerabilities and track their status.[168]  I have reviewed the evidence of how D-Link Systems managed the security flaws and vulnerabilities to which its routers and cameras were vulnerable.  This includes the testimony of Mr. Brown, AJ Wang, and

---

[166] See, e.g., Email from Daniel Hsu to William Brown (Apr. 24, 2015) (DLS0042150–167).

[167] Brown Investigational Hr'g. Tr. 35:7–20 (July 29, 2014).

[168] Brown Dep. 73:2–16 (Mar. 14, 2018) (admitting that he does not memorialize or log his tracking of security issues).

Patrick Cline; a spreadsheet maintained solely by Mr. Cline;[169] a presentation that describes and shows images of content from D-Link Corporation's SIM system;[170] and voluminous emails in which D-Link Systems attempted to manage the response to security issues and fixes.

102.    The manner in which they did so was ad hoc and poorly maintained.  D-Link Systems has relied on email chains to keep track of open issues.[171]  The only centralized record D-Link Systems possessed of past vulnerabilities was a single spreadsheet maintained by Patrick Cline for keeping track of the reported security issues for which he was personally responsible.[172]  The mere fact that there was no clear-cut policy on how to track vulnerabilities demonstrates that D-Link Systems failed to put in place the basic processes necessary to be responsible for identifying and correcting vulnerabilities.  As with everything else, their process appears to have been entirely based on blind trust in their parent organization.

---

[169] Email from William Brown to Peter Tsai attaching file Security Incident Report—SitRep-022216.xlsx (Sept. 1, 2016) (DLS0036806–807).

[170] D-Link Product Security Issue Analysis (Oct. 10, 2017) (DKC0648113–54, at DKC0648115–16).

[171] E.g., Brown Dep. 254:23–255:11 (Mar. 14, 2018) (William Brown would have to search back through his email to locate information on particular vulnerabilities); D-Link Sys. 30(b)(6) Dep. 145:16–17 (Apr. 25, 2018) ("[W]e were just using e-mail to communicate and follow up by phone calls.").

[172] Based on the text of his email, in 2016, Patrick Cline's spreadsheet, with a list of past issues, was the only resource Mr. Brown could provide to D-Link Corporation for it to update its SIM database.  Email from Brown to Tsai attaching Security Incident Report—SitRep-022216.xlsx (Sept. 1, 2016) (DLS0036806–07) ("Prior to SIM, my team which was eliminated and now just me, used this tracking sheet. It was provided to Yin/RC/AJ at one point but it maybe [sic] good to go back and validate closed or open and place them into SIM for proper tracking."); Cline Dep. 45:16–47:23 (Apr. 24, 2018).  At his deposition, Mr. Brown gave equivocal testimony that he and John Jimenez created this spreadsheet, and that it was then passed to Mr. Cline.  Brown Dep. 243:9–20 (Mar. 14, 2018). But Mr. Brown subsequently testified, as did Mr. Cline, that this was not the case.  D-Link Sys. 30(b)(6) Dep. 148:24–149:2 (Apr. 25, 2018) ("Q: Did [D-Link Systems] use any other system, other than the e-mails you were describing, to track vulnerabilities and fixes prior to the implementation of the SIM? A: . . . So Patrick kept a spreadsheet of what he was working on; otherwise, I myself would use e-mail, and we'd communicate verbally all the time. . . ."); Cline Dep. 45:16–47:23 (Apr. 24, 2018).  With the exception of one issue from August 2014, the spreadsheet's entries are dated between January 2015 and February 2016, during Mr. Cline's short tenure on Mr. Brown's team.  Email from Brown to Tsai attaching file Security Incident Report—SitRep-022216.xlsx (Sept. 1, 2016) (DLS0036806–07); Cline Dep. 10:4–21 (Apr. 24, 2018) (Cline dates of employment in the Office of the CTO).  Even were this spreadsheet a tracking system D-Link Systems maintained, it would be inadequate for managing something as complex as the many reported vulnerabilities D-Link Systems received regarding its devices, for many of the same reasons as D-Link Systems' email management, as described below.

103.    A mere exchange of emails, without a formal, centralized mechanism of tracking, is inadequate to stay abreast of vulnerabilities.[173]  Worse, even Mr. Brown's "system" of using emails is suspect in light of the fact that his main contact at D-Link Corporation appears at one point to have attempted to transfer his communications with Mr. Brown off of official company email and onto his personal email:  "From now on I will use my private email to update the status of reported exploits."[174]  Mr. Brown's explanation for this email, in his testimony on behalf of D-Link Systems, makes no sense to me.[175]  Regardless of the motivation, it is highly ill-advised for a security professional to transfer these types of communications to non-corporate email.  This behavior shows a lack of disciplined security awareness, a lack of concern for accurately tracking vulnerabilities, and bypasses the ability for the corporation to have data back-ups to preserve these critical communications.  Moreover, by using his personal email address, Mr. Brown opens up additional potential concerns about the security of the information he is transferring, since his personal email would presumably not be subject to the same security procedures as his official corporate email.

104.    Based on this evidence, I have concluded that D-Link Systems' processes for tracking and remedying security flaws in its devices was at the most basic level, more expected for a start-up organization or one with very limited products.  In addition, D-Link Systems' current

---

[173] COMMON CRITERIA, PART 3, SECURITY ASSURANCE COMPONENTS 155 (Apr. 2017) ("Flaw remediation requires that discovered security flaws be tracked and corrected by the developer. Although future compliance with flaw remediation procedures cannot be determined at the time of the TOE evaluation, it is possible to evaluate the policies and procedures that a developer has in place to track and correct flaws, and to distribute the flaw information and corrections."), https://www.commoncriteriaportal.org/files/ccfiles/CCPART3V3.1R5.pdf;

Michael Howard & Steve Lipner, *The Security Development Lifecycle: A Process For Developing Demonstrably More Secure Software* 30, 51, 72, 183 (2006) ("It is critically important that security and privacy bugs be tracked correctly in your bug-tracking database."), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/.

[174] Email from dlink dlink <wrpd.exploit@gmail.com> [Daniel Hsu] to dubyabee2@mac.com [William Brown] (Aug. 4, 2014) (DLS0042456–61, at DLS0042456).

[175] D-Link Sys. 30(b)(6) Dep. 212:2–6 (Apr. 25, 2018) (suggesting the corporate email system was "down").

processes in this area continue to be inadequate, or at least are entirely dependent on the reliability of its parent, because D-Link Systems does not have write-access to the vulnerability management system maintained by D-Link Corporation.[176]

### 5.  Ignored Repeated Warnings that Security Practices Were Inadequate

105.    While D-Link Systems failed to institute steady or systematic policies or process to promote security quality, they did make sporadic efforts to identify issues with their products in the years 2012-2013.  Notably, however, when issues were identified by the consultants and experts D-Link Systems engaged, the advice of those paid experts to address software development flaws systematically was ignored.[177]  For example, in the one security evaluation report Rapid7 produced about D-Link Systems devices in 2011, Rapid7 recommended that "[d]ue to the degree of these vulnerabilities Rapid7 additionally recommends D-Link develop and implement a comprehensive Security Development Life cycle program that will integrate secure design principals [sic] into the development process." [178]

106.    Likewise, when D-Link Systems engaged Jason Doyle to perform security evaluations of two of its routers in 2013, Mr. Doyle advised in his report that "[o]verall, the results of this

---

[176] Brown Dep. 249:1–11 (Mar. 14, 2018) (Mr. Brown cannot write information to the SIM); D-Link Sys. 30(b)(6) Dep. 137:19–138:1 (Apr. 25, 2018) (D-Link Systems cannot add information to the SIM; D-Link Systems sends information to contacts at D-Link Corporation and relies on D-Link Corporation to enter it).  In some cases, correspondence shows that other D-Link subsidiaries around the world had to argue with D-Link Corporation staff to get a SIM entry created for an issue so that information on its resolution and status could be shared.  Email from Mary Harrison, Head of European Marketing, to Quenton Miao, D-Link Corporation (Mar. 18, 2016) (DLS0038010–92).

[177] This is in addition to the warnings D-Link Systems should have heeded from the many serious vulnerabilities it was being informed of by outside security researchers, discussed further in Section III.E below.

[178] Rapid7, *mydlink DCS-1130L Assessment* (Jan. 25, 2011) (DLS0056608–59, at DLS0056611).  Although it is unclear whether Rapid7 was performing services for D-Link Corporation or D-Link Systems, at least Ted Kuo of D-Link Systems received this report.  Email from Mac Mac to Laurence Tsai, attaching Rapid7_-_D-Link_-_MyDlink.com_-_DCS-1130_Final.pdf (Feb. 8, 2012) (DLS0056607–59, at DLS0056607) (copying Ted Kuo of D-Link Systems, writing "[a]ttached is the Rapid7 test report.").  I have been told by the FTC attorneys that the DLS prefix for the Bates numbers means the report was provided from D-Link System's files.  The FTC's attorneys informed that the Bates numbers on documents beginning "DKC" designates documents from D-Link Corporation, and those with DKS Bates numbers were provided during the investigation period.

assessment are indicative of [a] system that has not undergone a thorough security evaluation."[179]

He further recommended that "developers become familiar with the OWASP Top 10 list of web

application security vulnerabilities and trained on secure coding practices which will help address

common application vulnerabilities."[180]  This advice was provided in April 2013.  Had D-Link

Systems acted on this advice and initiated a meaningful review of its product line, it likely could

have addressed or prevented some of the serious vulnerabilities later discovered in its routers and

IP cameras (see Section III.E below).

107.    Surprisingly, various D-Link Systems and D-Link Corporation employees' emails

suggest they were well aware of broader security problems.  At nearly the same time as Mr.

Doyle's reports, William Brown opined that "Alpha products are more vulnerable than Cameos.

Cameos vulnerabilities are catastrophic when found."[181]  Despite that perception, he notes that D-

Link Systems has just three processes in place to "discover and/or verify issues":

(1) monitoring forums; (2) a (short-lived) bug bounty program (see Section III.F.3 below); and (3)

D-Link Corporations' work with III/Onward and Mr. Brown's contracting out to some trusted

experts.[182]

108.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[179] Jason Doyle, *DIR-826L Security Evaluation* (Apr. 16, 2013) (DLS00038165–76, at DLS00038168).  Mr. Doyle's work for D-Link Systems is also discussed in Section III.F below.

[180] Ibid.

[181] Email William Brown to Rick Chiang (Apr. 9, 2013) (DLS0030587–89, at DLS0030587).

[182] Ibid.

███████████████████████████████████████████████████

███████

### 6.  "Trust" Is Not Enough

109.     Mr. Brown's mantra in response to questions about the processes in place at D-Link

Systems is to repeat that he simply "trusts" D-Link corporation.[184]   As discussed above, the

touchstone in the security field is "assurance," not "trust."   Assurances are based on reliable,

auditable processes.   All that said, even if "trust" were a legitimate approach to security, that

trust could only be premised on results that would inspire trust.   As I will discuss in the next

section, the flaws that were repeatedly found in the code of D-Link routers and IP cameras

should have undermined the basis of any trust.   D-Link Systems should have never simply

"trusted" someone else to make sure its devices were secure.   But, even if "trusting" were a

legitimate approach, D-Link Systems should have quickly understood, based on the nature of the

flaws that have been identified by third parties from late 2012 to the present, that its trust in its

parent corporation and the vendors was badly misplaced.   The vulnerabilities that third parties

identified revealed fundamental failures in the way these devices were being developed.[185]

---

[183] Email from Jay Radcliffe to Ping Chen (Apr. 11, 2015) (DLS0049144–45, at DLS0049145).   In the same
exchange, Hans Liu of D-Link Corporation pointed out that the devices should not have the *telnet* daemon, see
Section III.D.4 above (Unnecessary Protocols and Services), or be using http basic authentication. ███████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

[184] Brown describes the relationship with D-Link Corporation as one of "trust."   See, for example, Brown Dep.
108:12–111:21, 139:3–9, 161:12–16 (Mar. 14, 2018); D-Link Sys. 30(b)(6) Dep. 73:9–21, 75:15–76:1, 87:19–88:4
("I think it's—I don't know of any documents in—a document could never replace the relationship that I've had,
and the trust relationship I have with [D-Link Corporation] and the vendors."); 108:18–109:7, 197:12–198:14 (Apr.
25, 2018).

[185] See, for example, Jason Doyle and Rapid7 quotes in Section III.C.5 above, and Section III.F below.

110.    D-Link Systems' trusting approach is in stark contrasts to that of one of its European

counterparts.[186]  I have reviewed 2013 correspondence showing a D-Link business unit in

Germany advocating for D-Link Corporation have devices tested by III/Onward.[187]  While they

were in the process of choosing which devices to test, Michael Messner disclosed numerous,

serious vulnerabilities in D-routers (affecting some D-Link Systems models too, see Section

III.E.1.c below).[188]  In response, the business unit "reorganized our resources in DCE

[abbreviation for the business unit], so that we could perform our own testing."[189]  Alexander

Koller of the business unit evaluated several routers (the DIR-300, DIR-600, DIR-615, DIR-645,

DIR-815, and DIR-845L).[190]  Mr. Koller found a number of additional problems.  For example,

regarding the DIR-615, he wrote "[m]ultiple options for code injections….  The problem is all

variables are written directly into a Javascript code block at the top of the page, so a simple

javascript injection is possible….  As [I] say [sic] before you have to check all input fields for

malicious code injection."[191]  Although the type of testing that "DCE" conducted would not

solve D-Link Systems' problem, it is a step in the right direction.  In addition, in my experience,

the serious response evidenced in the business unit's reactions to Mr. Messner's report is more in

line with how companies who take security seriously would react.

---

[186] See Email from Tarik Erdemir to Daniel Hsu et al. and attached D-Link Router Security Test report (Mar. 28, 2013) (DKC0010751–815, at 10780–81).

[187] Ibid. at DKC00010780–82.

[188] Ibid. at DKC00010778–80.

[189] Ibid. at DKC00010776–77.  D-Link Systems, by comparison, paid an outside security researcher, Jason Doyle, $2000 to perform tests on two routers, one time.  Jason Doyle Evaluation Request (July 25, 2013) (DKS00011858–59).

[190] Ibid. at DKC00010783–815.  Mr. Koller tested for new problems, and also tested whether vulnerabilities disclosed by Mr. Messner were fixed.

[191] Ibid. at DKC00010789.

111.    In my opinion, at least after receiving the evaluations it hired Jason Doyle to perform in

April 2013, D-Link Systems should have realized that D-Link Corporation and the third-party

vendors were shipping devices with multiple fundamental vulnerabilities resulting from a lack of

a "comprehensive Security Development Life cycle program."[192]  These multiple vulnerabilities

and the lack of a comprehensive SDLC should have ruled out "trusting" D-Link Corporation and

their vendors to assure adequate security in these devices.

> **D.    The Fundamental Code Development Failures that Repeatedly Appeared in
> D-Link Routers and IP Cameras Demonstrate that D-Link Systems' Trust in
> D-Link Corporation and its Vendors was Misplaced**

112.    In the following sections, I will discuss some of the most basic design, implementation,

and code maintenance failures (collectively, "code development failures") that appeared in D-

Link devices.  I will describe how these types of failures were well-known to security

professionals before 2012—sometimes for decades before.  I will describe how security

professionals and software developers were aware of many different ways to identify and prevent

these vulnerabilities from appearing in devices.  Lastly, I will describe how these failures

appeared in multiple D-Link devices, with reference to the next section, in which I will discuss

some of the particular vulnerabilities involving these failures.

113.    I discuss in this report a representative subset of the failures caused by D-Link's

development policies and processes.  This is not an exhaustive list.  I have selected these flaws

and failures because they are illustrative of the immature state of D-Link Systems' security

processes.  They are illuminating because they have been well-known for a long time, and are so

---

[192] Rapid7 warned D-Link about this issue in 2011.  See Rapid7, *mydlink DCS-1130 Assessment* (Jan. 25, 2011)
(DLS0056608–DLS0056659 at DLS0056611).

easily preventable.  The aggregate impact of these flaws and failures is to render D-Link

Systems' routers and IP cameras not secure against unauthorized access or control.

██████████████████████

114.     The first pervasive software flaw affecting D-Link Systems' routers and IP cameras is a

failure to properly filter or validate input.  Simply put, input filtering or validation is the process

of inspecting user input (such as a string of characters typed in from a keyboard) to make sure

that it will not cause a malfunction.[193]  This malfunction could be anything from improper data

being written to a database field, to a device executing a hacker's command and thereby handing

over control of the device.  Although it may be necessary in other contexts, input filtering as a

security practice is critical where the input being handled comes from a user, either whole or in

part.  For example, where there is a field where a user needs to enter some information (like the

user's name, for the software to add to a database), a malicious actor could enter certain symbols

that the software would execute as code, rather than just writing the information to the database

as expected.[194]  Depending on the purpose of the input, there are numerous techniques to make

sure correct inputs are permitted and incorrect inputs are rejected.  Failing to properly filter

---

[193] Although I refer to this as user input for simplicity, this really applies to any time device software handles input that is provided in any respect by an external source (as opposed to the result of an earlier step in the software process or internal data).  This could be text an individual types into a field in an interface.  But it could also be any information a device receives from an outside source, like an "I'm here" message transmitted by another device on the network.  If the input to a particular process is coming into the software from an external source, the software engineer needs to assume it could be incorrect in a damaging way or intentionally manipulated by someone with control over that external source, who may be trying to gain unauthorized access to the device.

[194] *A1 2004 Unvalidated Input*, OWASP (Apr. 18, 2010) ("Attackers can tamper with any part of [a]… request, including the url, querystring, headers, cookies, form fields, and hidden fields, to try to bypass… security mechanisms."), https://www.owasp.org/index.php/A1_2004_Unvalidated_Input#Description.

inputs, for example, is a predicate to command injection vulnerabilities, a class of vulnerability that security researchers repeatedly reported to D-Link Systems.[195]

115.    Failing to properly filter user input creates an opportunity for attackers to try to feed arbitrary input to the software to cause it malfunction in a useful way (to the attacker). Depending on what library the input is provided to, the attacker could successfully inject commands to the device allowing him or her to retrieve non-public information; cause the device to crash; make unauthorized changes; or, in the worst case, provide the attacker with ongoing, remote control of the device by creating a shell or command line by which the attacker can enter commands to the device on their computer, over the Internet.  A famous comic from 2007[196] explained the dangers of failing to filter inputs:



The explanation is this:  The database wants to know the child's name.  But if the name input has " '); " after it, the database in question (a common SQL database) is cued to interpret the next word as a command, rather than a further part of the user's input.  In this case, the next word was a command to erase ("drop") a database ("table") called "students."  Thus, the input of the fictional child's name has the result of erasing the table with all the students' names.

---

[195] RICHARD R. LINDE, OPERATING SYSTEM PENETRATION 361–368 (AFIPS National Computer Conference, May 19–22, 1975), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

[196] See *Exploits of a Mom*, XKCD, https://xkcd.com/327/.

116.    The need for input filtering has been recognized since at least 1975,[197] and it has been represented in OWASP's list of top ten web application flaws since its inception, circa 2004.[198] Every general software security reference with which I am familiar calls attention to the importance of input filtering or validation.[199]

---

[197] RICHARD R. LINDE, OPERATING SYSTEM PENETRATION 361–368 (AFIPS National Computer Conference, May 19–22, 1975), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

[198] In OWASP's 2004 updates to its Top Ten Web Application Flaws, "Unvalidated Input" was the number one flaw. *A1 2004 Unvalidated Input*, OWASP (2004), https://www.owasp.org/index.php/A1_2004_Unvalidated_Input. It remained the number one flaw in 2010.  See *Top 10 2010-A1-Injection*, OWASP (2010), https://www.owasp.org/index.php/Top_10_2010-A1-Injection ("Injection flaws occur when an application sends untrusted data to an interpreter").

[199] For example, here is a good, but not exhaustive list:

ROSS ANDERSON, SECURITY ENGINEERING: A GUIDE TO BUILDING DEPENDABLE DISTRIBUTED SYSTEMS 849 (2nd ed. 2008) ("you certainly need to educate all your developers to the point that they understand the basics, such as the need to sanitise input to prevent overflows"); www.cl.cam.ac.uk/~rja14/book.html;

BRIAN CHESS & JACOB WEST, SECURE PROGRAMMING WITH STATIC ANALYSIS (2007);

MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES 92–93, 103–106 (2003);

MICHAEL HOWARD & DAVID LEBLANC, WRITING SECURE CODE 341–361 (2nd ed. 2003) ("Chapter 10: All Input Is Evil!"), https://blogs.msdn.microsoft.com/michael_howard/;

MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 274–284 (2006) ("Fuzz testing is an effective testing technique for input validation issues."), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/;

GARY MCGRAW, SOFTWARE SECURITY: BUILDING SECURITY IN (1st ed. 2006), http://www.swsec.com/;

ROBERT C. SEACORD, SECURE CODING IN C AND C++ (1st ed. 2006) (2nd ed. 2013);

KENNETH R. VAN WYK, MARK G. GRAFF, DAN S. PETERS & DIANA L. BURLEY, ENTERPRISE SOFTWARE SECURITY: A CONFLUENCE OF DISCIPLINES (2015);

JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE: HOW TO AVOID SECURITY PROBLEMS THE RIGHT WAY (1st ed. 2001);

Robert Seacord, *Top 10 Secure Coding Practices*, CERT, CMU/SEI (2009) ("1. Validate Input"), https://wiki.sei.cmu.edu/confluence/display/seccode/Top+10+Secure+Coding+Practices;

*CWE, CWE-241: Improper Handling of Unexpected Data Type*, CWE ("Assume all input is malicious. Use an 'accept known good' input validation strategy, i.e., use a whitelist of acceptable inputs that strictly conform to specifications."), http://cwe.mitre.org/data/definitions/241.html;

*CWE, CWE CATEGORY: CERT C Secure Coding (2008 Version) Section 09–Input Output (FIO)*, CWE, http://cwe.mitre.org/data/definitions/743.html;

*CWE, CWE-78: Improper Neutralization of Special Elements used in an OS Command ('OS Command Injection')*, CWE, https://cwe.mitre.org/data/definitions/78.html;

117.    There are two general approaches to filtering input.  The first is blacklisting, where the software rejects certain inputs.[200]  At a bare minimum, programmers can blacklist unneeded special characters like slashes, percentage signs, and quotation marks that could never represent legitimate input, and might be used by an attacker to cause a malfunction.  Depending on the desired outcome, the programmer might set up the software to either delete the special characters from the input and process the remainder, or reject the input entirely.  A more secure method is to whitelist, which is to define the permitted inputs, and to reject any input that does not match that definition.[201]

118.    Since at least 2012, D-Link Systems and D-Link Corporation have been alerted numerous times to input validation failures in D-Link Systems devices, both by experts they hired and outside security researchers alerting D-Link Systems to vulnerabilities.  Indeed, to read the reports commissioned by D-Link Systems and D-Link Corporation is to encounter a litany of entreaties for improved input filtering.  For example, in his 2013 security evaluation of both the DIR-505L and the DIR-826L, Mr. Doyle identified directory traversal vulnerabilities in each.  In

---

*Never Use Unvalidated Input as Part of a Directive to any Internal Component*, US-CERT (June 26, 2013), https://www.us-cert.gov/bsi/articles/knowledge/coding-practices/never-use-unvalidated-input-part-directive-any-internal; and

SAFECODE, FUNDAMENTAL PRACTICES FOR SECURE SOFTWARE DEVELOPMENT 15–18 (2nd ed. Feb. 8, 2011) ("Validate Input and Output to Mitigate Common Vulnerabilities"), https://www.safecode.org/publication/SAFECode_Dev_Practices0211.pdf.

[200] OWASP has long suggested that developers avoid blacklisting.  *A1 2004 Unvalidated Input*, OWASP (Apr. 18. 2010) ("'Negative' approaches that involve filtering out certain bad input or approaches that rely on signatures are not likely to be effective and may be difficult to maintain."), https://www.owasp.org/index.php/A1_2004_Unvalidated_Input#How_to_Protect_Yourself.

[201] See *M1: Establish and maintain control over all of your inputs*, CWE MONSTER MITIGATIONS (2011), http://cwe.mitre.org/top25/archive/2011/2011_mitigations.html#Mit-M1; *A1.5 2004 Unvalidated Input, 5. How To Protect Yourself*, OWASP (Apr. 18, 2004) https://www.owasp.org/index.php/A1_2004_Unvalidated_Input#How_to_Protect_Yourself.

each report, he advised: "[v]alidate user input to ensure only known good characters are used. Refer to the OWASP reference for detailed approaches."[202]

119.    In addition, I have reviewed more than ten III/Onward reports that advised this change.[203] For example, in a report on IP ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████

120.    D-Link Systems' pervasive input filtering/validation failures led in part to its devices being vulnerable to the most serious kinds of attacks, including the ability to remotely inject commands—taking over devices—and the many harms to device-owners that come with complete takeover, as discussed in Section III.A.1 above.  Input filtering failures contributed to many of the critical vulnerabilities I discuss in detail below, and affected many D-Link Systems' devices just in these few examples.  See Sections III.E.1.b (Three Additional Paleari Command Injection Vulnerabilities), III.E.1.c (Messner Buffer Overflow Exploit), III.E.1.d (Lovett Vulnerabilities—Clear Text Password, XSS, and Remote Code Execution Vulnerabilities), III.E.1.e (Huntley/Qihoo/Heffner Command Injection Vulnerability in HNAP), III.E.1.f (Adkins Command Injection Vulnerability), III.E.1.g (Romero Remote Code Execution Vulnerability), and III.E.2.c (Senrio Stack Overflow Vulnerability), below.

---

[202] Jason Doyle, *DIR-505L Security Evaluation* (Apr. 8, 2013) (DLS0030614–624, DLS0030618); Jason Doyle, *DIR-826L Security Evaluation* (Apr. 16, 2013) (DLS00038165–76, at DLS00038169).

[203] See Appendix C (Materials Considered), Category III (III/Onward Device Security Reports). ████████████

████████████████████████████████████████

[204] ████████████████████████████████████████████████

████████████████████████████████████████████████

2. ████████████

121.     In addition to failing to filter or validate input, D-Link Systems routers and IP cameras have exhibited basic failures in other aspects of handling user input strings.  String handling is the manipulation of character strings.  The software can invoke various functions to shorten the strings, terminate them, combine them with others (concatenate them), move them from location to location, or otherwise manipulate them.  It is important to properly handle strings and (on linux/Unix systems) terminate them with a null byte[205] so that, should input filtering not successfully reject malicious code, that code is not processed as a command.  If, on the other hand, a programmer uses methods that pass on entire strings of unlimited, unvalidated user input—or that fail to terminate strings—this can result in a buffer overflow or stack overflow.[206]  Overflows are a type of vulnerability wherein the software stores more characters of a string in memory than was reserved for that purpose, leaving the excess saved in memory—at locations "running off the end" of the buffer or stack, as applicable—where it may be erroneously interpreted by the processor as though it were a new instruction or data value by the software program.[207]

---

[205] A null byte is the classic way to signal that a string has ended in Unix/Linux.  The software will discard anything after the null byte when copying the string, preventing buffer overflows.

[206] A *buffer* is a designated location in computer memory that the software uses to temporarily store pieces of information as it carries out software instructions.  It's like an expanded version of the Memory function on a basic calculator.  The term "stack," in this context, is a reference to the *call stack*, a formatted memory location that preserves where in the larger software process the software should return when a particular subroutine is completed.  The processor will pass control to particular subroutines in the execution of the software, and the call stack will record where the software should return after the subroutine is finished.

[207] MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 188–89 (2006), ("Stack-based buffer overruns go back to the 1980s or before (Eichlin and Rochlis 1989), and the authors put tremendous effort into removing them during the Microsoft Windows Server 2003 security push. But exploitable heap-based buffer overruns and integer overflow attacks on the length calculations that attempt to prevent buffer overruns are relatively new developments. For example, the ASN.1 network protocol– parsing component of Microsoft Windows was extensively scrubbed for buffer overrun vulnerabilities during the security push (CERT 2002). A researcher subsequently pointed out that the component was vulnerable to integer overflow attacks in the code that was supposed to prevent buffer overruns. Of course, our tools, training, and processes now focus on such vulnerabilities, but at the time of that particular security threat, we

122.    One of the failures that leads to buffer and stack overflow vulnerabilities is the use of functions that fail to limit the input they accept to only that which is expected and necessary for the program when handling user input.

123.    Here's a simplified example:  one step in a software program may be to use a function to add a country code to a user-entered telephone number.  Suppose that the programmer anticipates only digits in the input string—no parentheses, no hyphens, no other characters of any kind.  The function that takes the user input from one location and combines it with the country code (concatenates the two in programming terms) might then allocate space for only eleven bytes for the user input (ten for the phone number and one null byte, which is how the end of a string is signified in C).  There are numerous functions in the C library that are set up to accomplish this allowing only the set number of characters—eleven in this case—and rejecting the excess.  That way, if the user enters a ten-digit number but adds to the end of the number some exploit code that attempts to issue a command to the software to allow the user to take over, the software rejects the characters after the phone number, and the attack is foiled.  But there are also older functions that take any size of user input and pass it along.  Using these functions for user input risks the software passing along additional input that, if properly styled by an attacker, the software would read as a command—an exploitation of an overflow vulnerability.[208]

_____

had to invoke our security response process and release Microsoft Security Bulletin MS04-007 to deal with vulnerabilities in a component we thought we had gotten right (Microsoft 2004a)."), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/.

[208] This problem is slightly different from input filtering.  Input filtering should be performed before the function handles the input.  Input filtering typically addresses the content of the input, although it can also address length.  For example, in this example, the software engineer should have also had an input filtering step, which could include rejecting too-long entries, blacklisting all characters other than numerical digits and dashes, or whitelisting input that conforms to a (###) ###-#### format.  Performing input filtering and avoiding insecure functions are both critical when handling user input, because attackers will constantly be trying to evade input filtering rules with cleverly

124.    Common examples of this problem are *strcpy()* and *strcat()* (which stand for "string copy" and "string concatenate," respectively), which have no built-in method to limit the size of the string they handle.[209]  For example, if a programmer uses *strcpy()* to move a string of user input into the buffer, agnostic of how many characters are expected by the process that is instructed to retrieve the data from the buffer, the next process may well take only the characters needed and leave the remainder in the buffer.  This extra string may cause an error or, if an attacker has correctly styled the additional input, may result in the software executing an attacker's command.

125.    People have known about string function manipulation problems for decades.  One function that was included in the original C language—*gets()*—was deemed so inherently

---

styled input.  As discussed in Sections III.E.1.e and 2.c below, D-Link Systems devices had buffer overflow vulnerabilities due to the lack of input filtering and the use of *strcpy()* to handle that input.

[209] Daniel Plakosh, *strcpy() and strcat()*, U.S. CERT (Sept. 27, 2005) ("The *strcpy()* and *strcat()* functions are a source of buffer overflow vulnerabilities."), https://www.us-cert.gov/bsi/articles/knowledge/coding-practices/strcpy-and-strcat;

SAFECode, FUNDAMENTAL PRACTICES FOR SECURE SOFTWARE DEVELOPMENT 12–14 (2nd ed. Feb. 8, 2011) ("Minimize Use of Unsafe String and Buffer Functions"), https://www.safecode.org/publication/SAFECode_Dev_Practices0211.pdf;

SAFECode, FUNDAMENTAL PRACTICES FOR SECURE SOFTWARE DEVELOPMENT 7–10 (1st ed. Oct. 8, 2008) (noting a common cause of buffer overrun is using unsafe string- and buffer-copying C runtime functions, and recommending that function families such as the "*strcpy()* amily" be removed from older code), http://www.safecode.org/publication/SAFECode_Dev_Practices1108.pdf;

*Top 25 Most Dangerous Software Errors (2011) CWE-676: Use of Potentially Dangerous Function*, CWE/SANS ("the programmer does not ensure that the size of the data pointed to by string will fit in the local buffer and blindly copies the data with the potentially dangerous *strcpy()* function. This may result in a buffer overflow condition if an attacker can influence the contents of the string parameter"), http://cwe.mitre.org/top25/#CWE-676, https://cwe.mitre.org/data/definitions/676.html;

*Top 25 Most Dangerous Software Errors (2011) CWE-120: Classic Buffer Overflow*, CWE/SANS ("Buffer overflows are Mother Nature's little reminder of that law of physics that says: if you try to put more stuff into a container than it can hold, you're going to make a mess. The scourge of C applications for decades, buffer overflows have been remarkably resistant to elimination.  However, copying an untrusted input without checking the size of that input is the simplest error to make in a time when there are much more interesting mistakes to avoid.  That's why this type of buffer overflow is often referred to as "classic."  It's decades old, and it's typically one of the first things you learn about in Secure Programming 101."), http://cwe.mitre.org/top25/#CWE-120.

insecure that it was removed from the C standard language in 2011.[210]  Since at least 1996,[211] experts have publicized problems with other, often problematic functions, such as *strcpy()* and *strcat()*, and advised caution in their use with user input.[212] ██████████████████

████████████████████████████████████    ██████    ████████████████

██████████████████████████████████████████████████████████

---

[210] See ISO/IEC, PROGRAMMING LANGUAGES—C xiv (2011) ("removed the gets function (<stdio.h>)") http://www.open-std.org/jtc1/sc22/wg14/www/docs/n1570.pdf.  See also SAFECODE, FUNDAMENTAL PRACTICES FOR SECURE SOFTWARE DEVELOPMENT, 7 (1st ed. 2008) (recommending that "gets family" function be removed from older code), http://www.safecode.org/publication/SAFECode_Dev_Practices1108.pdf.

[211] Aleph One, *Smashing the Stack For Fun and Profit*, PHRACK 7 (49) (1996), http://phrack.org/issues/49/14.html.
[212] *Reviewing Code for Buffer Overruns and Overflows*, OWASP (Sept. 9, 2010), https://www.owasp.org/index.php/Reviewing_Code_for_Buffer_Overruns_and_Overflows;

MICHAEL HOWARD, DAVID LEBLANC & JOHN VIEGA, 19 DEADLY SINS OF SOFTWARE SECURITY: PROGRAMMING FLAWS AND HOW TO FIX THEM (1st ed. 2005);

ROBERT C. SEACORD & JASON RAFAIL, SECURE CODING IN C AND C++: A LOOK AT COMMON VULNERABILITIES (CERT, SEI-CMU, Nov. 2005), https://resources.sei.cmu.edu/asset_files/presentation/2005_017_101_52657.pdf;

MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES 85–93, 101 (2003), http://securecoding.org;

ROBERT C. SEACORD, CoBASSA 2005: BEST PRACTICES FOR SECURE CODING (CERT, SEI, Carnegie Mellon, Nov. 2005), https://resources.sei.cmu.edu/asset_files/presentation/2005_017_001_52663.pdf;

MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 242–49 (2006), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/; SAFECODE, FUNDAMENTAL PRACTICES FOR SECURE SOFTWARE DEVELOPMENT 7–10 (1st ed. 2008) (noting a common cause of buffer overrun is using unsafe string- and buffer-copying C runtime functions, and recommending that function families such as the "*strcpy()* family" be removed from older code), http://www.safecode.org/publication/SAFECode_Dev_Practices1108.pdf; *Reviewing Code for Buffer Overruns and Overflows*, OWASP (Sept. 9, 2010), https://www.owasp.org/index.php/Reviewing_Code_for_Buffer_Overruns_and_Overflows.

[213] See, e.g., III/Onward, *DCS-930L Device Security Testing Report*, Appendix D (Aug. 27, 2012) (DKC0003183–203, at DKC0003185, DKC0003187, DKC0003189); III/Onward, *DIR-826L Device Security Testing Report*, Appendix D (Sept. 28, 2012) (DKC0003966–4003, at DKC0003971, DKC0003980, DKC0003981, DKC0003984, DKC0003985); III/Onward, *DCS-942L Device Security Testing Report*, Appendix D (Nov. 10, 2012), (DKC0003351–65, at DKC0003353); DCS-942L Vulnerability Info Spreadsheet (DKC0501497); III/Onward, *DCS-935L Device Security Testing Report*, Appendix D (June 26, 2015) (DKC0003222–56, at DKC0003239); III/Onward, *DCS-960L Device Security Testing Report*, Appendix D (Aug. 6, 2015) (DKC0003387–407, at DKC0003400).

input, but this did not result in sufficient steps to prevent the function from leading to exploitable vulnerabilities in D-Link Systems' routers and IP cameras.[214]

126.    Improper string handling, such as incautious use of *strcpy( )* function, can create an opportunity for attackers to interfere with the operation of a computer, and in some circumstances compromise its security.  If, for example, the program copies whatever the user inputs into a buffer without removing malicious characters or properly terminating the string, the attacker may be able to overflow the buffer intended to contain the string.  Sometimes, this malicious overflow of a buffer can cause the computer (such as a router) to halt entirely.  In other instances, a specially designed input string which is improvidently copied into a buffer contained in one of the computer's registers could alter the path of execution of the software, causing malicious code to be executed instead of the program that was originally loaded onto the computer (or router).  This latter technique, first identified in print in 1996, is known as "smashing the stack," and special utilities have existed for more than a dozen years easing the task for an attacker to compose the precise set of bytes needed to effect a stack-smashing attack. It is also possible to compromise the security of a system by, for example, injecting or appending a malicious command into an otherwise benign input string.  In this case, the buffer is not overfilled, but nevertheless has been subjected to malicious manipulation as a result of the improper string manipulation.

---

[214] D-Link Sys. 30(b)(6) Dep. 222:3–10 (Apr. 25, 2018)

127.    There are many ways to avoid having problematic string handling in software.  For example, a series of alternative, generally safer, versions of string-handling functions have been available in the C language for many years.  The simplest are *strncpy()* and *strncat()*, functions where the letter "n" denotes the fact that the programmer must specify the length of the string to be passed along.[215]  (By specifying the precise number of bytes to be moved, these functions avoid many of the problems associated with misuse of the *strcpy()* and *strcat()* functions, which merely move bytes until they encounter a "0").  Companies can also prevent or find and correct these flaws in numerous ways, including developer training and testing source code with basic static code checkers.  It is easy for these checkers to find unbounded functions like *strcpy()* and *strcat()* by scanning source code, and any free or commercial static code checker distributed in the last decade or more would be set up to catch these and flag them to be double-checked and fixed if necessary.

128.    ███████████████████████████████████████████████████████████████

███████████████████████████ including, among the examples I discuss below, a remote code execution vulnerability disclosed to D-Link Systems by Daniel Romero in 2016 (Section III.E.1.g below), which affected numerous D-Link Systems routers, and a stack overflow vulnerability disclosed to D-Link Systems by Senrio in 2016 (Section III.E.2.c below), which affected many D-Link Systems IP Cameras.

---

[215] Although they can be somewhat more secure than *strcpy()* and *strcat()*, even *strncpy()* and *strncat()* can be subject to overflow problems in some cases.  For that reason, C has released a series of other *strcpy()*- and *strcat()*-related functions, giving programmers an arsenal of solutions to avoid using these insecure functions when handling user input.  See ROBERT C. SEACORD & JASON RAFAIL, SECURE CODING IN C AND C++: A LOOK AT COMMON VULNERABILITIES (CERT, SEI-CMU, Nov. 2005), https://resources.sei.cmu.edu/asset_files/presentation/2005_017_101_52657.pdf; ROBERT C. SEACORD, COBASSA 2005: BEST PRACTICES FOR SECURE CODING (CERT, SEI, Carnegie Mellon, Nov. 2005), https://resources.sei.cmu.edu/asset_files/presentation/2005_017_001_52663.pdf.

### 3. Unnecessary *System()* Library Calls

129.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████[216]

130.   *System()* calls are an easy way to accomplish tasks in software.  On the one hand, they are easy because the *system()* call can process any type of command, such as changing date and time or shutting down the device.  Other library calls can only accomplish a narrower subset of tasks, and they require the developer to satisfy the application programming interface (API) specifications of the library in order to complete the desired task.

131.   That ease of use is sometimes outweighed by the significant risk of completing tasks through *system()* calls.  *System()* can be an insecure way to accomplish tasks because when invoked by a privileged process, it operates with full privileges, meaning there is no limit to the commands that it can execute.  Because of this, secure coding resources advise programmers to limit the use of *system()* calls to situations where it is absolutely necessary, and to avoid using *system()* when handling user input without extensive validation.[217]  Other library functions that can achieve the same result are less powerful because they operate with limited privileges, but as a result, the damage is mitigated if an attacker is able to feed the function a command.

---

[216] This is equivalent to the command line applications available on personal computers.  Unlike most software applications, which only allow you to accomplish certain tasks and only through the interface of the application, the command line will allow you to control any aspect of the computer, with properly formatted commands.

[217] MARK G. GRAFF, SECURE CODING: THE STATE OF THE PRACTICE 4.5.1. (Para–Protect Services, Inc., White Paper, 2001) ("Use *exec()* instead of *system()*, to avoid invoking a shell.").

132.    The perils of using *system()* have been well-documented for at least a decade.[218] ▐▐▐



133.    Use of *system()* can be avoided by substituting specific functions that can accomplish the

desired task without running at full privilege, and coding the input to make use of that specific

function.  Companies can easily find instances of *system()* by running a static code checker.

Because the risk of using *system()* is so well-known and easy to detect when scanning source

code, any free or commercial static code checker distributed in the last decade or more could be

set up to search for *system()*.

134.    Several of the serious vulnerabilities I discuss below were caused in part by unnecessary

*system()* calls, or the related problem of accepting commands to functions running with privilege,

which could have been avoided using standard code review processes.  See Sections III.E.1.c

(Messner Buffer Overflow Exploit—passing commands to privileged ping function), III.E.1.e

---

[218] Ben Tucker, *ENV33-C. Do not call system()*, SEI-CMU ("Use of the *system()* function can result in exploitable vulnerabilities, in the worst case allowing execution of arbitrary system commands"), https://wiki.sei.cmu.edu/confluence/pages/viewpage.action?pageId=87152177; MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES 85–89 (2003), http://securecoding.org; ROBERT C. SEACORD, THE CERT C SECURE CODING STANDARD 479–487 (2009).

[219] III/Onward, *DIR-615 Device Security Testing Report*, Appendix D (May 10, 2013) (DKC0003511–3535, at DKC0003517) ("The web application apply dangerous functions (e.g., system command execution) without filtering the parameter value sent by the client-side user.  Attackers can let the target execute arbitrary command through sending the special designed string. . . . Solution . . . Disable dangerous command execute function, such as exec,system.").

[220] Email from Daniel Hsu to William Brown (Oct. 9, 2014) (DLS0029140–41) (emphasis added).

(Huntley/Qihoo/Heffner Command Injection Vulnerability in HNAP), and III.E.1.f (Adkins Command Injection Vulnerability), below.

### 4.  Unnecessary Protocols and Services

135.    D-Link Systems also frequently ran unnecessary protocols and services on its devices, expanding the potential opportunities for compromise.  Routers and IP cameras typically receive connections from across the Internet, and these connections can relate to numerous protocols and be directed to a variety of services.[221]  Services typically make use of a designated software port on the device, for example 8080 for HTTP, which enables the router to direct traffic from over the Internet to the correct piece of software handling requests for that service.

136.    Ports are numbered openings (or addresses) for information to be exchanged by networked devices.  If a linux/Unix computer (such as a router) wishes to offer a particular service (such as http the web-browsing protocol), it specifies a particular piece of software to handle requests for that service.  That servicing software, often referred to as a "daemon," is invoked for each incoming connection request of that service.  When information is received, the daemon will be invoked.  Each port and service is potentially vulnerable to attack.  For that reason, it is a well-known security flaw to run protocols or services that are not needed.[222]  These are needless risks.

---

[221] Protocols are communication languages, like Hyper-text Transfer Protocol (HTTP).  Services are particular functions or functionalities, such as a File Transfer service (often named by the protocol it uses: File Transfer Protocol, or FTP).  They are usually implemented by executables or scripts saved on the device that are called into action when they receive appropriate input.  Telnet is another example of a protocol and service that share a name.

[222] *CWE-477: Use of Obsolete Function*, CWE ("The code uses deprecated or obsolete functions, which suggests that the code has not been actively reviewed or maintained."), https://cwe.mitre.org/data/definitions/477.html; *A10.1 2004 Insecure Configuration Management*, OWASP (2004), https://www.owasp.org/index.php/A10_2004_Insecure_Configuration_Management#Description.

137.    The risk of running unnecessary services or protocols has been understood for decades, and many security resources advise against it.[223]  Today, sources such as OWASP explicitly advise against this practice too.  The reason why a basic tenet of secure design is to trim unnecessary protocols and services is because you cannot predict all the potential ways they could be misused.  As with other flaws affecting D-Link Systems' devices, D-Link Corporation's security testing vendor warned of this problem in specific instances and advised against it.[224]

138.    Companies can avoid running unnecessary protocols and services through basic security design review.  First, through security design review, developers should identify and document everything they are trying to do with the device.  Second, they should evaluate everything that is running in the code.  If there is any service that is not necessary to provide the functionality

---

[223] Simpson Garfinkle & Gene Spafford, PRACTICAL UNIX AND LINUX SECURITY 17.1.3 (1st ed. 1996), Chapter 17 TCP/IP Services, At The /etc/inetd Program, https://docstore.mik.ua/orelly/networking/puis/ch17_01.htm;

MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 81 (2006) (requiring developers to ask: "'Is this feature needed by at least 80 percent of our users?' If the answer is no, the feature should be turned off, not installed, or disabled by default."), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/;

MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES 45 (2003) ("features that do not exist cannot be subverted, and programs that do not need to be written have no bugs."), http://securecoding.org;

GARY MCGRAW, SOFTWARE SECURITY: BUILDING SECURITY IN 124 (1st ed. 2006), http://www.swsec.com/;

*Insecure Configuration Management*, OWASP (listing server configuration problems, such as "unnecessary services enabled"), https://www.owasp.org/index.php/Insecure_Configuration_Management;

*Top 10 2013-A5-Security Misconfiguration*, OWASP (2013) ("Are any unnecessary features enabled or installed (e.g., ports, services, pages, accounts, privileges)?"), https://www.owasp.org/index.php/Top_10_2013-A5-Security_Misconfiguration;

*Enterprise Application Security Vulnerability Assessment*, OWASP (2010) (Top 10 OS issues – 2010 include "Unnecessary enabled services"; Top 9 Application Issues – 2014 include "Unnecessary enabled functionality"), https://www.owasp.org/index.php/Enterprise_Application_Security_Vulnerability_Assessment;

*OWASP Secure Coding Practices Checklist*, OWASP (Jan. 21, 2016) (system configuration includes "remove all unnecessary functionality and files"), https://www.owasp.org/index.php/OWASP_Secure_Coding_Practices_Checklist.

[224] ████████████████████████████████████████████████████

identified in the first step, it should be completely removed from the system.  (Leaving a piece of software resident on the router, even though it does not need to be there, represents a vulnerability in that an intruder or attacker might activate the software and use it for nefarious purposes).  Companies can also make use of free tools like NMAP to see what ports are in service and evaluate whether some services are not needed.[225]  NMAP is a free security scanner that will contact an IP address at each potential port to see if the port is being serviced (which will tell a company the services running that are associated with those ports).[226]

139.    D-Link Systems' failure to prevent or remove unnecessary protocols and services on its devices contributed to several of the vulnerabilities I discuss in detail below.  See Sections III.E.1.c (Messner Buffer Overflow Exploit), III.E.1.e (Huntley/Qihoo/Heffner Command Injection Vulnerability in HNAP), III.E.1.f (Adkins Command Injection Vulnerability), and III.E.2.a (Hidden Guest-Guest Account, maintaining a undisclosed, default account meant for business users in cameras sold to consumers), below.

### 5.  Backdoors: Hard-Coded and Undocumented Credentials

140.    D-Link Systems has also struggled with multiple reports of backdoors, hard-coded credentials, and undisclosed accounts on its devices.  I will discuss each of these security failures in this section.

141.    Credentials are the keys to access privileged resources on a device or system, for example, the settings by which the device is controlled.  Because they can provide privileged access, attackers routinely search target systems for these flaws.  Credentials must be unique and

---

[225] See Nmap ("Network Mapper") (described as "a free and open source (license) utility for network discovery and security auditing"), https://nmap.org/.

[226] Unfortunately, attackers also make use of services like NMAP to conduct "port knocking," scanning the Internet for devices with known vulnerabilities.

restricted to users who should hold the privilege.  That restriction is undermined when there are

preset, alternative credentials that provide access to those resources.  The ability of the privileged

users (the users with the password to access privileged resources) to protect themselves is further

undermined if they are not aware of the alternative credentials and how, if possible, to make

them unique and private.  This can take the form of alternative accounts on a device, hard-coded

credentials, and/or backdoors.[227]  Hard-coded credentials and backdoors often appear when code

inserted for debugging is not removed before deployment.[228]

142.    Credentials should never be hard-coded—written into source code—for several reasons.

First, they are not unique to the user, meaning the compromise of one device can lead to the

compromise of all others.  Second, the barrier to changing them in the case of compromise is too

high, because it requires the company to issue new software, rather than have the user change the

credentials in an appropriately-protected user table.  And finally, passwords in the code will not

be protected—unless special steps have been taken to obfuscate them—from attackers who can

---

[227] A few definitions:  In the security field, we typically refer to credentials as "hard-coded" if they are written into the source code of the software, and can only be changed in the software end-users are running by modifying the code and pushing it out to end-users as updated software.  A backdoor is a means to gain access to a device without needing to know the user's credentials or make use of another vulnerability.  In many cases, what we consider backdoors are openings that have been intentionally put in the code.  This could be either malicious, to allow a bad actor inside the organization to exploit the software, or because a developer needed the access during the development of the software but failed to remove it before it was shipped.  Sometimes a flaw is both: a hard-coded credential that gives privileged access to a device could also be described as a backdoor.  By undocumented and/or hidden credentials, I mean credentials associated with an alternative user account that are not brought to the attention of the end-user in any way.  By preset or default, I mean that the credentials are set up to work without the user taking any action to enable them.

[228] Carol Woody, et al., *Predicting Software Assurance Using Quality and Reliability Measures* 25 CMU/SEI-2014-TN-026 (Dec. 2014) ("Backdoors often appear when code inserted for debugging is not removed before deployment or when code is added for remote system administration, but not properly secured."), https://resources.sei.cmu.edu/asset_files/technicalnote/2014_004_001_428597.pdf; *CWE-489: Leftover Debug Code*, CWE ("A common development practice is to add 'back door' code specifically designed for debugging or testing purposes that is not intended to be shipped or deployed with the application.  These back door entry points create security risks because they are not considered during design or testing and fall outside of the expected operating conditions of the application."), https://cwe.mitre.org/data/definitions/489.html.

disassemble or decompile[229] code to decipher them.  Even if the code is obfuscated,[230] a

motivated attacker has the means to reveal the password without breaking additional barriers.

143.    Backdoors are among the most serious possible vulnerabilities, in part because they may

indicate purposeful malicious acts by the programmers.  In my experience, the discovery of a

potential backdoor on a system would be treated as a security emergency.  In some cases, a

backdoor can provide a means for circumventing all of the security defenses on a system, and

proceeding directly to act as a privileged user.  To illustrate the gravity of this kind of problem:

in my experience as a security profession in situations like these, I have advocated that my

company stop shipping the software and alert customers explicitly about the issue.[231]  However,

not all backdoors are created with malicious intent; some are created by programmers as a

debugging aid.  In that case, the programmer would know the backdoor was there, and would

have the responsibility to ensure that it was removed before the software shipped.

144.    Hard-coded credentials, backdoors, and secret credentials have been known to be a flaw

for decades.[232]  OWASP discussed hardcoded passwords in its earliest iterations.[233]  Unlike most

---

[229] To "disassemble" an executable file is to produce, via a byte-by-byte analysis of the binary contents of the file, a new output file that inferentially resembles a notional assembly-language version of the program.  "Decompilation" is a similar process aimed at producing a higher language simulacrum of the program.

[230] "Code obfuscation" refers to the security practice of writing software that is intentionally obscure, offering obstacles to interpretation via disassembly or decompilation. One way to obfuscate code is to conceal the logical sequence of execution by unnecessary jumps and calls. Strings can also be obfuscated by breaking up character sequences and assembling them only when needed.  For example, to prevent the prompt "Password" from being uncovered in an executable file via disassembly, and obfuscating programmer could build the string starting with "P," concatenating "as" to it, then concatenating the word "sword" to the string being built.  A search of the executable file for strings containing "Password" would not find it, but at run time the string would be ready for use.

[231] By comparison, see D-Link Systems' disclosure regarding a hidden user account, advising that users change the password on the "guest" account, but not mentioning that the guest account had an easily-guessed "guest" password. Guest User Account Security Advisement for Select D-Link IP Cameras (May 7, 2013) (DLS0005316–17, at DLS0005317).

[232] See Richard R. Linde, Operating System Penetration 368 (AFIPS National Computer Conference, May 19–22, 1975) ("Clandestine Code—The submission of "patch" code containing trap doors used to repair an operating system or utility program error, allowing the repairman to subsequently enter the computer system in an unauthorized fashion."), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

vulnerabilities, which require conditions to be met and careful attacks to be crafted, alternative credentials/backdoors are like a door being left unlocked. Many sources flag the risk of alternative credentials.[234] D-Link Corporation's security testing vendor raised the issue of hard-coded credentials to D-Link Corporation in 2014.[235]

145.     These alternative credentials can be prevented in a number of ways. Companies can forbid their use by policy, and provide checklists to programmers of last-minute items to confirm before software is completed. Good software development practice, in my opinion, requires checks before release that all debugging or development shortcuts—including hardcoded credentials—are removed.[236] In the case of alternative, secret accounts, companies should engage in design-level discussion of who their products are for, and what the risks are in the way those customers will deploy them. Peer code review is another method by which a hard-coded credential might be identified and removed.

146.     Hard-coded or hidden credentials were the cause of two critical backdoors I discuss below that were discovered in many of D-Link Systems' IP Cameras. See Sections III.E.2.a

---

[233] *A3 2004 Broken Authentication and Session Management*, OWASP (2004), https://www.owasp.org/index.php/A3_2004_Broken_Authentication_and_Session_Management ("Passwords should never be hardcoded in any source code.").

[234] *CWE-798: Use of Hard-coded Credentials*, CWE (2011), http://cwe.mitre.org/top25/#CWE-798; https://cwe.mitre.org/data/definitions/798.html;

*CWE-259: Use of Hard-coded Password*, CWE (2009), https://cwe.mitre.org/data/definitions/259.html;

*Configuration*, OWASP (May 3, 2009) ("Do not hard code any backdoor accounts or special access mechanisms"), https://www.owasp.org/index.php/Configuration;

*Top 10 2010-A3-Broken Authentication and Session Management*, OWASP (2010), https://www.owasp.org/index.php/Top_10_2010-A3-Broken_Authentication_and_Session_Management;

MARK G. GRAFF, SECURE CODING: THE STATE OF THE PRACTICE, 4.3 Design Ideas ("Do not code usernames or passwords into an application.") (Para–Protect Services, Inc., White Paper, 2001).

[235] See, e.g., III/Onward, *DCS-2136L Device Security Testing Report*, Appendix D (Sept. 22, 2014) (DKC0002878); DCS-2136L Vulnerability Info Spreadsheet (DKC0501497); III/Onward, *DIR-890L Device Security Testing Report*, Appendix D (Feb. 24, 2015) (DKC0004364); III/Onward, *DIR-868A Device Security Testing Report*, Appendix D (Apr. 25, 2017) (DKC0004070).

[236] MICHAEL HOWARD & DAVID LEBLANC, WRITING SECURE CODE 561 (2d ed. 2003).

(Hidden Guest-Guest Account) and III.E.2.b (Core Security Hard-Coded Backdoor in RTSP), below.

### 6. Clear Text Passwords

147.    Another well-known flaw that is present repeatedly in several D-Link Systems' devices is passwords stored in clear text.  As a matter of general practice, it is best to not store credentials on the device that is being secured.  If the secret portion of a credential must be stored somewhere on a device or in software, it should not be stored in clear, human-readable text.  Rather, the developers should store the password in a mathematically transformed state that makes it difficult to infer the original clear text from the stored version.  It should never be stored in the format that it was typed.[237]

148.    Storing passwords with at least some form of obfuscation has been advised since the 1970s.[238]



---

[237] Hash has two meanings.  One way of using the word hash is to perform a numerical operation on a series of bytes to produce a new series of bytes.  You have used a mathematical operation to transform it.  The result is often used as a lookup index into a table.  Secondarily, I have seen some people use "hash" to mean such a transformation that is symmetrically reversible.  Some of these routers, for example, take content and flip all the 1s to 0s, and all the 0s to 1s, as a form of obfuscation.  It is poor practice to rely on this as a form of masking, because it is trivial to reverse it.

[238] RICHARD R. LINDE, OPERATING SYSTEM PENETRATION 361, 363, 366 & 367 (AFIPS National Computer Conference, May 19–22, 1975), https://www.computer.org/csdl/proceedings/afips/1975/5083/00/50830361.pdf.

██████████████████████  ██████  █████████████████████████████████

████████████████████████████████████████████████████████████████

149.    There are many ways for developers to avoid storing clear text passwords on a router or

IP camera on which the password is being used.  Assuming there is not a need to use the original,

typed version of the password, the password can be stored through one-way hashing.  Passwords

can be hashed using one of several widely available, free algorithms that are available on the

Internet.[241]  In unusual circumstances where the original, typed version of the password is

necessary (e.g., the device itself needs to authenticate to another web-server that requires the

clear text password), then the password can be stored encrypted, and then can be decrypted when

it is used to authenticate to the web server.  Like hashing, encryption and decryption can be

accomplished using one of several widely available, free algorithms that are available on the

Internet.[242]  These hashing and encryption techniques have been known and commonly used for

decades.

150.    █████████████████████████████████████████████████████████████

████████████████████████████████████████            See Sections III.E.1.a (Paleari Command Injection

---

[240] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████

[241] See, e.g., *Hash Functions*, NIST (Aug. 5, 2015) https://csrc.nist.gov/projects/hash-functions/nist-policy-on-hash-functions; *SHA-3 Project*, NIST (Jan. 4, 2017), https://csrc.nist.gov/projects/hash-functions/sha-3-project.

[242] See, e.g., *SP 800-111, Guide to Storage Encryption Technologies for End User Devices*, NIST (Nov. 2007), https://csrc.nist.gov/publications/detail/sp/800-111/final;

*Cryptographic Standards and Guidelines AES Development*, NIST (Dec. 29, 2016), https://csrc.nist.gov/Projects/Cryptographic-Standards-and-Guidelines/Archived-Crypto-Projects/AES-Development;

*Cryptographic Storage Cheat Sheet*, OWASP (Dec. 19, 2009) https://www.owasp.org/index.php?title=Cryptographic_Storage_Cheat_Sheet&oldid=75271;

William E. Burr, *Data Encryption Standard*, NIST, https://nvlpubs.nist.gov/nistpubs/sp958-lide/250-253.pdf.

Vulnerability), III.E.1.d (Lovett Vulnerabilities—Clear Text Password, XSS, and Remote Code Execution Vulnerabilities), and III.E.3 (Failing to Encrypt Mobile App Credentials), below.

### 7.   Code Maintenance Failures

151.    In addition to flaws that D-Link Systems' vendors created (or adopted if they reused or incorporated others' code), D-Link Systems devices were also subject to vulnerabilities that could have been prevented by using proper code maintenance.  Code maintenance is an umbrella term for a number of competent practices that developers should engage in when altering code that has already been released; for example, to alter the code to introduce a new feature, or to fix a vulnerability that has been identified in the original code.[243]

152.    <u>Actually fixing the particular flaw.</u>  In addition, companies must make sure their programmers are working to fix the real issue underlying a vulnerability, not just breaking an exploit by black-listing a character used in a researcher's or tester's proof-of-concept that a vulnerability exists.  When developers are given an exploit and told to "fix this," they often just stop the exploit from working, which may not address the underlying flaw that caused the vulnerability.  As a result, another version of the same exploit is likely to be feasible.[244]

153.    <u>Fixing identical instances of the flaw.</u>  Properly fixing a flaw using competent code maintenance entails finding and resolving other instances of the same flaw.[245]  It's common for different pieces of software, especially when owned or developed by a single owner or

---

[243] Where a company lacks access to the source code that underlies its own devices, as with D-Link (see D-Link Corp. 30(b)(6) Dep. 157:3–16 (Jan. 30, 2018)), then these code maintenance requirements must be mandated by its policies for, or contracts with, the entities responsible for the source code maintenance.

[244] MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 219 (2006) ("Failing to take the time to search for related vulnerabilities exposes you to the risk that the researcher who reported the first vulnerability, or one of his peers, will be back the week after you release your update with a new report that looks almost like the last one"), free ebook available at https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/.

[245] Ibid.

developer, to share code.[246]  Indeed, this is efficient and smart.  What that means, however, is that when a vulnerability is found in one piece of code, it may very well exist in other software that shares that code.  Accordingly, a single vulnerability can exist across multiple pieces of software.  Thus, when a vulnerability is found in a single piece of software, malicious actors know that they are likely to be able to run the same exploit in other similar pieces of software from the same company.

154.    <u>Fixing analogous instances of the flaw.</u>  Another key part of competent code maintenance is to understand the cause of a flaw, and to fix all flaws emanating from that cause that can be reasonably be found, rather than just fixing the known flaw.[247]  These additional analogous flaws can often be found by examining what failure caused the known problem, and then to look for other, as-yet-unknown flaws that are likely to have been caused by the same failure.

155.    Improper code maintenance not only ignores additional, latent issues that might exist in code, it is also inefficient.  Much of the cost of revising code are the fixed costs of having a developer dig into a code base and test the finished product.[248]  The cost of making multiple

---

[246] MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 209 (2006) ("In large software organizations such as Microsoft, sharing and reuse of code and software components are common.  (We've referred to those components as giblets, after the plastic bag of assorted innards that comes inside a frozen turkey.)  The practice of reusing and sharing components has benefits for efficiency and consistency, but it does carry with it the risk that a vulnerability in giblet A will be manifest in product B, whose development team didn't create giblet A and might not have the capability to update it."), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/.

[247] MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 219 (2006) ("Failing to take the time to search for related vulnerabilities exposes you to the risk that the researcher who reported the first vulnerability, or one of his peers, will be back the week after you release your update with a new report that looks almost like the last one"), free ebook available at https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/.

[248] MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE, 11, 13 (2006) ("SDL is not free; it costs time, money, and effort to implement.  But the upfront benefits far outweigh the costs of revisions, developing and testing security updates, and having customers deploy the updates.") ("Most importantly, if you get it right upfront, the cost of fixing bugs later diminishes rapidly. . . . You can pay now and increase the odds that you'll get it right, or you can pay much more later.").

changes does not linearly increase the cost of the revision.  Generally, then, it is most economical to make all necessary fixes at one time, where feasible.[249]

156.    The importance, from a security and efficiency standpoint, of not taking a whack-a-mole approach to addressing vulnerabilities has been expressed in the literature since at least 2006, in Howard and Lipner's book on the Secure Development Lifecycle.[250]  It was common practice before then as well, because it is also just common sense and basic management for a company interested in any level of assurance as to the security of its software to require that a problem identified in one location is remedied anywhere it might exist.

157.    Companies can engage in proper code maintenance through policy and processes.  When addressing known vulnerabilities, the instruction should be for developers to remedy not only the particular flaws and failures underlying that vulnerability, but also to identify the causes of those flaws, and to remediate, if feasible, any additional flaws created by the root cause.  In order to efficiently address vulnerabilities across multiple devices that share code, companies commonly use tools to track code trees.[251]  Accordingly, the evidence of the successful accomplishment of the task should not be evidence that the exploit is no longer effective, but rather that the

---

[249] MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES 56 (2003) (citing IBM Systems Sciences Institute statistics, cited by Kevin Soo Hoo, Andrew W. Sudsbury & Andrew R. Jaquith in "Tangible ROI through Secure Software Engineering," Secure Business Quarterly, Volume 1, Issue 2), http://securecoding.org.

[250] MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 212–13 (2006) ("The final but most important response-related task for the product team is to use vulnerability reports as a learning experience and to fix as many vulnerabilities as possible with as few updates as possible. To do this, the team must develop an in-depth understanding of each reported vulnerability and then determine whether the vulnerability represents an instance of some recurring pattern. If it does, the team must try to find the other instances and correct them all."), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/.

[251]

underlying cause of those flaws has been identified, and all flaws resulting from that same cause have been identified and remediated.[252]

158.    D-Link Systems' repeated failure to exercise basic code maintenance contributed to several of the vulnerabilities I discuss below.  See Sections III.E.1.d (Lovett Vulnerabilities—Clear Text Password, XSS, and Remote Code Execution Vulnerabilities), III.E.1.e (Huntley/Qihoo/Heffner Command Injection Vulnerability in HNAP), and III.E.1.f (Adkins Command Injection Vulnerability).

### 8.  Private Key Exposure

159.    Finally, another serious issue arose from D-Link Systems' failure to properly manage the private key used to sign its code.

160.    Private code-signing keys are a type of cryptographic key used to validate the source of a piece of software.  Cryptographic keys were originally developed to address the problem of trust on the Internet:  Specifically, how a recipient of a file on the Internet can know the file truly came from wherever it claims to have come from.[253]  Cryptographic keys solve this problem of trust with a private key and a public key:  A person can sign the information with a private key, and the authenticity of that signature can be validated with a public key.  If the public key does not validate the private key signature, the information does not come from where it claims to come from.

---

[252] MICHAEL HOWARD & STEVE LIPNER, THE SECURITY DEVELOPMENT LIFECYCLE: A PROCESS FOR DEVELOPING DEMONSTRABLY MORE SECURE SOFTWARE 219 (2006) ("Failing to take the time to search for related vulnerabilities exposes you to the risk that the researcher who reported the first vulnerability, or one of his peers, will be back the week after you release your update with a new report that looks almost like the last one"), https://blogs.msdn.microsoft.com/microsoft_press/2016/04/19/free-ebook-the-security-development-lifecycle/.

[253] Whitfield Diffie & Martin E. Hellman, *New Directions in Cryptography*, IEEE Transactions on Information Theory, (Vol. IT–22, No. 6, Nov. 1976), https://ee.stanford.edu/~hellman/publications/24.pdf; Steve Fyffe & Tom Abate, *Stanford Cryptography Pioneers Whitfield Diffie and Martin Hellman Win ACM 2015 A.M. Turing Award*, STANFORD NEWS (Mar. 11, 2016), https://news.stanford.edu/2016/03/01/turing-hellman-diffie-030116/.

161.     In the context of code signing keys, the private key is held by the author of the software. The public key can be looked up from the Internet, or found on the operating system itself, when that software is intended to run.  When the operating system detects that software was signed by a known and trusted private key, it permits the software to run.  If it was not signed by a known and trusted private key, the operating system can either, depending on its security settings, (a) give the user the option of running the software anyway or (b) prevent the software from running without input from the user.[254]

162.     In the context of the Microsoft Windows operating system, companies such as Symantec have the authority to issue digital certificates, which are public keys combined with certain identifying information of the entity that holds the private key.[255]  Companies such as Symantec that hold this delegated authority are tasked to only issue these certificates to companies the identity of which they have validated.

163.     Of course, the cryptographic key system only works properly if the holder of the private key actually keeps that key private.  Proper management of the private key is an important element of this "distributed trust" code-signing ecosystem.

164.     Microsoft Corporation has implemented a system of code signing to prevent rogue software from being run on its operating system.  This arrangement allows a system to run software with assurance that it originates from the credited source.  When developing software intended to run on the Windows operating system, the software author is the keeper of a private key.  Anyone with access to the private key can use it to create software that is signed with the

---

[254] See generally *Microsoft Security Advisory 3097966: Inadvertently Disclosed Digital Certificates Could Allow Spoofing*, MICROSOFT (Oct. 13, 2015) ("Advisory FAQs. . . . What caused the issue?  The issue was caused by D-Link Corporation inadvertently publishing the certificates."), https://technet.microsoft.com/en-us/library/security/3097966.

[255] See, e.g., *Code Signing Certificate Technical Resources*, DIGICERT https://knowledge.digicert.com/solution/SO26496.html.

identity of the key owner.  These digital signatures offer an important protection against malicious software being installed that purports to be from a trusted source.  Given the penetration of the Windows operating system on computers across the world, software—or malware—that runs automatically is can carry significant risk and has a huge potential for cybercrime.[256]  This danger is well known and understood.[257]  Indeed, in discussions of encryption of sensitive data, private keys are always among the top examples of sensitive data that must be properly encrypted.[258]

165.    Professionals have understood the necessity of keeping private keys private since the inception of cryptographic keys in the mid-1970s.[259]  In 2010, Symantec published a white paper advising holders of private keys about the importance of securing those private keys.[260]  The

---

[256] *How Cybercrime Exploits Digital Certificates*, INFOSEC INSTITUTE (July 28, 2014) https://resources.infosecinstitute.com/cybercrime-exploits-digital-certificates/#gref.

[257] Dan Goodin, *Stuxnet-style code signing is more widespread than anyone thought*, ARS TECHNICA (Nov. 3, 2017), https://arstechnica.com/information-technology/2017/11/evasive-code-signed-malware-flourished-before-stuxnet-and-still-does/.

[258] *Top 10 2007-A8-Insecure Cryptographic Storage*, OWASP (2007) ("Insecure use of strong algorithms" and "Hard coding keys, and storing keys in unprotected stores"; also "Generate keys offline and store private keys with extreme care. Never transmit private keys over insecure channels.  Ensure that infrastructure credentials such as database credentials or MQ queue access details are properly secured (via tight file system permissions and controls), or securely encrypted and not easily decrypted by local or remote users"), https://www.owasp.org/index.php/Top_10_2007-Insecure_Cryptographic_Storage;

*Top 10 2010-A7-Insecure Cryptographic Storage*, OWASP (2010) (demonstrating that the A8 vulnerability type from 2007 is still significant in 2010), https://www.owasp.org/index.php/Top_10_2010-A7-Insecure_Cryptographic_Storage;

*Top 10 2013-A6-Sensitive Data Exposure*, OWASP (2013) ("Sensitive Data Exposure," includes "Insecure Cryptographic Storage") (demonstrating that the same vulnerability type from 2007 and 2010 is still significant in 2010), https://www.owasp.org/index.php/Top_10_2013-A6-Sensitive_Data_Exposure and https://www.owasp.org/index.php/Category:OWASP_Top_Ten_Project#OWASP_Top_10_for_2013;

Christopher J. May, et al., *Defense in Depth: Foundations for Secure and Resilient IT Enterprises*, 110–11, CMU/SEI-2006-HB-003 (Sept. 2006), https://resources.sei.cmu.edu/asset_files/Handbook/2006_002_001_14633.pdf.

[259] Whitfield Diffie & Martin E. Hellman, *New Directions in Cryptography*, IEEE Transactions on Information Theory, (Vol. IT–22, No. 6, Nov. 1976), https://ee.stanford.edu/~hellman/publications/24.pdf.

[260] Larry Seltzer, *Securing Your Private Keys As Best Practice for Code Signing Certificates*, SYMANTEC (2010), https://www.symantec.com/content/en/us/enterprise/white_papers/b-securing-your-private-keys-csc-wp.pdf.

potential concerns with the exposure of a private key have existed as long as the existence of private keys themselves, because the exposure of a key creates the very problem that the invention of a private key was designed to address (i.e., allowing a computer to trust an untrustworthy system).  Indeed, the contract that Symantec had with the recipients of certificates made clear that the private keys must be kept secret.[261]

166.    In 2007, Microsoft itself published a paper that included a section with advice on how to maintain the secrecy of private keys, which advised:  "The cryptographic keys that are the core of the code-signing process must be well protected and treated with the same care as a company's most valuable assets."[262]  As detailed in the Symantec's 2010 white paper on securing private keys, "companies that are diligent and willing to invest in the appropriate security measures can make the compromise of their private keys highly unlikely."[263]  The paper identified two "critical factors" in keeping private keys secret:  (1) securing the system where they're located, and (2) minimizing access.[264]

167.    As discussed below in Section III.D.4, an exposed key for D-Link software in 2015 placed at risk, potentially, all users of most of the then-current versions of the Windows Operating System for approximately six months.[265]  Although there is no evidence that any of the

---

[261] Code Signing Certificate Subscriber Agreement Version 10.0 (May 2015) (DKC1825166–75, at DKC1825166).

[262] *Code Signing Best Practices*, MICROSOFT 32 (July 25, 2007), http://download.microsoft.com/download/a/f/7/af7777e5-7dcd-4800-8a0a-b18336565f5b/best_practices.doc.

[263] Larry Seltzer, *Securing Your Private Keys As Best Practice for Code Signing Certificates*, SYMANTEC 3 (2010), https://www.symantec.com/content/en/us/enterprise/white_papers/b-securing-your-private-keys-csc-wp.pdf.

[264] Larry Seltzer, *Securing Your Private Keys As Best Practice for Code Signing Certificates*, SYMANTEC 3 (2010), https://www.symantec.com/content/en/us/enterprise/white_papers/b-securing-your-private-keys-csc-wp.pdf.  See also *Key Management Cheat Sheet*, OWASP, https://www.owasp.org/index.php/Key_Management_Cheat_Sheet#Authors_and_Primary_Editors (describing how private keys should only be shared with trusted parties who are authorized to sign on behalf of the key owner).

[265] See generally *Microsoft Security Advisory 3097966; Inadvertently Disclosed Digital Certificates Could Allow Spoofing*, MICROSOFT (Oct. 13, 2015) ("Advisory FAQs. . . . What caused the issue?  The issue was caused by D-

myriad harms associated with private key exposure came to pass, the fact of its exposure

demonstrates the inadequacy of D-Link Systems' security processes, policies, and procedures.

E.      **Critical Vulnerabilities that Appear in D-Link Routers and IP Cameras**

168.    In this section, I will evaluate reported vulnerabilities in routers and IP cameras sold by

D-Link Systems.  As I conclude below, these vulnerabilities demonstrate that these devices were

not secure from unauthorized access or control.  As I also conclude, these vulnerabilities

demonstrate that many of the basic code development failures discussed above, in Section III.D,

were present in D-Link routers and IP cameras.  The significance of this second conclusion is

that, in my opinion, these vulnerabilities, caused by basic code development failures, establish

that the lack of secure software development practices created the conditions where these

vulnerabilities were highly likely to occur.

169.    As a side note, it is not always possible to identify precisely in which previous releases of

software a given vulnerability exists.  However, common sense will tell, and my experience

shows, that if a bug was fixed in release number nine, for example, that it was present in release

number eight, and quite possibly in earlier versions as well.  Quite often, a vulnerability will

exist in the originating version, and carry through unnoticed and unfixed through several

versions of the software.

170.    In my review of these vulnerabilities that I discuss below, I did not endeavor to re-create

the exploit that demonstrated the vulnerability.  In many cases, neither D-Link Systems nor the

security researcher provided sufficient public information to re-create the exploit.  Nonetheless, I

---

Link Corporation inadvertently publishing the certificates."), https://technet.microsoft.com/en-us/library/security/3097966.

was able to rely on my expert experience to evaluate the vulnerability as described both in the (a) public documents[266] and (b) internal D-Link Systems and D-Link Corporation documents.

171.    The vulnerabilities I discuss below are only a fraction of those that affected D-Link Systems' routers and IP cameras since 2011.[267]  I have not endeavored to describe every vulnerability, and my choice of those discussed below is not meant to be an exhaustive list of serious vulnerabilities, or those that resulted from avoidable software development failures.[268]

172.    As to all the vulnerabilities described below, I was able to reliably conclude that they were, in fact, exploitable vulnerabilities that permitted unauthorized access or control to a D-Link router or IP camera.  In the subparts below, I describe each vulnerability, including (a) what the vulnerability was; (b) how the vulnerability permitted unauthorized access and control; (c) what code development flaws it relied on; and (d) what devices were known to be implicated by this vulnerability.

173.    For each of the vulnerabilities described below, I have not reviewed any evidence that these vulnerabilities have been exploited.[269]  The absence of evidence, however, does not indicate that they have not been exploited.

---

[266] Rapid7 maintains an open source database called Metasploit, which contains lists of exploits that are attributed to various vulnerabilities.  See RAPID7, METASPLOIT, https://www.metasploit.com.

[267] E.g., MITRE, CVE search results for D-Link, https://cve.mitre.org/cgi-bin/cvekey.cgi?keyword=D-Link; CVEDetails, CVE results for D-Link, https://www.cvedetails.com/vendor/899/D-link.html (showing vulnerabilities given CVE numbers by year).  Note, these search results include devices not on Appendix A.  See also Appendix C, Category Security Advisories (list by Bates ranges of Security Advisories and Support Announcements D-Link Systems has made regarding vulnerabilities affecting devices in Appendix A).

[268] In addition, because not all vulnerability disclosures are alike, in many cases the documentation of a vulnerability will not have enough information to conclude exactly what failures contributed to it.

[269] One exception is an article on an attack campaign in which a researcher states the attack also exploits a vulnerability that affected D-Link Systems' routers.  See Footnote 331 below.  I note this report as an example of public reports that certain attacks are not hypothetical, but it did not inform my opinion.

### 1. Router Vulnerabilities

### a. Paleari Command Injection Vulnerability

174.     On February 20, 2013, a security researcher named Roberto Paleari identified a

vulnerability that permitted a remote user to access the administrator password of the device,

which was being stored (and then was transmitted) in clear text.[270]  The password could then be

used to access the device with full privileges.[271]  Because it involves accessing the administrator

password, this exploit permits a remote user to completely take over the device, and control all

settings, even if the consumer has remote administration turned off.[272] ████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[270] Roberto Paleari, *Unauthenticated remote access to D-Link DIR-645 devices* (Feb. 27, 2013), http://roberto.greyhats.it/advisories/20130227-dlink-dir.txt; see also *D-Link DIR 645 Password Extractor*, RAPID7 VULNERABILITY & EXPLOIT DATABASE, https://www.rapid7.com/db/modules/auxiliary/admin/http/dlink_dir_645_password_extractor.

[271] Roberto Paleari, *Unauthenticated remote access to D-Link DIR-645 devices* (Feb. 27, 2013), http://roberto.greyhats.it/advisories/20130227-dlink-dir.txt; see also *D-Link DIR-645 Password Extractor*, RAPID7 VULNERABILITY & EXPLOIT DATABASE, https://www.rapid7.com/db/modules/auxiliary/admin/http/dlink_dir_645_password_extractor.

[272] This exploit was available locally, as well.  Remotely, the exploit could be used only if turned on "remote administration," which is a feature that D-Link included on its routers.  Consumers may have turned on remote administration themselves, or it could be turned on through the use of an additional exploit, such as cross-site scripting or cross-site request forgery.

██ ████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Mr. Brown appears to have been quoting a forum post about this attack.  See Skello, *Multiple D-Link Router Authentication Bypass Vulnerabilities* (Jan. 22, 2011), http://forums.dlink.com/index.php?topic=23161.0.

175.    The exploit works by exploiting a significant vulnerability in the web interface of the DIR-645.[274] By using the *getcfg.php* script, the attacker can simply ask the router to send the configuration of the router, including the clear text password.  This exploit implicates two security failures:  First, the software fails to require authentication to access these directories, which is easy to fix (and is how D-Link addressed this issue).[275]  Second, the command allowed the hacker to receive the administrator password in clear text (see Section III.D.6 above), an egregious failure.

176.    The flaw affected the DIR-645, on versions of the firmware prior to v1.03.[276]  This means the vulnerability was live from the release of the device in September 2011 at least through November 2012.[277]  Moreover, although Mr. Paleari identified the flaw after the firmware update was announced, due to delays of updating firmware, the flaw likely affected many active devices.[278]  In addition, we cannot know if any, or how many, malicious hackers may have identified this vulnerability prior to Mr. Paleari.  I'm not aware of any evidence that it was exploited maliciously.

---

[274] *D-Link DIR 645 Password Extractor*, RAPID7 METASPLOIT FRAMEWORK (Aug. 30, 2017), https://github.com/rapid7/metasploit-framework/blob/master/modules/auxiliary/admin/http/dlink_dir_645_password_extractor.rb.

[275] Roberto Paleari, *Unauthenticated remote access to D-Link DIR-645 devices* (Feb. 27, 2013), http://roberto.greyhats.it/advisories/20130227-dlink-dir.txt ("D-Link has released an updated firmware version (1.03) that addresses this issue.").

[276] Roberto Paleari, *Unauthenticated remote access to D-Link DIR-645 devices* (Feb. 27, 2013), http://roberto.greyhats.it/advisories/20130227-dlink-dir.txt ("The firmware is already available on D-Link web site, and introduces additional restrictions to forbid unauthenticated access to page "getcfg.php".").

[277] DIR-645 Revision A Release Notes (June 11, 2013) (DLS0008837).  Mr. Brown validated that this vulnerability existed in the original release:  "To see it simply load a DIR-645 with FW 1.00 (that was my devices [sic] version) then follow the vulnerability below."  Email from William Brown to Daniel Hsu (Mar. 4, 2013) (DLS0023965–70, at DLS0023965).

[278] See Section III.A.1.c above.

### b. Three Additional Paleari Command Injection Vulnerabilities

177.     In June 2013, Mr. Paleari disclosed to D-Link Systems three additional command injection flaws exploiting buffer overflows.[279]  These vulnerabilities permitted a remote user to completely take over the devices being attacked, without authentication.[280]  As D-Link Systems described in its security advisory: "This router model is affected by multiple security vulnerabilities.  All of them are exploitable by remote, unauthenticated attackers."[281]  When Mr. Brown received this report, he reported to Mr. Hsu and others at D-Link Corporation:  "Mr. Roberto Paleari came back to me with six new vulnerabilities for the DIR-645.  This information cannot get out to public regarding our 11ac products!!"[282]

178.     The second two exploits are available as exploits on Rapid7's exploit database.[283]  Both of these exploits rely on the fact that the *hedwig.cgi* and *authentication.cgi* scripts accept inputs of a username (for *hedwig.cgi*) or password (for *authentication.cgi*), but both permit any size input for these values.  As a result, an exploit can be crafted that inserts large numbers of characters to overflow the buffer set aside for these inputs, and then inject a script that will open a shell, which permits the attacker to run any commands with privilege on the machine, taking it

---

[279] Roberto Paleari, *Multiple vulnerabilities on D-Link DIR-645 devices* (Aug. 2, 2013) (FTC-DLS-00054012–13). See also *D-Link hedwig.cgi Buffer Overflow in Cookie Header*, RAPID7, VULNERABILITY & EXPLOIT DATABASE, https://www.rapid7.com/db/modules/exploit/linux/http/dlink_hedwig_cgi_bof; *D-Link authentication.cgi Buffer Overflow*, RAPID7, VULNERABILITY & EXPLOIT DATABASE, https://www.rapid7.com/db/modules/exploit/linux/http/dlink_authentication_cgi_bof.

[280] D-Link, Security Advisory: DIR-645 – Multiple Security Vulnerabilities: Buffer Overflow and Cross-site (XSS) Scripting – Firmware 1.03B08 and lower (Dec. 31, 2013) (DLS0059960–63, at DLS0059960) (stating "Ensuring Remote Management is off does **not** mitigate exposure to these vulnerabilities.") (emphasis added).

[281] Ibid. at DLS0059961.

[282] Email from William Brown to Daniel Hsu (Mar.7, 2013) (DKC0012298–DKC0012304, at DKC0012301).

[283] Brent Cook, *dlink_hedwig_cgi_bof.rb*, RAPID7/METASPLOIT-FRAMEWORK (Feb. 8, 2013), https://github.com/rapid7/metasploit-framework/blob/master/modules/exploits/linux/http/dlink_hedwig_cgi_bof.rb; h00die, *dlink_authentication_cgi_bof.rb*, RAPID7/METASPLOIT-FRAMEWORK (Feb. 8, 2013), https://github.com/rapid7/metasploit-framework/blob/master/modules/exploits/linux/http/dlink_authentication_cgi_bof.rb.

over completely.  Both of these exploits make manifest a critical failure to engage in input filtering (see Section III.D.1 above).

179.    These flaws affected the DIR-645, this time including what was then the latest version of the firmware, 1.03.[284]  It appears that the subsequent version, 1.04, was released on June 11, 2013.[285]  According to internal emails, the vulnerability also affected "many of the [third-party vendor] Alpha Routers… 850L, 865L confirmed."[286]  Remarkably, D-Link Systems only acknowledged in its Security Advisory the one device Mr. Paleari had identified, rather than identifying all devices that were implicated by the vulnerabilities.[287]

### c.   Messner Buffer Overflow Exploit

180.    On April 5, 2013, a security researcher named Michael Messner identified yet another command injection attack on a number of D-Link routers.[288]  This vulnerability was demonstrated to permit an attacker to completely take over a router, remotely, without authentication.[289]

---

[284] DIR-645 Revision A Release Notes (Nov. 21, 2012) (DLS0008837–38).

[285] DIR-645 Revision A Release Notes (June 11, 2013) (DLS0008837–38).  It appears there may also have been earlier releases that were called "beta" firmware patches that addressed some of these flaws at earlier times.

[286] Email from William Brown to Daniel Hsu (Mar.7, 2013) (DKC0012298–304, at DKC0012301).  Of the six vulnerabilities that Mr. Paleari reported, it is unclear whether just one or all six affected all Alpha-sourced routers.

[287] D-Link, Security Advisory (Dec. 31, 2013) (DLS0059960).  Perhaps uncharitably, the failure to identify the other routers suggests to me that D-Link may have only intended to admit to vulnerabilities when it was going to get caught.  They may, though, have benign reasons to conceal these other vulnerable systems—perhaps the patches for the other systems may been delayed.

[288] Michael Messner, *Multiple Vulnerabilities in D-Link devices*, S3CUR1TY.DE (Apr. 5, 2013), http://www.s3cur1ty.de/m1adv2013-017; Michael Messner, *D-Link DIR-645 / DIR-815 diagnostic.php Command Execution*, RAPID7, VULNERABILITY & EXPLOIT DATABASE, https://www.rapid7.com/db/modules/exploit/linux/http/dlink_diagnostic_exec_noauth; D-Link, Security Advisory: DIR-600/DIR-300 revB/DIR-815/DIR-645/DIR-412/DIR-456/DIR-110–Multiple Vulnerabilities Command Injection Information Disclosure (June 30, 2014) (DLS0060250).

[289] Unlike the prior vulnerability, which permitted direct remote command execution, it appears that this exploit first required an additional exploit, such as the four-step cross-site request forgery attack discussed above, Section III.E.1.a, because it cannot be run without remote administration.  See Security Advisory: DIR-600/DIR-300 revB/DIR-815/DIR-412/DIR-456/DIR-110–Multiple Vulnerabilities–Command Injection and Information Disclosure (June 30, 2014) (DKS00036745-46) (advising consumers to not turn on remote management).

181.    Based on my review of the exploit code available from Rapid7, an attacker could use this exploit to download a file to a router and then run that software remotely.[290]  The exploit described allows an attacker to use the code to download a program onto the D-Link device, modify that program, and then execute that program remotely.[291]  Alternatively, for certain D-Link devices without a particular feature (*wget*), an attacker would be able to use the code to inject a command to open a telnet daemon (*telnetd*), which could subsequently be used to take over the device.[292]

182.    The basic failure underlying this exploit is, once again, a failure to implement appropriate input filtering (see Section III.D.1 above).  This failure allowed an attacker to use the *diagnostic.php* script to inject a command.  The second failure was the passing of user input to a command (ping) that runs with privilege on the software.  This has a similar effect (but is not the same) as when a developer unnecessarily uses a *system()* call (see Section III.D.3 above)—the user input can be used to trigger powerful commands that can take over the device.  A third failure, is the unnecessary presence of the *telnetd* executable (see Section III.D.4 above—Unnecessary Protocols and Services), which would permit the attacker to take over the device in circumstances where the *wget* executable was not available to use the exploit described in the Rapid7 exploit code database.  I question, in fact, the wisdom of implementing the *diagnostic.php* script in the first place.  Its presence on the system significantly reduces the security of both the routers and any network to which the router is connected.  If business

---

[290] *D-Link DIR-645 / DIR-815 diagnostic.php Command Execution*, RAPID7, METASPLOIT FRAMEWORK, https://github.com/rapid7/metasploit-framework/blob/master/modules/exploits/linux/http/dlink_diagnostic_exec_noauth.rb.

[291] Ibid.

[292] Ibid.

considerations warranted its development and installation, prudence dictates special care should have been taken to forestall its misuse by attackers.

183.    These remote code execution exploits identified by Mr. Messner affected D-Link Routers DIR-815, DIR-645, and DIR-412 routers, among others.[293]  Only one security advisory that appears to have been published about this vulnerability, contemporaneous with this vulnerability.[294]  That advisory listed the DIR-412 fix as "pending" more than a year after its discovery, and perhaps more, and that advisory was never updated to suggest it was fixed.

### d.  Lovett Vulnerabilities—Clear Text Password, XSS, and Remote Code Execution Vulnerabilities

184.    

185.    I have reviewed the flaws based on the acknowledgement on the D-Link website[297] and Mr. Lovett's post on Packet Storm[298] to better understand how these vulnerabilities operate.  The clear text vulnerability appears to be able to exploited by a logged in user.  It permits an individual who is *not* the administrator to see the administrator password in clear text.[299]  The

---

[293] D-Link, Security Advisory: DIR-600/DIR-300 revB/DIR-815/DIR-645/DIR-412/DIR-456/DIR-110–Multiple Vulnerabilities Command Injection Information Disclosure (June 30, 2014) (DLS0060250).

[294] Ibid.

[295] Email from Kyle Lovett to William Brown (Apr. 19, 2014) (DLS0021794–801, at DLS0021799).

[296] D-Link, Security Advisory: DIR-652 / DIR-835 / DIR-855L / DGL-5500 / DHP-1565–Storage of Passwords in clear text, Cross-Site Scripting (XSS), Information Disclosure–(FW 1.02b18/1.12b02 or older) (DLS0060220–21).

[297] Ibid.

[298] Kyle Lovett, *D-Link Cross Site Scripting / Information Disclosure*, PACKET STORM (May 22, 2014), https://packetstormsecurity.com/files/126779/D-Link-Cross-Site-Scripting-Information-Disclosure.html.

[299] Ibid.

purpose of the administrator password is that there should be a trusted user with full privileges to make any changes to the device (the administrator) and other users with limited privileges (the non-administrator).  Although the conceivable misuses of this exploit are fewer than what I have identified for other vulnerabilities in this report, the storage of the administrator password in clear text, accessible by the non-administrator user, entirely negates the security feature of having an administrator password.

186.    The other vulnerability I will discuss is the "apply.cgi" cross-site scripting vulnerability. This vulnerability permits an unauthenticated user to execute a cross-site scripting attack, which permits the attacker to call up arbitrary folders, which should not be visible, such as contents of the /etc/passwd file on the device.

187.    These vulnerabilities demonstrate two failures:  First, the failure of storing password in clear text (see Section III.D.6 above), notwithstanding that it has been standard practice for decades to mathematically obfuscate passwords before storage.  And, second, a failure to implement proper input filtering.  If the input at apply.cgi were properly filtered, an attacker would not be able to enter characters that could be used as part of a command to conduct a cross-site scripting attack.

188.    Far more significant than these two vulnerabilities (password theft and cross site scripting) and these two code development failures (clear text password storage and input filtering) is the fact that D-Link Corporation had already been informed of the existence of both of these vulnerabilities *one year earlier* by III/Onward—its third-party security testing vendor.[300] That report identified the very same clear text password vulnerability:

---

[300] III/Onward, *DIR-855L Device Security Testing Report*, Appendix D–48 (Apr. 19, 2013) (DKC1896734–848).

Table 27: tools_admin.asp Password Store in Web Page Vulnerability

| Vulnerability ID | CTTI-VUZ-102-09004 | CVE ID | N/A |
|---|---|---|---|
| Vulnerability Name | tools_admin.asp Password Store in Web Page | Severity | Medium |

█████████████████████████████████████████████████████████ [301]

Table 13: apply.cgi Cross Site Scripting Vulnerability

| Vulnerability ID | CTTI-VUZ-102-09009 | CVE ID | N/A |
|---|---|---|---|
| Vulnerability Name | apply.cgi Cross Site Scripting | Severity | High |
| Vulnerability Type | Web Interface | Port | TCP 80 |

[302]



████████████████████████████████████████
██████████████████████████████
██  █████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████ It is

_____

■ ███████████████████████████████████████
████████████
■ ███████████████████████████████████████
████████████
■ ███████████████████████████████████████
█████████████████████████████████████
████████████████████████

[304] DIR-855L Vulnerability Info Spreadsheet, Last Modified by Peter Tsai (DKC0501497).

possible that the fix may have been in progress prior to Mr. Lovett's report, but the coincidental timing suggests that the fix was released only after the vulnerability was discovered by this third-party researcher.

190.

———————————————

[305] Email from Daniel Hsu to Jade Wang (Apr. 23, 2013) (DKC1321035).



████████████████████████████████████████████████

████████████

### e. Huntley/Qihoo/Heffner Command Injection Vulnerability in HNAP

193.     On January 22, 2015, a security researcher named Sam Huntley emailed William Brown to identify an exploit of a vulnerability with the implementation of the Home Network Administration Protocol (HNAP) of the DIR-645.[310]  D-Link was informed on March 18, 2015, by a different researcher, that a nearly-identical exploit worked on DIR-817, DIR-818L, DIR-820L, DIR-850L, DIR-868L, DIR-880L, and DIR-890L (as well as others not listed on Appendix A).[311]  The exploit permits a remote attacker, without authorization, to inject commands and take over the router.[312]

194.     According to the National Vulnerabilities Database, this vulnerability rated as a "10" on the Common Vulnerability Scoring System—the very worst score, indicating ease of execution and high degree of potential harm.[313]  This is a devastating attack made worse D-Link Systems

---

[309] Email from Rick Chuang to Charles Teng (May 28, 2013) (DKC1135800–01, at DKC1135801) ("We have merged the security code from the DIR-855L and we will lab in pre-test today to check these security on DIR-505.").  This suggests that both the DIR-855L and the DIR-505 were Cameo devices and shared the same vulnerabilities, but without a code-sharing inventory it is impossible to know with certainty.

[310] Email from Samuel Huntley to security@dlink.com [William Brown] (Jan. 22, 2015) (DKC0489690–695, at DKC0489693–695).

[311] Email from xueyufeng@360.cn [Qihoo] to security@dlink.com [William Brown] (Mar. 18, 2015) (DLS0052808–809, at DLS0052809).  I was able to find no indication in any of the emails I reviewed or searched for that D-Link Systems (or its parent or vendors on its behalf), prior to the March 18, 2015 email, had any understanding that the same HNAP vulnerability from the DIR-645 was also present on these many additional D-Link routers.

[312] See generally Samuel Huntley, Craig Heffner & Michael Messner, *D-Link Devices HNAP SOAPAction-Header Command Execution*, RAPID7 VULNERABILITY & EXPLOIT DATABASE ("This module has been tested on a DIR-645 device. The following devices are also reported as affected: . . . DIR-880L, DIR-865L, DIR-860L revA, DIR-860L revB DIR-815 revB, DIR-300 revB, DIR-600 revB, DIR-645"), https://www.rapid7.com/db/modules/exploit/linux/http/dlink_hnap_header_exec_noauth.

[313] *CVE-2015-2051 Detail*, NIST NATIONAL VULNERABILITY DATABASE (Feb. 23, 2015) ("The D-Link DIR-645 Wired/Wireless Router Rev. Ax with firmware 1.04b12 and earlier allows remote attackers to execute arbitrary

(or its parent) failed to realize until informed by a third party two months later that it affected not just one, but a large number of its devices.[314] ███████████████████████



██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██   █████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████   █████████████████████

█████████████████████████████████████████████

███████████████████████████████. This permits an attacker to inject a variety of commands including, as the exploit proposes, a *telnetd* command to open an unauthenticated root shell—that is, a command line that completely takes over the router. [317]

---

commands via a GetDeviceSettings action to the HNAP interface."), https://nvd.nist.gov/vuln/detail/CVE-2015-2051.

[314] Email from xueyufeng@360.cn [Qihoo] to security@dlink.com [William Brown] (Mar. 18, 2015) (DLS0052808–809, at DLS0052809).

[315] ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

[316] The omission was likely purposeful—I infer that the programmers felt that it was unnecessary to require authentication for *getdevicesettings*, because they believed this action to be passive and harmless.  On its face, it is; but because of the implementation failure (failing to conduct input filtering), the absence of authentication on the *getdevicesettings* action created a security hole one could drive a truck through.

[317] See generally *D-Link Devices HNAP SOAPAction-Header Command Execution*, RAPID7 VULNERABILITY & EXPLOIT DATABASE, https://www.rapid7.com/db/modules/exploit/linux/http/dlink_hnap_header_exec_noauth; See

196. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████ ██████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██ ██████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████████████████████████ ████

█████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████. 

---

Craig Heffner, *Hacking the D-Link DIR-890L*, /DEV/TTYS0 (Apr. 10, 2015),
http://www.devttys0.com/2015/04/hacking-the-d-link-dir-890l/.



 This

vulnerability amply displays why so many of D-Link's routers and IP cameras are not secure

from unauthorized access—D-Link Systems routinely failed to take reasonable steps to secure

their routers and IP cameras from easily predicable unauthorized access.

199.    A discussed above, this vulnerability affected the DIR-645,[322] as well as the DIR-817,

DIR-818L, DIR-820L, DIR-850L, DIR-868L, DIR-880L, and DIR-890L.[323]

### f.   Adkins Command Injection Vulnerability

200.    In January 2015, a security researcher named Peter Adkins reported a command injection

vulnerability to D-Link Systems.[324]   The vulnerability could be exploited from the local area

---

[320] Vulnerability Info (noting May 15, 2014 fixed date) (DKC0136325).

[321] Email from Daniel Hsu to Joseph Chao and Zhi-Feng Lin (May 22, 2014) (DKC1354860–71, at DKC1354862–63).

[322] D-Link, Security Advisory, DIR-645: Rev. Ax–Command Injection–Buffer Overflow: FW 1.04b12 (Version 9) (Apr. 24, 2015) (DLS0060307–09).

[323] D-Link, Security Advisory, D-Link Router: HNAP Privilege Escalation–Command Injection (Version 14) (Apr. 25, 2015) (DLS0060368–71).

network or over the Internet, under certain conditions.[325]  This vulnerability allows an attacker to take over the router, including the ability to install software, change settings or passwords, and attack other devices on the local network, including potentially installing malicious software on those devices.  For example, Mr. Adkins demonstrated changing the DNS settings, which could allow an attacker to redirect users to a malicious, spoofed version of a banking website.[326]

201.    Mr. Adkins explains in his disclosure how he disassembled the firmware and used methodical, but not original, techniques to identify a problem in the "ncc/ncc2" service of several D-Link Systems routers.[327]  The ncc/ncc2 service included a "ping" diagnostics function.  The ping function "ping" a specified IP address, by sending tiny packets of information to test whether the destination IP address is communicating with the device sending the ping.

202.    However, the ncc/ncc2 service ping function on the affected routers was accepting unauthenticated requests from within the local area network.[328]  As a matter of general principle, the ping function—or any network utility running on the router—should only be invoked by

---

[324] Peter Adkins, *D-Link and TRENDnet 'ncc2' service - multiple vulnerabilities*, DARKARNIUM/SECPUB (Jan. 11, 2015) ("Issues reported to D-Link via email (security contact)."), https://github.com/darkarnium/secpub/tree/master/Multivendor/ncc2;

*CVE-2015-1187: D-Link DIR-636L Remote Command Injection - Incorrect Authentication*, CVE Mitre (Jan. 17, 2015), https://cve.mitre.org/cgi-bin/cvename.cgi?name=CVE-2015-1187.

[325] D-Link, Security Advisory, DIR-626L/DIR-636L/DIR-808L/DIR-810L/DIR-820L/DIR-826L/DIR-830L/DIR-836L–Remote code execution–Information disclosure–DNS hijacking (Mar. 16, 2015) (DLS0060338–41); III/Onward, *DIR-820L Device Security Testing Report*, Appendix D (June 5, 2014) (DKC0003804–66); DIR-820L Vulnerability Info Spreadsheet (DKC0501497).

[326] Peter Adkins, *D-Link and TRENDnet 'ncc2' service - multiple vulnerabilities*, DARKARNIUM/SECPUB (Jan. 11, 2015), https://github.com/darkarnium/secpub/tree/master/Multivendor/ncc2;

*D-Link/TRENDnet NCC Service Command Injection*, RAPID7/METASPLOIT FRAMEWORK (first posted Mar 12, 2015), https://github.com/rapid7/metasploit-framework/blob/master/modules/exploits/linux/http/multi_ncc_ping_exec.rb.

[327] Peter Adkins, *D-Link and TRENDnet 'ncc2' service - multiple vulnerabilities*, DARKARNIUM/SECPUB (Mar. 3, 2015), https://github.com/darkarnium/secpub/tree/master/Multivendor/ncc2.

[328] D-Link, Security Advisory, DIR-626L/DIR-636L/DIR-808L/DIR-810L/DIR-820L/DIR-826L/DIR-830L/DIR-836L–Remote code execution–Information disclosure–DNS hijacking (Mar. 16, 2015) (DLS0060338–41);

users who have authenticated to the router.  Mr. Adkins states that the vulnerability could be

exploited over the Internet if the router had WAN management enabled or via a cross-site

request forgery (CSRF) attack.[329]  Classically, a CSRF is a way to remotely exploit a

vulnerability that can otherwise only be exploited locally, by forcing an end user to "execute

unwanted actions on a web application *in which they're currently authenticated*."[330]  In this case,

the vulnerability can be leveraged even without authentication because the vulnerable service did

not require authentication.  But regardless of whether we call it CSRF or not, it could be

exploited if an attacker could trick someone on the router's network to visit a website containing

properly-styled attack code.[331]

203.    Mr. Adkins revealed that the software did not filter the input provided to the ping request

for an IPv6 address.[332]  Rather than building in a step to verify that the input received matches

---

[329] Peter Adkins, *D-Link and TRENDnet 'ncc2' service - multiple vulnerabilities*, DARKARNIUM/SECPUB (Mar. 3, 2015), https://github.com/darkarnium/secpub/tree/master/Multivendor/ncc2.

[330] E.g., *Cross-Site Request Forgery (CSRF)*, OWASP, https://www.owasp.org/index.php/Cross-Site_Request_Forgery_(CSRF) (emphasis added).

[331] Peter Adkins, *D-Link and TRENDnet 'ncc2' service - multiple vulnerabilities*, DARKARNIUM/SECPUB (Mar. 3, 2015), https://github.com/darkarnium/secpub/tree/master/Multivendor/ncc2.  Attackers know how to attract people to such sites.  A common way is what is often called a water-cooler attack.  In my experience, attackers identify a subject that will be of interest to many people, based on the news or other current events, and then build websites that will draw people interested in trending topic.  For example, I saw examples of this kind of attack leveraging interest in the Fukushima nuclear power plant disaster, when that disaster was still occurring.  In this way, attackers can get many people to visit and some will be using software that is vulnerable to their crafted exploit.  See also Email from William Brown to Daniel Hsu (Mar. 4, 2013) (DLS0023965–70, at DLS0023966) (quoting http://forums.dlink.com/index.php?topic=23161.0, describing steps to use a D-Link forum post that would attract people having problems with a vulnerable router to visit and click.  The risk that such vulnerabilities would be exploited is not theoretical.  See Michael Mimoso, *Exploit Kit Using CSRF to Redirect SOHO Router DNS Settings*, THREATPOST (May 26, 2015), https://threatpost.com/exploit-kit-using-csrf-to-redirect-soho-router-dns-settings/112993/.  This attack campaign could change routers' DNS settings, which allows the attackers to redirect the users to websites of their choosing.  According to a researcher who observed the attack campaign, one of the vulnerabilities this attack leveraged was the one disclosed by Mr. Adkins.  See *CVE-2015-1187: D-Link DIR-636L Remote Command Injection - Incorrect Authentication*, CVE Mitre (Jan. 17, 2015), https://cve.mitre.org/cgi-bin/cvename.cgi?name=CVE-2015-1187.

[332] IPv6 is the abbreviation for a newer format for IP addresses: Internet protocol version 6.  It is a replacement for the more-familiar IPv4 addresses—which take the form ###.#.#.###—and will accommodate many more addresses than IPv4 (which is running out of unique addresses).

the parameters of the expected input—an IPv6 address—the software was written to pass along whatever the user provided to other functions.

204.   . If the software engineer had implemented a similar step when adding in the IPv6-handling code, Mr. Adkin's exploit code would have been rejected, and a substitute exploit would have been much harder to construct, if possible at all.

205.   The software then processed the foregoing IPv6 ping request using a *system()* call, instead of using a more appropriate, limited library call that could accomplish the ping task without processing the input at the highest privilege level.[333]   As described in Section III.D.3 above, this is a lazy and dangerous way to handle user input, which significantly raises the stakes for input filtering.

206.   Because D-Link Systems' vendor failed to filter input and passed the input to a *system()* call, the result was a command injection vulnerability, allowing complete takeover of the routers. Attackers know to look for vulnerabilities like this.  For example, Mr. Adkins identified that the

---

[333] In Mr. Adkins' disclosure, he uses the term __*system()*, because he is interpreting the symbol represented in the binary. This corresponds to *system()* which would appear in the programming language.

*jjhttpd* portion of the code would handle input, and he focused on that using a tool called *readELF* to examine the code looking for problems that could be exploited.[334]

207.    In addition to not requiring a user to be logged in to access ping, which itself is a serious code development failure, this vulnerability is made possible by three code development failures discussed above.  This vulnerability existed because of the software did not filter the input provided to the ping function (see Section III.D.1 above), and passed that user input to a *system()* call, (see Section III.D.3 above).  In addition, this vulnerability was due to a code maintenance failure (see Section III.D.7 above), because the software engineer failed to mirror the example of more secure solution in the very same part of the software.  Lastly, this is arguably an unnecessary service, to the extent it is unnecessary to permit a user to be able to trigger the ping command from the browser (see Section III.D.4 above).

208.    This vulnerability affected the following routers models listed on Appendix A: DIR-626L, DIR-636L, DIR-808L, DIR-810L, DIR-820L, DIR-826L, DIR-830L, DIR-836L.[335]

### g.  Romero Remote Code Execution Vulnerability

209.    In June 2016, a security researcher named Daniel Romero, working for a security company called NCC Group, disclosed a stack overflow vulnerability to D-Link Systems that affected several of D-Link Systems' routers and could be remotely exploited to enable remote code execution.[336]  The vulnerability could allow attackers to send commands to a vulnerable

---

[334] Peter Adkins, *D-Link and TRENDnet 'ncc2' service - multiple vulnerabilities*, DARKARNIUM/SECPUB (Mar. 3, 2015), https://github.com/darkarnium/secpub/tree/master/Multivendor/ncc2.

[335] D-Link, Security Advisory: DIR-626L/DIR-636L/DIR-808L/DIR-810L/DIR-820L/DIR-826L/DIR-830L/DIR-836L–Remote code execution–Information disclosure–DNS hijacking (Mar. 16, 2015) (DLS0060338–41).

[336] Email Daniel Hsu to William Brown (Aug. 10, 2016) (DLS0015101–10, at DLS0015104, at –10) (email forwarding Romero's report); *Vulnerability Note VU#332115: D-Link routers contain buffer overflow vulnerability*, CERT, SEI-CMU (Aug. 11, 2016), http://www.kb.cert.org/vuls/id/332115; D-Link, Support Announcement: CVE-2016-5681 VU#332115–Some D-link routers are vulnerable to buffer overflow exploit (June 2, 2016) (DLS0053132).  See also *CVE-2016-5681 Detail*, NIST NATIONAL VULNERABILITY DATABASE (Nov. 28, 2016),



211.    This vulnerability was the result of two code development failures discussed above, among other things.  First, this portion of the software did not handle strings properly, using *strcpy( )* improperly instead of a more secure method (see Section III.D.2 above).  A second cause was the failure to adequately filter input, which also would have prevented Mr. Romero's

---

https://nvd.nist.gov/vuln/detail/CVE-2016-5681?cpeVersion=2.2#vulnConfigurationsArea; Martin Beltov, *D-Link is Patching CVE-2016-5681, Critical Flaws in their Routers*, BEST SECURITY SEARCH, http://bestsecuritysearch.com/d-link-patching-cve-2016-5681-critical-flaws-routers/.



exploit from succeeding (see Section III.D.1 above).  As discussed further in Section III.D.2

above, the *strcpy()* function is an element of the C language library, found on many operating

systems, including linux/Unix.  *Strcpy()* passes on a string regardless of its length, creating in

some cases a potential overflow vulnerability.

212.    This vulnerability affected the following router models listed on Appendix A: DIR-817L,

DIR-818L, DIR-822, DIR-823, DIR-850L, DIR-868L, DIR-880L, DIR-890L, and DIR-895L.[341]

### 2.  Camera Vulnerabilities

213.    D-Link Systems IP Cameras also experienced many serious vulnerabilities.[342]  Below are

a few examples illustrating the kinds of serious vulnerabilities that affected D-Link Systems'

devices as a result of failures described in Section III.D above.

### a.  Hidden Guest-Guest Account

214.



---

[341] D-Link, Support Announcement: *CVE-2016-5681 VU#332115 - Some D-link routers are vulnerable to buffer overflow exploit* (Nov. 11, 2017) (DLS0053132); Email from William Brown to Daniel Hsu (Aug. 10, 2016) (DLS0015101-10, at DLS0015101-02) (listing affected models).

[342] E.g., Spreadsheet of IP Cameras Vulnerabilities and Affected Devices (last modified June 6, 2013) (DKS00002081).

[343] Email from AJ Wang to William Brown (Feb. 28, 2013) (forwarding email from Ersin Akar to Irfan Munir et al.) (staff of another D-Link Corporation subsidiary outside the U.S. realized the problem in February and looped in AJ Wang of DLS) (DLS0017467–81, at DLS00017480).

[344]

215.    The hidden user account had the easily-guessable username "guest" and password "guest".[345]  The hidden guest account seems to have been built into the cameras from the start.[346]

216.    Camera owners could change the password for the Guest Account in the administrative settings for the cameras, but they could not delete the account or change the username.[347]  The only way to change the default password for the account was to go through the steps to "add" a guest user account with a unique password, which overwrote the "guest" password.[348]  Remarkably—and, in my opinion, terrifyingly—there was no mention of the default Guest account in the setup for the cameras, in user manuals, or any warnings in the settings of the existence of the account.[349]

217.    Building an undisclosed, default credential into devices exemplifies two security failures I have discussed before.  D-Link Systems not only failed to prevent or remove undocumented credentials and backdoors (see Section III.D.5 above), but also D-Link Systems failed to prevent

E.g., DCS-2310 User Manual v.1.0 (Jul. 10, 2012) (DLS0005107–95, at DLS0005149–51) (setup IP camera to have its own IP address for access over the Internet).

[345] Email from AJ Wang to William Brown (Feb. 28, 2013) (DLS0017467–81, at DLS00017480) (email from Ersin Akar to Irfan Munir et al.); Guest User Account Security Advisement for Select D-Link IP Cameras (May 9, 2013) (DLS0005316–17).

[346] E.g., DCS-2132L Firmware Release Notes (July 29, 2013) (DKS00036648–50, at DKS00036649) (removing the default account "guest" in version V1.01.10, which was the first firmware version after the initial version, V1.00.06); DCS-2132L Vulnerability Info Spreadsheet (DKC0501497).  In my experience, firmware release notes are a reliable source of information on what is changed between software versions, and whether features were added.

[347] This was the case at the time of the disclosure.  Guest User Account Security Advisement for Select D-Link IP Cameras (May 9, 2013) (DLS0005316–17, at DLS0005317).  The default guest account was subsequently disabled in updated firmware.  E.g., DCS-2132L Firmware Release Notes (July 29, 2013) (DKS00036648–50, at DKS00036649); DCS-2132L Vulnerability Info Spreadsheet (DKC0501497).  In order to learn of the Security Advisement or get the updated firmware, I believe camera owners would have to either be checking D-Link Systems' websites or have downloaded its mydlink app.

[348] Guest User Account Security Advisement for Select D-Link IP Cameras (May 9, 2013) (DLS0005316–17, at DLS0005317).

[349] See, e.g., DCS-2310 User Manual v.1.0 (Jul. 10, 2012) (DLS0005107–95, at DLS00005179) (showing device management interface).  Instead, it says "but you may want to reserve at least one as a guest account," implying that there is no such account without action by the user.  Likewise, these User Manual sections instructing users how to configure cameras to be reachable over the Internet do not provide any warning about increased risks, tell users about the hidden guest account, or recommend users verify the access accounts they have set up.  DCS-2310L User Manual v.1.0 (July 10, 2012) (DLS0005107–95, at DLS0005149–51).

or remove unnecessary services, in that they maintained a default account designed for commercial purposes in IP cameras sold to consumers (see Section III.D.4 above).

218.    The devices with this hidden guest account were nominally "security" cameras, and D-Link Systems recommended many for use in the home.[350]  D-Link Systems could have avoided undermining the security of these cameras in a number of ways.  D-Link Systems could have asked users during setup whether they wished to enable a guest account, and prompted them to set a password (the process that the user manual seems to suggest, see Note 349 above).  D-Link Systems could have shipped the cameras with the guest account active, but required the user to create a unique password before the camera could be activated.  D-Link Systems could also have shipped the cameras with the guest account password set to a unique, not-guessable[351] default value that a user could easily find (but that an unauthorized user could not), such as the device's serial number.  Lastly, the risk of strangers watching D-Link Systems' customers in their homes—unknown to them—would have been reduced if the camera's user manual simply had explained the risk and remediation options to the camera's owners.  In addition, D-Link Systems could have prevented this problem by conducting a review of the user accounts on its devices, or requiring its vendors to do so.

219.    Around the time D-Link Systems and D-Link Corporation decided to address the hidden guest account, an article about the Internet-connected-device search engine Shodan[352] appears to

---

[350] See, e.g., DCS-2310L User Manual v.1.0 (July 10, 2012) ("unique solution for your small office or home . . . . that transmits high quality video images for security and outdoor surveillance.") (DLS0005107–95, at DLS0005112).

[351] For example, making the guest account password the model number of the camera would be guessable by persons trying to get unauthorized access to camera feeds.

[352] Shodan is a search engine that looks for Internet-connected devices.  Any Internet user can use Shodan to search for specific kinds of computers on the Internet, such as cameras, routers, and hardware devices, using a variety of filters.  SHODAN, https://www.shodan.io/.

have caused alarm at D-Link Systems and D-Link Corporation ███████████████

████████████████████████████████████████████ ███ ██████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████[4] The same day, D-Link Systems

published a statement advising customers to change the password for the guest account, and

notifying them that firmware that would remove it was underway.[355]

220.     In testimony, D-Link Systems employees have claimed that most of the affected cameras

were models intended for businesses, and that the hidden guest account was incorporated to

enable the cameras to be integrated into Video Management Systems (VMS).[356]  Even if this is

the reason the guest account was devised, there is no excuse for carrying this feature into at least

several cameras D-Link Systems describes as "consumer product[s]."[357]  What may have been a

feature for commercial purchasers became a backdoor putting consumers at risk of having their

security monitoring turned into surveillance against them.

221.     ███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[353] Email from William Brown to Kevin Wen (May 7, 2013) (DKS00035676–79, at DKS00035679) (email from Dan Dowdy sending link to Businessweek article).

[354] Email from William Brown to Kevin Wen (May 7, 2013) (DKS00035676–79, at DKS00035678) (email from William Brown to Robert Lin et al.).████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

[355] Guest User Account Security Advisement for Select D-Link IP Cameras (May 9, 2013) (DLS0005316–17).

[356] Brown Investigational Hr'g. Tr. 781:18–784:8 (July 31, 2014); Brown Dep. 101:24–103:9 (Mar. 14, 2018).  See also Wang Dep. 229:7–230:11, 233:13–234:8 (Dec. 6, 2017) (stating cameras were business, and guest account was necessary for devices to connect to Camera Management Systems (CMSs)).

[357] D-Link Sys. Answers and Objections to FTC 5th Set of Interrogs. No. 23–24 (May 4, 2018), Resp. to Interrog. No. 22 (listing the "Product Category" of the DCS-2132L, DCS-2310L, DCS-2332L as "Consumer Product").

██████████████████████████████ AJ

Wang, of D-Link Systems, on this point stated that, although he believed the Guest account was a feature, not a bug, it should not have been enabled by default.[359]

222.   The undisclosed guest account was built into the following devices listed in Appendix A: DCS-2132L, DCS-2210, DCS-2230, DCS-2310L, DCS-2332L, DCS-3112, DCS-3710, DCS-3716, DCS-6010L, DCS-6210, DCS-6510, DCS-6511, DCS-6513, DCS-6616, DCS-6818, DCS-7010L, DCS-7413, and DCS-7513.[360]

### b.  Core Security Hard-Coded Backdoor in RTSP

223.   Around the same time in early 2013, researchers from the firm Core Security disclosed the existence of a hard-coded password in numerous D-Link Systems' IP Cameras that acted as a backdoor to the device.[361]  The backdoor allowed anyone who could connect to the camera's IP address to view the camera's RTSP (Real Time Streaming Protocol) video stream—what the camera was capturing at any given moment—without needing to crack or steal the user's login

---

[358] Email from AJ Wang to William Brown (Feb. 28, 2013) (DLS0017467–81, at DLS00017476–77) (email from Mike Lange to Kevin Wen).

[359] Email from AJ Wang to Roger Kao, William Brown (Feb. 28, 2013) (DLS0017452–66 at DLS0017452) ("The only problem is that guest is enabled by default.  It should have been disable be [sic] default.").  Mr. Wang seems to have qualified his answer in his deposition, arguing that the hidden account was a feature.  Wang Dep. 239:4–19 (Dec. 6, 2017).  However, Mr. Wang did not seem to be aware of the user manuals for the affected devices, which do not disclose the hidden account.  Wang Dep. 239:4–19 (Dec. 6, 2017); DCS-2310 User Manual v.1.0 (Jul. 10, 2012) (DLS0005107–95, at DLS00005179).

[360] Guest User Account Security Advisement for Select D-Link IP Cameras (May 7, 2013) (DLS0005316–17); Spreadsheet of IP Cameras Vulnerabilities and Affected Devices (last modified June 6, 2013) (DKS00002081) (hidden column K notes cameras for which D-Link "Remove[d] Guest account").

[361] *D-Link IP Cameras Multiple Vulnerabilities*, CORE SECURITY (Apr. 29, 2013) (CVE-2013-1603, bypass RTSP authentication using hard-coded credentials), https://www.coresecurity.com/advisories/d-link-ip-cameras-multiple-vulnerabilities.

Core Security also disclosed several more critical vulnerabilities, including two ways to bypass the authentication of the cameras and a vulnerability that allowed an attacker to remotely execute commands on the affected cameras.  Ibid. (CVE-2013-1599, Command Injection; CVE-2013-1600, to access the video stream via HTTP; CVE-2013-1602, Authentication Bypass vulnerabilities); Email from William Brown to Oscar Navarro and attachments (Apr. 24, 2013) (DLS0030634–44, at DLS0030635) (attaching spreadsheet of devices affected by each CORE-disclosed vulnerability).  See also *D-Link IP Cameras RTSP Authentication Weak*, VULDB (May 6, 2013), https://vuldb.com/?id.8574.

credentials.  If a camera owner had set up his or her camera to connect directly to the Internet, as

D-Link Systems provided instructions how to do,[362] unauthorized users could watch the video

stream over the Internet.

224.    By disassembling the firmware, the researchers found that the code was written to accept

"?*" as a password, regardless of what username was entered, or if username was left blank.[363]

The backdoor was not obfuscated in the source code to make it harder for the researchers, or an

attacker, to find out.[364]

225.    As discussed in Section III.D.5 above, incorporating and not removing hard-coded

credentials is a serious code development failure.  It is inherently insecure to write credentials

directly into source code—the resulting credentials cannot be unique to each device, and they

require a firmware update to change if compromised.

226.    Hard-coded credentials are preventable because they are the result of a purposeful act,

rather than an oversight.  In addition to relying on the software engineer not to incorporate them

in the first place, organizations can take a number of steps that D-Link Systems and D-Link

Corporation did not to avoid them.  For example, organizations should have policies prohibiting

the use of hard-coded credentials, even during development, and could incorporate a step to

require programmers to affirm they have not used them or removed them before passing along

code.

---

[362] See, e.g., DCS-2310L User Manual v.1.0 (July 10, 2012) (DLS0005107–95, at DLS0005149–51).

[363] *D-Link IP Cameras Multiple Vulnerabilities*, CORE SECURITY (Apr. 29, 2013),
https://www.coresecurity.com/advisories/d-link-ip-cameras-multiple-vulnerabilities.

[364] Although hard-coded credentials are never acceptable for secure functions, like access to a camera's video, there are also numerous methods by which companies can obfuscate sensitive areas of code, such as authentication, to make it harder for attackers to reverse engineer and search for vulnerabilities.

227. The analysis of the researchers is straightforward, logical, and in my opinion highly credible. The researchers' disclosure showed at lines 10–12 of the disassembly exactly what they represented: "As we can see in the following dump, the submitted password is compared with the string :?* (the character : is used for concatenation of username:password)."



The effect of these lines is to authenticate any person who submits "?*" as the password. The company validated the existence of this backdoor in their internal documents, and they later incorporated checking for this password string in the regression tests conducted by D-Link Corporation's D-Lab (see Section III.F.1 below).

228. This backdoor affected the following D-Link Systems IP cameras listed on Appendix A: DCS-1100/1100L, DCS-1130/1130L, DCS-3410, DCS-3411, DCS-3430, DCS-5605, and DCS-5635.[365] Based on firmware release notes, noting fixes for other Core Security vulnerabilities, this hard-coded backdoor was likely in at least some of the affected cameras' software since they were first sold.[366]

---

[365] E.g., Spreadsheet of IP Cameras Vulnerabilities and Affected Devices (last modified June 6, 2013) (DKS00002081) (see column CVE-2013-1603) *D-Link IP Cameras Multiple Vulnerabilities*, CORE SECURITY (Apr. 29, 2013) (CVE-2013-1603, bypass RTSP authentication using hard-coded credentials), https://www.coresecurity.com/advisories/d-link-ip-cameras-multiple-vulnerabilities.

[366] E.g., DCS-5605/DCS-5635 Firmware Release Notes v.1.01_patch02, 7812 (Apr. 12, 2013) (DLS0006908–10); DCS-1130 Firmware Release Notes v.1.04B7712 (Apr. 30, 2013) (DLS0004558); DCS-1100 Firmware Release Notes v.1.04B7712 (Apr. 30, 2013) (DLS0004470). I don't see anything in the release notes for the affected IP cameras suggesting the RTSP code was added to the cameras source code in an intermediate firmware release.

### c. Senrio Stack Overflow Vulnerability

229.    In 2016, a security company named Senrio reported a remotely exploitable stack

overflow vulnerability to D-Link Systems affecting its IP cameras.[367]

230.    Senrio found the vulnerability by disassembling the firmware and reverse engineering the

source code using a well-known and reliable program called Interactive Disassembler,[368] or IDA,

which in my opinion is currently the gold standard for analyzing packaged code.  Here's how it

works:  First, a researcher or attacker could take D-Link Systems' firmware update packages and

decode them into a set of executables and data files.  Then, IDA can be used to generate

assembly language source code from those executable files.  This gives the researcher or attacker

something approximating the source code of the device as the software engineer who created it

would see it.

231.    Examining the code in this way, Senrio identified multiple, insecure uses of the function

*strcpy()*.[369]  As discussed in Section III.D.2 above, using *strcpy()* to handle user input insecurely

is an easily preventable flaw that can lead to buffer and stack overflows.  This is another example

of D-Link Systems' improper string handling in devices.  D-Link Systems had been warned of

---

[367] Senrio, *D-Link Vulnerability Details* (Jun. 13, 2016) (PX07000-001–10, at PX07000-006-10); D-Link, Support
Announcement: Regarding Senr.io Vulnerability Information Updates (Nov. 10, 2017) (DLS0053130–31); Email
Richard Chen to Yin Khvat (July 7, 2016) (DLS0042766-76, at DLS0042766) ████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████ Ibid.

[368] Ibid. at PX07000-006.

[369] Ibid. at PX07000-007 ████████████████████████████████████████████████████████
███████████████

115

problems in this area by III/Onward, and the insecure use of *strcpy()* in particular, for at least three years.[370]

232.    Senrio was able to find an instance where *strcpy()* was used to write to the stack that accepted input but did not check for a signature (based in part on the user password).[371]  The flaw was in a part of the code that listens for DCP (Discovery and Basic Configuration Protocol) packets on a loop.[372]  The vulnerability resulted from the combination of three well-known failures:  (1) not authenticating the user sending input on DCP service;[373] not filtering the user input properly to reject input that featured arbitrary characters (see Section III.D.1 above); and another instance where a D-Link Systems device used *strcpy()* to handle user input (see Section III.D.2 above—Improper String Handling).  Senrio leveraged the stack overflow vulnerability to send code to the device to change its password to one of Senrio's choosing.[374]

233.    Senrio's exploit of changing the device's password was just an example.  The stack overflow could also have allowed Senrio, or an attacker, to feed commands to the device.  In the case of Senrio's proof of concept, the command was used to change the device's password.  But this vulnerability would also have allowed an attacker to access a command shell,[375] to remotely control the camera, to install software, or more.

---

[370] See, e.g., III/Onward, *DCS-930L Device Security Testing Report*, Appendix D-3, D-5, D-7 (Aug. 27, 2012) (DKC0003183–203, at DKC0003185, DKC0003187, DKC0003189); III/Onward, *DIR-826L Device Security Testing Report*, Appendix D-6, D-15, D-16 (Sept. 28, 2012) (DKC0003966–4003, at DKC0003971, DKC0003980, DKC0003981, DKC0003984, DKC0003985); III/Onward, *DCS-942L Device Security Testing Report*, Appendix D-3 (Nov. 10, 2012), (DKC0003351–65, at DKC0003353).

[371] Senrio, *D-Link Vulnerability Details* (Jun. 13, 2016) (PX07000-001–10, at PX07000-006–08).

[372] Ibid.

[373] Only a user logged in to the IP camera should be permitted to use this service.  A user without the login credentials would not have a legitimate need for it.

[374] Senrio, *D-Link Vulnerability Details* (Jun. 13, 2016) (PX07000-001–10, at PX07000-008-09).

[375] A command shell is a piece of software on a linux/Unix system which uses a command-line interface to give the user access to the operating systems' services.

234.    This vulnerability could have been exploited over the Internet if the camera owner set up the device to connect to the Internet, which D-Link Systems instructs its users how to do in its manuals.[376]  Senrio stated that it found vulnerable cameras online using Shodan.[377]

235.    Many of D-Link Systems' IP Cameras at the time included this vulnerability, including the following models listed on Appendix A: DCS-930L, DCS-931L, DCS-932L, DCS-933L DCS-934L, DCS-960L, DCS-2132L, DCS-2136L, DCS-2210, DCS-2230, DCS-2310L, DCS-2330L, DCS-2332L, DCS-5009L, DCS-5010L, DCS-5020L, DCS-5222L, DCS-6010L, DCS-7010L, and potentially the DCS-1100 and DCS-1130.[378]

### 3.    Failing to Encrypt Mobile App Credentials

236.    In February 2014, a researcher named James Fitts contacted D-Link Systems with a disclosure that their mydlink Lite application for Android failed to encrypt user credentials stored on the devices.[379]  Mr. Fitts showed the specifics of what he found in his disclosure, and it was confirmed by representatives of D-Link Corporation.[380]

237.    Google has advised developers as early as 2008 to encrypt mobile application credentials, providing tools and tips for that purpose.[381]  Platform providers—such as Google and Apple— commonly create these basic tools to help developers do the right thing in the software distributed for their platform, i.e., code it securely.  Accordingly, companies that fail to use these

---

[376] See, e.g., DCS-2310L User Manual v.1.0 (July 10, 2012) (DLS0005107–95, at DLS0005149–51).

[377] Senrio, *D-Link Vulnerability Details* (Jun. 13, 2016) (PX07000-001–10, at PX07000-010).

[378] D-Link, Support Announcement: Regarding Senr.io Vulnerability Information Updates (Nov. 10, 2017) (DLS0053130–31).

[379] Security Advisory: mydlink Lite mobile application for Android–Mis-handling user-credentials with-in the local file system (Feb. 27, 2014) (DLS0059990–91).

[380] Email from William Brown to Kevin Chen, Mac Mac, and attachments (Feb. 12, 2014) (DLS0049688–91) (containing Mr. Fitts' report); Email from Mac Mac to William Brown (Feb. 14, 2014) (DLS0049714–15) (confirming vulnerability).

[381] See, e.g., PETER TEUFL, THOMAS ZEFFERER, CHRISTOF STROMBERGER, MOBILE DEVICE ENCRYPTION SYSTEMS (Feb. 9, 2017), https://hal.inria.fr/hal-01463828/document.

free tools available for platform developers—or provide equivalent protections—are in my opinion unnecessarily endangering their users' data privacy.

238.    This issue represents another instance of the code development failure I described as "Clear Text Passwords" in Section III.D.6 above.  As Mr. Fitts described, the username and password were stored in clear text in a file on the local file system.[382]  D-Link Systems, in my opinion unadvisedly, not only shows in its security advisory the precise location of the file containing the username and password in clear text, but also the precise sequence of commands needed to view them.[383]  It appears to me in studying the D-Link advisory that the credentials in question are not just those for the mobile app, but actually those needed to log into the user's account at mydlink.com, the D-Link cloud services site.  My understanding is this site allows users to view the video feed of some D-Link Systems IP Cameras and manage other functions related to cameras and some D-Link Systems routers, if the account is set up and configured to connect to them.[384]  Although the most likely exploitation scenario I can see involves a third party getting physical possession of the phone and unlocking it, this poor practice nevertheless creates significant unnecessary risks for D-Link Systems' customers.

239.    Not only should D-Link Systems have abated this vulnerability by adopting the recommended Google software, or equivalent methods, I referred to earlier, but it was told to do so by D-Link Corporation's security testing vendor III/Onward *as early as September 2012*.[385]

---

[382] D-Link Security Advisory: mydlink Lite mobile application for Android–Mis-handling user-credentials with-in the local file system (Feb. 27, 2014) (DLS0059990–91).

[383] Ibid.

[384] See, e.g., DCS-2310L User Manual v.1.0 (July 10, 2012) (DLS0005107–5195, at DLS0005136 ("You will be able to remotely access your camera from www.mydlink.com."), DLS0005140 ("The Settings tab [in mydlink] contains several options for you to control how your DCS-2310L operates.")).

[385] E.g., III/Onward, *DIR-826L Device Security Testing Report*, Appendix D-10 (Sept. 28, 2012) (DKC0003948–4024, at DKC0003975).  Two subsequent III/Onward reports in 2012 reported the same problem.

███████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████ they did not address this issue until it was

brought to their attention through the security report provided by Mr. Fitts.[386]

240.    This vulnerability appears to me to affect owners of all D-Link Systems devices ending in

an "L," if they made use of the mobile application in question (the D-Link Systems devices

ending in "L" related to the mydlink.com cloud service site), including those in Appendix A.[387]

### 4.  Code Signing Key Exposure

241.    In September 2015, D-Link Systems (via its parent) permitted its private key, which was

used to sign software that D-Link distributed to U.S. consumers, to be published on a public

website.[388]  D-Link Corporation, which acquired and managed the private key for software that

D-Link Systems distributed along with D-Link Systems devices,[389] shared the private key with

D-Link Systems' vendors so they could use it to sign software for Windows PCs.[390]  A vendor

had apparently copied the private key into a folder containing open source software it was using

in a device, and then failed to remove the private key from the folder before packaging the

---

[386] D-Link, Security Advisory: mydlink Lite mobile application for Android–Mis-handling user-credentials with-in the local file system (Version 4) (Feb. 27, 2014) (DLS0059990–91).

[387] D-Link Sys. 30(b)(6) Dep. 206:23–207:2 (Apr. 25, 2018) ("L" routers and IP cameras connect to mydlink.com); https://www.mydlink.com/apps.

[388] E.g., Email William Brown to AJ Wang (Sept. 22, 2015) (DLS0025082–87, at DLS0025083–87).

[389] If D-Link Corporation acquired a key that D-Link Systems was using in distributing software in the United States, D-Link Systems is just as responsible for ensuring the security of the key as its parent, including by making sure D-Link Corporation as its agent was not sharing it.

[390] D-Link Corp. 30(b)(6) Dep. 243:11–254:11 (Jan. 30, 2018).  The key was used to sign support software for D-Link Systems devices that is installed on PCs, not the firmware that runs on the devices themselves.

modified open source code.[391]  This failure provided access to the private key to anyone who

opened the package.

242.    The private key at issue, also known as code-signing key, was used to provide validation

that software signed with that key in fact came from a legitimate publisher who is trusted by

Symantec.[392]  When running any software signed with this key, an end user would not receive a

warning regarding the program (or, in more controlled environments, the program would not be

blocked from running) because it would appear to be legitimate D-Link software.[393]

243.    The unintentional exposure of a private key is a catastrophic event, permitting anyone to

sign any software so that it would appear to be a legitimate D-Link program and run without

warning on Windows devices.  The consequence of leaking the key was thus not limited to D-

Link Systems or even D-Link Systems' customers.  Because the key was trusted by all Microsoft

operating systems, it could be used to attack consumers who did not own a D-Link device of any

[391] Michael Mimoso, *D-Link Accidentally Leaks Private Code-Signing Keys*, THREATPOST (Sept. 18, 2015), https://threatpost.com/d-link-accidentally-leaks-private-code-signing-keys/114727/.  The open source software the vendor was using was subject to a license called GPL, for Gnu General Public License.  GPL is a prevalent license agreement for open-source software that allows free use and modification, but requires, among other things, that modifications be publicly re-shared for the benefit of the community.

[392] See generally *Inadvertently Disclosed Digital Certificates Could Allow Spoofing, Microsoft Security Advisory 3097966*, MICROSOFT (Oct. 13, 2015) ("Advisory FAQs. . . . What caused the issue?  The issue was caused by D-Link Corporation inadvertently publishing the certificates."), https://technet.microsoft.com/en-us/library/security/3097966.

[393] Michael Mimoso, *D-Link Accidentally Leaks Private Code-Signing Keys*, THREATPOST (Sept. 18, 2015), https://threatpost.com/d-link-accidentally-leaks-private-code-signing-keys/114727/;

Dan Goodin, *In blunder threatening Windows users, D-Link publishes code-signing key*, ARSTECHNICA (SEPT. 18, 2015), https://arstechnica.com/information-technology/2015/09/in-blunder-threatening-windows-users-d-link-publishes-code-signing-key/;

Chris Williams, *D-Link spilled its private key onto the web—letting malware dress up as Windows apps*, THE REGISTER (Sept. 18, 2015), https://www.theregister.co.uk/2015/09/18/d_link_code_signing_key_leak/;

Sean Buckley, *Leaked D-Link code-signing key could make malware look legit*, ENGADGET (Sept. 18, 2015), https://www.engadget.com/2015/09/18/leaked-d-link-code-signing-key-could-make-malware-look-legit/.

kind.[394]  Although Microsoft acted quickly to disable the key once it was discovered, it appears

that the key may have been publicly posted for six months before, and we have no way of

knowing whether it was found and used by bad actors in that time.[395]  The significance of the

event is demonstrated by how Microsoft swiftly and publicly reacted, including revoking trust in

the disclosed key.[396]  Similarly, William Brown expressed the gravity of this incident in

correspondence.[397]

244.    The exposure also indicates a failure of process.  As discussed in Section III.D.8 above,

D-Link Systems should have prohibited sharing the key with any third party.  If sharing the key

was necessary, D-Link Systems should have exercised significant control over the use and

storage of the key.  Finally, even if they failed to do both of these things, D-Link Systems should

have examined everything they made public that involved the use of the key to ensure that did

not expose the key.  Who was doing quality control on the open source software before it was

posted?[398]  The failure suggests that there were not protocols in place or a standardized process.

A company could avoid a failure like this by developing automated scripts to package up the

software and sign it, rather than relying on manual steps.  Ad hoc processes lead to failures.

---

[394] Email William Brown to AJ Wang (Sept. 22, 2015) (DLS0025082–87, at DLS0025086–87) (Sept. 18, 2015 email in thread from Jason Syu to Ping Chen, writing that leaking the code signing key "means anyone can use the private certificate to sign their virus/worm program and pretend its D-Link approved program.  For end user, they will trust D-Link and just run the program, the results will be very very bad.")

[395] Michael Mimoso, *D-Link Accidentally Leaks Private Code-Signing Keys*, THREATPOST (Sept. 18, 2015), https://threatpost.com/d-link-accidentally-leaks-private-code-signing-keys/114727/ (researcher who found the private key identified that it had been posted in February 27, 2015).

[396] See *Inadvertently Disclosed Digital Certificates Could Allow Spoofing, Microsoft Security Advisory 3097966*, MICROSOFT (Oct. 13, 2015), https://docs.microsoft.com/en-us/security-updates/SecurityAdvisories/2015/3097966.

[397] Email from William Brown to Roger Kao et al. (Sept. 26, 2015) (DLS0017981).

[398] There is evidence that, only after this disclosure, Patrick Cline of D-Link Systems took it upon himself to do some quality control on previously-posted D-Link Systems modifications of open-source software to look for any other private keys.  Cline Dep. 74:11–77:4 (Apr. 24, 2018).  Given how D-Link Corporation was sharing its key, D-Link Systems and D-Link Corporation should have had a process to scan the open source before it was posted for this or any other problematic disclosures.

There are well-known processes to permit code signing by a developer who outsources the development of source-code, and it is telling that D-Link Systems was able to undertake one of these processes,[399] but only following the disastrous exposure of their key.

### F.  D-Link Systems' Limited Affirmative Processes and Procedures Were Inadequate

245.   As discussed above, my opinion that D-Link Systems' routers and IP cameras were not secure from unauthorized access or control is based on the serious, preventable vulnerabilities affecting those routers and IP cameras.  These vulnerabilities result predictably from fundamental failures in software development processes and practices.  Reviewing the vulnerabilities and poor practices would lead any expert in my field to conclude that D-Link Systems' approach was reactive and inadequate.  Neither D-Link Systems, D-Link Corporation, nor D-Link Systems' vendors took meaningful steps to identify and address failures that were likely to, and often did, result in serious vulnerabilities.  In that way, the failures and vulnerabilities identified in their devices speak for themselves:  What they were doing wasn't working.

246.   I have also reviewed the practices D-Link Systems says it has taken to protect its devices and its software from malicious use or well-known security flaws.[400]  In addition to the generally

---

[399] D-Link Corp. 30(b)(6) Dep. 253:16–254:11 (Jan. 30, 2018); D-Link Sys. 30(b)(6) Dep. 195:11–22 (Apr. 25, 2018) ("Also how that key is handled today has been completely overhauled so the incident that we saw could not happen again."); D-Link Sys. Answers to FTC's 5th Set of Interrogs. 6 (May 4, 2018), (Resp. to Interrog. No. 15, "A robust Digital Signature Auto-Sign is also used to ensure secure product development.").

[400] D-Link Systems describes the following practices : (1) "black box" security testing by III/Onward Security since 2014; (2) work with "independent third-party security expert such as SEARCH-LAB and Jason Doyle"; (3) pre-release testing by D-Link Systems' vendors; (4) "quality assurance functional and security testing by D-Lab"; (4) Digital Signature Auto-Sign System (Private Key); (5) "source code scans ('white box' tests by Checkmarx software)" on the "vendors' source code for new products and firmware"; (6) "Software Security Risk Questionnaire… and [] Security Requirement Traceability Matrix"; (7) Security Issue Management (SIM) process. D-Link Sys. Answers to FTC 5th Set of Interrogs. 3–7 (May 4, 2018) (Resp. to Interrog. No. 15). In addition to the foregoing topics, D-Link Systems refers to its work with Kapil Khot and Rapid7's reports.  See D-Link Sys. Answers to FTC 1st Set of Interrogs. 5–6 (Resp. to Interrog. No. 2), 11 (Resp. to Interrog. No. 4) (Aug. 17, 2017).

sound practices D-Link Systems describes,[401] I have also considered other relevant development and oversight practices, addressed below, described in deposition testimony and documents produced by D-Link Systems and D-Link Corporation.[402]  D-Link Systems' security practices, which it sometimes engaged in on its own, but more often relied on its parent to handle, were ad hoc and generally ineffective prior to 2017.[403]  As discussed in this section, these practices reinforce my conclusion that, at least until approximately 2017, D-Link Systems' routers and IP cameras were not secure from unauthorized access or control.

247.    Much more recently, beginning in 2016 and more seriously in Spring 2017, there appear to be some efforts, primarily at D-Link Corporation, to work meaningfully on their software security program.  According to the testimony of Mr. Brown individually and on behalf of D-Link Systems, D-Link Systems still has little visibility into these recent efforts.[404]  And D-Link Systems still appears to have no means to require the continuation of these recent practices besides the same intermittent inquiry of D-Link Corporation that it has relied on in the past. Moreover, D-Link Systems seems not to receive the documentation that might enable it to evaluate the effectiveness of new practices or the security analyses of its products that are the

---

[401] Although sound in and of themselves, these practices do not add up to a secure development program.

[402] Although D-Link Systems does not mention it, I will also address D-Link Systems' short-lived bug bounty program.

[403] In addition to some ongoing testing conducted by D-Link Corporation and III/Onward, D-Link Systems and D-Link Corporation received evaluations from several other individuals and firms, but in almost every case, this work appears to have been a one-off, and general recommendations by these firms to put in place secure development processes seem not to have been acted upon.  Further, my count of reports of the device security testing that D-Link Systems requested and paid for itself is five: two from Jason Doyle, two from SEARCH-LAB, and one from Kapil Khot (compensated with free hardware only), for all the routers and cameras they sold.  See Sections III.F.3 and III.F.5.a below.

[404] In addition, I understand that the documents evidencing these changed practices come entirely from the files of D-Link Corporation, based on their Bates numbers.

product of these new practices.[405]  It is too early in the implementation of these improvements to evaluate the adequacy of their implementation, their impact on the security quality of D-Link Systems' devices, and whether these practices and tools properly and professionally implemented can in fact deliver assurance of security quality in the future.

### 1. D-Lab and Vendor Testing

248.    D-Link Systems points in its Responses to Interrogatories to testing conducted by D-Link Corporation's D-Lab unit as part of its security program.[406]  D-Lab is a division or department of D-Link Corporation.  I have reviewed the reports and testing plans evidencing this testing.[407]  It is clear from this documentation that D-Lab did very little testing for the purpose of uncovering new, undiscovered security issues.

249.    Rather, D-Lab was conducting functionality and quality assurance (QA) testing[408]—that is, running specified tests to ensure that devices function correctly and don't suffer from specific, known problems.  Quality assurance is important in its own right, but it can't replace processes for preventing or fixing not-yet-discovered failures that could lead to vulnerabilities.

250.    D-Lab's testing plans and reports describe the precise testing done.[409]   ██████████████

██████████████████████████████████████████████████████████████████████████

---

[405] D-Link Sys. 30(b)(6) Dep. 89:1–91:24 (Apr. 25, 2018) ████████████████████████████████
████████████████████).  The two exceptions may be D-Link Systems' engagement of SEARCH-LAB Ltd. and Kapil Khot of Qualys.  Each of these is addressed below.

[406] D-Link Sys. Answers and Objs. to FTC 5th Set of Interrogs. No. 15.

[407] See Appendix C (Materials Considered), D-Lab Testing.  D-Link Systems identified a number of reports by Bates number as "(testing)."  D-Link Sys. Answers and Objs. to FTC 1st Set of Interrogs. No. 2.  I have determined that these "testing" documents (and others like them that were provided recently) are likely D-Lab testing reports and plans, based on other documents that mention D-Lab (e.g., DKC1827671 (using "DKP" numbers as "ID"s, which are used in testing plans and reports), and a handful of these "testing" documents that mention "Dlab system," e.g., DKC1826417–30, at DKC1826429).

[408] Brown Dep. 137:2-16 (Mar. 14, 2018);

[409] ████████████████████████████████████████████████████████████████████████████
███████████████████





252. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

█████████████████████████

253.    D-Link Systems also refers to "rigorous pre-release testing" by its vendors.[416]  Although D-Link Systems did not identify any documents reflecting this testing, I have reviewed a number of spreadsheets and test reports that appear to originate from D-Link Systems' vendors and identify testing processes.[417]  I understand the testing being described.[418]  Like D-Lab's testing documents, these documents also reflect functionality and Quality Assurance testing.[419]  In the few instances where the documents do relate to security vulnerabilities, they simply confirm that a past problem has been solved, just like D-Lab's testing.[420]

[414] Regression testing is a feature of sound quality assurance practices intended to ensure that flaws previously remediated do not recur in subsequent versions of the software.

[415] See Section III.E.1.b above, which describes an egregious example of D-Link Systems' vendors breaking a specific exploit—most likely by black-listing a character used in it—without addressing the underlying programming failure.

[416] D-Link Sys. Answers and Objs. to FTC 5th Set of Interrogs. No. 15.

[417] ████████████████████████████████████████████████  See Appendix C, Materials Considered, Section VI – Vendor Test Reports.  I selected several for review, including samples from each of the vendors, and read them closely.

[418] E.g., Alpha Networks, *D-Link DIR-850LA1 FW V1.06 Test Report* (June 13, 2013) (DLS0042893).  In some cases, the reports I selected for review referred to attachments containing related findings and test reports that did not seem to have been supplied.  For example, see the Alpha Networks, *DCS-934L Firmware Test Report* (Nov. 11, 2014) (DKC1828478–84, at DKC1828481).

[419] These reports/processes are distinct from the 2017 implementation of Checkmarx source code scanning, which I discuss in Section III.F.5.d below.

[420] Alpha Networks, *D-Link DIR-850LA1 FW V1.06 Test Report* (June 13, 2013) (DLS0042893) (see tab "1. Test Case," rows 716-39 ("6. Web security")).  In some cases, the vendors did try to test for vulnerabilities, such as when

254. The testing conducted by D-Link Corporation's D-Lab unit and D-Link Systems' vendors are additional examples of D-Link Systems' reactive approach to security. D-Lab and D-Link Systems' vendors tested to make sure *known* security problems were not present in subsequent software. D-Lab and the vendors made little documented effort to identify coding failures or implementation flaws that could result in undiscovered vulnerabilities.

## 2. III/Onward Security

255. D-Link Systems repeatedly mentioned III/Onward as part of its security program.[421] III/Onward is a security testing company that evaluated IP cameras and routers for a discrete set of security issues.[422]

256. I have reviewed the reports of device security testing conducted by III/Onward that were provided by D-Link Corporation.[423] As described below, D-Link Systems was not reasonable in relying on III/Onward's services to provide documented assurance that D-Link Systems devices were secure from unauthorized access or control.

257. By and large III/Onward's reports reflect competent tests, employing in many cases commonly-accepted testing tools. But the scope of what III/Onward was asked to do was

---

Cameo tried to test for a potential path traversal vulnerability. Cameo, *D-Link DIR-505, Hardware Rev. A1,*



[421] E.g., D-Link Sys. Answers and Objs. to FTC 5th Set of Interrogs. No. 15; D-Link Sys. Answers and Objs. to FTC's 4th Set of Interrogs. Nos. 8, 11, 12 (Mar. 29, 2018).

[422] Decl. of Chung-Chieh Lin ¶ 28 (ECF 50-3) (Apr. 3, 2017). E.g., Contract of Info. Sec. Testing Servs. V1.0 (Dec. 13, 2016) (DKC0004490-T–501-T, at DKC0004494-T) (see Article 3.1, "Work Scope"). D-Link Corporation appears to have had some devices tested by III/Onward since at least 2012, and, according to D-Link Systems, its devices have been subject to pre-release testing by III/Onward since 2014. D-Link Sys. Answers and Objs. to FTC 5th Set of Interrogs. No. 15 (May 4, 2018)

[423] See Section II.A of Appendix B (Materials Considered).

limited,[424] and the way they pursued the answer to the questions posed was also limited.[425]

However, the work they did within these narrow confines was competent. Even with their

limitations, III/Onward's findings could have tipped off D-Link Systems—if it had reviewed

them—and D-Link Corporation to the need for significant improvements in their software

development process, and some of the specific ways in which the vendors were falling short.

258.



<hr>

[424] E.g., Proposal for Product and System Security-enhancing Services (D-Link Corporation) (Jan. 1, 2014) (DKC0004402-T–15-T, at DKC0004403-T) ("Work Scope" includes "Opaque System ['Black Box'] Testing (including vulnerability scanning, penetration testing, fuzz testing ['fuzzing']) testing and inspection) (brackets in original).

[425] III/Onward, *DIR-855L Device Security Testing Report* 1 (Apr. 19, 2013) (DKC1896734–848, at DKC1896740) ("Project Scope Description…1.1 Project Briefing…III emulates hacker skill, including vulnerability scan, penetration test and fuzzing test[], to evaluate the security level of the target device.").

[426] E.g., III/Onward, *DIR-855L Device Security Testing Report* A-1, (Testing Tool List), C-1-14 (Test Results, stating vulnerabilities which were tested for and the Test tool used) (Apr. 19, 2013) (DKC1896734–848, at DKC1896761, DKC1896765–78); III/Onward, *DCS-5020L Device Security Testing Report*, Appendix A, A-1 (Oct. 3, 2014) (DKC0002979) (Testing Tool List).

[427] Ibid.

[428] E.g., III/Onward, *DCS-935L Device Security Testing Report* 16 (June 26, 2015) (DKC0003222–56, at DKC0003237) ("Testers used CSRFTester testing tool."). CSRFTester is the name of a free OWASP tool, which is likely what III/Onward testers were using. OWASP, OWASP CSRFTester Project, https://www.owasp.org/index.php/Category:OWASP_CSRFTester_Project.

259.    Because of its tools and techniques, III/Onward has, with limited exception, only been able to test D-Link Systems' routers and IP cameras for known vulnerabilities or security issues already recognized in the community.  Without access to source code and disassembly analyses, it would be difficult for III/Onward to identify logic errors, backdoors written into source code, or the insecure use of functions or library calls, each of which might lead to serious, but preventable future vulnerabilities.[430]

260.    III/Onward appears to have been professional in completing what it was asked to do and reporting and cataloging results.[431]  III/Onward's recommendations have also been reasonably competent, but seem often to have been disregarded or downplayed.[432]  III/Onward's reports includes a summary section with high-level recommendations based on the most critical issues revealed.[433]  In these brief, summary recommendations, the report provides headline advice, such as "Filter use input data," "Encrypt sensitive data," or "Check System Configuration," paired

---

[429] E.g., D-Link Corp. 30(b)(6) Dep. 124:8–126:13.

[430] III/Onward states in its "Test Items Checklist" that it tests for certain CWEs (Common Weakness Enumerations) for which it cannot truly test in any meaningful way without examining source code or binaries.  E.g., III/Onward, *DIR-855L Device Security Testing Report* B–2–3 (Apr. 19, 2013) (DKC1896734–848, at DKC1896763–64) ("Table 2: CWE/SANS Top 25 Most Dangerous Software Errors Checklist").  For example, the DIR-855L report states that III/Onward tested for "Use of Hard-coded Credentials."  Ibid. at B-2 (DKC1896763).  This is misleading.  In fact, III/Onward would only be able to test the use of specific, known hard-coded credentials.  It could not, for example, detect the hard-coded backdoor identified by CORE Security in the RTSP protocol, see Section III.E.2.b above, without disassembling the software or getting extraordinarily lucky.

[431] E.g., III/Onward, *DIR-855L Device Security Testing Report* 1-3 (Apr. 19, 2013) (DKC1896734–848, at DKC1896740–43).

[432] See generally Section III.D above, in which I have noted several examples where III/Onward had warned of categories of problems that contributed to serious vulnerabilities later uncovered by researchers.

[433] E.g., III/Onward, *DIR-855L Device Security Testing Report* 17–19 (Apr. 19, 2013) (DKC1896734–848, at DKC1896756–58) ("Conclusions and Suggestions").

with concise explanations and recommendations.[434]  In my opinion, as discussed above in Section III.D, III/Onward's recommendations were seldom if ever heeded.

261.    To the extent III/Onward's recommendations as to specific vulnerabilities were followed, I have reviewed examples suggesting they were followed in only the narrowest sense, addressing the particular exploits to which III/Onward found a device to be vulnerable.  For example, as discussed previously, had D-Link Systems required its vendor Cameo Communications to follow III/Onward's full input-filtering recommendations to address vulnerabilities in the DIR-855L, a cross site scripting vulnerability researcher Kyle Lovett found and disclosed a year later would likely have been mitigated long before (see Section III.D.1.e above).

262.    There are several other problems with D-Link Systems' reliance on III/Onward.  First, D-Link Systems cannot reasonably rely on III/Onward's testing because it does not have a direct business relationship with III/Onward to require and direct testing.  III/Onward's contract is with D-Link Corporation.[435]  In addition, it has not received the reports of III/Onward's testing done on D-Link Corporation's behalf.[436]  Without receiving the documentation itself, D-Link Systems

---

[434] Ibid.

[435]



has been hamstrung from overseeing how comprehensive the testing was, its results, and whether it was adequate to provide assurance to D-Link Systems.

263.    In addition, III/Onward's testing, though useful, could not replace the many basic steps D-Link Systems was not taking, or requiring its vendors to take, to ensure its devices were not subject to serious, undiscovered vulnerabilities.  The kind of testing III/Onward was asked to do is not a panacea, and D-Link Systems was unreasonable in expecting that the most serious risks to its devices would come from the kind of vulnerabilities III/Onward was equipped to find, as opposed to new flaws discovered in its devices.  In that way, III/Onward is another example of D-Link Systems relying on a wait-and-see approach, assuming any serious problems would be brought to its attention by the security community (as opposed to first exploited by attackers against its customers).

264.    D-Link Systems and D-Link Corporation could have made better use of III/Onward's recommendations and findings by considering the broader trends those findings revealed about the poor state of D-Link Systems' vendors' software development.  For example, even relying on the limited tools it used to test D-Link Systems devices, I can see that, across the testing reports to which I have access, III/Onward flagged more than three dozen instances of unfiltered input problems between August 2012 and November 2015 in reports on at least fourteen devices.[437] But D-Link Systems, and D-Link Corporation, did not take such trends as a warning sign that its vendors were not creating secure code.  Despite the high number of such flaws identified, D-Link Systems did not change its security oversight practices, or require its vendors to do so. Perhaps D-Link Systems and D-Link Corporation were not capable of recognizing the

---

[437] See Appendix C (Materials Considered), Category III (III/Onward Device Security Reports).  Input filtering recommendations or vulnerabilities were flagged in reports for IP Cameras DCS-930L, 935L, 942L, 960L, 2132L, and 2136L, and routers DIR-615, 645, 820L, 826L, 830L, 880L, 890L, and 895L.

consequence of these pervasive problems in its vendors' software development; perhaps they were capable, but chose not to spend the time and money to abate these risks.[438]

265.    For the reasons stated above, the work III/Onward performed for D-Link Corporation was insufficient to provide the documented assurance D-Link Systems needed that its devices were secure from unauthorized access or control.

### 3.  Short-Lived Bug Bounty Program

266.    From sometime in 2011–2012 until mid-2013, D-Link Systems maintained an unpublished bug bounty program.[439]

267.    Bug bounty programs can be a good addition to a security program, and it was a commendable instinct to create one.  The emergence and evolution of formal bug bounty programs is evidence of the professionalization of white hat hacking—security researchers can now make a living looking for vulnerabilities.

268.    However, a bug bounty program is not the first software security process companies should implement—not even close.  There are many more things a company should focus on prior to creating a bug bounty program.  William Brown's instinct to create a bug bounty program was commendable.  However, D-Link Systems was unlikely to have incentivized researchers to find the most pressing security problems in its devices—to the extent security

---

[438] See Email from Tarik Erdemir to Daniel Hsu et al. and attached D-Link Router Security Test report (Mar. 28, 2013) (DKC0010751–815, at 10780–81) (Richard Edlin speaking on behalf of D-Link Corporation to staff of foreign business unit implies that D-Link Corporation's agreement to have four models tested, presumably by III/Onward, represents "considerable cost" and "demonstrates our commitment to resolving these problems.").

[439] Brown Investigational Hr'g 268:23–270:6 (July 30, 2014).  The exact dates are unclear; Will ▇▇▇▇▇▇▇ tified that the program ran from October 2011 until March 2013, but he also said it kicked off with a ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇, the first evidence of which I've seen taking place in June 2012.  Email Jason Doyle to William Brown and attached signed agreement (June 19, 2012) (DLS0053419–23) ▇▇▇▇▇▇▇▇▇▇ Letter from William Brown to Jason Doyle (Jan. 25, 2013) (DKS00009097) ▇▇▇▇▇▇▇▇.  The end date he states doesn't align with documents, suggesting it was still going at least in April 2013.  Email William Brown to Rick Chiang (Apr. 9, 2013) (DLS0030587–89, at DLS0030587) (noting unpublished bug bounty program); Email from William Brown to Jason Doyle (Aug. 20, 2013) (DLS0021772) (confirming bounty program ended).  Regardless, the various sources all agree that the bounty program was in place in the 2012–2013 time frame.

researchers are able to do this, which is not a given—with such a short-lived program that was

unpublished.  If D-Link Systems had published its bug bounty program, it may have attracted

reports from a wider set of sources, rather than just those seeking to establish a reputation as

security researchers.[440]

269.    During its short-lived bug bounty program, D-Link Systems paid bounties to researcher

Jason Doyle.[441]  Mr. Doyle sent disclosure reports on IP camera models DCS-932L and

DCS-5222L, describing  vulnerabilities in each that could enable an attacker to retrieve the

camera's admin password.[442]  Apparently, William Brown was sufficiently impressed with Mr.

Doyle's work that he commissioned him to perform an evaluation of two routers.[443]  Mr. Doyle's

findings as to those two devices included several findings he deemed high risk, and, as mentioned

before, led him to note as to the DIR-826L that "the results of this assessment are indicated of a

system that has not undergone a thorough security evaluation."[444]  Although Mr. Doyle was

limited in his techniques, he nonetheless found some vulnerabilities of note, and saw enough

problems to conclude D-Link Systems needed to make process improvements; it seems to me that

this was well-warranted advice at the time.

270.    It is not entirely clear to me why D-Link Systems stopped its bug bounty program,

although Mr. Brown stated to a security researcher that D-Link Systems "discontinued [the

---

[440] See Email from William Brown to Angelica Zack (Sept. 3, 2014) (DLS0033352) (stating that D-Link Systems ended bounty program because researchers were declining the bounty because it "may reflect badly on their integrity").

[441] Email from Jason Doyle to William Brown and attached signed agreement (June 19, 2012) (DLS0053419–23); Letter from William Brown to Jason Doyle (Jan. 25, 2013) (DKS00009097▮▮▮▮▮▮▮▮▮▮.

[442] Vulnerability Disclosure—D-Link DCS-932L Network Camera (June 20, 2012) (DKS00001802–06); Vulnerability Disclosure – D-Link DCS-5222L Network Camera (Jan. 1, 2013) (DKS00009301–06).

[443] Jason Doyle Evaluation Request (July 25, 2013) (DKS00011858–59).  See Jason Doyle, *DIR-505L Security Evaluation* (Apr. 8, 2013) (DLS0030614–24, DLS0030618); Jason Doyle, *DIR-826L Security Evaluation* (Apr. 16, 2013) (DLS00038165–76, at DLS00038168–69).

[444] Ibid.

bounty program] based on feedback from a number of security experts declining because it would

may [sic] reflect poorly on their integrity."[445]   Given D-Link Systems' repeated statements about

its commitment to security, maintaining a bug bounty program was among the few affirmative

steps to which it could point.[446]   D-Link Systems decision to drop the bug bounty program seems

to have reverted its posture back to a primarily reactive one.

#### 4.   Other Security Practices

271.     In addition to the above, I considered other pre-2017 security practices in forming my

opinion.  I have reviewed information about various software security trainings held by D-Link

Corporation in Taiwan, often apparently conducted by III/Onward, and sign-in sheets for these

training.[447]   It is clear that at least some representatives of D-Link Systems' main vendors

attended the trainings, which is important given that the vendors are performing the software

development.[448]   D-Link Systems employees did not attend the trainings.[449]

272.     Application security training is an important part of a software security program.

Although much of the content of the training slides I reviewed is in Chinese, I can tell from the

substantial English content and topics that the content of these training sessions was likely of

substantial quality, and improving over the presentations dated in subsequent years.[450]   In

conjunction with other parts of a software security program, training can help programmers and

---

[445] Email from William Brown to Angelica Zack (Sept. 3, 2014) (DLS0033352).

[446] See Email William Brown to Rick Chiang (Apr. 9, 2013) (DLS0030587–89, at DLS0030587).

[447] Compilation of Sign-In Sheets for Secure Development Trainings (Sept. 18, 2015–Mar. 29, 2017) (DKC1827536–48).  E.g., D-Link 資安檢測服務 (Sept. 25, 2015) (DKC1827751–86); 安全軟體開發教育訓練 (Sept. 8, 2016) (DKC0005191–287) (Sept. 8, 2016) (DKC0005191–287); 20170526 Mobile Security (May 25, 2017) (DKC1827913–79); D-Link-Training-1026 (Oct. 26, 2017) (DKC1827699–750).

[448] Compilation of Sign-In Sheets for Secure Development Trainings (Sept. 18, 2015–Mar. 29, 2017) (DKC1827536–48, at DKC1827536).

[449] Ibid.

[450] E.g., 安全軟體開發教育訓練 (Sept. 8, 2016) (DKC0005191–287).

others understand how to meet the expectations the organization has set.  But training needs to be conducted in conjunction with other security practices if an organization.  In addition, the importance of training as part of a software security program has been well-known long before the September 2015 date the provided sign-in sheets begin.[451]  If it is the case that D-Link Corporation did not conduct or require security training prior to that, it is further evidence of their minimal security efforts.

273.    I also reviewed documentation, referenced above, of evaluations conducted by Rapid7. D-Link Corporation engaged Rapid7 in 2010 to evaluate the mydlink service and the D-Link Systems IP camera DCS-1130L, but it also seems to have conducted testing on D-Link Systems IP camera DCS-930.[452]  D-Link Systems cited to these reports in its interrogatory responses.[453] As noted previously, in addition to describing specific vulnerabilities, Rapid7 told D-Link Corporation and D-Link Systems in January of 2011 that "[d]ue to the degree of these vulnerabilities Rapid7 additionally recommends D-Link develop and implement a comprehensive Security Development Life cycle program that will integrate secure design principals [sic] into the development process."[454]

### 5.  Recent Efforts to Address Security

274.    Starting in late 2016, and to a greater extent in 2017, D-Link Systems and D-Link Corporation appear to have begun efforts on a number of different fronts to improve its secure software development practices.

---

[451] Compilation of Sign-In Sheets for Secure Development Trainings (Sept. 18, 2015–Mar. 29, 2017) (DKC1827536–48).

[452] Statement of Work for D-Link (July 13, 2010) (DLS0056583–606) (contract between D-Link Corp. and Rapid7); Rapid7, *mydlink DCS-1130 Assessment* (Jan. 25, 2011) (DLS0056608–659).

[453] D-Link Sys. Answers and Objs. to FTC 1st Set of Interrogs. No. 4.

[454] Rapid7, *mydlink DCS-1130L Assessment* (Jan. 25, 2011) (DLS0056608–59, at DLS0056611).

### a.   SEARCH-LAB Ltd. and Kapil Khot

275.    D-Link Systems points to its work with SEARCH-LAB, Ltd. and Kapil Khot as an

affirmative security step it has taken.[455]   In both cases, these were third-party security researchers

that approached D-Link Systems with vulnerability disclosures before publicly disclosing them.

D-Link Systems chose to engage both SEARCH-LAB and Mr. Khot for additional evaluations.

The follow-up work each researcher performed pursuant to their engagement by D-Link Systems

was recent:  SEARCH-LAB provided its evaluation reports in the summer of 2016, and Mr. Khot

in mid-2017.

276.    SEARCH-LAB contacted D-Link Systems in September 2015 regarding serious

vulnerabilities in the myDlink service.[456]   Under the norms of responsible disclosure, SEARCH-

LAB gave D-Link Systems a chance to address problems before it publicly disclosed its report.

Ibid.  It appears that D-Link Systems engaged SEARCH-LAB to investigate its myDlink findings

further and help address them.[457]

277.    From correspondence, it appears that the publicity surrounding the vulnerabilities

reported by Senrio (see Section III.E.2.c above) spurred D-Link Corporation to ask SEARCH-

LAB to evaluate two of its IP cameras.[458]   It appears from reviewing the SEARCH-LAB

---

[455] D-Link Sys. Answers and Objs. to FTC 5th Set of Interrogs. No. 15 (SEARCH-LAB); D-Link Sys. Answers and Objs. to FTC 1st Set of Interrogs. No. 2 (SEARCH-LAB and Kapil Khot).

[456] Email William Brown to AJ Wang et al. and attachments (Sept. 21, 2015) (DLS0025073–81) (email attaching SEARCH-LAB notice of "Numerous critical security vulnerabilities found in D-Link's mydlink services").  D-Link Systems and/or D-Link Corporation seem to have previously worked with SEARCH-LAB on a disclosure relating to categories of devices not listed in Appendix A.  SEARCH-LAB, *Security Advisory V3.0–Multiple Vulnerabilities in D-Link DNS-320, 320L, 327L, and DNR-326 Devices* (May 27, 2015), https://www.search-lab.hu/media/D-Link_Security_advisory_3_0_public.pdf.

[457] Email William Brown to Zoltán Hornák (Nov. 20, 2015) (DLS0036531–41) (negotiating proposal for D-Link Systems to pay SEARCH-LAB to address vulnerabilities found in mydlink); Email William Brown to Mellani Stainbrook attaching SEARCH-LAB Project Proposals (Jan. 20, 2016) (DLS0036354–68); Email Zoltán Hornák to William Brown (Apr. 21, 2016) (DLS0035325–32) (transmitting links to mydlink report).

[458] Email William Brown to Anny Wei (June 10, 2016) (DLS0042005–18, at DLS0042006–07).  In this email, Ted Kuo of D-Link Systems writes: "[l]ast time we specifically commissioned the Search-Lab to audit the cloud servers

documents that were provided to the FTC that such device testing has only been performed as to

two devices in Appendix A as of the present: the DCS-932L and DCS-5222L.[459]  William Brown

testified that there was an ongoing relationship with SEARCH-LAB.[460]  If that relationship

involves testing of devices included in Appendix A, I am surprised that there are no further

evaluation reports for me to review, two years later.

278.    I reviewed the final SEARCH-LAB evaluation reports, which date from July 2016.[461]

These reports are comprehensive and of high quality.  The reports are also devastating in their

evaluation of these two IP cameras.[462]  For example, in the DCS-5222L report, the problems

identified include multiple buffer overflow vulnerabilities, including at least one that could be

remotely exploitable to crash the device;[463] that the firewall was turned on but configured to

accept all input;[464] that the Linux distribution on which the firmware was based contains many

---

but not devices.  Nevertheless, they managed to find some security issues about our devices from a couple
accompanied devices."  Ibid.  Richard Chen replies that: "PP already asked the vendors to provide the sample for
Search Lab already."  Ibid.  See also Email from Zoltán Hornák to Mac Mac et al. attaching proposed contract,
quarterly testing proposal (June 24, 2016) (DLS0037403–57).  Although no executed contract was provided,
proposed contracts were, and the testing reports described next seem to imply that D-Link Systems at least began to
use SEARCH-LAB's services pursuant to the contract.

[459] SEARCH-LAB, *Security evaluation of the D-Link Systems Inc. DCS-5222LB1 Camera* (July 8, 2016)
(DKC0207601–734); SEARCH-LAB, *Security evaluation of the D-Link Systems Inc. DCS-932LB1 Camera* (July 8,
2016) (DKC0207735–826); Email from Mac Mac to Albert Chang et al. (July 13, 2016) (DKC0207600)
(transmitting final reports to D-Link Corp.); SEARCH-LAB, *Security evaluation of the D-Link Systems Inc.
DCS-5222LB1 Camera (Preliminary Report)* (July 1, 2016) (DLS0037665–783); SEARCH-LAB, *Security
evaluation of the D-Link Systems Inc. DCS-932LB1 Camera (Preliminary Report)* (July 1, 2016) (DLS0037784–
839); Email from Balázs Berkes to Mac Mac (July 1, 2016) (DLS0037657–664) (transmitting preliminary reports).

[460] D-Link Sys. 30(b)(6) Dep. 114:10-116:19 (Apr. 25, 2018).

[461] SEARCH-LAB, *Security evaluation of the D-Link Systems Inc. DCS-5222LB1 Camera* (July 8, 2016)
(DKC0207601–734); SEARCH-LAB, *Security evaluation of the D-Link Systems Inc. DCS-932LB1 Camera* (July 8,
2016) (DKC0207735–826),

[462] SEARCH-LAB, *Security evaluation of the D-Link Systems Inc. DCS-5222LB1 Camera* (July 8, 2016)
(DKC0207601–734, at DKC0207605).

[463] Ibid. at DKC0207667.  In an internal response to outstanding issues from SEARCH-LAB's evaluations, a
representative of D-Link Systems' vendor APPRO Tech acknowledge that two of the buffer overflows SEARCH-
LAB found were caused by failing to limit the string size.  Email from Louie Hsu to Albert Chang et al. (July 20,
2016) (DKC0208484–486, at DKC0208484).

[464] Ibid. at DKC0207671.

outdated and vulnerable third-party services and applications;[465] that the web interface was not protected by any CSRF mitigation techniques;[466] and that all the Linux processes were running as root.[467]

279.    In my experience, a security professional would been have justified in immediately sounding the alarm upon receipt of these reports; suggesting or demanding the products be suspended from production and withdrawn from the stores; and immediately suggesting or demanding changes to whatever process had yielded such security-defective devices.  Best security practice would have been to subject devices to this kind of assessment before any were shipped.

280.    SEARCH-LAB's findings regarding two D-Link Systems IP cameras reinforce my opinion that many serious, undiscovered vulnerabilities are present in D-Link Systems' routers and IP cameras, due to D-Link Systems' lacking software development process, and that  D-Link Systems' routers and IP cameras have not been secure from unauthorized access or control. SEARCH-LAB's work, like D-Link Corporation's recent improvements discussed below, is too recent to evaluate whether it has resulted in meaningful improvement in the underlying security quality of D-Link Systems' software.  It remains to be seen whether D-Link Systems uses SEARCH-LAB's findings to drive improvements on an ongoing basis, rather than just providing them to its vendors to minimally patch the specific exploits.  In addition, it remains to be seen whether D-Link Systems will use SEARCH-LABs in a more systematic fashion, by, for example, having them test more key routers or IP cameras.

---

[465] Ibid. at DKC0207668.

[466] Ibid. at DKC0207669–70.

■ ████████████████████████████████████████████
████████████████████████████████████████████████.

281.    D-Link Systems also mentions that it contracted with a security researcher named Kapil Khot of Qualys.[468]  Based on my review of the correspondence, Mr. Khot seems to have contacted D-Link Systems in February 2017 with a security report regarding IP camera DCS-933L and related hardware.[469]  Mr. Brown then asked Mr. Khot to do some follow-up retesting to see if mitigations incorporated by the vendors addressed his findings.[470]  Mr. Khot provided a follow-up report pointing out how cross site request forgery protections incorporated into D-Link Systems IP cameras in 2016, according to Mr. Brown, could still be circumvented.[471]  Mr. Khot was not paid for his work; he received free devices.[472]

282.    As with D-Link Systems' work with SEARCH-LAB, I cannot conclude whether these recent steps have improved the security of D-Link Systems' devices from unauthorized access or control, without evidence that D-Link Systems will do more with Mr. Khot's findings than feed them to its vendors for minimal patching, and trust D-Link Corporation to decide if anything more is needed.

### b.  Security Incident Management (SIM)

283.    As discussed above in Section III.C.4, D-Link Systems lacked an effective mechanism for tracking the post-release vulnerabilities that were identified in products.  At some point in 2015 or 2016, D-Link Corporation implemented its new system, which D-Link Corporation calls

---

[468] D-Link Sys. Answers and Objs. to FTC 1st Set of Interrogs. No. 2.

[469]



[472] D-Link Sys. 30(b)(6) Dep. 121:15–122:24 (Apr. 25, 2018).

the Security Incident Management or "SIM".[473]  The SIM is much closer to an appropriate mechanism for tracking vulnerabilities than the incomplete table maintained by Mr. Cline or the use of emails.[474]

284.    D-Link Corporation has stated that it implemented the SIM in March 2015.[475]  However, even in mid-2016, some D-Link Systems personnel working on D-Link Systems' response to a security issue affecting its mydlink service had not heard of the SIM.[476]  Assuming that access to the SIM was rolled out to D-Link Systems by no later than 2016, it represents a significant step forward in security quality; however, it is still not a sufficient means for D-Link Systems to track and ensure security flaws were fixed.  Here is why:  D-Link Systems relies on D-Link Corporation to enter information into the SIM.  It does not have the ability to enter information into the SIM or open new tickets.  Correspondence produced by D-Link Systems shows that in some cases, other regions have had to argue with D-Link Corporation about whether tickets should be opened in SIM, with D-Link Corporation either delaying in doing so or not doing so at all.[477]  D-Link Systems cannot manage open security issues and be assured of their adequate resolution by using a tool for which it is a bystander.

285.    Given the premise, discussed above at Section III.B.2, that D-Link Systems is responsible for security of the devices sold in the United States, it is, under these circumstances,

---

[473] D-Link Corp. Answers to FTC 2nd Set of Reqs. for Admis. No. 45 ("SIM was utilized starting from early March in 2015.").

[474] D-Link Product Security Issue Analysis (attached to Oct. 10, 2017 email) (DKC0648113–54, at 115–116) (presentation with introduction of SIM).

[475] D-Link Corp. Answers to FTC 2nd Set of Reqs. for Admis. No. 45 (May 18, 2018) ("SIM was utilized starting from early March in 2015.").

[476] Email from Ted Kuo to Richard Chen (June 9, 2016) (DLS0042005–18, at DLS0042007) ("Indeed I'm not aware of the existence of the SIM system.").  See also email from William Brown to Ted Kuo (June 10, 2016) (DLS0045583–87, at DLS0045583) ("Today SIM is very young.").

[477] Email from Mary Harrison to Quenton Miao (Mar. 18, 2016) (DLS0038010–92, at DLS0038010–12) (email between D-Link Europe staff and D-Link Corporation about why a security issue was not entered into SIM).

unacceptable for D-Link Systems to not have privileges to enter information into the SIM directly.  Again, this reflects the fact that D-Link Systems is at the mercy of its parent to track and resolve vulnerabilities.  That said, this is a positive step, but it is too early to know whether it will be effective to manage the resolution of vulnerabilities consistently and reliably.

### c.  BSIMM

286.    D-Link Systems also refers to the implementation of BSIMM by D-Link Corporation.[478] The Building Security in Maturity Model (BSIMM, pronounced "Bee Sim"), developed in 2008 by Gary McGraw, is a tool for measuring the presence and probable efficacy of software development measures contributing to security quality.[479]  Additionally, BSIMM allows a company to compare the maturity of its software development processes to other companies in the same industry.  I have used BSIMM in my capacity as a Chief Information Security Officer, and found it useful.  In my understanding, it is most effective when repeated year after year to measure the impact of incremental improvements.

287.    BSIMM is not a "standard"; BSIMM is not a guide.  It does not provide checklists.  It does not supply rules of what to do or not to do.  It does not fix problems.  Rather, it is a measurement tool.  Properly used, it can help identify issues with development processes; security quality improvement could result thereafter from efforts to improve the processes.

288.    Not having seen any reports or measurements provided by D-Link Corporation or D-Link Systems that would result from a BSIMM evaluation, I cannot offer an opinion as to what improvements might have been made in their software development process, and what if any

---

[478] E.g., D-Link Sys. Answers and Objs. to 4th Set of Interrogs. No. 14.  See also D-Link Corp. Answers and Obj. to FTC 1st Set of Interrogs. No. 2.

[479] BSIMM, https://www.bsimm.com/; Cigital, *Building Security in Maturity Model (BSIMM) Version 7* (DKC1895789–859).

improvements in the security quality of their products might result.  In addition, I cannot

comment on the accuracy of any comparison BSIMM might offer to other companies, because

D-Link Systems and D-Link Corporation did not provide the results of any such comparison.

289.    Much like with the SIM, D-Link Systems didn't seem to have anything to do with

BSIMM.  Even though D-Link Systems discusses in its Interrogatory responses the

"implementation of BSIMM,"[480] it's obvious that neither Mr. Brown nor D-Link Systems itself

have any idea what BSIMM actually is:

> Q       What are the requirements of [BSIMM]?
> *[Attorney Objection]*
> THE WITNESS:       [D-Link Systems ] doesn't—doesn't—[D-Link Systems]
> —[D-Link Systems ] doesn't use [BSIMM].  It's [D-Link Corporation].  And I
> require them to have that—have—again, for me, I feel like I'm testifying to the
> same thing over and over, and I apologize.
>
>         [BSIMM] is—is a [D-Link Corporation] work.  And, again, the goal is—
> to me is to get quality firmware.  So as far as their audits and how they deal with
> [BSIMM], I think it's a very qualified process, but it's outside the scope of [D-
> Link Systems] or my job scope.
>
> BY MR. MORIARTY:
> Q       Can you identify one requirement of [BSIMM]?
> *[Attorney objection]*
> THE WITNESS:       So based on my personal knowledge through my normal
> scope of work, when that term came up in conversation, [BSIMM] is a
> guideline—a public guideline.
>
>         So you can go to a place called B-SIM.org [sic] —or I don't remember the
> URL exactly—and it explains what their—their framework is.  That's from my
> personal knowledge.
>
>         At one point I've—I've looked at that, but beyond that, I don't know if I
> can testify for [D-Link Systems ] anything further.[481]

---

[480] D-Link Sys. Answers and Objs. to FTC's 4th Set of Interrogs. No. 14.

[481] D-Link Sys. 30(b)(6) Dep. 90:15–91:24 (Apr. 25, 2018).

290.     While BSIMM is a good step, it cannot be reduced to an inchoate shared desire for "quality firmware," as Mr. Brown describes it.  If D-Link Systems is going to understand the quality of security of the products they sell in the United States, it needs to be able to understand what measures are being used by BSIMM to evaluate security processes.

### d.  2017 D-Link Corporation Policy Documents

291.     D-Link Systems also refers to a series of policy documents produced by D-Link Corporation.[482]  I have reviewed these documents (see Appendix C, Category D-Link Corporation 2017 Security Policies).[483]  All the documents state an implementation date around March 2017.[484]  These policies seem very promising.  Writing good policies is important, but implementing them is more important.  D-Link Systems does not possess the documents evidencing practices D-Link Corporation is ostensibly imposing on D-Link Systems' vendors, has apparently not reviewed them, and has not described any means to ensure that the practices are not dropped tomorrow.[485]  Given their recent date, the fact that Mr. Brown was unable to substantively describe these or any requirements being imposed on D-Link Systems' vendors, and that D-Link Systems is not the party reviewing, creating, and requiring compliance with these policies, these recent policies do not affect my opinion as stated above.  It is too soon to know whether D-Link Corporation will meaningfully enforce these policies, and whether the new system articulated in the policies, which D-Link Systems continues to be unable to control,

---

[482] D-Link Sys. Answers and Objs. to FTC 4th Set of Interrogs. No. 14; D-Link Sys. Answers and Objs. to FTC 5th Set of Interrogs. No. 15; D-Link Corp. Answers and Obj. to FTC 1st Set of Interrogs. No. 2 (stating Bates range of policy documents).

[483] See Summary List of PSC Management Documents (Nov. 24, 2016) (DKC0005968) (listing policy documents). I believe that this set of policies may be what D-Link Systems and D-Link Corporation mean when they speak of implementing BSIMM in testimony and written responses.  E.g., D-Link Sys. Answers and Objs. to FTC 4th Set of Interrogs. No. 14.  As discussed above, this understanding is incorrect.

[484] E.g., Vendor's Source Code Security Testing Process (Mar. 1, 2017) (DKC0006053–57) (stating "Announcement" occurred on March 1, 2017).

[485] D-Link Sys. 30(b)(6) Dep. 87:19–88:17; 90:16–91:3 (Apr. 25, 2018).

will provide sufficient assurance as to the security quality of D-Link Systems devices.  In my experience as a CISO, I would never rely on another party to decide on the rules and evaluate the security testing in the way D-Link Systems does.  But in any case, there is not enough evidence regarding these late improvements to assess their impact.

### e.  Checkmarx Code Scanning

292.    D-Link Systems also refers to the use of Checkmarx to scan its software during product development.[486]  Checkmarx provides a static code checker.[487]  Unlike the types of security tests that III/Onward did, involving the operation of the devices, static code checkers subject the actual source code to analysis.  Static code checkers have been in common use since at least 1995; and many of these tools are free, or distributed as shareware at minimal cost.

293.    It appears that D-Link Corporation that it began requiring vendors to have their source code scanned by Checkmarx in March 2017.[488]  That is great, but long overdue.  Even simple static code checking—available from free, public-domain utilities—could in earlier years have flagged for remediation many of the problems that have instead plagued D-Link Systems' devices.

294.    I have reviewed the testing reports D-Link Corporation produced evidencing the results of Checkmarx testing.[489]  Many—the "Code review brief reports"—appear to be summaries of

---

[486] E.g., D-Link Sys. Answers and Objs. to 5th Set of Interrogs. No. 15 ("During the product verification stage, source code scans ('white box' tests by Checkmarx software) are used on the vendors' source code for new products and firmware.").

[487] See https://www.checkmarx.com/products/static-application-security-testing/.

[488] E.g., *D-Link Product Security Issue Analysis* (attached to Oct. 10, 2017 email) (DKC0648113–54, at DKC0648128) ("All product [firmware] must have source code scan report before release[;] D-Link provide scan tool: http://checkmarx.com [;]…Start from 2017/3/31."); Appro, *Code review brief report DCS-7010L_V1.09.00* (Apr. 5, 2017) (DKC1828112); D-Link Sys. 30(b)(6) Dep. 96:1–23 (Apr. 25, 2018) (Checkmarx, BSIMM required in February or March of 2017).

[489] See Appendix C, Category Checkmarx Scan Reports.  I have reviewed sample reports, that I selected, out of approximately 150+ reports identified in Appendix C.  There appear to be two kinds:  (a) lengthy reports produced

the results of Checkmarx scanning meant to demonstrate that a particular firmware passes

muster, pursuant to D-Link Corporation's new standards.[490]  As summary reports, they are

adequate and comprehensive.  ███████████████████████████

███████████████████████████████

█████████████

295.    I also note that the documents make clear that these are not the *initial* static code checker

reports on the vendor's source code—these are the *final* reports, ostensibly demonstrating that

the software is of sufficient quality to be shipped.  The ███████████████

███████████████████████████████

███████████████████████████

███████  ██████████████████████

███████████████████████████████

█████████████████████████████

█████████████████████  █



by Checkmarx listing particular vulnerabilities (e.g., Checkmarx Camera_Series_Web 掃描報告 (Mar. 15 ,2017)
(DKC1842647–98)), and (b) summary spreadsheets ("Code review brief report[s]") (e.g., Appro, *Code review brief
report DCS-7010L_V1.09.00* (Apr. 5, 2017) (DKC1828112)).

296.    In addition, D-Link Systems continues to be ignorant of these processes, and does not

demand to review these reports, at least as of the time of Mr. Brown's deposition on behalf of D-

Link Systems. [493]

      **G.**    **Many D-Link Routers and IP Cameras Were Not Secure From Unauthorized Access or Control**

            **1.**    **From December 2013 to September 2015, D-Link Systems Failed to Take Reasonable Steps to Secure D-Link Routers and IP Cameras From Unauthorized Access**

297.    As discussed in Sections III.C, D, E, and F, from December 2013 to September 2015, D-

Link Systems failed to take reasonable steps to secure its routers and IP cameras from

unauthorized access, such as through back doors or other means of unauthorized access.  These

failures included lack of input filtering or validation, improper string handling, unnecessary

*system()* calls, unnecessary protocols and services, hard-coded and undocumented credentials,

clear text passwords, code maintenance failures, and private key exposure.  These failures

resulted in the types of flaws identified above in Section III.D.  The types of flaws identified

above in Section III.D caused the types of vulnerabilities identified above in Section III.E.  These

failures would have affected any of the devices being developed, maintained, or sold by D-Link

Systems during the period of December 2013 to September 2015.

            **2.  The DIR-615 Was Not Secured From Unauthorized Access or Control**

298.    The DIR-615 was not secured from unauthorized access or control.   Although none of

the documents or testimony I have reviewed have confirmed that the DIR-615 versions sold by

---

[493] E.g., D-Link Sys. 30(b)(6) Dep. 100:15–23 (William Brown can request Checkmarx reports, he does not appear
to receive them as a matter of course).

D-Link Systems[494] could have been remotely compromised, the DIR-615 was subject to vulnerabilities that significantly reduced the security of the device,[495] resulting from code development failures including the failure to adequately filter or validate input (see Section III.D.1 above) and failure to conduct adequate code maintenance (see Section III.D.7).[496] D-Link Systems acknowledged that these vulnerabilities included a cross-site scripting vulnerability and an open redirect in the ping_response.cgi, and a lack of protection to cross-site request forgery attacks in apply.cgi.[497] In addition, as discussed in Sections III.C, III.D, and III.F above, D-Link Systems failed to develop and maintain its routers, including the DIR-615, to secure them from unauthorized access or control.

### 3.   The DIR-412 Was Not Secured From Unauthorized Access or Control

299.    The DIR-412 was not secure from unauthorized access or control.  Specifically, the DIR-412 suffered from a command injection vulnerability resulting from numerous code development failures, as discussed in Sections III.D and III.E.1.c above.  Moreover, as discussed in Sections III.C, III.D, and III.F above, D-Link Systems failed to develop and maintain its routers, including the DIR-412, to secure them from unauthorized access or control.

---

[494] D-Link Sys. 30(b)(6) Dep. 157:1–158:15 (Apr. 25, 2018) (stating hardware revisions sold by D-Link Systems).

[495] DIR-615 Firmware Release Notes (Apr. 14, 2014) (DLS0023364); Osande Malith, *D-Link DIR-615 Open Redirection and XSS*, BLOG OF OSANDA, https://osandamalith.com/2017/01/04/d-link-dir-615-open-redirection-and-xss/;  Osande Malith, *D-Link DIR-615 Open Redirection/Cross Site Scripting*, PACKET STORM (Jan. 13, 2017), https://packetstormsecurity.com/files/140489/D-Link-DIR-615-Open-Redirection-Cross-Site-Scripting.html; Email from Osanda Malith Jayathissa to William Brown attaching proposed public disclosure (Jan. 10, 2017) (DLS0023351-54); Email from from Osanda Malith Jayathissa to William Brown attaching proof of concept (Dec. 19, 2016) (DLS0023365–66).

[496] As discussed in Section III.C.4 above, the effect of these vulnerability was needlessly exacerbated for United States customers by D-Link Corporation's failure to recognize that United States routers were also vulnerable to this problem that it patched in 2014.  See Email from William Brown to Osanda Malith Jayathissa (Dec. 21, 2016) (DLS0023367–68) (noting a fix had been posted on worldwide support site in 2014, but not to the United States support site).

[497] DIR-615 Firmware Release Notes (Apr. 14, 2014) (DLS0023364) ("Fixed the exploit… that can be used for CSRF attack from LAN side. … Corrects XSS and Open Redirect on ping_response.cgi.").

#### 4.  The DIR-815 Was Not Secured From Unauthorized Access or Control

300.    The DIR-815 was not secure from unauthorized access or control.  Specifically, the DIR-815 suffered from a command injection vulnerability resulting from numerous code development failures, as discussed in Sections III.D and III.E.1.c above.[498]  Moreover, as discussed in Sections III.C, III.D, and III.F above, D-Link Systems failed to develop and maintain its routers, including the DIR-815, to secure them from unauthorized access or control.

#### 5.  The DIR-645 Was Not Secured From Unauthorized Access or Control

301.    The DIR-645 was not secure from unauthorized access or control.  Specifically, the DIR-645 suffered from several command injection vulnerabilities resulting from numerous code development failures, as discussed above at Sections III.D.1 and III.E.1.a – e.[499]  Moreover, as discussed in Sections III.C, III.D, and III.F above, D-Link Systems failed to develop and maintain its routers, including the DIR-645, to secure them from unauthorized access or control.

#### 6.  Many D-Link IP Cameras Were Not Secure From Unauthorized Access or Control

302.    The Specified IP Cameras—the DCS-2132L, DCS-2210, DCS-2230, DCS-2310L, DCS-2332L, DCS-3112, DCS-3710, DCS-3716, DCS-6010L, DCS-6210, DCS-6510, DCS-6511, DCS-6513, DCS-6616, DCS-6818, DCS-7010L, DCS-7413, and DCS-7513, and the DCS-1100/1100L, DCS-1130/1130L, DCS-3410, DCS-3411, DCS-3430, DCS-5605, and DCS-5635—were not secure from unauthorized access or control.  Specifically, the Specified IP Cameras contained the hard-coded credentials and hidden default credentials vulnerabilities, as discussed above in Sections III.D.5, III.E.2.a, and III.E.2.b.  Moreover, as discussed above in

---

[498] Ibid.

[499] Ibid.

Sections III.C, III.D, III.E.2-3, and III.F, the Specified IP Cameras were developed in a way that rendered them not reasonably secure from unauthorized access or control.

**Appendix A**
**List of Routers and IP Cameras**

1

*Appendix A*

2

| Routers | IP cameras |
|---|---|
| DIR-412 | DCS-8xxL/ |
| DIR-505/505L | DCS-825L |
| DIR-605/605L | DCS-9xx |
| DIR-615 | DCS-930L |
| DIR-626L | DCS-931L |
| DIR-636L | DCS-932L |
| DIR-645 | DCS-933L/1150 |
| DIR-808L | DCS-934L |
| DIR-810L | DCS-935L |
| DIR-815 | DCS-940/940L |
| DIR-817L | DCS-942L (and "newer" cameras as of |
| DIR-818L | January 2013) |
| DIR-820L | DCS-943L |
| DIR-822/822-US | DCS-960L |
| DIR-823 | DCS-1100/1100L |
| DIR-826L | DCS-1130/1130L |
| DIR-830L | DCS-2103 |
| DIR-836L | DCS-2130 |
| DIR-850L | DCS-2132L |
| DIR-855/855L | DCS-2136L |
| DIR-868L | DCS-2210 |
| DIR-880L | DCS-2230 |
| DIR-890L | DCS-2310/2310L |
| DIR-895L | DCS-2330/2330L |
| | DCS-2332L |
| | DCS-2360L |
| | DCS-3112 |
| | DCS-3410 |
| | DCS-3411 |
| | DCS-3430 |
| | DCS-3710 |
| | DCS-3716 |
| | DCS-5009L |
| | DCS-5010L |
| | DCS-5020L |
| | DCS-5029L |
| | DCS-5202L |
| | DCS-5211/5211L |
| | DCS-5222/5222L |
| | DCS-5605 |
| | DCS-5635 |
| | DCS-6004L |
| | DCS-6010L |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S THIRD AMENDED INITIAL DISCLOSURES
3:17-CV-00039-JD

27

A-2

| | |
|---|---|
| | DCS-6210 |
| | DCS-6510 |
| | DCS-6511 |
| | DCS-6513 |
| | DCS-6616 |
| | DCS-6818 |
| | DCS-681x |
| | DCS-7010L |
| | DCS-7413 |
| | DCS-7513 |

PLAINTIFF'S THIRD AMENDED INITIAL DISCLOSURES
3:17-CV-00039-JD

A-3

**Appendix B**
**Experience, Qualifications, Testimony, and Publications**

# MARK G. GRAFF, CISSP

*New York, NY • (650) 714–3550 • mark@tellagraff.com*

## CHIEF INFORMATION SECURITY OFFICER & CONSULTANT

Highly accomplished senior executive with more than 40 years of success within IT, cyber security, national security, and broadcasting.  Programmer and technologist, with 40+ years of ongoing development experience.  Broad range of specialty fields including information security, risk assessment and management, election security, communications, team building and development, security awareness and training, software development, and human cognition. Author of several books and host of weekly radio show/podcast, "CyberMatters with Mark Graff."

## CRITICAL LEADERSHIP INITIATIVES

- Shared cyber security responsibility for protecting America's nuclear secrets over a nine-year period, successfully upholding all security measures and combating attempted breaches.
- Protected largest stock market company in the world from cyber attack.
- Founded cyber security collaboration group for World Federation of Exchanges.
- Developed and hosted the first-ever gathering of world stock market security experts, the Defense of International Markets & Exchanges Symposium, in April 2014.
- Established first-ever radio show focusing on bringing cyber security to the general public.
- Expert witness for State of California on electronic voting system software (2008-2009) and U.S. Congress (2000, 2012).
- Co-founder of Para-Protect Services, a startup company that was the first to make a profit from managed security services.

## PROFESSIONAL EXPERIENCE

**CEO & Founder, TELLAGRAFF LLC**                                                    2015 to Present
- Established cyber security consulting firm to deliver critical threat and risk evaluation and remediation, C-level and Board-level training and decision support, expert witness services, keynote addresses and presentations to technical and non-technical audiences, and technical product development guidance.
- Established strategic professional relationships/board positions with leading/emerging cyber security firms.
- Cyber expert for national news outlets and publications including CNN International, CBS News, Wall Street Journal.

**Chief Information Security Officer, NASDAQ QMX**                                    2012 to 2015
- Managed a $17-20 million budget and led a team of 30 staff to secure worldwide operations and data against cyber-attacks by foreign countries, criminal organizations, and other hostile entities.
- Directed global security policy, awareness and training, quality in software development, risk assessments, and application security.
- Created and hosted the first-ever gathering of Information Security Experts from global exchanges and stock markets, the Defense of International Markets & Exchanges Symposium (April 2014).

B-2

**Chief Cyber Security Strategist,** LAWRENCE LIVERMORE NATIONAL LAB          2008 to 2012
- Designed and wrote complex software utility for DOE sites to detect Personally Identifiable Information and other sensitive data on workstations and servers.
- Conducted numerous cyber security research projects and risk analyses, including classified systems.
- Key advisor to senior executive team on cyber policy, strategy, R&D topics, and potential investments.

**Chief Cyber Security Officer,** LAWRENCE LIVERMORE NATIONAL LAB          2003 to 2008
- Led comprehensive Cyber Security Program across unclassified and classified operations, overseeing a $23 million budget and 60 employees, including teams for incident response, security training and awareness, and internal audits.
- Oversaw regulatory compliance with DOE and NNSA standards, while managing the policy and procedure formulation for internal projects.
- Negotiated compliance schedules and contractual agreements with federal regulatory officials and agencies.
- Spearheaded laboratory-wide FISMA-mandated certification and accreditation program, implementing a Safe Harbor approach to move lab forward while meeting rigid compliance requirements.

**Vice President & Chief Scientist,** PARA-PROTECT          2000 to 2002
- Managed technology forecasting, security trend and threat analysis, and led promotional activities to raise awareness of necessity of secure future for global information infrastructure.
- Assisted in the development and execution of managed security service portfolio, including incident prevention and response.

**Manager, Information Security Deployment,** SUN MICROSYSTEMS          1992 to 2000
- Held a range of increasingly responsible positions from Security Coordinator (1993-1997) to Network Security Architect (1997-1999) to Manager, Information Security Deployment (1999-2000)
- Responsible for corporate global programs to measure security risks and deploy countermeasures, including program and resource development, security awareness training, and lecturing.
- Testified before U.S. Congress, delivered invited lectures to nuclear research laboratories and the American Academy for the Advancement of Science on information security measurement and risk assessment techniques.

## PUBLICATIONS

THE OFFICIAL (ISC)2 GUIDE CISSP CBK REFERENCE (5th ed. forthcoming 2018) (ISBN 9781119423348) (authored chapter on Identification and Access Control)

KENNETH R. VAN WYK, MARK G. GRAFF, DAN S. PETERS & DIANA L. BURLEY, ENTERPRISE SOFTWARE SECURITY: A CONFLUENCE OF DISCIPLINES (Addison-Wesley 2015)

MATT BISHOP, SEAN PEISERT, CANDICE HOKE, MARK G. GRAFF & DAVID JEFFERSON, E-VOTING AND FORENSICS: PRYING OPEN THE BLACK BOX (2009),

https://www.usenix.org/legacy/event/evtwote09/tech/full_papers/bishop.pdf

CANDICE HOKE, MATT BISHOP, MARK G. GRAFF & DAVID JEFFERSON, RESOLVING THE UNEXPECTED IN ELECTIONS: ELECTION OFFICIALS' OPTIONS, CLEVELAND STATE UNIVERSITY, Book 38 (2008), https://engagedscholarship.csuohio.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1000&context=lawfac_reports

MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING: PRINCIPLES & PRACTICES (2003), http://securecoding.org

MARK G. GRAFF, TWENTY YEARS OF INTERNET SECURITY, NEXT TWENTY YEARS NEWSLETTER (2001)

MARK G. GRAFF, SECURE CODING: THE STATE OF THE PRACTICE (Para-Protect Services, Inc., White Paper, 2001)

MARK G. GRAFF, PEXLIB: A REFERENCE MANUAL, PRENTICE-HALL (1994)

PEXLIB: A TUTORIAL, PRENTICE-HALL (1994) (Mark G. Graff, Editor)

MARK G. GRAFF, THE ACCESS CONTROL EXECUTIVE: PSYCHOLOGICAL ELEMENTS OF COMPUTER SECURITY, (Monograph 1987)

## CONGRESSIONAL TESTIMONY

*Cyber Threats to Capital Markets and Corporate Accounts: Hearing Before the H. Financial Services Committee Subcommittee on Capital Markets* 112th Cong. (June 1, 2012) (Testimony of Mark G. Graff, Vice President, NASDAQ OMX Group), https://financialservices.house.gov/uploadedfiles/hhrg-112-ba16-wstate-mgraff-20120601.pdf.

*Next Steps Towards Internet Security: Hearing Before the Joint Economic Committee*, 106th Congress (Feb. 23, 2000) (statement of Mark G. Graff, Sun Microsystems), https://www.jec.senate.gov/archive/Documents/Hearings/graff22300.htm

## EXPERT WITNESS TESTIMONY

Bowen v. Election Systems & Software, Inc. (ES&S) (2007-2009) (electronic voting system software) (San Francisco Superior Court), http://admin.cdn.sos.ca.gov/press-releases/prior/2007/DB07_086.pdf, and  http://admin.cdn.sos.ca.gov/press-releases/2009/db09-014.pdf

## EDUCATION

UNIVERSITY OF SOUTHERN MISSISSIPPI
Bachelor of Science (BS), Computer Science, 1978

## CERTIFICATION & TRAINING

CISSP CERTIFICATION (2017, 2009)
FCC Amateur Extra Broadcast License (2009)
1000+ hours of commercial training
3000+ hours of technical training

## MILITARY EXPERIENCE

U.S. AIR FORCE
Computer Technician, 1975-1979

## BOARDS & ADVISORY ROLES

DIGITAL AUTHENTICATION TECHNOLOGIES
Board Member

NETWORK TIME FOUNDATION
Board Member

BLACKRIDGE TECHNOLOGY
Technical Advisory Board Member

FORUM OF INCIDENT RESPONSE & SECURITY TEAMS (FIRST)
Former Chair

LA HONDA-PESCADERO UNIFIED SCHOOL DISTRICT
Former President & Board Member

## SELECTED SPEAKING ENGAGEMENTS

"CYBER MATTERS WITH MARK GRAFF"
Radio Show Host

NYIT CYBER SECURITY CONFERENCE (2016)
Keynote Speaker

ACM CPR SIG (2015)
Keynote Speaker

SPLUNK CYBER SECURITY CONFERENCE (2014)
Keynote Speaker

YOUTUBE / TELEGRAFF WEBSITE
Sixty-Second Video Essays

## SELECTED FEATURES AND OPINION PIECES

INC., FORBES, USA TODAY, SF CHRONICLE, CSO MAGAZINE, PC MAGAZINE, CNN INTERNATIONAL, CBS RADIO, THE INTERCEPT

## SELECTED HONORS & AWARDS

INFORMATION SECURITY EXECUTIVE OF THE YEAR FOR NORTHEAST US, 2014

"KEEP IT SAFE" EDUCATIONAL VIDEO -TELLY AWARD, 2000

TESTIFIED BEFORE CONGRESS 2000, 2012

**Appendix C**
**Materials Considered**

      In addition to the documents cited in my opinion, and my process described in Section I.C, above, I considered the following sets of documents provided by D-Link Systems and D-Link Corporation, identified by Bates number or range.

**I.      D-Lab Testing Reports, Testing Requests, and Test Plans**

DKC1826527 – DKC1827520
DKC1827606 – DKC1827696
DKC1861455 – DKC1861464
DKC1861479 – DKC1861526
DKC1861542 – DKC1861554
DKC1895636 – DKC1895637
DKC1895889
DKC1896849 – DKC1896933
DKS00021147 – DKS00027373

**II.     Institute for Information Industry/Onward Security Device Security Testing Reports**

DKC0002523
DKC0002538 – DKC0002584
DKC0002667 – DKC0002757
DKC0002792 – DKC0002795
DKC0002840 – DKC0002919
DKC0002979 – DKC0003039
DKC0003040 – DKC0003063
DKC0003155 – DKC0003221
DKC0003222 – DKC0003256
DKC0003323 – DKC0003326
DKC0003342 – DKC0003386
DKC0003387 – DKC0003407
DKC0003491 – DKC0003535
DKC0003568 – DKC0003593
DKC0003652 – DKC0003744
DKC0003804 – DKC0003866
DKC0003948 – DKC0004024
DKC0004025 – DKC0004053
DKC0004054 – DKC0004100
DKC0004254 – DKC0004331
DKC0004354 – DKC0004375
DKC0004376 – DKC0004389
DKC1896734 – DKC1896848

**III.    Checkmarx Scan Reports**

DKC0257716 – DKC0257721
DKC1635409 – DKC1636176
DKC1756967 – DKC1756978
DKC1828078 – DKC1829766
DKC1842647 – DKC1848963
DKC1849020 – DKC1861440
DKC1862088
DKC1862094
DKC1862102
DKC1862104
DKC1862126
DKC1862130
DKC1862284
DKC1876959 – DKC1876992
DKC1886119 – DKC1886239
DKC1886580 – DKC1886803
DKC1895861 – DKC1895864

**IV.    D-Link Systems Security Advisories/Support Announcements**

DLS0059930 – DLS0059933
DLS0059937 – DLS0059943
DLS0059960 – DLS0059965
DLS0059969 – DLS0059971
DLS0059981 – DLS0059983
DLS0059990 – DLS0059991
DLS0059994
DLS0060008 – DLS0060009
DLS0060012 – DLS0060015
DLS0060055 – DLS0060056
DLS0060161 – DLS0060167
DLS0060220 – DLS0060221
DLS0060226 – DLS0060227
DLS0060248 – DLS0060258
DLS0060265 – DLS0060267
DLS0060270 – DLS0060273
DLS0060280 – DLS0060282
DLS0060307 – DLS0060309
DLS0060338 – DLS0060344
DLS0060368 – DLS0060371
DLS0060408 – DLS0060412
DLS0060446 – DLS0060447
DLS0060456 – DLS0060457
DLS0060519 – DLS0060522
DLS0060551 – DLS0060552

DLS0060559 – DLS0060560
DLS0060580 – DLS0060581
DLS0060598 – DLS0060601
DLS0060776 – DLS0060779
DLS0060802 – DLS0060803
DLS0060812 – DLS0060814
DLS0060844 – DLS0060848
DLS0060852 – DLS0060854
DLS0060869 – DLS0060870
DLS0060873 – DLS0060874
DLS0060883 – DLS0060884

## V.     Third-Party Vendor Test Reports

DKC0042892 – DKC0042893
DKC1828204 – DKC1842646
DKC1862442
DKC1868608
DKC1871054 – DKC1872284
DLS0042893 – DLS0042893

## VI.     D-Link Corporation 2017 Security Policies

DKC0005921 – DKC0005925
DKC0005968 – DKC0005969
DKC0005975 – DKC0006071
DKC0006073 – DKC0006078
DKC0006080
DKC0006082
DKC0006084 – DKC0006090
DKC0006097 – DKC0006101

## VII.     SEARCH-LAB, Ltd. Reports and Correspondence

DKC0207600
DKC0207601 – DKC0207734
DKC0207735 – DKC0207826
DLS0024446 – DLS0024452
DLS0036354 – DLS0036368
DLS0037657 – DLS0037664
DLS0037665 – DLS0037783
DLS0037784 – DLS0037839
DLS0042019 – DLS0042025

**VIII.    Translated Contracts/Scope of Work**

DKC0004402-T – DKC0004415-T
DKC0004416-T – DKC0004425-T
DKC0004426-T – DKC0004430-T
DKC0004431-T – DKC0004435-T
DKC0004436-T – DKC0004462-T
DKC0004463-T – DKC0004468-T
DKC0004469-T – DKC0004489-T
DKC0004490-T – DKC0004501-T
DKC0006140-T – DKC0006154-T
DKC0006155-T – DKC0006173-T
DKC0006183-T – DKC0006198-T

**IX.    Depositions and Investigational Hearings**

July 29-31, 2014 Investigational Hearing of William Brown
December 6, 2017 Deposition of AJ Wang
January 30, 2018 Deposition of Peter Tsai as 30(b)(6) Witness for D-Link Corporation
January 31, 2018 Deposition of Daniel Hsu
February 1, 2018 Deposition of Robert Lin
March 14, 2018 Deposition of William Brown
April 24, 2018 Deposition of Patrick Cline
April 25, 2018 Deposition of William Brown  as 30(b)(6) Witness for D-Link Systems

**X.    Discovery Responses**

Defendant D-Link Systems, Inc.'s Answers and Objections to Plaintiff Federal Trade Commission's First Set of Interrogatories

Defendant D-Link Systems, Inc.'s Answers and Objections to Plaintiff Federal Trade Commission's Second Set of Interrogatories

Defendant D-Link Systems, Inc.'s First Amended Answers and Objections to Plaintiff Federal Trade Commission's Third Set of Interrogatories

Defendant D-Link Systems, Inc.'s Answers and Objections to Plaintiff Federal Trade Commission's Fourth Set of Interrogatories

Defendant D-Link Systems, Inc.'s Answers and Objections to Plaintiff  Federal Trade Commission's Fifth Set of Interrogatories

Non-party D-Link Corporation's First Amended Answers and Objections to Plaintiff Federal Trade Commission's First Set of Interrogatories to Non-party D-Link Corporation

Non-party D-Link Corporation's Answers and Objections to Plaintiff Federal Trade Commission's Second Set of Interrogatories to Non-party D-Link Corporation

## XI.    Other

DLS0053134
DLS0008839
DLS0017452 – DLS0017466
DLS0022930 – DLS0022932
DKC0008477–89
DKC0009490–9503
Declaration of Jerome Radcliffe, In the Matter of D-Link Systems, Inc., Before the Federal Trade Commission (Mar. 16, 2015)

*CVE-2017-14429 Vulnerability Details* (Sept. 13, 2017), https://www.cvedetails.com/cve/CVE-2017-14429/.

Kyle Lovett, *D-Link DAP-1320 Directory Traversal / Cross Site Scripting*, PACKET STORM (Apr. 17, 2014), https://packetstormsecurity.com/files/126219/dlinkdap1320-traversalxss.txt.

Michael Messner, *D-Link DIR-600, DIR-300 Command Execution / Bypass / Disclosure*, PACKET STORM (Feb. 5, 2013), https://packetstormsecurity.com/files/120052/D-Link-DIR-600-DIR-300-Command-Execution-Bypass-Disclosure.html.

Michael Messner, *D-Link DIR-600, DIR-300 Remote Command Execution*, PACKET STORM (Apr. 9, 2013), https://packetstormsecurity.com/files/121152/D-Link-Remote- Command-Execution.html.

Michael Messner, *D-Link DIR-615, CSRF / Disclosure / Command Injection*, PACKET STORM (Feb. 11, 2013), https://packetstormsecurity.com/files/120208/D-Link-DIR-615-Rev-H-CSRF-Disclosure-Command-Injection.html.

Michael Messner, *D-Link DIR-645, Authentication Bypass*, PACKET STORM (Feb. 28, 2013), https://packetstormsecurity.com/files/120591/D-Link-DIR-645-Authentication-Bypass.html.

Mumbai and Zdenda, *DIR-850L (Un)authenticated OS Command Exec*, RAPID7 (Mar. 23, 2018), https://www.rapid7.com/db/modules/exploit/linux/http/dlink_dir850l_unauth_exec.

Pierre Kim, *Pwning the DLink 850L routers and abusing the MyDlink Cloud protocol*, GITHUB (Sept. 8, 2017), https://pierrekim.github.io/blog/2017-09-08-dlink-850l-mydlink-cloud-0days-vulnerabilities.html.

Pierre Kim, et al., *D-Link DIR-850L Credential Disclosure*, PACKET STORM (Nov. 23, 2017), https://packetstormsecurity.com/files/145097/dlink-850-admin-creds-retriever.sh.txt.

**Appendix D**
**Bibliography of Selected Secure Coding Books**

ROSS ANDERSON, SECURITY ENGINEERING: A GUIDE TO BUILDING DEPENDABLE DISTRIBUTED SYSTEMS (John Wiley & Sons, 2nd ed., 2008), www.cl.cam.ac.uk/~rja14/book.html.

BRIAN CHESS & JACOB WEST, SECURE PROGRAMMING WITH STATIC ANALYSIS (Addison-Wesley, 2007), http://buildingsecurityin.com.

MARK G. GRAFF & KENNETH R. VAN WYK, SECURE CODING (O'Reilly, 2003), http://securecoding.org.

MICHAEL HOWARD & DAVID LEBLANC, WRITING SECURE CODE (Microsoft Press, 2nd ed., 2003), http://blogs.msdn.com/michael_howard.

MICHAEL HOWARD & STEVE LIPNER, THE SECURE DEVELOPMENT LIFECYCLE, (Microsoft Press, 2006).

GARY MCGRAW, SOFTWARE SECURITY: BUILDING SECURITY IN (Addison-Wesley, 2006), www.swsec.com.

ROBERT C. SEACORD, SECURE CODING IN C AND C++ (Addison-Wesley, 2nd ed., 2013).

FRANK SWIDERSKI & WINDOW SNYDER, THREAT MODELING (Microsoft Press, 1st ed., 2004).

KENNETH R. VAN WYK, MARK G. GRAFF, DAN S. PETERS, & DIANA L. BURLEY, ENTERPRISE SOFTWARE SECURITY: A CONFLUENCE OF DISCIPLINES (Addison-Wesley, 2015).

JOHN VIEGA & GARY MCGRAW, BUILDING SECURE SOFTWARE: HOW TO AVOID SECURITY PROBLEMS THE RIGHT WAY (Addison-Wesley, 2001), www.buildingsecuresoftware.com.